UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
------------------------------------------------------X

STEVEN JUDE,                    Plaintiff,

-v-

NEW YORK STATE DEPARTMENT OF CORRECTIONS AND
COMMUNITY SUPERVISION ("DOCCS"); NEW YORK STATE
OFFICE OF MENTAL HEALTH ("OMH"); DANIEL F.
MARTUSCELLO, COMMISSIONER OF ("DOCCS");
CATHERINE MARTUSCELLO, ASSIST. COMMISSIONER ("DOCCS");
NICHOLAS MARTUSCELLO, CHIEF INVEST. OSI ("DOCS");
ANNEMARIE MCGRATH, DEPT. COMMISSIONER OF ("DOCCS");
JEFF MCKOY, DEPT. COMMISSIONER PROGRAMS ("DOCCS");
REBECCA A. LOREN, INMATE GRIEVANCE COORD. ("DOCCS");
ANTHONY RODRIGUEZ, DIR. SPECIAL HOUSING ("DOCCS");
JAMES ADAMS, COMMISSIONER HEARING OFFICER ("DOCCS");
JOHN OR JANE DOES, ADA COORDINATOR ("DOCCS");
R. BISHOP, SUPT. OF FIVE POINTS C.F.; THOMAS DELMAR,
DEPT. SUPT OF SECURITY, FIVE POINTS C.F.;
DANIELLE HODGES, FIRST DEPT. FIVE POINTS C.F.;
MORGAN EMERSON, ADS PREA DEPT, FIVE POINTS C.F.;
CHRISTINA LYNN HILL, DEPT. SUPT. OF PROGRAMS FIVE POINTS C.F.;
TRICIA M. MILLER, DEPT. SUPT. OF MENTAL HEALTH FIVE POINTS C.F.;
SCOTT DEFRUSICO, CORRECTION SERGEANT AT FIVE POINTS C.F.;
WILLIAM DUMONT, CORRECTION SERGEANT AT FIVE POINTS C.F.;
BRYCE HELMICKI, SENIOR COUNSELOR AT FIVE POINTS C.F.;
JENNIFER KOTZUR, ASSIST. DIR. CLASSIFICATION & MOVEMENT ("DOCCS");
DENNIS LAUREANO, CORRECTION OFFICER FIVE POINTS C.F.;
JEFFERY KEMP, CORRECTION OFFICER FIVE POINTS C.F.;
MOLLY FISCHER, NURSE PRACTITIONER FIVE POINTS C.F.;
ANNEMARIE SULLIVAN, COMMISSIONER OF NEW YORK
STATE OFFICE OF MENTAL HEALTH, ("OMH"); DANIELLE
DILL, EXEC. DIR OF ("OMH");
CHRISTINA M. DOLLEY, ("OMH") UNIT CHIEF FIVE POINTS C.F.;
JOHN & JANES DOES '1' thru '4', Individually
and Officially, (the names John & Jane
Does being fictitous, as plaintiff does not know the Associate
Commissioner name of Mental Health Corrections
who took Byrant Hilton position who has authorized these
Correction Mental Health Deputy Superintendent to oppress SMI, I.I.
& Subject them to cruel & unusual punishment in the
RMHIU's, & other disciplinary units for mentally ill prisoners.

                          Defendant(s).

------------------------------------------------------X

24 CV 1001-V

1983 COMPLAINT U.S.C.

JURY TRIAL DEMANDED

UNITED STATES DISTRICT COURT
FILED
OCT 18 2024
MARY C. LOEWENGUTH, CLERK
WESTERN DISTRICT OF NY

## INTRODUCTION

In enacting HALT, the Legislature spoke with unmistakable clarity about the need to curtail solitary SHU confinement in New York, imposing stringent and precisely worded constraints, embodies in section 137(6)(k)(ii) of the Correction Law, on the narrow circumstances under which DOCCS could subject plaintiff as well as others similarly situated to extended segregation and other disciplinary confinement. But DOCCS, and its agents, servants and the defendants herein has willfully evaded those constraints, enacting a policy, custom and practice that far expands the limited conduct for which the Legislature authorized extended segregation confinement and ignores the robust individualized factual inquiries required under the Act (collectively, the "Extended Segregation Policy").

The Extended Segregation Policy reflects a brazen disregard for the carefully crafted requirements that the legislature saw fit to include in section 137(6)(k)(ii), and predictably subject plaintiff Steven Jude, as well as hundreds of others at any given time, to extended segregation and other disciplinary confinement that the HALT Act simply does not allow, which also violates the Eighth and Fourteenth Amendments to the United States Constitution, and equal protection of the laws, as it subject's plaintiff to cruel and unusual punishment.

This widespread use of solitary confinement is especially troubling given that the deletrious effects of SHU confinement and housing-especially to those assigned to long-term as the plaintiff has, which he has been in SHU confinement already nine months for refusing a direct order to sit, & threatening to spit, which never occurred on a custodial security guard who was using unnecessary use of force on him during a time he was undergoing a mental health crisis, & did not pose a threat to the safety or security of the facility, staff or others, and was restrained in handcuff's behind his back, which force was use against plaintiff in violation of the Use of Force Policy #4944, which plaintiff has yet to address, but needs a TRO, as his life and safety is in imminent danger at Five Points Correctional facility and he is a legally blind person who needs protection, and is scare for his life, safety and property.( Court just ruled is illegal Fields v. Martuscello- #902997-23)

The HALT Act limits the Use of Disciplinary Confinement. In 2021, responding to widespre concern over the harmful impact of siciplinary confinement across NYS. The Legislature passed HALT Act, imposing stringent limits on who can be placed in solitary, & for how long & why. The Act came into full effect on March 31, 2022...

Please (See. www.nysfocus.com/2022/09/12/halt-solitary-implementation-doc...

** An Class Action Article 78 was filed which they just won stating DOCCS was violating the HALT Act, In Albany County Supreme Court, which Plaintiff expounds upon... Index # No. 902997-23

## TABLE OF CONTENTS

| | |
|---|---|
| INTRODUCTION | 1. |
| PRELIMINARY STATEMENT | 5. |
| JURISDICTION AND VENUE | 5. |
| EXHAUSTION OF ADMINISTRATIVE REMEDIES | 5. |
| JURY TRAIL DEMANDED | 6. |
| THE PARTIES | ¢. |
| Defendants & State Actors | 6. |
| I. FACTUAL HISTORY | 19. |
| Plaintiff ADA & Rehabilitation Rights Violated | 23. |
| General Prohibitions Against Discrimination | 25. |
| Denial and/or Improper Modifications of accommodations | 25. |
| CONSULTATIONS & REQUEST MECHANISM | 28. |
| There is no redress for DOCC's Disable (NO Discrimination Grievances Allowed | 29. |
| 28 C.F.R § 35.105 Self-Evaluation | 32. |
| Solitary Confinement Eighth & Fourteenth Amendment | 32. |
| Retaliation/Due Process "Jeffery Kemp"  Ex. "G" | 37. |
| DOCCS' Failure to Follow Solitary Confinement Law   Ex. "C" Court Decision | 39. |
| Equal Protection & Racial Discrimination | 43. |
| DOCCS FAIL TO FOLLOW THE LAW | 44. |
| Sexual Abuse/Harassment/Retaliation | 47. |
| Failure to Protect   Ex. D | 47. |
| Failure to Protect/Retaliation | 50. |
| Structure of Mental Health Care System | 54. |
| Insufficient Mental Health Care in SHU | 59. |
| A Cycle of Torment: | 61. |
| Insufficient Mental Health Programs | 63. |
| State Prisons Routinely Violating SHU Law | 65. |
| Observation Cells (RTCP) | 68. |
| Outdated Policies | 69. |
| Mr. Jude's Life While In SHU Confinement | 70. |
| Failure to Ameliorate Conditions in Solitary Confinement | 72. |
| Medical Indifference  Ex. "B" | 73. |
| FIRST CLAIM FOR RELEIF | 78. |
| SECOND CLAIMS FOR RELEIF | 78. |
| THIRD CLAIMS FOR RELIEF | 80. |
| FOURTH CLAIMS FOR RELIEF | 81. |
| FIFTH CLAIMS FOR RELIEF | 82. |
| SIX CLAIMS FOR RELIEF | 83. |
| SEVEN CLAIMS FOR RELIEF | 83. |
| EIGHTH CLAIMS FOR RELIEF | 86. |

| | |
|---|---|
| EX. "A" MBR WHICH BROUGHT PLAINTIFF TO SHU 197 DAYS FOR THREATENING TO SPIT, | "A" |
| Ex. "B" MEDICAL DOCUMENTATION OF BLINDNESS, MEDICAL CONDITION M.H. DIAGNOSES | "B" |
| Ex. "C" DECISION & ORDER-DOCCS EXTENDED SHU CONFINEMENT IS ILLEGAL-CLASS | "C" |
| Ex. "D" Failure to Protect, Falsified MBR, Disposition, Affidavit | "D" |
| Ex. "E" Justice Center Annual Report Protection of Special Needs on HALT | "E" |
| Responses to Letters going back to 2022 About Plaintiffs Plight in SHU | G |
| EX. "G" Sexual abuse/Retaliatory Cell Searches, from Kemp & Laureano plant weapon | "H" |
| Ex. "I" Correction Association Annual Report on HALT Investigations | "I" |

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
-------------------------------------------X
STEVEN JUDE,                    Plaintiff,

    -v-                                              VERIFIED COMPLAINT

NEW YORK STATE DEPARTMENT OF CORRECTIONS AND
COMMUNITY SUPERVISION ("DOCCS"); NEW YORK STATE        JURY TRAIL DEMANDED
OFFICE OF MENTAL HEALTH ("OMH"); DANIEL F.
MARTUSCELLO, COMMISIONER OF ("DOCCS");
CATHERINE MARTUSCELLO, ASSIST. COMMISSIONER OF ("DOCCS");
NICHOLAS MARTUSCELLO, CHIEF INVEST. 'OSI' ("DOCCS");
ANNEMARIE MCGRATH, DEPT. COMMISSIONER OF ("DOCCS");
JEFF MCKOY, DEPT. COMMISSIONER OF PROGRAMS ("DOCCS");
REBECCA A. LOREN, INMATE GRIEVANCE COORD. ("DOCCS")'
ANTHONY RODRIGUEZ, DIR. OF SPECIAL HOUSING ("DOCCS");
JAMES ADAMS, COMMISSIONER HEARING OFFICER ("DOCCS");
JOHN OR JANE DOE, ADA COORD. ("DOCCS"); R. BISHOP,
SUPERINTENDENT OF FIVE POINTS C.F.; THOMAS DELMAR,
DEPT. SUPT. OF SECURITY OF FIVE POINTS C.F.; DANIELLE
HODGES, FIRST DEPT OF FIVE POINTS C.F.; MORGAN EMERSON,
ADS PREA DEPT. OF FIVE POINTS C.F.; CHRISTINA LYNN HILL,
DEPT. OF SUPT. OF PROGRAMS; TRICIA M. MILLER, DEPT. SUPT. OF MENTAL
HEALTH ("DOCCS"); SCOTT DEFRUSICO, CORRECTION SERGEANT OF FIVE POINTS C.F.;
WILLIAM DUMONT, CORRECTION SERGEANT OF FIVE POINTS C.F.;
BRYCE HELMICKI, SENIOR COUNSELOR OF FIVE POINTS C.F.;
JENNIFER KOTZUR, ASSIT. DIR. OF CLASS & MOVEMENT ("DOCCS");
DENNIS LAUREANO, CORRECTION OFFICER OF FIVE POINTS C.F.;
JEFFERY KEMP, CORRECTION OFFICER OF FIVE POINTS C.F.;
MOLLY FISCHER, NURSE PRACTITIONER OF FIVE POINTS C.F.;
ANNEMARIE SULLIVAN, COMMISSIONER OF NEW YORK STATE
OFFICE OF MENTAL HEALTH, ("OMH"); DANIELLE DILL,
EXECUTIVE DIR. OF ("OMH"); CHRISTINA DOLLEY, UNIT CHIEF OF FIVE POINT C.F.
("OMH").
                                 Defendant(s).
-------------------------------------------X

    Plaintiff, **Steven Jude**, acting pro-se, as For a Verified Complaint, respectfully alleges upon information and belief:

## PRELIMINARY STATEMENT

    This is a Civil rights action filed by **Steven Jude**, ("Mr. Jude," or "Plaintiff"), a registered 54 year old, 'legally blind' qualified individual with a disability, who is entrusted to the care, custody & control of the New York State Department of Corrections & Community Supervision ("DOCCS"), who currently resides at Five Points C.F., who seeks relief for the defendants violations, under color of State Law, of rights, privileges, immunities secured by 42 § U.S.C. 1983; the New York State Human Rights Law; the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12112;

.[1].

12132; et, seq, & the Rehabilitation Act of 1973, ("Section 504"), 29 U.S.C § 794. The Eighth, First, Fifth, & Fourteenth Amendments to the U.S. Constitution, & the Constitutional laws of the State of New York, Due Process, & Equal Protection Clause; 1985; 1988; by defendants individually, jointly & severely subjecting plaintiff to inter alia, cruel & unusual punishment, sexual abuse, PREA, disability & racial discrimination, retaliation, deliberate indifference, failure to protect, wrongful confinement, Gross Negligence, & intentional infliction of emotional distress, causing substantial physical & mental injuries & significant atypical hardship in relation to the ordinary incidents of prison life for a 'legally blind' incarcerated person forced to endure severe consecutive SHU sanctions for extraordinary long periods.

1. This civil action challenges the clearly established statutory or constitutional rights of the plaintiff, by DOCCS cavalier & arbitrary use of SHU sanctions & its policies, procedures, & customs that places every I.I. in DOCCS custody to extraordinary long & severely harmful disciplinary segregation as punishments that inflicts enormous damage on plaintiff, & others as punishment for behaviors which are not eligible for segregated confinement, & is the essence of "cruel & unusual" punishment, despite the implementation of the Humans Alternative to Long-Term Solitary Confinement Act ("HALT Act" or "HALT"). The plaintiff alleges that DOCCS, & the New York State Office of Mental Health, "OMH" act with deliberate indifference to the serious medical needs of incarcerated persons with mental illness, & sensorial disabilities, by failing to provide adequate mental & medical services, & necessary specialty care treatment & inpatient residential mental health & sensorial disable programs, services, & activities of the Sensorial Disable Unit, & Program & rehabilitation programming by excluding the plaintiff from participation in, or denied the benefits of, the services, programs, housing, & activities of the SDU, & have imposed punishments in SHU & other deprivations which aggravate his mental illness & discriminates against him on the basis of his disabilities.

2. The Defendants have sentenced the plaintiff to unlawfully consecutive prolong periods of segregated confinement in a deplorable, punitive SHU/RMHTU, where there is no therapy, treatment, or rehabilitative programming in open defiance of the Legislatures express will, & the tenets of the HALT, by changing his mental health classification in order to exclude him from the SDU, & transfer him to a SHU/RMHTU, which facility lacks in varying degrees the necessary auxiliary aids & assistive devices, thus denying him the equal opportunity to participate in & benefit from the SDU, provided he is healthy, sane, or well behaved, rendering his accommodations conditional.

.[2[.

3. Because of the mental anguish and the well-known risk of serious harm caused by isolated confinement, mental health professionals, legal organizations, human rights experts, and correctional authorities advise that prisoners such as Plaintiff with mental illness should be isolated from the general prison population when necessary to protect the physical safety of prisoners and staff, but only for short periods of SHU confinement such as 15 or 30 days.

4. The State legislature passed the HALT Act in 2021; but the law only went into full effect a year later,i.e. March 31, 2021. The law placed strict limitations on whom defendants could place in solitary confinement, and for what infractions an for how long they could be confined.

5. The policies and customs authorized by DOCCS top policy-making officials, who are defendants herein, are at Odds with the HALT Act, as "52" State Legislators sent a letter to DOCCS lambasting the agency for reenacting regulations that flout the solitary confinement provisions and regulations contained in the statutes of the HALT Act.

6. The astonishingly long SHU confinement sentences imposed on the Plaintiff at Sullivan and Five Points Correctional Facility, were arbitrary, and capricious in the constitutional sense, grossly disproportionate to the underlying allege misbehavior, had no legitimate penological justification, and constituted a gratuitous infliction of wanton and unncessary pain and suffering that fell short of the evolving standards of decency, and the tenets of the HALT Act.

7. The disciplinary Hearing Officers at Sullivan, and Five Points Correctional who imposed these severe, unjustified, and illegal punishments, and the superintendents and administrators that authorized adn enforced Plaintiff's confinement in the Special Housing Unit, "SHU" in the Diversion Unit, and RMHU, at their prison, did so despite the enactment of a Law that precludes Plaintiff from SHU confinement due to his 'serious mental illness', 'legal blindness,' and drop foot condition.

8. Despite that, any reasonable official, who wasn't authorized to act with impunity, would have known, or should have known that the extraordinary severity of these punishments would do little more than inflict unnecessary pain and suffering and place the Plaintiff at an unjustified risk of harm, aggravate his mental illness, and discriminate against him in violation of his clearly Constitutional rights, and cause significant hardship in relation to the ordinary incidents of prison life for a legally blind person.

.[3].

9. Plaintiff's consecutive sentences in SHU, & the changing of his mental health status in order to transfer him out of the Sensorial Disable Unit, SDU program under the SHU exclusion law, & into the Regional Mental Health Unit, RMHU, a facility without a SDU, or SDP, a facility that he otherwise would not normally be housed is violative of the ADA, & Rehabilitation Act, which defendants were warned about from Judge Sweet in a case captioned <u>Clarkson v. Coughlin</u>, 898 F. Supp. 1019, whereas the same thing was occurring to Sensorial Disable Deaf & Hard of hearing I.I's.

10. Plaintiff's sentences & the transferring of him out of a Sensorial Disable Unit, SDU Facility, to a Mental Health Special Housing Unit, to serve illegally imposed SHU time, which abuses are systemic & examples of the ongoing & systemic harm caused by the policies & customs authorized & maintained by DOCCS, & the reasons why the HALT Act was passed, responding to a significant public concern over DOCCS widespread use & abuse of their Tier III, disciplinary program, & why Judge Sweet placed an permanent injunction on the <u>Clarkson v. Couhlin,</u>, supra. case.

11. Consensus is now clear, that solitary confinement, even for relatively short periods, inflicts profound, & often times irreversible damage on the Plaintiff & others. Yet for decades, defendants have persisted in imposing long periods of SHU confinement & other oppressive similar forms of sanctions & harsh deprivations while under confinement, & have sent more I. I. to SHU confinement after HALT, then before it's enactment, & especially those who suffer from serious mental illness, & other disabilities, who are allegedly not eligible for SHU confinement because of their "special population" status as defined under Correction Law § 2, subd. 33.

12. The defendants have continued to violate Plaintiff & others of New York States rights under the Eighth & Fourteenth Amendments to the U.S. Constitution, despite decades of litigation, which has resulted in consent decrees, damage awards, settlement agreements, about the dangers of SHU confinement, & the mental health treatment of the prisoners at various prisons, & other evidence of deficiencies in the caring for the Seriously Mentally Ill, & Sensorial Disable.

13. The Plaintiff seeks declaratory & injunctive relief herein to protect him against the risk of future unconstitutional & severely harmful sentences & punishments, & the discriminatory practices of transferring him out of the SDU, into the RMHU, to other facilities that he normally would not be housed, which lacks in varying degrees, the necessary accommodations, programs, services & activities he needs for his daily living needs, & also seeks damages for the mental and physical harms he suffered unnecessarily.

.[4].

14. The Plaintiff has been transferred out of the SDU, & made a Mental Health Level 1-S, classification, due to defendants failing to create a Residential Rehabilitation Unit, RRU, under Correction Law § 2, subd. 34, that is capable of housing B-240 -Legally Blind, Sensorial Disable Person's, after the creation of the HALT Act, which DOCCS operates atleast three units in maximum secuirty prisons defined as Sensorial Disable Units, 'SDUs', & each runs a Sensorial Disable Program, 'SDP.'

## JURISDICTION AND VENUE

15. This Court has jurisdiction over this action pursuant to 28 U.S.C. 1331 & 1343(3) & (4), as this action seeks redress for violations of plaintiff's statutory, civil & common law rights.

16. The Western District of New York is an appropriate venue under 28 U.S.C. 1391 (1)(2).

17. DOCCS receives State & Federal Funding to operate it's Correctional Facilities, & thus must comply with Title II of the ADA, & 504 of the Rehabilitation Act. In addition DOCCS was appropriated $45,280,000.00, in the Executive Budget for the fiscal year of 2022-2023, for costs associated with the implementation of the HALT Act. As a Department of New York, "DOCCS" & "OMH" is a "public entity" within the purview of the ADA, 42 U.S.C §§ 12121; 12132.

18. Supplemental jurisdiction is conferred upon the court over any & all State Law Claims that are so related to the federal claims that they form apart of the same case or controversy under Article III of the U.S. Constitution under 28 U.S.C. 1367.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

19. In accordance with 42 U.S.C. 1997(a), the plaintiff has complied with the exhaustion requirements & has raised a grievance concerning every complaint he has made in this complaint, which the grievance supervisors, & director defendant Loren has tried to interfere, hinder, & frustrate plaintiff's grievance process, & has failed to comply with 28 C.F.R. § 35.107(a)(b), & DOCCS Directive #4040, as they have failed to allow disable inmates to file disability discrimination grievances, which are not being sent to the Superintendent or designee, ADA Coordinator and Officer of Diversity & Inclusion in central office, which process operates as a simple dead end, by officials putting the wrong titles, codes, & consistently failing to provide any relief, thinking they are covering for other correctional staff, or simply not filing or appealing to the next level, & not notifying the individual or supervisor so they can retaliate against grievant.

.[5].

## TRIAL BY JURY

20. Plaintiff demands trail by jury on each & every one of his claims as pled herein pursuant to Fed. R. Civ. P. 38(b).

## STATEMENT OF CLAIM

21. At all times relevant herein, Defendants were "persons" for the purpose of 42 U.S.C. § 1983, & acted under color of State law to deprive Plaintiff of his Constitutional, Statutory, & civil rights as set forth more fully below.

## PARTIES

22. Plaintiff STEVEN JUDE, ("Plaintiff" or "Mr. Jude") is and was at all times relevant herein, a registered, 'legally blind,' seriously mentally ill, multi-disabled qualified individual with a disability. Plaintiff was made a M.H. classification level 1-S, after being assigned to the Diversion Unit at Sullivan, after he was sentenced to SHU & other severe sanctions in SHU. Plaintiff's legal blindness substantially impairs his ability to communicate, read & write. As a legally blind I.I., DOCCS must house Mr. Mr. Jude in the most integrated setting appropriate to his needs such as in a Sensorial Disable Unit "SDU" in DOCCS facility. Three maximum security facilities incorporate SDU's: "Sullivan," "Eastern," & Wende Correctional Facility.

23. Defendant New York State Department of Corrections & Community Supervision, "DOCCS" is and was at all times relevant herein an agency created by the State of New York for the purpose of incarcerating New York residents who are committed by judicial order to serve prison sentences. DOCCS is responsible for the care, rehabilitation, custody & control of over 49,500 I.I.'s & was appropriated 45,280,000.00 in the Executive Budget for the fiscal year of 2022-2023 for costs associated with the implementation of the HALT Act. DOCCS failed to make any RRU in a designated Sensorial Disable Unit "SDU" facility, & Shall not place Plaintiff in inappropriate security classifications, or designated mental health or medical designations when he is not receiving medcial, or actual mental health treatment, and cannot transfer Plaintiff out of the SDU designated facility, to another facility without a SDU, and exclude him from the participation of the programs, services & activities, housing of the Sensorial Disable Unit, & Program designated facility for the legally blind due to disciplinary and/or mental health reasons.

.[6].

24. Defendant New York State Office of Mental Health, "OMH" is & was at all times relevant herein an agency created by the State of New York for the purpose of controlling, proving, & supervising the State's Mental Health Services for New York residents with mental illness, including mental health services for I.I's. OMH is a "public entity" within the purview of the ADA, 42 U.S.C. §§ 12131 & 12132.

25. Defendant **Daniel F. Martuscello III** ("Defendant Martuscello") is & was at all times relevant herein the Commissioner of DOCCS, who was responsible for the supervision, management, & control of all DOCCS facilities. Defendant Martuscello does not have the authority to circumvent the law. He has final policy-making & supervisory authority within DOCCS, & was personally involved in authorizing & maintaining the unconstitutional policies & customs challenged by Plaintiff. Defendant Martuscello duties were to be carried out in a manner consistent with the legal mandates that govern the operation of DOCCS, including its policies, procedures, & protocols, as well as all relevant local, state, & federal statutes, & regulations. Defendant Martuscello is being sued in his official capacity for declaratory & injunctive relief.

26. Defendant **Catherine Martuscello** (Defendant Martcuscello") is & was at all relevant times herein the assistant Commissioner of DOCCS, who was responsible for the supervision, management, & control of all DOCC's facilities. Defendant Martuscello, does not have the authority or discretion to circumvent the law. She has final policy-making & supervisory authority within DOCCS, & was personally involved in authorizing & maintaining the unconstitutional policies & customs challenged by Plaintiff. Defendant Martuscello duties were to be carried out in a manner consistent with the legal mandates that govern the operation of DOCCS facilities, including its policies, procedures, & protocols, as well as all relevant local, state, & federal statutes, & regulations. Defendant Martuscello is being sued in her official capacity for declaratory & injunctive relief.

27. Defendant **Martuscello** ("Defendant Martuscello") is & was at all relevant times herein the Chief Investigator for Offices of Special Investigations, OSI, who was responsible for keeping staff & I.I.'s safe within Correctional Facilities. As Chief Investigator, he had final policy-making & supervisory authority within DOCCS. Defendant Martusecllo was personally involved in maintaining the unconstitutional policies & customs challenged by Plaintiff. Defendant duties were to be carried out in a manner consistent with the legal mandates that govern DOCCS, including it's

.[7].

policies, procedures, & protocols, as well as all relevant local, state, & federal statutes, & regulations. Defendant Martuscello is being sued in his individual and official capacities for declaratory and injunction relief.

28. Defendant Annemarie McGrath ("Defendant McGrath") is and was at all times relevant herein was the Deputy Commissioner of DOCCS, who was responsible for the supervision, management, & control of all DOCC's facilities. Defendant McGrath does not have the authority to transfer the Plaintiff out of the Sensorial Disable Unit designated facilities to Five Points Regional Mental Health Special Housing Unit, RMHU for disciplinary or mental health reasons, & deny him the equal opportunity to participate in and benefit from the programs, services, & activities of the Sensorial Disable Unit's Program, in which Five Points is not a designated facility for B-240 legally blind, sensorial disable I.I.'s. Defendant McGrath has final policy-making & supervisory authority within DOCCS, & was personally involved in authorizing and maintaining the unconstitutional policies & customs challenged by Plaintiff. Defendant McGrath duties were to be carried out in a manner consistent with the legal mandates that govern the operation of DOCCS, including its policies, procedures, & protocols, a well as all relevant local, state, & federal statutes, & regulations. Defendant McGrath is being sued in heerindividual and official capacity for declaratory and injunctive relief.

29. Defendant Jeff McKoy ("Defendant McKoy") is and was at all times relevant herein was the Deputy Commissioner of Program Services of all DOCCS facilities. Defendant McKoy is responsible for the delivery of program services to DOCCS I.I.'s, including the Sensorial Disable Unit, SDU, Sensorial Disable Program, SDP, Disciplinary Program, recreation, education, vocational, commissary, & visitation. Defendant McKoy haws final policy-making & supervisory authority within DOCCS, & was personally involved in authorizing & maintaining the unconstitutional policies & customs challenged by Plaintiff. Defendant McKoy does not have the authority to order the transfer of the Plaintiff out of the Sensorial Disable Unit designated facility for legally blind sensorial disable I.I.'s, & place him in Five Points RMHU allegedly for mental health & disciplinary reasons, as Five Points is not a facility that Plaintiff would normally otherwise be housed, & lacks in varying degress the necessary auxiliary aids and assistive devices the Plaintiff needs for his daily living needs, & is not the most integrated setting appropriate for his needs. Defendants duties were to be carried out in a manner consistent with the legal mandates that govern the operation of DOCCS, including its policies, procedures, & protocols, as well as all relevant local, state & federal statues, & regulations. Defendant McKoy is being sued in his individual and official capacities for declaratory and injunctive relief.

.[8].

30. Defendant Rebecca A. Loren ("Defendant Loren") is & was at all times relevant herein the Inmate Grievance Coordinator for DOCCS, who was responsible for overseeing the I.I. Grievance Program. Defendant Loren has refused to allow Grievance Supervisors at the facilities to allow disable I.I. to file disability grievances. The disability statutes 28 C.F.R. § 35.107 & State Law 7 NYCRR § 701.10, 9 NYCRR § 7654, imposes an affirmative obligation upon public entities to create & maintain a coherent grievance mechanism by which can have some effect for disable inmates who claim that DOCCS have failed to honor some or all of its affirmative obligations to make programs, services accessible to disable individuals in accordance with 28 C.F.R. § 35.107. Defendant Loren failed to adopt & have published grievance procedures providing for prompt & equitable resolution of complaints alleging discrimination. Defendant Loren was personally involved in authorizing & maintaining the unconstitutional policies & customs challenged by Plaintiff. Defendant Loren has final policy making & supervisory authority within DOCCS, & has failed to make information regarding both the protections against discrimination & the existence & location of accessible services, activities & facilities. 28 C.F.R. §§ 35.106; 35.163. Defendant Loren duties were to be carried out in a manner consistent with the legal mandates that govern DOCCS facilities, including its policies, procedures, & protocols, as well as all relevant local, state, & federal statutes & regulations. Defendant Loren is being sued in her official & individual capacities for declaratory & injunctive relief.

31. Defendant Anthony Rodriguez ("Defendant Rodriguez") is & was at all times relevant herein the Director of Special Housing Units for DOCCS in all facilities. Defendant Rodriguez has been employed by DOCCS since 1994, as a C.O., Sergeant, Investigator, Lieutenant, & Assistant Director of SHU. Defendant Rodriguez as Director of SHU, was responsible for overseeing the operation of the computerized I.I. disciplinary system, & develop & conduct training sessions for facility staff responsible for the operation of I.I. disciplinary system & training. Defendant Rodriguez has final policy-making & supervisory authority within DOCCS, & was personally involved in authorizing & maintaining the unconstitutional policies & customs challenged by the Plaintiff. Defendant Rodriguez has allowed the conditions in the SHU/RMHU for SMI, I.I. serving SHU sanctions to operate as a punitive, deplorable, severely harsh disciplinary unit, where there is no therapy, treatment or rehabilitative programming, & allows SMI to be subjected to prolong solitary confinement resulting in significant psychological harm, which are grossly disproportionate to the reasons for the confinement, where SMI, I.I. are deprived of adequate food, clothing, sanitation, medical, & personal safety, phone, tablet & subjected to serious deprivations & other odious conditions of confinement.

.[9].

defendant Rodriguez has failed to create a RRU within one of the designated facilities that houses B-240 Sensorial Disable legally blind I.I's since the implementation of HALT, in accordance with Corr. Law, § 2, subd. 34. Defendant Rodriguez does not have the authority to override the will of the legislature in regards to SHU confinement, or exclude plaintiff, & deny him the benefits of, the services, programs, or activities of DOCCS Sensorial Disable Housing Unit, or Program, because a facility is inaccessible or unusable by placing him in an inappropriate security classification or facility that he normally otherwise would not be housed. 28 C.F.R. § 35.152(a)(b)(2)(i)(ii)(iii). Defendant Rodriguez authority & discretion regarding disciplinary confinement by transferring Plaintiff out of the SDU where his needs were being met, to Five Points RMHU, renders his accommodations 'conditional' provided that he is sane, healthy or well behaved, which authority cannot stand in tension with defendants obligations under the ADA & the Rehabilitation Act. Defendant Rodriguez duties were to be carried out in a manner consistent with the mandates that govern the operation of DOCCS, including its policies, procedures, & protocols, as well as all relevant local, state & federal statutes & regulations. Defendant Rodriguez is being sued in his official and individual capacities for monetary, declaratory & injunctive relief.

32. Defendnat James Adams ("Defendant Adams") is & was at all times relevant herein a Commissioner Hearing Officer, CHO for DOCCS, who was responsible for residing over Tier III Superintendent Hearings for DOCCS in a fair, impartial manner. Defendant Adams acted as Hearing Officer presiding over Mr. Jude's August 2024 disciplinary hearing at Five Points C.F. & imposed the unconstitutional consecutive SHU & harsh sanctions & deprivations on Plaintiff, & excluded him from his hearing, after denying him assistance, documentary evidence, & witnesses, for a MBR, where he was set up with a weapon by defendant Dennis Laureao, in retaliation for filing grievances & complaints and a PREA compalint. Defendant Adams duties were to be carried out in a manner consistent with the legal mandates that govern the operation of DOCCS, including it policies, procedures & protocols, as well as all relevant local, state, & federal statutes, & regulations. Defendant Adams is being sued in his individual capacity for monetary & declaratory relief.

33. Defendant John or Jane Doe ("Defendant Doe") is and was at all times relevant herein the Disability Rights Coordinator for DOCCS, with the responsibility for coordinating DOCCS efforts to comply with & carry out is responsibilities under

.[10].

28 CFR § 35.107, against the prohibitions against discrimination. 28 CFR § 35.130(a)(b)(i)(ii)(iii)(iv)(v)(vi)(2)(3)(i)(ii)(iii)(4)(i)(ii). Defendant Doe was responsible for the development & implementation of policies regarding I.I.'s with disabilities, & suppose to be the person identified by DOCCS as having knowledge & information pertaining to compliance with the ADA, & Rehabilitation Act. Defendant Doe has never initiated a review of any of the plaintiff's denied reasonable accommodations requests, or any of the denied grievances. Defendant Doe has final policy making & supervisory authority within DOCCS, & was personally involved in authorizing & maintaining the unconstitutional policies & customs challenged by plaintiff. Defendant Doe duties were to be carried out in a manner consistent with the mandates that govern the operation of DOCCS, including its policies, procedures, & protocols, as well as all relevant local, state, & federal statutes & regulations. Defendant Doe is being sued in his or her individual & official capacity for declaratory & injunctive relief.

34. Defendant R. Bishop ("Defendant Bishop") is & was at all relevant times herein the acting Superintendent at Five Points C.F.. Defendant Bishop was the highest ranking official at Five Points C.F., who was charged with the supervision, management, & control over both staff & I.I.'s, & care, custody & control. Defendant Bishop has policy making & supervisory authority with regards to Five Points, & the SHU/RMHTU, & he authorized his correctional staff, & defendant Miller, & Hill to discriminate, retaliate, & oppress plaintiff as well as other SMI, I.I. & he continued Mr. Jude's unconstitutional placement in his facility SHU/RMHTU, & confinement in a harsh, restrictive, deplorable disciplinary ran SHU unit, where there was no therapy, treatment, or rehabilitative programming of SMI incarcerated people, where they were treated differently & worst then I.I.'s in the Residential Rehabilitation Unit, (RRU), subjecting plaintiff to cruel & unusual conditions of confinement. Defendant Bishop was personally involved in authorizing & maintaining the unconstitutional policies & customs challenged by plaintiff. Defendant Bishop's duties were to be carried out in a manner consistent with the legal mandates that govern the operation of DOCCS' facilities, including its policies, procedures, & protocols, as well as with all relevant local, state & federal statutes, & regulations. Defendant Bishop is being sued in his individual & official capacities for declaratory, monetary & injunctive relief.

.[11].

35. Defendant **Thomas Delmar** ("Defendant Delmar") is and was at all relevant times herein the Deputy Superintendent for security at Five Points C.F., who was charged with the care, custody & control of I.I.'s & staff, & was the highest ranking uninformed security personnel at Five Points, overseeing the security. Defendant Delmar had policy making & supervisory authority with regards to Five Points SHU/RMHU, & he authorized security & civilian staff to oppress, discriminate & retaliate against the Plaintiff & failed to protect the Plaintiff from a assault by another SMI, I.I., & sexual abuse from Dennis Laureao, & authorized & continued Mr. Jude's unconstitutional placement in his facilities SHU/RMHU, & confinement in harsh, restrictive, deplorable, punitive conditions, where there was no therapy, treatment, or rehabilitative programming of incarcerated people, where SMI, I.I. were treated differently & worst then I.I's in the Residential Rehabilitation Unit (RRU), subjecting Plaintiff to cruel & unusual conditions of confinement. Defendant Delmar was personally involved in authorizing & maintaining the unconstitutional policies & customs challenged by the Plaintiff. Defendant Delmar duties were to be carried out in a manner consistent with the mandates that govern the operation of DOCCS facilities, including its policies, procedures, & protocols, as well as with all relevant local, state, & federal statutes, & regulations. Defendant Delmar is being sued in his individual & official capacities for declaratory, monetary & injunctive relief.

36. Defendant **Daniel Hodges** ("Defendant Hodges") is and was at all relevant times herein the First Deputy Superintendent at Five Points C.F., who was charged with the supervision, management, & control over both staff & I.I.'s =., & care, custody & control. Defendant Hodges was the highest ranking civilian at Five Points who acted as Superintendent & had policy making & supervisory authority with regards to Five Points, & the SHU/RMHU, & she authorized correctional & civilian staff to oppress, discriminate, & retaliate against the Plaintiff, & authorized & continued Mr. Jude's unconstitutional placement in the facilities SHU/RMHU, & confinement under harsh, restrictive, deplorable conditions, where there was no therapy, treatment, or rehabilitative programming of Incarcerated people, where SMI, I.I. in the SHU/RMHU, was treated differently & worst then I.I.'s in the residential Rehabilitation Unit, RRU, subjecting Plaintiff to cruel & unusual conditions of confinement. Defendant Hodges was personally involved in authorizing & maintaining the unconstitutional policies, & customs challenged by the Plaintiff. Defendant

.[12].

Hodges duties were to be carried out in a manner consistent with the legal mandates that govern the operation of DOCCS facilities, including its policies, procedures, & protocols, as well as with all relevant local, state, & federal statutes, & regulations. Hodges is being sued in her official capacity for injunctive relief.

37. Defendant Morgan Emerson ("Defendant Emerson") is & was at times relevant herein the Prison Rape Elimination Act, PREA, in accordance with PREA standard 115.11[c]), at Five Points C.F. who was charged with the authority to coordinate the facility's efforts to comply with the PREA standards & implementation of policies & programs to address sexual victimization of incarcerated individuals within the facility. Defendant Emerson as ADS PREA was responsible for coordinating & providing oversight of PREA Compliance activities & efforts to address sexual victimization at their designated cluster facilities in coordination with the Superintendent & facility executive team at each facility. Defendant is expected to maintain ongoing communication with the Associate Commissioner, Director of PREA Compliance, Superintendent, & prevention efforts & investigate matters & shall keep the Associate Commissioner apprised of any issues requiring attention, including but not limited to matters regarding audit & compliance. Defendant      Emerson      was personally involved in authorizing & maintaining the unconstitutional policies & customs challenged by the Plaintiff. Defendant Emerson duties were to be carried out in a manner consistent with the legal mandates that govern the operation of DOCCS facilities, including its policies, procedures, & protocols, as well as all relevant local, state, & federal statutes, & regulations. Defendant Emerson is being sued in her individual & official capacities for declaratory, injunctive & monetary relief.

38. Defendant Christina Lynn Hill ("Defendant Hill") is & was at all relevant times herein the Deputy Superintendent of Programs At five Points Correctional Facility, who was charged with the responsibility for care,m custody & control, & the delivery of program services to Five Points incarcerated population, including, but not limited to education, state shop, Residential Mental Health Unit, RMHU, Residential Rehabilitative Unit, RRU, General Library, commissary, recreation, Incarcerated Grievance Program, IGP, visitation, phone home program, & for some inexplicable reason she is in charge of approving reasonable accommodations for disable incarcerated individuals who require accommodations, and is responsible for the development and implemenation of policies regarding incarcerated individuals with disabilities. Defendant Hill had final polic-making & supervisory authority

.[13].

within Five Points CCFF., & was personally involved in authorizing & maintaining the unconstitutional policies & customs challenged by plaintiff, & knows that Five Points, is not a designated Sensorial Disable designated facility for B-240- legally blind I.I.'s, & unable to house him in their general population. Defendant Hill knows, or should know that plaintiff's accommodations which were already medically approved, should follow him through any transfers & is not conditional based on whether he is healthy, sane or well behaved, & that another verification was not necesssary, & has discriminated against plaintiff by denying already approve accommodations for his serious medical condition in violation of disability statues. Defendant Hill duties were to be carried out in a manner consistent with the legal mandates that govern the operation of DOCCS facilities, including its policies, procedures, & protocols, as well as with all relevant local, state, & federal statutes, & regulations. Defendant Hill is being sued in her individual & official capacities for declaratory, monetary & injunctive relief.

39. Defendant **Tricia M. Miller** ("Defendant Miller") is & was at all times relevant herein the Deputy Superintendent of Mental Health Correctional at Five Points, who was responsible for the management, control, supervision of the RMHTU, SHU. Defendant Miller had policy making & supervisory authority at Five Points, & was personally involved in authorizing security staff to operate the SHU/RMHTU, as a restrictive, punitive, disciplinary unit, where conditions were deplorable for SMI, I.I., with no therapy, treatment, or rehabilitative programming or services for the seriously mentally ill, serving extended segregated confinement sanctions, where SMI, I.I. were treated differently then the RRU's I.I.'s at Five Points, subjecting plaintiff as well as others to cruel & unusual conditions of confinement. Defendant Miller was personally involved in authorizing & maintaining the unconstitutional policies & customs challenged by plaintiff. Defendant Miller duties were to be carried out in a manner consistent with the legal mandates that govern the operation of DOCCS facilities, including its policies, procedures, & protocols, as well as with all relevant local, state, & federal statues, & regulations. Defendant Miller is being due in her individual & official capacities for declaratory, monetary & injunctive releief.

40. Defendant **William Dumont** ("Defendant Dumont") is & was at all times relevant herein a Correction Sergeant employed at Five Points. Defendant Dumont is responsible for care, custody & control of I.I.'s, & first line supervision of custodial security staff. Dumont has supervisory authority in the SHU/RMHU & was

.[14].

responsible for the retaliation & authorized the continued unconstitutional placement in the SHU/RMHU, where the conditions were harsh, restrictive, deplorable, punitive conditions, where SMI, I.I's were abused by correctional staff & neglected & deprived of any type of therapy, treatment, or rehabilitative programming of the SMI, I.I., who were treated differently & worst then I.I.'s in the Residential Rehabilitation Unit, (RRU), subjecting plaintiff to cruel & unusual conditions of confinement. Defendant Dumont was personally involved in authorizing & maintaining the unconstitutional policies & customs challenged by the Plaintiff. Defendant Dumont duties were required to be carried out in a manner consistent with the legal mandates that govern the operation of DOCCS facilities, including its policies, procedures, & protocols, as well as with all relevant local, state, & federal statutes, & regulations. Defendant Dumont is being sued in his individual capacity.

41. Defendant Scott Defrusico ("Defendant Defrusico") is and was at all relevant times herein a Corrections Sergeant at Five Points. Defendant Defrusico is responsible for the care, custody & control of I.I.'s & has first line supervision of security staff. Defendant Defruscio has supervisory authority in the SHU/RMHU. & was responsible for the retaliation, & authorized the continue security staff to oppress, discriminate & failed to protect the Plaintiff from an assault by another SMI, I.I. & sexual abuse from Dennis Laureano, & authorized the continued placement in the SHU/RMHU, under harsh, restrictive, deplorable, punitive conditions, where there was no therapy, treatment, or rehabilitative programming or SMI I.I.'s, were SMI, I.I. were treated differently & worst then I.I.'s in the Residential Rehabilitation Unit, (RRU), subjecting Plaintiff to cruel & unusual conditions of confinement. Defendant Defruisco was personally involved in authorizing & maintaining the unconstitutional policies & customs challenged by the Plaintiff. Defendant duties were to be carried out in a manner consistent with the legal mandates that govern the operation of DOCCS facilities, including its policies, procedures, & protocols, as well as with all relevant local, state, & federal statutes, & regulations. Defendant Defrusico is being sued in his individual capacity.

42. Defendant Bryce Helmicki ("Defendant Helmicki") is and was at all relevant times herein a Senior Counselor at Five Points Correctional facility, who is responsible for overseeing Offender Rehabilitation Counselors. Defendant Helmicki is not a Commissioner Hearing Officer, & doesn't have the required minimum hours

.[15].

required to preside over Tier III Superintendent's hearing in accordance with Correction law § 137, since the passing of the HALT. Defendant Helmicki acted as a Hearing Officer, presiding over Mr. Jude's June 2024 Disciplinary hearing at Five Points C.F. which was not conducted in an fair or impartial manner, or Due Process, & imposed the unconstitutional consecutive SHU, sanctions of 210 days, & other severe sanctions for conduct that does not result in SHU confinement under the specific enumerated offenses under HALT, & denied Plaintiff documentary evidence, large print, assistance to marshal evidence. Defendant Helmicki is being sued in her individual capacity for monetary relief.

43. Defendant Jennifer Kotzur ("Defendant Kotzur") is & was at all times relevant herein a Assistant Director of Classification Analysts, who handle transfers & appropriate placement decisions for I.I.'s statewide for DOCCS. Defendant Kotzur had supervisory authority for determining where to place I.I. either at the beginning of their sentence or upon transfer. Defendant Kotzur had supervisory authority to determine where to place a specific individual, which requires careful consideration of several factors, such as security level, medical & mental health needs, programing needs, reasonable accommodations, staff or I.I's separations, previous transfer history, & previous disciplinary or protective custody related transfers, & was personally involved in authorizing & maintaining the unconstitutional policies & customs challenged by the Plaintiff. Defendant Kotzur duties were to be carried out in a manner consistent with the legal mandates that govern the operation of DOCCS, including its policies, procedures, & protocols, as well as with all relevant local, state, & federal statutes, & regulations. Defendant Kotzur is being sued in her individual & official capacity for declaratory & injunctive relief.

44. Defendant Dennis Laureano ("Defendant Laureano") is & was at all time relevant herein a C.O. employed by DOCCS at Five Points, who was charged with care, custody & control. Defendat Laureano violated Employees Manual § 2.10,which prohibits an employee from engaging in sexual abuse, sexual harassment,or related retaliation. Defendant Laureano duties were to be carried out in a manner consistent with the legal mandates that govern the operation of DOCCS facilities, including its policies, procedures, & protocols, as well as all relevant local, state, & federal statutes, & regulations. Defendant Laureano is being sued in his individual capacity.

.[16].

45. Defendant Jeffery Kemp ("Defendant Kemp") is & was at all times relevant herein a correction officer employed by DOCCS at Five Points, who was charged with the responsibility of care, custody & control. Defendant Kemp acted outside the scope of his duties when he retaliated against the Plaintiff on more than one occasion due Plaintiff filing a PREA complaint against Dennis Laureano by going into his cell, ripping up & confiscating legal documents & destroying property. Defendant Kemp duties were to be carried out in a manner consistent with the legal mandates that govern the operation of DOCCS facilities, including its policies, procedures, & protocols, as well as all relevant local, state, & federal statutes, & regulations. Defendant Kemp is being sued in his individual capacity.

46. Defendant M. Hawker ("Defendant Hawker") is & was at all times relevant herein a correction officer employed by DOCCS at Five Points, who was charged with the responsibility of care, custody, & control. Defendant Hawker had a duty to exercise reasonable care, so as to prevent a known, seriously mentally ill prisoner from assaulting the Plaintiff on May 25, 2024 at Five Points recreation, which the defendant created an unreasonable risk of harm to Plaitniff, & knew, or had reason to know that the Plaintiff was going to be assualted, & intentionally walked away from his post, in order for the other prisoner to assault Plaintiff, in retaliation for the Plaintiff filing grievances & complaints & PREA complaints against Dennis Lauerano. Defendant Hawker had an affirmative duty under the Eighth Amendment to protect the Plaintiff, who was incarcerated under conditions posing a substantial risk of harm, which defendant knew, or should have known that the Plaintiff was legally blind, elderly, & multi-disable & ambulates with a cane, which makes [him] particularly vulnerable to any acts of violence & prone to being assaulted, as he does not have the physical capacity to be able to adequately fight back, and/or defend himself. Defendant hawker duties were to be carried out in a manner consistent with the legal mandates that govern the operation of DOCCS facilities, including its policies, procedures, & protocols, as well as all relevant local, state, & federal statutes, & regulation. Defendant Hawker is being sued in his individual capacity.

47. Defendant Molly Fischer ("Defendant Fischer") is & was at all times relevant herein a Nurse Practitioner at Five Points C.F., who was charged with the responsibility of providing medical care to I.I.'s housed in the SHU/RMHU. Defendant Fischer acted with deliberate indifference to the Plaintiff's serious medical needs of orthopedic footwear for his Ankle-to-Foot, AFO, leg-brace for his drop foot condition which has to be provided by Hanger Prosthetics, & physical therapy by

.[17].

intentionally interfering with prescribed treatment and/or delaying acces to medical professionals who practice either in DOCC's Regional Medical Unit speciality clinics, or speciality offices concerned with the design, construction, & fitting of prostheses, & pain management, resulting in the Plaintiff condition degenerating & causing him extreme chronic pain, difficulty walking, decreased function, discomfort, increased fall risk, neurological pain & fatigue. Defendant Fiscker knew, or should have known that it was medically necessary for the Plaitniff to have custom orthpedic footwear to wear with his AFO, provided by the Hanger Speciality care Clinic which provided his custom Prosthetic AFO leg brace, pain management, & physical therapy for his chronic pain & degenerating condition, & aliments causing his condition to worsen. Defendant Fischer duties were to be carried out in a manner consistent with the legal mandates that govern DOCC's facilities, including its policies, procedures, & protocols, as well as all relevant, local, state, & federal statutes, & regulations. Defendant Fischer is being sued in her individual & official capacity for declaratory, monetary & injunctive relief.

48. Defendant **Annemarie Sullivan** ("Defendant Sullivan") is & was at all times relevant herein the Commissioner orf the New York State Office of Mental Health, "OMH". Pursuant to N.Y. Correction Law § 401, DOCC's has designated the "OMH" to provide psychiatric services to DOCC's incarceated population, & to be responsible for the Correctional Mental Health aspect of services, as well as the management, supervision, & control of all special programs dealing with mental health. Defendant Sullivan was personally involved in authorizing & maintaining the unconstitutional policies & customs challenged by the Plaintiff, & had final policy-making & supervisory authority within "OMH." Defendant Sullivan's duties were to be carried out in a manner consistent with the legal mandates that govern OMH & DOCC's, including its policies, procedures, & protocols, as well as all relevant local, state, & federal statutes, & regulations. Defendant Sullivan is being sued in her individual & official capacities for declaratory & injunctive relief.

49. Defendant **Danielle Dill** (Defendant Dill") is & was at all relevant times herein the Executive Commissioner of OMH. Pursuant to Correction Law 401, DOCC's has designated OMH to provide psychiatric services to DOCC's incarcerated population & to be responsible for the Mental Health aspect of such services & programs as well as well as management, supervision, & control of all special programs dealing with mental health. Defendant Dill was personally involved in authorizing & maintaining

.[18].

the unconstitutional policies & customs challenged by the Plaintiff, & had final policy making & supervisory authority within "OMH." Defendant Dill's duties were to be carried out in a manner that is consistent with the legal mandates that govern the operation of DOCCS facilities, including its policies, procures, & protocols, as well as with all local, state, & federal statutes, & reulations. Defendant Dill is being sued in her individual & official capacities for declaratory & injunctive relief.

50. Defendant **Christina M. Dolley** ("Defendant Dolley") is & was at all times relevant herein the Mental Health Unit Chief for the New York State Office of Mental Health, "OMH," charged with the operation & administration of programs for the treatment of Seriously Mentally Ill incarcerated patients confined in the SHU/RMHU at Five Points C.F., Defendant Dolley was responsible for developing therapy, treatment, & rehabilitative programming for the SMI, I.I., & the supervision, & management of the SHU/RMHU mental health personnel, & care, custody, & safety of all mental health patients in the program, & identifying & removing from SHU confinement patients who psychiatrically deteriorate as a result of not being able to tolerate their prolong SHU confinement in the restrictive, punitive harsh conditions of segregated confinement, where SMI patients were treated differently then general population SHU individuals in the RRU, where SMI, patients were deprived of adequate food, clothing, sanitation, medical, mental health treatment, personal safety, phone, tablet, cosmetics, electronics, & subjected to serious deprivations & cruel & unusual conditions of confinement. Defendant Dolley has final policy-making & supervisory authority in the SHU/RMHU at Five Points, & was personally involved in authorizing & maintaining the unconstitutional policies & customs challenged by the Plaintiff. Defendant Dolley's duties were to be carried out in a manner consistent with the legal mandates that govern the operation of DOCCS, & OMH facilities, including its policies, procedures, & protocols, as well as with all relevant local, state, & federal statutes, & regulations. Defendant Dolley is being sued in her individual & official capacities for declaratory, monetary & injunctive releif.

## FACTUAL ALLEGATIONS

51. Plaintiff **Steven Jude** is a 54-year old African American, legally blind person registered with the New York State Commission for The Blind & Visually handicapped in accordance with law, Section 8704. CF# 162955 since 2004, married & practicing Muslim, & currently incarcerated at Five Points Special Housing Unit for Seriously Mentally Ill, SMI patients, a dedicated, restrictive, punitive, non-therapeutic disciplinary housing unit, where the SMI. I.I. were treated differently

.[19].

than other incarcerated person's without mental illness, or sensorial disabilities in the Residential Rehabilitation Units, RRU. Mr. Jude was sentenced & confined to SHU at Sullivan Correctional Facility, where he was in the Sensorial Disable Unit SDU, housing and Program, & his mental health classification was changed to a mental health level 1-S, by OMH unit Chief Gregory Savage to force DOCCS to transfer him out of the Diversion Unit, under the SHU exclusion law, to Five Points Mental Health Special Housing Unit, & out of the SDU, & into the SHU/RMHU.

52. Plaintiff suffers from advanced bilateral degenerative glaucoma & myopia. He suffers from Diabetes [Mellitus] Type II (adult oneset) which causes progressive vision loss, restricting his vision in both eyes, & also resulting in photophobia, or intolerance to light, which will ultimately cause incurable blindness. Plaintiff's vision loss causes him to struggle with activities of daily living such as climbing steps, reading, writing, learning, walking & communicating, Moreover, Plaintiff also had been diagnosed with a learning disability & attention deficit disorder from a head injury as a child.

53. In addition to his sensorial disabilities, Plaintiff wears a custom-molded fiber-glass Prosthetic Ankle-to-Foot, AFO leg-brace on his left leg for a drop foot condition, & custom orthopedic footwear, which has to be provided by the Hanger Prosthetics clinic. Without the custom orthopedic footwear, to fit onto the custom brace, the Plaintiff has difficulty walking, decreased function, discomfort, increased fall risk, neurological pain & fatigue & suffer extreme chronic pain, & unable to wear the Prosthetic, & must drag his foot.

54. Due to his sensorial & physical disabilities, Mr. Jude presents a fall risk, & must use a support cane to ambulate, and/or blind mobility cane, & DOCCS assigns him a inmate assigned to him to escort him & help him navigate as part of the Sensorial Disable Unit, SDU, Blind Program.

55. Prior to the Plaintiff being admitted into DOCCS custody in 2017, he was a detainee in the Federal Bureau of Prison's, FOB, where he was receiving mental health treatment, & on his intra-transfer medical problem list, it stated that the Plaintiff suffered from mental illness, in addition to his sensorial & physical disabilities, & was being treated with various anti-psychotic medications for the management of symptoms related to psychiatric disorders, including but not limited to, schizopherina, biploar disorder, anxiety disorder, personality disorder & unspecified mood disorder.

.[20].

56. Plaintiff mental health issues are mostly sporadic due to stress, anxiety, or oppression, which can be triggered by his environment or conditions of confinement, & he does not like medications, & is distrustful of mental health due to past dealings of carrying out policies, & practices that routinely place severely mentally disturbed persons in SHU, without though to whether such placement would exacerbate their mental illnees, & a systemic failure to supply proper treatment for those stuck in SHU, where he made more than 3X serious suicide attempts in the past, due to SHU conditions of confinement.

57. Under DOCCS regulations, #2612 § III.C. "Inmates with Sensorial Disabilities" (i.e., those that meet the definition of blindness (B-240), or Severe Vision Impairment (V230), as defined in directive) shall be referred for transfer to one of the following designated facilities which can accommodate their needs Wende; Sullivan; & Eastern C.F, which are all maximum security facilities, FIVE POINTS IS NOT A DESIGNATED FACILITY... nor have staff with expertise in that field, nor the full range of auxiliary aids & assistive devices for plaintiff's serious medical disabling condition.

58. The above facilities all have Sensorial Disable Units, and Sensorial Disable Programs, & capable of housing & accommodating this specific group of "special needs inmates, or population, Five Points could not housed plaintiff in their general population or RRU.

59. As described above, plaintiff is substantially impaired absent appropriate accommodations, in his ability to see, walk, read, write, hear, five major life activities. Plaintiff is also substantially limited in other major life activities such as his ability to maintain attention or by hyperactive & impulsive behavior or by a combination of both, which impairs functioning in school, home, work, or social settings.

60. As described above, plaintiff with or without reasonable accommodations meets the essential eligibility requirements for receiving services, & participating in the programs, services & activities DOCCS offers. He also meets the requirements for residing in & receiving, housing, services, programs, & activities & full range of auxiliary aids & assistive devices provided to SDU I.I.'s at Sullivan, Wende, & Eatern C.F.

61. As described below, plaintiff is a "qualified individual" with diabilities," as that term is defined in the ADA, & Rehabilitation Act, 29 USC 794, & 42 USC § 12131(2). because of his disabilities, he has been & continue to be denied access to program, services, & activities provided & operated by Defendant's.

.[21].

62. The Plaintiff is also apart of the "special population" as defined in Correction Law 2, subdivision 33, in accordance with the HALT law, who is & allegedly not eligible for SHU extended SHU confinement, especially for conduct which does not fall under the seven specific enumerated offenses that the legislature saw fit to serve extended segregated confinement, DOCCS' have four categories of prisoners with disabilities it determined are exempt from solitary confinement, which includes serious medical problems such as "Blindness", those in wheel chairs, & chronic, or terminal conditions.

63. The Plaintiff has never had a Mental Health level 1-S designation until after the passing of the HALT Act, even with his suicide attempts, & repeated self-injurious behaviors while in SHU, which has existed throughout the years, when he had mentally deteriorated under SHU segregated confinement.

64. The Mental Health Unit Chief at Sullivan, Gregory Savage made the Plaintiff a mental health level 1-S designated after conferring with Plaintiff, who agreed with it, due to Savage trying to help the Plaintiff get out of Sullivan's SHU/Diverion Unit after being stuck there for 4½ months, instead of transferred to an RRU within 15 days, after receiving Extended SHU confinement sanctions, & DOCCS being unable to transfer him to an Residential Rehabilitation Unit, because DOCCS failed to create one in one of the designated "SDU" facilities, where defendants could only house him, which the conditions in the SHU/Diversion Unit at Sullivan was deplorable as to violate the HALT, & Eighth Amendment strictures against cruel & unusual punishment.

64. The Defendants could not send the Plaintiff to Five Points RRU, due to the facility not being a designated SDU/SDP facility that is capable of housing 'legally blind' (B-240) I.I.'s in their general population in accordance with directive 2612, & the disability statutes, because it is not the most integrated setting appropriate to his needs. 28 CFR § 35.152(2); nor a facility that offer the same programs, services as the facility where he would otherwise be housed (iii); also § 35.130(4)(8)(d)> A public entity shall administer services, programs, & activities in the most integrated setting appropriate to the needs of Plaijntiff.

65. The OMH Unit Chief Gregory Savage also informed Plaintiff that the change of his mental health classification he was told, would force defendant DOCCS' to transfer him out of the Diversion/SHU, under the "SHU Exclusion Law." & that he would be precluded from serving more than thirty days in solitary confinement at a time. "Serious Mental Illness," SMI ("'S' designation"). "This Scheme allowed defendants to transfer the Plaintiff out of the SDU, & into the SHU/RMHU, a barrier-infested, deplorable, harsh, restrictive, punitive, non-therapeutic unit.

.[22].

Transfers Into/Out of The SDU For Disciplinary,
Medical Or Mental Health reasons Violate The
ADA And The Rehabilitation Act

66. All of the needs were basically being met of the Plaintiff at the SDU/SDP designated facilities for "Sensorial Disable Legally Blind/Severely Visually impaired Facilities, which were dedicated 'sensorial disable units' with staff allegedly trained with the knowledge & expertise of his particular disability, witht the full range of equipment & auxiliary aids, & assistive devices, in which the Plaintiff had to sue them for discrimination & retaliation about his reasonable accommodations.: (See. Jude v. Brown, 21-CV-00654, which the Plaintiff did not want to except the $250,000.00, Defendants were offering him in that matter, because the defendants were continuing to violate by them sending him to the barrier-infested SHU/RMHU at Five Points, were he was experiencing numerous difficulties in obtaining the full range of such auxiliary aids & assistive devices needed for his daily living needs.

67. The Honorable Judge Lawrence J. Vilardo, a very intelligent, shrewd Judge advised Plaintiff in a hearing to take the money, & if the defendants are continuing to violate his rights, which they should know better because of his successful suit, which they should surely all hear about, because he was a very vocal blind jailhouse litigator, that he could turn around & redress the government Judicial System again, for any harms done with another civil action, because to be sensorial disable in prison is particularly awful, as such prisoners are extremely vulnerable that even the most logical accommodations, have not have been effected, & Officials are so apparently so severely inhibited by their own allegiance to uniformity & inflexibility, that they are unable to deal humanely with persons in need of individualized, special consideration like the Plaintiff.

68. On or about April 16, 2024, Plaintiff was transferred from Sullivan Diversion Unit, after Defendants OMH changed his mental health classification to a level 1-S designation, from a "2" just to force DOCCS to transfer him out of the SDU, & into the SHU/RMHU, to serve illegally imposed SHU segregated confinement in a Residential Mental health Unit, Special Housing Unit, SHU, which housed inmates with mental disorders, who were being held under very strict, harsh, punitive inadequate conditions in a non-therapeutic, disciplinary unit, where these inmate-patients where being warehoused, with no therapeutic treatment for mentally disturbed persons who rather pass the greater part of their time sleeping, or otherwise dormant in their cells medicated in torment with prolong SHU sanctions, & deprivations which

.[23].

constructive psychotherapy is virtually non-existent, & a large number of inmate-patients resort to self-mutilations, suicide attempts, & other dramatic cries for help. OMH, & DOCCS officials have often characterized these actions as attempts to "manipulate the system" & have punished the suicide-prone inmates, like Plaintiff , rather than making provisions for mental health professionals to counsel with or otherwise supervise them.

69. DOCCS Directive #2612, entitled "Inmates with Sensorial Disabilities" does not designate Five Points as an accommodating Facility with an SDU, and/or SDP. Accordingly, Five Points do not have the capability to accommodate the needs of inmates with sensorial disabilities who are 'legally blind' (B-240), or Deaf (HL10). Nor do the facility has the complete range of auxiliary aids or assistive devices that permit sensorial disable legally blind I.I., such as Plaintiff to participate fully in, & have meaningful access to programs, services, & activities that are made available to sensorial disable inmates at the SDU and/or SDP designated facilities.

70. Defendants know, or should know, that their authority & discretion regarding disciplinary confinement & medical or mental health care, cannot stand in tension with their obligations under the ADA, & Rehabilitation Act, as their transfer & placement practice of transferring the Plaintiff out of the SDU/SDP, by changing his mental health classification, where his needs were otherwise being met, to a facility without a SDU, & into a SHU/RMHU, a facility that he otherwise would not be housed, & where they could not house him in their general population or RRU, renders his accommodations 'conditional' & therefore violative of the ADA & Rehabilitation Act, where is needs are not actually being met in the SHU/RMHTU at Five Points C.F.

71. The disability statutes do not provide Plaintiff with an equal opportunity to participate in & benefit from, the programs, & services 'provided' that he is healthy, sane, or well behaved. Rather the statutes 'unconditionally' provide for equal opportunity with or without reasonable accommodations. A Federal District Judge J., Sweet, warned defendants in Clarkson v, Coughlin, 898 F. Supp. 1019 (1995) about their failures, & conduct violating All disability statutes, & issued an permanent injunction for the same conduct dealing with sensorial disable 'Deaf' & 'Hard of Hearing' I.I., being transferred out of the SDU designated facilities to other facilities like Five Points for allegedly disciplinary, medical & mental health reasons, which facility does not have a SDU, or the full range of auxiliary aids & assistive devices.

72. The Defendants conduct have the purpose or effect of defeating or substantially impairing accomplishment of the objects of DOCCS program with respect to Sensorial Disable inmates, & have the purpose or effect of excluding him from, &

.[24].

denying him the benefits of, or otherwise subjecting him to discrimination. 28 CFR § 35.130(a)(b)(i)(ii)(iii)(iv)(3)(i)(ii)(iii)(4)(i)(ii). In addition § 35.152, Jails, detention & correctional facilities. have violated the statues (1)(2)(i)(ii)(iii)(iv)(3).

73. The Plaintiff has had great difficulties trying to obtain the necessary accommodations that he previously had, & was necessary for his daily living needs, & the numerous difficulties he has experienced in obtaining such devices, & his placement in a mental health special housing for segregated confinement, where he is not actually receiving no mental health treatment, or is otherwise ill, & his "S" designation, has resulted in him being treated differently from general population or of sensorial disable legally blind inmates in the SDU, where he has been denied privileges and accommodations afforded to them; for example, he is not able to have his cosmetics no longer, electronics, extension cord for accommodations, beard trimmers, food, commissary, packages, tablet, purchase any type of food from commissary, purchase a T.V., radio, or tobacco, & only permitted to spend $5.00 once a month on junk food, which unit is being ran like a harsh, disciplinary unit in violation of the HALT, and not like a RRU.

28 CFR § 35.130 General Prohibitions Against Discrimination + Denial or Improper Modifications of Reasonable Accommodations + Consultations & Request Mechanism

74. On or about April 16, 2004, Plaintiff was transferred from Sullivan SHU/Diversion, to Five Points SHU/RMHU, to serve illegal imposed SHU segregated confinement for conduct which does not result in SHU segregated confinement, during which incident Plaintiff was having a mental health crisis.

75. Due to Plaintiff's stauts, as a 'sensorial disable I.I., he can only be housed in a facility with a SDU, or SDP - limiting options to "Sullivan", "Wende," & "Eastern" Correctional Facilities, & despite that, defendants OMH scheme of changing his mental health classification permitted DOCCS to transfer him out & otherwise exclude him from the SDU designated facilities.

76. DOCCS' Directive #2612, entitled "Inmates with Sensorial Disabilities" does not designate Five Points C.F. as an accommodating Facility with an SDU. Accordingly, Five Points do not have the capability to accommodate the needs of I.I. with sensorial disabilities like Plaintiff, who is 'legally blind" (B-240), or Deaf (HL10), nor has the complete range of auxiliary aids & assistive devices that permit him to participate fully & have meaningful access to programs, services, & activities that are made available to sensorial disable inmates at the SDU designated facilities.

.[25].

77. Under currently DOCCS' policy under ASSESSMENT PROCEDURES VI.: Once a patient is identified as an SDP candidate, with hearing or vision disabilities, who require adaptive equipment, will enter into an evaluation period of assessment & be transferred to the Eastern; Wende, or Sullivan, C.F., or any other facility designated in directive #2612, which has staff with experience in the field of deafness, & visual impairments. Female inmates will remain at Bedford Hills C.F..

78. Under current DOCCS' policy, Directive #2612 XI. TRANSFERS OF INMATES WITH SENSORIAL DISABILITIES. C: SHU TO SHU transfers of inmates who are deaf (HL10), hard of hearing (HL20), legally blind (B240), &/or Severely Visually Impaired (V230) must be to another designated facility.

78. Under DOCCS' policy, Directive #2612 IX. REASONABLE ACCOMMODATIONS PROCESS. C.2. request for accommodations shall be "acted upon within five business days, or less if necessary, in making the decision, consideration shall be given to the choice of accommodation made by the inmates. All request shall be forwarded to the Deputy Superintendent of Programs, or designee, a civilian non medical staff with no expertise or knowledge in the field of the particular disability, in which another verification is usually not necessary in most cases where the inmate has previously already been medically assessed & approved.

79. Once transferred, a patient should not have to start anew the process of applying & being approved for R.A., & is suppose to have his previously approved accommodations continued. 28 CFR § 35.130(8): States DOCCS, shall not impose or apply an eligibility criteria that screen out, or tend to screen out an individual with a disability from fully, & equally enjoying any service, program or activity.

80. However, the transfer of an SDU patient from one facility, to another is considered a "triggering event" in Directive #2612, mandating a reassessment of R.A.'s. this scheme is not only discriminatory & violative of the ADA, & Rehabilitative Act, but it allows for untrained SDU, or SDP or Defendant Hill, a civilian, non-medical staff with no expertise or knowledge in that field to deny R.A.'s and/or modify, and/or exclude disable inmates altogether, under the auspice that they no longer require the accommodations, despite the fact that they have already been medically approved, and/or was already receiving the accommodations or previously had it at the prior facility, & only got on a van, to go to one facility to another, whereas nothing changed, in regards to that persons "serious medical condition," which conduct is also violative of the Eighth & Fourteenth Amendment, & Equal Protection Clause.

.[26].

81. Prior to his transfer to Five Points, Plaintiff was housed in the SDU at both Sullivan & Wende, & also was at Eastern C.F., where he was medically confirmed to be 'legally blind' & been in the SDU since 2004, over (20) years, where he was admitted into DOCCS's custody with verification from the Lighthouse International, The Hadley School For The Blind, & Commission of the Blind.

82. The Plaintiff was previously approved for several R.A.'s, including, but not limited to: large print forms, mobility instruction, magnifiers for spot checking, talking book player for audio materials, talking dictionary, talking chess set, portable CCTV, for in cell use, a guidance cane, a support cane, a lamp, visor/sunglasses for indoor/outdoor use, talking watch, 20/20 pens, talking calculator, bold line paper, heaphones, & preferred seating, At Sullivan he also was issued a typewriter, with large print keys to be able to effectively communicate, which he had to sue Wende about & had a Court Order for his lawyer to purchase a portable CCTV, & typewriter.

83. On April 16, 2024, Mr. Jude was transferred to Five Points SHU/RMHU, a disciplinary, restrictive, deleterious & debasing character of solitary confinement, where the hardships placed on seriously mentally ill inmates serving segregated confinement are primitive & unnecessary, where the SMI, I.I. were treated differently from those in the Residential Rehabilitation Units, RRU, where SMI, I.I. punishments were particularly traumatic & harmful, & faced hardships long extended periods of SHU confinement, that served no valid penological purpose & needlessly inflicted pain, whereas The Plaintiff neighbor, (Steven Sidbury #17-A-4920) had been in SHU confinement since 2018, cycling him back & forth throughout the years from a psychiatric hospital, which he has over 8 more years to do.

84. On or about April 22, 2024, Plaintiff's Offender Rehabilitation Counselor, ORC, made rounds & asked Plaintiff to fill outbt a Reasonable Accommodations Request Form, even though Plaintiff had previously been medically assessed & approved for reasonable accommodations for his serious medical condition(s).. Plaintiff told his ORC Sheena Ector, that he was already medically approved & didn't have to fill out another form, which copies were in his Guidance folder, & medical & Community Supervision files, & a copy should also be maintained in theOMH file, in which the Plaintiff had over '20' reasonable accommodations forms in his files which verified his legal blindness, in which the Plaintiff filled it out anyway with her help.

.[27].

85. The medical verification of Plaintiff's legal blindness was conducted by defendant "Molly Fischer" who approved it on April 24, 2024. N.P. Molly Fischer, never examined Plaintiff, or seen him, & a verification and/or assessment consist of nothing but a medical provider looking on the Facility Health Service database, ("FHS1"), or on the medical problem list on the computer.

86. The Reasonable Accommodations Request Form was then taken to Defendant "Christina Lynn Hill". Defendant Hill is not a medical doctor, does not have any specialize training or expertise in the field of visual impairment of legal blindness to assess accommodations, & have no knowledge about directive #2612, or #2612C, "Inmates with Sensorial Disabilities", or even the Americans with Disabilities Act Title II Regulations, nor does she oversee a Sensorial Disable Unit, SDU, or SDP, which is a special program for "legally blind" (B-240) Incarcerated persons, who require special assistance to assist them in surmounting the physical hurdles he face, or require mobility assistance, or a blind mobility or guidance cane. Defendant Hill has now denied, or modified four request forms.

87. Defendant Hill subsequently "arbitrarily modified" Plaintiff request, noting: that all accommodations approved, with the exception of headphones, guidance cane, approved, support cane, which Plaintiff came with, was not, dated April 29,2024. Directive #2612C, states, "legally blind, Severely Visually Impaired persons are entitled to a "support cane, guidance cane, & headphones, whichhe had prior to coming to Five Points, which Sullivan ORC, overseeing the SDU, failed to forward the Plaintiff's R.A.'s to Five Points of the above items, with the Inmate Records Coordinator, along with his records, or by mail.

Consultations & Request Mechanism

88. As a public entity DOCCS must provide Plaitniff with an opportunity to request the auxiliary aids & services of his choice. See DOJ, Technical Assistance Manual, Title II, ADA, II-7.1100. Plaintiff never had the benefit of any direct discussion with Defendant Hill or anybody else, about his own need for auxiliary aids & devices, & Defendant Hill denied Plaintiff's accommodations request's, & never answered other request forms that he submitted for reasonable accommodations such as a Sara Scanner, & legal work to be placed on tape, & a talking chess game, & extension cord to be able to plug in all his accommodations, (without fulfilling the very limited criteria under the ADA by which such request may legally be denied), &never responded to his request, & ignored him when she made rounds, or said she had to go, & couldn't talk, when Plaintiff did appeal, she never met with plaintiff then.

.[28].

89. On May 8, 2024, "22" days later, still without his accommodations for his blindness, Sheena Ector returned the R.A. request Form with the 'modification' to Plaintiff, in which he disagreed with the decision, & appealed the denial/modification to defendant Lowerre, for his review.

90. Under DOCCS' policies & procedures, the Superintendent may name a designee to conduct a review of a denial of a reasonable accommodation. Defendant Hill assigned herself as the designee for the Superintendent, to review her own denails on May 13, 2024, stating that the meeting with Plaintiff was ("N/A"), & approved his headphones, but not his guidance cane, which a correction officer defendant Kemp came to the Plaintiff cell, demanding him to turn over his support cane, which he needed to ambulate, & came to Five Points with, & had for several years, which caused hostility & a conflict with defendant Kemp, who began threatening to take it from plaintiff by force if necessary, as it was not approved by defendant Hill.

## Grievance Mechanisms

91. Plaintiff grieved the denial/modification of his accommodations, which if a inmate who's request for reasonable accommodations are denied or modified, or who believe they were discriminated against by DOCCS', because of their disability, have a right to file a grievance under the "inmate Grievance Program" ("If the IGP supervisor determines that the grievance may be a harassment, discrimination, or strip/frisk search grievance, it **shall** be processed in accordance with the respective expedited procedure.

92. A grievance alleging unlawful discrimination, & its related documentation, shall be forwarded to the Superintendent, with a copy to the Office of Diversity Management, within 24 hours. § 701.9 **Allegations of Unlawful Discrimiantion:** acts or policies which adversely affect individuals based on race, religion, national origin, sex, sexual orientation, age, disabling conditionfs·, or political belief. These grievances shall initiate an in-house investigation by the Superintendent by a higher ranking supervisory personnel and/or request the Office of Diversity Management to conduct an investigation. (These grievances are given a Code (49) & Title of Unlawful Discrimination

93. None of the Plaintiffs Unlawful Discrimination grievances received a code (49), nor was it forwarded to the Superintendent, with a copy to the Office of Diversity Management, & ADA Coordinator within 24 hours, in order to have some effect. The Disability statues imposes am affirmative obligation upon DOCCS' to create & maintain a coherent effective grievance procedure regarding accommodations. which DOCCS failed to do for disable I.I.'s. (See. IGRC Grievance Sheet. NO Discrimination A

.[29].

94. The Defendants have failed to adopt and publish grievance procedures providing for prompt & equitable resolution of complaints alleging discrimination by Plaintiff & other qualified individuals with a disability in accordance with 28 CFR § 35.107(b), being held in their care, custody & control, & upon information & belief have instructed IGRC supervisors overseeing the grievance programs throughout NYS, not to file disability grievances, whereas Plaintiff's grievance process have been hindered & interfered with, his retaliation, harassment & disability grievances were not being filed in accordance with the law, or DOCCS regulations, receiving the wrong titles, & codes intentionally, which process operates as a simple dead end, & failing to achieve its desired effect.

95. WHEREAS, the Plaintiff alleges, among other things, that DOCCS' had not designated a responsible employee to coordinate its efforts to comply with DOCCS obligations under the ADA, with respect to DOCCS inmates, & refused to provide the Plaintiff with the name, address, & telephone number of that employee, see § 35.107;

96. WHEREAS, as a public entity with fifty or more employees, DOCCS is obligated under the ADA to "designate at least one employee to coordinate its efforts to comply with & carry out its responsibilities under the disability statutes, including any investigation of any complaint communicated to it, alleging its noncompliance with this part or alleging any actions that would be prohibited by this part. 28 CFR § 35.107(a).

97. On April 29, 2024, Sheena Ector brought Plaintiff his personal CCTV, which would permit him to be able to read in his cell, which was mailed from Sullivan by his ORC "Jessica Sircable," along with his talking digital book player, however all of the other reasonable accommodations he possessed at Sullivan, was never forwarded, such as typewriter, lamp, talking watch, talking chess game, magnifier, headphones, blind mobility cane, which CCTV was without the charger, preventing Plaintiff from being able to use it, as defendants did not have a specialized charger that would fit his CCTV.

98. The Defendants not being a SDU, or SDP designated facility without the full range of auxiliary aids and assistive devices, had to submit an order to the Maxi-Aids catalog, to purchase a Ruby Portable CCTV, which would permit Plaintiff to be able to effectively read in his cell, his lawyer "Amy J. Agnew" had to order him another Portable CCTV, as she couldn't get a cord, and another typewriter, plaintiff went without the necessary accommodations & auxiliary aids & assistive devices for more than two months, due to the denials, & not having the items available at Five Points.

.[30].

99. The straitened circumstances under which the plaintiff had to live while at Five Points SHU/RMHTU, a barrier-infested, restricted, non-therapeutic disciplinary unit, & defendants response & actions in regards to his accommodations were contrary to reason & common sense, where he had to rely on other I.I.'s to read his mail, legal mail, placing him in grave danger, denied his extension cord to plug in accommodations & manage as best as he can, subject to a living environment which he cannot understand, & cannot succeed, with virtually no special assistance, in a physical environment which poses extreme dangers, where officials have done little to protect me from abuse, physical harm & discrimination, which has caused me frustration, depression & suicidal thoughts, where I filed many complaints, & had to wait 2½ months for accommodations that should have traveled with me, instead of having to wait until Five Point ordered them due to not having them readily available as a SDU/SDP designated facility would.

100. The plaintiff spent most of his days vegetating in his cell, where he endured recurrent abuses from other SMI prisoners & security staff, mostly due to his complaints, who simply refused to deal with him differently, & retaliated against him, where he was provided essentially no accommodations, which would permit him to effectively communicate, read in his cell, or provide effective access to programs & services, at a facility that he normally would not be housed, in a allege program that was not rehabilitative, & have to contend with his desperately onerous situation, & had numerous non-trivial temporal delays & denials to minor accommodations by SORC Robert Lapp, DSP Hill, & Miller, I was subjected to disparate treatment, denied medical consultations, orthopedic shoes, & excluded from participation in the SDU/SDP, & treated worst because of of my handicaps.

101. While at Five Point SHU/RMHTU, plaintiff was completely dependent on accommodations alotted to him by defendants DOCCS, & Hill, to function more easily & participate more fully in the amenities DOCCS affords which were woefully deficient.

102. After 2½ months of waiting on minor accommodations & auxiliary aids & assistive devices, which Officials has not seen fit to make these accommodations available, he was brought a 'short' blind mobility cane, which he was unable to use, & gave to defendant "kemp" who turned it in & made it appear he confiscated it from plaintiff, due to not using it appropriately, in which staff never wanted him to possess due to it being metal, & could be folded up & deemed it to be a weapon, which "Kemp" begun harassing plaintiff about his hearing & vision disabilities, stating he was dumb deaf & blind, & even 'faking' blindness, & decided to mistreat him, simply because of his handicaps, & special needs, which were more specialized or complex, & started to persistently create an unpleasant or hostile situation, by uninvited & unwelcome verbal or physical conduct., & begun steady harassing plaintiff.

.[31].

§ 35.105 Self-Evaluation

103. Plaintiff assert that defendants have failed other affirmative obligations imposed by the ADA, by failing to provide him the opportunity to request the auxiliary aids & services of his choice. DOJ, Technical Assistance Manual, Title II, ADA, II-7.1100.

104. The plaintiff also was never provided any notice of the protections the ADA afforded him, regarding discrimination, as assured by 28 C.F.R. 35.106. In addition, 28 C.F.R. § 35.163, provides DOCCS provide him with information as to the existence & location of accessible services, activities, & facilities.

105. WHEREAS, plaintiff asserts that defendants failed to conduct a "self-evaluation" of its programs, services, & physical plant to determine what modifications of policy & structure are necessary to comply with the ADA. 28 C.F.R. § 35.105. DOCCS never identified its policies & practices that deny, or limit the participation of him, as well as other legally blind individuals in the Sensorial Disable Unit's Program, who faced disciplinary SHU sanctions, but could not be sent to an Residential Rehabilitation Unit, RRU, due to it not being in one of the designated facilities that legally blind I.I.'s could be sent, causing the plaintiff, as well as others like "Dominick Nelson,', & many others sentenced to SHU sanctions, to be stuck in the Diversion Unit, instead of transferred within 15 days to a RRU, in accordance to HALT, like non-disable incarcerated persons.

### Solitary Confinement Sanctions In Violation Of The Eighth And Fourteenth Amendments

106. Defendants policies & customs authorized by top policy-making correctional officials permit SHU sanctions to be imposed as a sanction for minor & non-violent misbehavior that demonstrates no risk to the physical safety of prisoners or staff despite the passing of the HALT Act which precludes defendants from doing so, which they have refused to take notice of. As a matter of policy & custom, such sentences are imposed arbitrarily with inadequate sentencing procedures, & no upper limit on the length of a sentence the plaintiff as well as others may be forced to endure.

107. The average SHU sentences in New York being issued by Commissioner Hearing Officers is 120, to 160 days, approximately five times the 'maximum' tolerable amount according to mental health, legal, correctional, human right authorities & the state legislature's, who passed the law, the Human Alternatives to Long-Term (HALT) Solitary Confinement Act, in 2021. (See. Exhibit "C" Decision & Order-illegally imposing SHU sanctions...

.[32].

108. The experience of plaintiff **Steven Jude**, typify what is wrong & unconstitutional about New York's disciplinary system, despite recent solitary confinement reform law, which has been met with aggressive push back from corrections officers unions, & officials, which have launched a in-your-face public campaign demanding repeal. They argue that prolong solitary confinement, which has been shown to produce grave mental angusih, is key to preventing prison & jail violence. Proponents of the law have countered that re-introducting a punishment denounced by international human rights bodies is a non-starter. "HALT will never be repealed because New York will never again sanction the use of torture," said Senator Juila Salazar, who sponsored HALT in the state Senate, where she chairs the corrections committee.

109. The Plaintiff was sentenced to 197 days SHU, & other corresponding deprivations & losses of privileges at Sullivan Correctional Facility by a former Sullivan County prosecutor "Lisa Marie Bondarenka," a grossly disproportionate sentence for non-violent behavior, from which he was suffering a mental health crisis, in Sullivan's Sensorial Disable Housing Unit, SDU, after engaging in self-harm in general population. Plaintiff was subsequently issued dozens of additional disciplinary tickets while he remained in solitary confinement -often "for non-violent behavior symptomatic of [his] deteriorating mental state."

110. Each new disciplinary ticket led to the imposition of still more solitary confinement sentences, & severe deprivations while under this statuts on plaintiff, which all ran consecutively, from which hearings his fundamental due process rights were violated, by either being excluded from his hearing, without posing a threat to the safety or security of correctional goals, or being denied assistance to marshal evidence, witnesses, or documentary evidence, or documents in large print being a 'legally blind' sensorial disable person medically approved and entitled to such, therefore exposing plaintiff to extraordinary & disproportionate lengths of SHU confinement, causing atypical & significant hardship on plaintiff who is 'legally blind,' in violation of Due Process & Equal Protection laws.

111. The Plaintiff was forced to endure severely harmful conditions of confinement in a Mental Health Special Housing Unit, which was a restrictive, deplorable, harsh disciplinary unit, where their was no therapy, treatment, or rehabilitative programming, subjected to the noise of other mentally ill prisoners yelling & making loud noises, cursing & insulting each other for long periods, all day & night; Throwing feces, starting fires, & just crying out for help due to being tormented in SHU.

.[33].

112. The astonishingly long sentences imposed on the Plaintiff were arbitrary, grossly disproportionate to the underlying misbehavior, had no legitimate penological justification, & constituted a gratutious infliction of wanton & unnecessary pain that fell far short of evolving standards of decency. The disciplinary hearing officers that imposed these severe & unjustified punishments, & the superintendents & administrators that authorized & enforced plaintiffs' confinement in the Diversion Unit, SHU/RMHU, at their prisons, did do despite a law that precludes his confinement, & the fact that any reasonable official would have known that the extraordinary severity of these punishments would do little more than inflict unnecessary pain & put plaintiff at an unjustified risk of harm in violation of his clearly established constitutional rights.

113. Plaintiff's sentences are just a few examples of the ongoing & systemic harms caused by the policies & customs authorized & maintained by New York top correction official defendants. Plaintiff, as well as others similarly situated confined in New York State prison system are a captive population in constant contact with correction officers who are able to punish inmates for over 100 different rule book regulations, governing everything from failing to comply direct order, out of place, unspecified "threats," "fighting" (but not assault) lewd conduct, interfering with an employee, Causing a disturbance, "unhygienic" acts.

114. DOCCS' appears to have determined on a blanket basis that <u>all</u> misconduct charged as a Tier III offense is eligible for segregated SHU confinement sanctions, "irrespective of the nature of the particular act." Once a correctional staff alleges an infraction has been committed, a conviction is secured 99% of the time. Defendants policies & customs put plaintiff as well as all current & future prisoners at imminent risk of being sent to 'the box' for long periods for no legitimate reason at all. A New York Focus investigation at ( https://www.nysfocus.com/2022/09/12/halt-solitary-implementation-doc. describes how the department has misinterpreted a HALT provision barring facilities from sending anyone with a mental or physical disability to SHU, such as plaintiff has.

115. Lawmakers & oversight organizations have repeatedly told DOCCS that anyone with a disability or on its mental health caseload is exempt from SHU confinement or isolation, but prisons continue to send dozens of people with mental illnesses such as plaintiff & others to SHU confinement every month, & yet they continue to sentence people to long stays is SHU -including for lesser offenses clogging up the RRU's & RMHU's, not being able to <u>comply with the limits</u> the law places on them.

116. The Defendants have not only violated, but have continued to violate the Eighth & Fourteenth Amendments to the United States Constitution, & the plaintiff needs immediate judicial intervention, a Temporary Restraining Order, TRO, & seeks declaratory & injunctive relief to protect him against the risk of future unconstitutional & severely harmful SHU sanctions in units not designated as solitary, but yet still separated from general population, which does not meet the standards of Correction Law, Section 2, subd. 34-RRU, which suppose to be used for therapy, treatment, & rehabilitation, to address the needs & underlying causes of problematic behaviors, but is actually functioning as an unofficial solitary confinement, which is deleterious & debasing for mentally ill prisoners in this Five Points SHU/RMHU, which the plaintiff seeks damages for the harms he's suffering unnecessarily, which he wish the defendants would go to trial, so he can get all the severely disturbed inmates serving sanctions to testify about their experiences.

117. The hardships that the defendants & high ranking officials in DOCCS have imposed upon mentally ill prisoners & plaintiff, who is a multi-disable, elderly man, & not just 'legally blind' in these SHU/RMHU, serving SHU sanctions at just Five Points, but the stories he has heard about Marcy's SHU/RMHU, Great Meadow's Behavior Health Unit, BHU, & the deprivations, & monthly restrictions being imposed on us constantly, where we are being treated differently in violation of the equal protections laws, then general population I.I.'s in the RRU's, is primitive, & unnecessary, the evidence will demonstrate that defendants, both OMH & DOCCS have made no earnest attempt to minimize or prevent inmates who medical conditions should have disqualified them from SHU confinement under the HALT regulations, were & are nevertheless consigned to such placement anyway.(See. www.nysfocus.com/2022/09/26/prisons-are-illegallythrowing People With Disabilities...

118. The Plaintiff asserts that [the] law is quite clear, & the defendants just don't want to comply with it-, or reckon with the fact that an enormous number of individuals such as plaintiff is living with a 'disability,' the plaintiff is one of the 'protected populations from which the HALT law derived from, the defendants in this action, cannot "legislate, that is the role of the legislature, & they cannot advance no penological justification for the deleterious & debasing character of solitary confinement in this allege "Residential Mental Health Unit, RMHU," that this Defendant Tricia M. Miller, oversee's, which the Federal Bureau of Prisons stopped punishing inmates in this manner forty or fifty years ago, & the punishments, deprivations, & loss of privileges placed on plaintiff is severe, &

the Eighth Amendment prohibits punishments that serve no valid penological purpose & needlessly inflict pain, also prohibited are punishments which are grossly disproportionate to the severity of the offense.

120. Defendant Miller asked defendant William Dumont to prepare a list of names of SMI, I.I. in July 2024, in the SHU/RMHU, who have a history of throwing or charged with unhygienic acts, in which higher ranking officials overseeing her in Albany authorized her to implement a illegal policy & practice of depriving SMI, I.I.'s of their personal cosmetics, or shampoo & other things that can be utilized to squirt, in which, defendant's had implemented at Marcy's SHU/RMHU, where they were basically torturing SMI, I.I.'s, & in retaliation for the plaintiff filing grievances & complaints & opposing the deleterious & deplorable conditions of SHU confinement in the SHU/RMHU, placed plaintiff's names on this list to deprive of his numerous cosmetics in his cell, which he was legally permitted to have, along with his personal property.

121. Defendant Dumont placed plaintiff's name on this list of inmates to be deprived of his cosmetics, although he did not have a history of any throwing onto staff, or I.I.'s, never was charged with an unhygienic act, in the past or present & did not have a history of such, which while on suicide watch, all his property was taken out of his cell, 2 pair of brand new sneakers left foot were discarded by correctional staff, leaving him with the right foot only, & 16 bars of Dove soap were taken, 14 bottle of VO5 shampoo's, numerous lotions & jars of creams, some of which were medically prescribed & 4 brand new magazines were missing, & all of plaintiff's legal work, bible, religious & spiritual books were confiscated, & over 32 magazines, stating that defendant Miller, ordered these items to be taken away & placed him on deprivations, claiming the plaintiff utilized his legal work, & religious items to cover his Expanded Vision Panel, EVP, which has bars over it & is impossible to cover with paper.

122. The Plaintiff filed grievances & complaints about the deprivations & that DOCCS keeps an elaborate reporting data system & there would be log book entries & treatment team meetings minutes & negatives, if plaintiff indeed did cover his EVP with his legal papers which was ridiculous, & that he never received any deprivation order's for this allege conduct, Defendant Dumont back dated deprivation orders claiming plaintiff did indeed had deprivation orders, as well as deprivation orders for the closing of his EVP, which suppose to remain in an open position as a SMI, I.I., which defendants arbitrarily closed cause he told defendant "Kemp" he was going to sue him for refusing to feed him & retaliating against him which defendant

.[36].

Retaliation/ Due Process "Jeffery Kemp"

kemp wrote the plaintiff a misbehavior report for on August 13, 2024, when he was going to his hearing before defendant James Adams, a CHO, who the same day excluded plaintiff from his hearing & held it outside his presence, because he stated he was feeling suicidal & depressed due to the retaliation & harassment from defendant Kemp, & feeling sick from not being fed, gave Plaintiff 210 SHU consecutively days.

123. On August 13, 2024, defendant Kemp, went into the plaintiff's cell subsequently after plaintiff told him he was going to sue him for depriving him and another inmate "Michael Meggason" of food trays, at 2:00pm, while he was at his hearing & destroyed plaintiff cell, ripped up & confiscated legal documents he was preparing for this lawsuit, took employee rosters from Five Points, Sullivan, & OMH, he purchased under the F.O.I.L, bent up his fitted caps, & dumped his bags of tobacco in the toilet, had his EVP closed for more than 30 days, which defendants from OMH & DOCCS' permitted, which his EVP was only suppose to be closed if he was being disruptive during movement, which suppose to be temporarily closed until the threat was abated, but there was never no threat to be abated, & was closed in retaliation for stating he was going to sue "kemp" for failing to feed him.

124. Defendant Kemp wrote the plaintiff a MBR, for threatening to sue him, which a disciplinary hearing was allegedly held outside his presence without his notice, which found him guilty for (60) days depriving him of his packages, commissary, phone, & tablet from 9/1/24 until 10/13/24, preventing the plaintiff from calling his family & friends, & attorneys or the Office of Special Investigations, OSI, which tablet is a electronic device distributed by security to each I.I. assigned to a SHU/RRU, and/or SHU/RMHU, which has telephone access, & contains a variety of preloaded applications including educational material, videos, e-books, music, games, & other media, which came about from a lawsuit settlement captioned "Peoples v. Annucci, 180 F. Supp. 3d 294 (2016) which suppose to make the conditions of SHU confinement for SMI, I.I. in SHU less severe, & less difficult to contend with as part of a settlement agreement.

125. Defendant "Kemp" violated the plaintiff's constitutional rights by writing him up for threats to sue him, which he communicated his intent to exercise his constitutional rights to access the courts, & "he cannot be penalized for 'threatening' to do something, i.e., file a lawsuit, that he has every right to do." To punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort. (See. Gourdine v. Anuucci, 164 A.D. 3d 1647; Bordenkircher v. Hayes, 434 U.S. 357 (1978); Corr Law § 138(4), which plaintiff's OMH therapist "Gregory Synder" endorse the MBR. EX. "G" MBR; DEPRIVATIONS.

.[37].

126. The plaintiff is unaware of the agent or DOCCS' employee name who sort to punish him & penalized him because he has done what the law plainly allows him to do, which he should learn through discovery, & would like to sue him as a defendant for disciplining him, & he wants the court & defendant Anthony Rodriguez to expunge all references from plaintiff's institutional record, as he never had a hearing to respond to the charges, which the SHU/RMHU have audio & video of the date this allege conduct occurred, as well as hearing, which he was never notified of.

127. Defendants DOCCS & OMH, have carried out policies, practices & customs that resulted in the routine placement of plaintiff & other severely mentally ill incarcerated persons in SHU, with absolutely no thought to whether such placement would exacerbate the mental disorders, & a systemic failure to supply proper treatment for SHU/RMHU inmates, & a lack of protecting the plaintiff housed in the SHU/RMHU from the effects of housing him on the same unit with seriously mentally ill prisoners, where he otherwise normally wouldn't be housed, due to "sensorial disable classification, which was intentionally changed to have him removed from his SDU designation to one of a seriously mentally ill one, which approach to prison discipline created conditions of confinement for him to violate the Eighth Amendment because of the deplorable state of the SHU/RMHU, & at the same time involved such egregious failures to address the serious medical needs of the plaintiff mental & medical needs as to constitute constitutionally impermissible "deliberate indifference."

128. The defendants are fully aware of the risk of harm, the severe pain it causes, & the affront it represents to basic human dignity by the public outcry about the illegal practices & failing to remedy the many deficiencies in its previous regulations that are continuing to be pointed out, & apart of the reasons these violations continue to occur, which law makers, concerned citizens & fifty-two state legislators sent a letter to DOCCS lambasting the agency for re-enacting regulations that flout solitary confinement law. (See: "New York Focus - www.nysfocus.com/2023/03/06/prison-rules-ignore-halt-solitary.

129. Defendants, however uses SHU sanctions & other severe deprivations as a disciplinary tool of first resort with astonishing frequency, & length for the violations of any one of over one hundreds internal prison regulations. The frequency with which DOCCS uses SHU as punishment is a direct consequence of system-wide policies & customs governing the conduct & punishment of not only plaintiff but all I.I.'s throughout NY prison system. In contrast to clearly defined standards & criteria, without any legitimate penological rationale.

.[38].

130. Humane rights authorities & bodies have similarly found minimum safeguards are absolutely necessary to protect against the harm of SHU confinement. For example, the United nations Special Repporteur on Torture has concluded that solitary confinement used specifically for the purpose of punishment can never be justified, given the magnitude of suffering it imposes. Where SHU is absolutely necessary for protecting the safety of the prisoner or staff, the UN Special Rapporteur has held that more than 15 days of confinement amounts to torture or cruel, inhuman, or degrading treatment, & recommended that the use of SHU in excess of the 15 days be abolished in all cases, due to its potentially damaging effects.

131. The recommendations of various experts & organizations reflect the overwhelming consensus that if SHU segregated confinement is to be used at all, sufficient protocols & safeguards are necessary to prevent the severe harm caused by its inadequately constrained use, & to ensure that SHU confinement is used sparingly as a last resort, for short amounts of time, & under tight controls.

### DOCCS Fails to Follow the Solitary Confinement Law - Again

132. SHU segregated confinement sanctions, & other harsh disciplinary sanctions continue to be used by DOCCS officials despite the passing of the HALT law, & lawmakers concerns about DOCCS' failure to follow the law.

133. The HALT Act invented ("Residential Rehabilitation Units, RRU's"), so facilities in theory could have a relatively humane & rehabilitative place away from the general population to send those whom are no longer allowed to be kept in solitary confinement. However DOCCS, & the defendants herein especially defendant Anthony Rodriguez, aren't adhering to HALT's standards for RRU's, instead treating them as an extension of segregated confinement. The SHU/RMHU are suppose to be ran, & operated or comparable to the RRU, which DOCCS is in violation of the equal protection laws.

### Discrimination Based On Disabling Condition & Equal Protection

133. Plaintiff has been discriminated against based on his disabling condition of 'legal blindness,' which did not permit him to be transferred to an RRU, as the evidence will reflect, there is not another designated facility under Directive #2612, which can house, or accommodate "sensorial disable legally blind prisoners." which is the reason OMH unit chief Gregory Savage changed his mental health classification to a S-1 designation to force DOCCS to transfer plaintiff to get him out of the Diversion Unit at Sullivan, which they were not able to transfer him within the 15 days in accordance with the HALT provisions, as they did not disable

without 'legal blindness,' which not only did they treat the plaintiff & other legally blind prisoners differently, then those without legal blindness, but the ADA provisions 28 CFR § 35.152(a)(b)(1)(2)(i)(ii)(iii), that he was not to be excluded from participation, in or be denied the benefits of the services, programs, or activities of DOCCS sensorial disable unit, & program because:

(i). A facility with an RRU, is not accessible to Plaintiff;
(ii). Plaintiff is housed in the most integrated setting appropriate to his needs;
(iii). Placed in a facility that do not offer the same programs as the facility where he would otherwise be housed;
(iv). Deprive Plaintiff visitation with family members by placing him in distant facilities he would otherwise be hosued.

134. The HALT mandates that the RMHU, meets the standards of the RRU, none of the other allege alternative to SHU housing units conform to the same requirements as RRU's, the plaintiff as well as others similarly situated have not been offered any "therapeutic" programming, which mental health & correctional staff in the Five Points SHU/RMHU, show nothing but movies in the am/pm, with no other activities, The RRU at Five Points prisoners are able to purchase T.V.'s as incentives, whereas the T.V.'s in the RMHU plugs were all taken out so that the SMI I.I. can not watch T.V., although the Plaintiff T.V. in his cell works, they are able to have ALL their cosmetics, even shampoo bottles & property, purchase radios as incentives, have better time cut's & privileges, are able to smoke, & have tobacco, where Defendant Miller just stopped SHU/RMHU, SMI from having tobacco products, without even giving us a 30 day warning, amongst other restrictions & derivations.

135. According to HALT, a I.I. is not suppose to spend no more than 15 days in confinement in a 30 day period, however ALL inmates are committed to extended periods of time in solitary confinement, often while suffering from serious medical & mental health issues like the plaintiff who has yet to see defendant Molly Fischer, who has failed to pull him out for an examination so that he could be placed in for a specialist for pain management, & physical therapy, which he was on the list for, however never called him for one session, claiming he refused to attend, in addition Plaintiff requires custom orthopedic footwear to be able to wear his custom Ankle-to-Foot, AFO leg brace for his drop foot, but has waited more than a year ½ to have an appointment made, & DOOCS medical health services staff continue to delay access by ordering regular medical boots that is provided to every inmate without ever seeing him, which he cannot wear, causing him to suffer pain unnecessarily.

.[40].

136. DOCCS policies provide minimal guidance to correctional staff regarding how to assign tier ratings to allege misbehavior. DOCCS policies so not to provide I.I.'s with an explanation of what types of conduct may result in more or less severe tier ratings. DOCCS policies do not provide I.I.'s with any notice of potential sentencing ranges to SHU if convicted for a infraction.

137. Plaintiff as well as others facing Tier III charges are afforded a limited hearing, with minimal process to adjudicate guilt. DOCCS employee themselves act as hearing officers, who are indifferent to HALT, & many have minimum training required under HALT, like defendant Helmicki, a senior counselor who never had the required training & presided over plaintiff hearing, & denied him assistance to marshal evidence, documents in large print, & documentary evidence & reports & sentenced plaintiff to an additional consecutive 210 days in SHU confinement & loss of privileges, like phones, commissary,recreation, packages, & good time, for conduct that don't fall under HALT, & dealt with his mental illness.

138. With regards to adjudicating guilt, hearing officers are permitted to credit the testimony of correction staff over that of a prisoner. The prisoner can be denied the opportunity to present his own defense, & evidence, question adverse witnesses, to have counsel represent him, have assistance to help marshal evidence & identify witnesses, & the hearing officers now want to also act as the assistance since HALT, & prisoners can be, & are frequently convicted of infractions based on the disputed word of a single officer or report, for conduct which often times they could receive a counsel & reprimand.

139. The DOCCS disciplinary process almost always secures a conviction. From 2021 to 2013, DOCCS conducted more than 105,500 tier III disciplinary hearings, with a conviction rate of approximately 97%, if an individual facing a Tier III charge iis amongst the 95% who are convicted, he or she is more likely than not punished with extended SHU confinement sanctions. Of the Tier III disciplinary hearings that resulted in a conviction from 2021 to 2023, a Tier III SHU sanction was imposed as punishment approximately 85% of time time, as well as severe losses of privileges.

140. DOCCS policies permit & even encourage sentences to extended segregation for behaviors that demonstrates no risk of harm, & where there is no showing that the prisoner like plaintiff needs to be removed from general population in accordance with HALT provisions, in order to protect staff & I.I.'s. For example, from 2021-2023, only 20% of sentences to SHU involved MBR's that implicated violent conduct, or weapons, which HALT has specific enumerated offenses which could result in SHU extended segregation confinement. (See. Correction Law § 137(6)(k)(A). See Ex'C" Woh Article 78 Stating DOCCS been violating the law.

[41].

141. With regards to sentence length, DOCCS' policies provide no mandatory sentence ranges & no upper limit on the length of any single sentence. DOCCS policies, & customs recommend 90-day 'minimum sentences' in SHU for types of non-violent misbehavior. DOCCS policies also do not place any upper limit on the number of consecutive sentences to SHU that plaintiff or others may be forced to serve. Consequently, even SHU sentences of (30) days may have the practical effect of ensuring the prisoner will spend months or years confined in Extended confinement as the prisoner serves multiple SHU sentences as the plaintiff is doing now.

142. When it come to the rationale for when SHU is justified as a sanction, DOCCS policies provide only vague & generic crieria. DOCCS' policies do not require an adequate articulation of the rationale for imposing Extended segregation confinement or for the length of the sentence. As reflected in plaintiff's hearing dispositions, discussed below, hearing officers often provide explanations for these sanctions that are, on their face, plainly insufficient to justify the severity of the sanction. Such sentences are routinely authorized & enforced as a matter of policy & custom when the HALT Act specifically details the process that DOCCS must follow to imposed extended segregation in it's findings.

143. Furthermore, DOCCS & OMH policies permit staff to impose Extended confinement as punishment without tasking into the factors of Correction Law § 137(6)(k)(ii), the "Seven Acts," or that such confinement particularly painful, harmful, & punishment punishment particularly disproportionate for the plaintiff. DOCCS staff are permitted to impose SHU confinement without restriction on seriously mentally ill prisoners, the elderly, the disabled (including seriously mentally ill prisoner in wheelchairs, & other serious medical illnesses like HIV). While New York State HALT law requires DOCCS' to divert those with the most severe forms of mental illness from SHU, they just place them in this allege Residential Mental Health Units, which are actually 'worst' then SHU, very harsh, restrictive, & punitive in nature, the plaintiff just had to exchange on a 1-for-1 basis a bar of soap, that he is no longer to have in his cell, Defendants have done nothing to significantly ameliorating conditions of SHU since HALT (As of 2023, approximately 79% of the people confined to SHU confinement has been diagnosed with a serious mental illness). As a result, individuals like plaintiff who may have the least capacity to tolerate SHU confinement for even short periods may be a weighty punishment, may nevertheless end up condemned to months, years suffering terrible consequences like Steven Sidbury #17-A-4920, who is SMI, been in SHU since 2018, & have many more years before his SHU release date which is 'shocking to the conscience' even for me.

.[42].

144. Once an individual begins serving his or her SHU sanction, DOCCS' policies allow lengthy confinement without any subsequent individualized reviews or assessment to determine whether is is still necessary to confine that individual in the SHU. Nor do policies require that officials periodically evaluate whether, as the sentence drags on for weeks, months & years, the punitive confinement may be causing the individual increasingly severe & grave harm.

145. DOCCS' policies & customs governing the post sentencing review of SHU sanctions including the disciplinary appeals process & discretionary review that can be requested by prisoners, fail to ensure any consistent or meaningful relief from grossly disproportionate SHU sanctions. Upon review, & evidence by the Plaintiff, SHU sentences are affirmed, modified or vacated arbitrarily & inconsistently. For example the plaintiff just received a appeal back from defendant Rodruguez, who modified his charges taking off the causing a disturbance charge & interference with an employee, by dismissing those two charges, however left the sanction of 210 days SHU confinement, which on the plaintiffs disposition it states at the top "SHU cell ineligible."    **Racial Discrimination**

146. All of the above policies work in conjunction with customs that have the force of formal policy throughout the DOCCS system, tolerating & encouraging needlessly & purposely harmful SHU sentences for all forms of misbehavior & for perceived disobedience. Unconstrained by adequate policies & procedures, doccs staff impose unjustified & arbitrary punishments that are customarily authorized, ratified, & enforced system wide, however the plaintiff has had over 15 Tier III misbehavior Tier III guilty sentences reverse by Article 78 challenging the decision of appeals, claiming hearing officers violate his procedure for due process.

147. In combination, DOCCS policies & customs result in unjustified, inconsistent, & harmful SHU sentences. The Plaintiff as well as others similarly situated receive lengthy SHU sanctions that are grossly disproportionate as compared to the underlying misbehavior. Similarly situated receive inconsistent, often vastly different sentences for similar misconduct. African American prisoners are more likely to receive SHU sentences, & receive longer SHU sentences, as compared to individuals of other racial & ethnic groups, there is two Caucasian inmates out of 50 confined in the SHU/RMHU, who receive 30 to 45 days the most & are not sent to SHU at all most times, it is just people of color & Hispanic, which the SHU/RMHU is packed to full capacity with SMI I.I. serving long SHU confinement sentences.

.[43].

DOCCS COMMISSIONERS FAIL TO FOLLOW LAW OR MAKE CHANGES

148. Commissioner Maruscello, who seems to have his whole family with high ranking policy-making & supervisory authority within DOCCS, has failed to correct what Anthony Annucci should have. As Commissioner, & pursuant to New York law, & all the public attention about the HALT law, and DOCCS continued abuse and refusal to comply with it, is fully aware of & has ultimate authority with regards to all DOCCS internal rules, regulations, policies, procedures & customs, which he has his staff periodically review these policies & customs. he reviews data & statistical analyses that reflect the effects of these policies & customs, & knows exactly whats been going on prior to his appointment after Annucci, & what mess he left behind. I know Commissioner Martuscello has the authority to cause DOCCS' policies to be amended, & adopted to reflect the legislature intent, but just have refused to do so.

149. The Director of Special Housing & Incarcerated Disciplinary Program Anthony Rodriguez, a position formerly held by Norman Bezio, Donald Selsky, & now defendant Rodriguez, allegedly reviews, develops, implements, & monitors DOCCS' disciplinary policies & procedures & their consequences & reports to the Commissioner & his family. The director evaluates statistical data to analyze trends & patterns & was in office when the HALT law came into effect. The director is responsible for staff training & supervision on disciplinary policies & procedures, & for developing a program of on site inspections of the conditions of DOCCS SHU facilities, especially the RMHU/SHU. The director, along with staff under his direct supervision & guidance, reviews all appealed determinations of Tier III hearings & sustains, overturns or amends those dispositions.

150. Defendants Martuscello, his family, Catherine & Nicholas, Rodriguez, were, and defendants Miller, Delmar, Hill, Mckoy, & MCgrath, personally involved in authorizing & maintaining the disciplinary policies, procedures, & customs detailed in this complaint, & their consequences & effects, they have the responsibility to review & evaluate DOCCS' disciplinary policies & the authority to adopt, amend, or revise them, which they are setting themselves up for serious litigation, which they do not care, cause no money is coming directly out of their pocket to pay for representation, or to settle these lawsuits, & until they start having to pay outof their pockets, instead of tax payers & state coffers, then they will continue to violate the plaintiffs as well as others rights.

.[44].

151. Defendants Martuscello, his who family in Central Office, Catherine & Nicholas, Rodriguez, as well as the rest are aware of the consequences of their policies & customs as the result of numerous communications to them & the former Commissioner Annucci from outside organizations & entities, from the Correctional Association to Prisoner Rights Project, Prisoner legal Services, & all the attention this has garnered & wide public concern, which for years have been documented the systemic deficiencies in the DOCCS disciplinary process, as well as the Office of Mental Health's deficiencies in caring for the mental health of the inmates in their care, custody & control, Defendants are also aware of a pattern & practice of deficiencies through complaints they have received through the Justice Center for the Protection of People with Special Needs, & through disciplinary appeals, grievances, civil litigation, Article 78 petitions challenging the arbitrary & unjustified SHU sanctions from disciplinary which the plaintiff has won more than (8) favorable decisions.

152. Defendants have long been aware that DOCCS disciplinary procedures failed to provide many of the minimum safeguards of due process recommended by correctional,legal, mental health, & human rights experts. The certainty that these policies & customs have & will continue to lead to unjustified & harmful SHU sentences is plain from the lack of adequate guidance contained in DOCCS written policies themselves, & the fact that DOCCS' customarily impose SHU penalties far exceeding even the minimal guidance that is permitted by law, but yet they still have refused to revise their policies, procedures, & customs, & the crazy thing about it is they are not being held personally liable, they are still operating with impunity, & still allowed to maintain their jobs, making hundreds of thousands of dollars a year for them & their entire family, off the blood, sweat & tears of prisoners like plaintiff who did not shed his constitutional rights at the prison gate.

153. The defendants failed to implement safeguards-for example, adopting adequate criteria design to ensure proportionality & curtail the length of SHU sanctions, avoid the risk of harm for vulnerable prisoners like Plaintiff, Mr. Allah who is in a wheel chair, Mr. Sidbury, who is mentally fried, & provide to plaintiff & others, & staff of the length of SHU punishment that may be imposed for particular misbehavior in accordance with HALT provisions would significantly protect against the risk of erroneous deprivations of the most fundamental constitutional rights, & would not unduly interfere with defendants legitimate interests, the plaintiff meant to make Kathy Hochul a defendant being she is responsible for appointing Commissioner & overseeing DOCCS, & been real quite on the situation at all about the actions of Defendants.

.[45].

## HALT Categorically Prohibits Defendants From Placing People With Disabilities In Solitary Confinement

154. A key purpose to HALT was to protect particularly vulnerable populations from solitary confinement of any kind or duration. Indeed, the Legislature made plain that one of its objectives is passing HALT was to "end the segregated confinement of vulnerable people." because "[s]egregated confinement can be particularly devastating for certain vulnerable people, such as young, or elderly people, pregnant women, & people with disabilities or trauma histories." HALT therefore categorically prohibits the use of solitary confinement for plaintiff (Correction Law § 137[6][i]). These groups, which the law calls "special populations," are excluded from being placed in solitary for any length of time.

155. "Special populations" under HALT include "any person ... with a disability as defined in paragraph (a) of subd. 21 of 292 of the Executive law" (Correction Law § 2 [33] [c]). Executive Law § 292 (21) ("the New York State Human Rights Law"), in turn, defines "disability" as "a physical, mental, or medical impairment resulting from anatomical, **physiological, genetic, or neurological conditions** which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic or (b) a record of such an impairment or (c) a condition regarded by others as such an impairment ..."

156. Courts have broadly interpreted Executive Law § 292 (21)'s definition of disability to "**cover a range of conditions varying in degree from** those involving the loss of a bodily function to those which are merely diagnosable medical anomalies which impair bodily integrity & thus may lead to more serious condition in the future" (Krause v. Lancer & Loader Group, LLC 965 NYS 2d 322 [Sup Ct, NY County 2013], quoting Davis v. Bowes, 159 F3d 1246 [2d Cir 1998][explaining that the NYS Human Rights Law includes a more expansive definition of disability that the ADA, because it does not require any showing that the disability substantially limits any major life activity]; State Div of Human Rights v Xerox Corp, 65 NY2d 213 [1985]; Exhibit 1, Letter from CAIC & MHASC, at 2-3 "[a]ccording to the NYS Division of Human Rights, '[t]here are qualifiers as to the severity of the disability. Unlike federal law, there is no requirement under the NYSHRL that the impairment 'substantially limit a major life activity," citing "Reasonable Accommodation & Disability Rights under the NYS Human Rights law, NYS Division of Human Rights, [May 2022], at 3 available at https://dhr.ny.gov/system/files/documents/2022/05/nysdhr    disability-rights-handbook-073020.pdf

.[46].

157. By incorporating this broad definition of "disability" from the New York State Human Rights Law, the Legislature made clear that HALT protects from solitary confinement any person with [any] disability. Because HALT defines solitary confinement as any form of cell confinement for more than 17 hours a day, regardless of the name of the unit (Correction Law § 2 [23]), HALT bars Defendants from confining any person with any disability to their cell for more than 17 hours in a day-for any reason, in any unit, in any prison, unless the purpose is for mental health or medical treatment o there is a facility-wide emergency (Correction Law § 137 [6][h]).

158. Prior to HALT, the SHU law limited DOCCS ability to hold I.I.'s in SHU segregated confinement of they had a "S" designation (SMI). Correction Law § 401(5)(a), provides a person in RMHIU cannot be sanctioned with SHU confinement for misconduct on the unit unless two factors are met. First, the conduct must present an "exceptional circumstance" that poses a significant & unreasonable risk to safety or security, & Second, the person must have been found to have committed one of "seven acts." Any segregated confinement sanction imposed against plaintiff while in the RMHIU, on the unit must be reviewed by the joint case management committee before the person will be required to serve them. In extraordinary circumstances where a person's conduct conduct "poses an immediate unacceptable threat" to safety, or security, however such person may be immediately moved to an RRU.(Plaintiff sanctions must be Annulled on unit).

### Sexual Abuse/ Harassment/ Retaliation/ PREA Violation

159. In May 2004, the plaintiff filed harassment complaints against Dennis laureano, who is an openly gay, aggressive, homosexual who has a overt authoritative desire to want to control & dominate another man, & has a pattern & practice of antagonizing serious mentally ill prisoners in the RMHIU, & harassing them trying to oppress them, more than they already are, who purposely do unnecessary things to try to garner a reaction out of prisoners under a auspice "he's doing is job so good," who been involved in multiple unusual incidents & use of forces on SMI, I.I., where the DSS Thomas Delmar, had been trying to target for termination from DOCCS, according to Laureano, "but he is unable to touch him."

160. New York State allegedly has zero tolerance approach, criminalizing sexual assault in prison setting. See. PENAL LAW § § 130.05(3)(e), 130.52 (2018); See also Shepherd II, 2017 Wl 666213, at *23 ([T]he fact that the allege [physical] conduct constituted a crime under New York State Law, & was the subject of national legislation aimed at stopping such conduct in prisons, reinforces the

,[47].

fact that Dennis Laureano knew that he could not engage in impermissible physical contact with the plaintiff, in retaliation for filing the harassment grievance, then turn around & do it again three (3) more times, which the plaintiff filed grievances about, & even seen by medical, & two days after making the PREA complaint on 6/28/24, allegedly for a cell search with another officer "Guaurado," when neither officer worked plaintiff's housing, which an officer "Dean" was assigned & suppose to have searched his cell, which "Guardao" never filled out any paper work about being in plaintiff cell or finding a weapon along with Laureano, as per policy & procedure, which he allege he found weapon on 6/30/24, 2 days after the third filed PREA, 2 harassment & retaliation complaints.

167. Plaintiff was allowed to continue to be targeted after filing harassment complaint on 5/7/24, which escalated to sexual harassment/abuse with not impermissible pat frisk & physical contact meant to intimidate, by repeatedly grabbing, squeezing, plaintiff genitalia, & fondling, while making offensive demeaning comments, running his hands inside the inner thighs, & pulling back his waistband, around his buttocks in such a way to look down the plaintiff buttocks, which was mean to intimidate, & humiliate plaintiff & gratify his sick, sexual desire to take control a man, & dominate.

168, In plaintiff's filed complaints, he requested to be separated each time from defendant Laureano, to cease the harassment, where it had gotten to the point where plaintiff felt maybe if he made an threat to have a contract placed on the defendant, it would garner enough attention from administrators & high ranking officials like defendant Moragn, the PREA ADS, that she would protect him from the continued abuse, but she did absolutely nothing to protect plaintiff, from harassment & retaliation, as required by law, & DOCCS alleged zero tolerance.

169. DOCCS employee Manual 2.19, prohibits an employee from engaging in sexual abuse, sexual harassment, or related retaliation, & DOCCS suppose to protect plaintiff after making the difficult decision to come forward & report the abuse for (90) days after reporting, by monitoring. For example, where there were any change in plaintiff housing unit, program of any disciplinary action, which just two days after plaitniff's (3rd) filed grievance, defendant Laureano went into his cell 6/30/24, & now claimed he found a weapon, when he nor the other officer even worked plaintiff's housing unit, assigned different job assignments in the SHU/RMHTU, which the other officer was assign a recreation post which was being ran during the time the allege cell search was being conducted.

.[48].

170. Defendant Emerson, Lowerre, Hodges & Martcuscello Nisholas, the OSI chief did absolutely nothing to protect the plaintiff from continuing to be targeted by Lauerano, which allegedly the department has zero tolerance for sexual abuse, or harassment, however have retained many male correction officers accused of sexual abuse of female prisoners who claim they had sexual relations with the officers, who after the women came forward to make the difficult decision to complaint, was still allowed to be targeted with misbehavior reports by the accused, so how is it that after the plaintiff's first harassment, then third PREA, Laureano was allowed to retaliate against him, go into his cell with another coward officer which neither worked the plaintiff housing unit or area, & assigned different post, go into plaintiff cell & in retaliation claim he found a weapon that plaintiff could have easily taken with him to the yard, as it was plastic & undetectable is the million dollar question., which plaintiff has 3 state sentences with out having a weapon.

171. How is it that the above officials not only allow this perpetrator of sexual abuse to continue to target plaintiff but they allowed him to retaliate, failed to conduct any meaningful investigation, & the OSI officer assigned to the case, stated she heard alot of stories about this custodial security guard Laureano, & that they were going to try to get him fired, however come to the facility two months later allegedly for an investigation to make it look good on paper, & pulled five SMI, I.I. out of their cells who cell doesn't face the gallery, who is unable to see plaintiffs cell or down the gallery, & ask them did they see anything, then they pull out a inmate "Shakeem White" to question him who shows Lauerano his penis & jerks off to him for tobacco, which plaintiff never put none of these people down for witnesses, as DOCCS has cameras & audio & could have easily pulled the video, men lie, women lie, but the video/audio don't lie, & the video/audio is there to protect plaintiff as well as staff, so why was it not reviewed as part of complaint.

172. Defendant Enmerson, had made no attempt to speak to plaintiff or interview him, or do anything to protect him, & her & this OSI Chief, who is has to be a family member of the Commissioner, did absolutely nothing to protect the plaintiff or monitor him for "90" days after he made the report, which he should of never been allowed to be set up with a weapon from this aggressive, sexual predatory homosexual who was allowed to continue to sexually abuse him with these sexually suggestive statements, at pat frisk meant to intimidate & humiliate plaintiff, this creep admittedly been googling the plaintiff & stated I am discriminating against him & committing a offense, because I am opposing his sexual desires towards men, & its a hate crime, he has rights too, when its not within scope of his duties to subject plaintiff to sexual abuse for his own sick desires.

.[49].

## Failure to Protect/ Retaliation

173. On or about May 25, 2024, at 8:30am at Five Points SHU/RMHU congregate recreation, in pen # 6, defendants M. Walker knowingly & intentionally walked away from his post, & inside the building of the SHU/RMU, in order to permit another Seriously Mentally Ill prisoner to assault plaintiff, in retaliation for filing grievances & complaint against Defendant Dennis Laureano, who conspired with Defendnats Scott Defrusico to have him assaulted, which they paid the inmate with tobacco "Joshua Vasquez #21-A-1339" who later informed the plaintiff because defendant Defrusico did not keep his end of the bargain by allowing him to acquire a tobacco package, which he provided an affidavit to plaintiff. See Ex "D" Affidavit

174. The plaintiff is an elderly, legally blind, multi-disable person who ambulates with a cane, & not even suppose to be at Five Points SHU/RMHU, for many reasons described in this complaint, as it is not the most safe or integrated and appropriate place for his needs. Plaintiff requires a sighted guide due to his blindness, as he has serious disabling conditions, which makes [him] particularly vulnerable to any acts of violence, & prone to being assaulted, as he doesn't have the physical capacity to be able to adequately fight back, or defend himself.

175. The Plaintiff was viciously attacked by Vasquez, assaulted on video, which Vasquez is a seriously mentally ill prisoner, who has a known history of assaultive behavior leading up to the assault. In accordance with the affidavit provided by Vasquez, who defendants later had beaten with a lock & chain in a class-room, by another SMI, after finding the affidavit in plaintiff cell, that vasquez provided to him, which they paid that SMI, I.I. "Black Jewels" with tobacco to assault Vasquez, for putting plaintiff on notice of their actions, & providing him the affidavit attached, which resulted in Vasquez receiving 40 staples in his head, amongst other injuries, which the other inmate "Black Jewels told plaintiff they paid him with a 6 ounce bag of four Aces pipe tobacco to assault Vasquez & purposely did not lock or secureI.I. Jewels chain in the restart chair to be able to assault Vasquez with it, which Jewels beat Vasquez with the lock & chain which security staff did not respond to immediately & allowed to occur until he laid in a pool of blood, for awhile.

176. While at medical plaintiff over hear defendant Defrusico ask Hawker "whether plaintiff & Vasquez had broken up the fight", which defendant Hawker

.[50].

replied that "he didn't know, that they weren't fighting when him & other officers responded." Defendant Defrusico, the area supervisor according to DOCCS regulations #4933, "Special Housing Units" suppose to be present during SHU recreation responded O.K. I know what to do, & subsequently left.

177. Defendant Defrusico went back to his office, after allowing plaintiff to go back to his cell, where a female officer tried to come to his cell & take pictures of his face through the bars, stating they stated he had injuries to his face, which Vasquez had kicked plaintiff in the face while he was on the ground, which defendant Defrusico, suppose to had plaintiff strip down to his boxers at medical & had him turn around to see whether he had any other injuries on his body, & take pictures of him in his boxers, as part of a fight investigation, & interview plaintiff, which never occurred, which DOCCS regulations require in a fight investigation.

178. Defendant Defruisco sent defendant Laureano into plaintiff cell, who was suppose to search, however took two bottle of VO5 shampoo & dump it out all over plaintiffs bed, & legal documents, & defendant Defrusico went to his office & generated a computer written falsified MBR, alleging plaintiff was fighting, charging him with 100.13-fighting; 104.11-violent conduct; 104.13-creating a distrubance; 106.10-Direct Order; 107.10-interference, making it appear in the report that Plaintiff was the aggressor exchanging close fist punches with Vasquez, to his head & torso, when in fact plaintiff did not throw a punch or exchange any punches, & could not even defend himself from the attack due to his serious disabling condition, luckily for plaintiff they had video, or else he would of been found guilty just like at Wende, when the same thing occurred & he was jumped & beaten, & officers fabricated reports, as plaintiff would have been found guilty just based on this fabricated report, where he was a vicitim both times. Ex."D"

179. The Plaintiff seen defendant M. Hawker three days later, & asked him, "why would he falsify the MBR, that he can be fired for that, or get into trouble, & he responded by saying "defendant Defrusico falsified the reports, & signed his name, & nobody said nothing to him about it, & he didn't get into trouble, which according to DOCCS regulations & employees Manual, Defruisco knew M. Hawker had left his post, & failed to adequately supervise him, & according to state regulations. (9 NYCRR 7003.2[c][1],[3], & 7003.4, required defendant Hawker to maintain "active supervision" while prisoners are participating in outside activities to provide continuous & direct supervision by permanently occupying an established post, which Defendant Delmar, & others knew they violated, by failed to discipline them for their improper or unlawful behavior, authorizing this kind of malfeasance.

.[51].

180. Making this case even more egregious is the conspiratorial cover-up that took place after the attack by defendants, Defrusico, Hawker & Laureano, obviously lying about what happened in official governmental reports in violation of federal law. See 18 U.S.C § 1519, & Penal Law § 210.45, a misdemeanor with the tactic understanding that this area supervisor would falsify the official reports, which defendant Hawker was required to prepare in violation of DOCCS regulations #4932, "Inmates Standards of Behavior" & crime, which should have resulted in defendants termination, however defendants Martuscello, Bishop, Lowerre, & Delmar each were personally involved in & responsible for Jude's attack, because as detailed in the complaint, they have been unconstitutionally deficient in permitting assaults, excessive use of force, & sexual abuse cover-ups just like this one with impunity to continue inside the walls of DOCCS facilities.

181. Defendant Defruisco, a high ranking supervisor with first line supervision over custodial security guards knowingly & intentionally falsified reports to obscure the facts & cover-up for him & his subordinates gross negligence & deliberate indifference & callous disregard for plaintiff's life & safety, who could of possibly died, being beaten in the rec pen, who should have been on "single-rec" pen status, for vulnerability or "Vasquez," who was known to be a highly assaultive serious mentally ill prisoner who took contracts from staff & inmates for tobacco, & drugs to assault other inmates.

182. As The record will reflect, within the two span prior top the assault on plaintiff, his assailant "Vasquez" who was in prison for 'rape' of a minor, & had been involved in several upon inmates in the SHU/RMHU, which occurred either in the rec pen, or at programs, & prior to his admittance to the SHU/RMHU, which was for assault on a inmate in the mental health program in Attica, & has been in several use of forces with custodial security guards leading up to the assault on plaintiff & he was spiraling out of control due to the conditions of his confinement in the SHU/RMHU, which defendants OMH, failed to treat or protect plaintiff or staff by isolating Vasquez, or having others ways to deal with his out of control assaultive.

183. As the record will reflect, Vasquez assaultive behavior has neither abated nor moderated, but rather escalated in the weeks, & days preceding the instant assault on plaintiff, as he had committed at least five assaults under similar circumstance & week ½, prior assault a correction officer "Young" in the rec pen, & pulled out an 11 inch shank, which chemical weapons had to be deplored.

.[52].

184. As the record will reflect, prior to the assault upon plaintiff, & other I.I.'s, & staff, Vasquez, who custodial security guards is said to have paid to cause the violent attack, has been in numerous additional attacks at other facilities &, corrections as well as mental health made official notations regarding his propensities towards violence, as well as the threat he posed to others, which placed defendants on notice of the likelihood of an assault, which they allegedly arranged & therefore imposed a heighten duty to take necessary precautions, which they instituted & enforced practices & policies designed to limit I.I.'s opportunities to pursue legal activities of those who they perceived as litigious like plaintiff, as [he] was earmarked by DOCCS officials as a "trouble maker," which he was constantly hounded, & harassed wherever he went within the prison system.

185. DOCCS & OMH, was also fully aware of Vasquez's serious psychological problems, & despite that, he was still allowed to mingle amongst other vulnerable SMI, I.I.'s at programs, & congregate rec, when there was precautionary measures to deal with assaultive I.I.'s, such as isolate in 'single-rec' pen status, or transferred to an RRU, GTP, or BHU program, where there has been a determination that continuing to participate in the SHU/RMHTU presents a risk to the safety of I.I"s or staff.

186. Although there were other options for DOCCS & OMH for dealing with Vasquez, who had a history of assaultive behavior, who perpetrated five other attacks under similar circumstances, 2 of which occurred 12 days prior to the attack on plaintiff, thus the manifestation of 'deliberate indifference' was the video will show, defendant Hawker walking away from his assigned post, & Defrusico being no where around, leaving Mr. Jude unprotected in a cage, amongst seriously mentally ill dangerous prisoners, one of who was notoriously violent, who was instructed to attack plaintiff, to "scare him off" the filing of harassment, retaliation & sexual abuse complaints, violating employee's Manual 2.36, 3.1(m), which states they are to adhere to the highest standards of ethical conduct & avoid conduct that violates public trust, & section 2.1.; 4.19, on Sexual abuse.

187. Defendants displayed 'deliberate indifference' & disregarded a substantial risk to plaintiff's health & safety by arranging the violent attack to be perpetrated on plaintiff for his persistence in pursuing his protected speech, in an effort to discourage his recourse of legal actions, then falsified reports to cover-up their conduct, subjecting plaintiff to false misbehavior, & incident reports, which they have a duty to not impose unreasonable & unnecessary hardships upon the plaintiff, protecting the integrity of DOCCS, Section 3.1(m).(See Ex. of falsified reports                    .[53].

## Structure of Mental Health Care System

188. The CNYPC provides both inpatient & outpatient services to prisoners in DOCCS facilities. Inpatient services are provided at the psychiatric hospital CNYPC IN Marcy New York. Outpatient services are provided at DOCCS Correctional facilities through a system of OMH Satellite Mental Health Units, each with a catchment of correctional facilities.

189. OMH Satellite OMH units are located in 10 of the fifteen maximum security facilities, which Sullivan & Great Meadow is suppose to be closing down at the end of this year, but all level "1" facilities. OMH do not have full-time staff but operate Residential Crisis Treatment Programs ("RCTP"), which actually is not no program at all, but nothing but strip cells that serve all of the prisons within the OMH unit's catchment area, including medium & minimum security facilities. The RTCP consist of nothing but observation cells, ran by corrections, who watch the inmates through a camera within a cell, which they are not even in the area of the cells, and do not monitor the camera video footage, where prisoners are admitted & left in the cells, with nothing but a smock, a soiled dirty green tear resistant mattress, & sometimes slippers, depending on what facility your in, as Sullivan left plaintiff in a cell for (90) days walking barefoot on a cold concrete floor where he got sick.

190. Intermediate Care Programs ("IPC") are located ay maximum security facilities, which have OMH Satellite Mental Health Units. ICP's are DOCCS programs that are jointly staffed by OMH & DOCCS. Prisoners housed in ICP's have been deemed unable to function in the general population due to the effects of mental illness.

191. OMH utilizes a classification system which designates each mentally ill prisoner with an OMH "service level desigantion" of 1, 2, 3, 4, or 6. There is no level 5. A designation of "level 6" indicates that the prisoner "does not require or is appropriate for Mental Health Service, "level 4" indicates "the need for and/or interest in psychotherapy," level 3 indicates "current or future need for short term chemotherapy for minor disorders such as anxiety, moderate depression, or adjustment problems, level 2,indicates "psychiatric treatment for current prescription but not serious, prisoners in need of the highest level of care are designated a level 1, or level 1-S, which indicates Seriously Mentally Ill, SMI, medication by psychiatric nurse, & admission to CNYPC, day treatment program ("AVP" or "ICP"), or placement in a Satellite Unit bed, RMHU, BHU, or Step-Down.

.[54].

192. Plaintiff as well as others suffering from allegedly mental illness are frequently moved from one OMH needs level classification to another, from allege therapeutic housing in ICP setting to a more restrictive non-therapeutic housing & from one facility to another. Such changes often drastically & inappropriately alter the mental health treatment provided or that is available to the prisoner. For example, the plaintiff never had a mental health 1-S designation until after the passing of the HALT law, & was in SHU for years, which according to defendants the plaintiff does not have a mental health problem, & only have a "personality disoder" diagnosis, although he came to prison into DOCCS custody with his mental health & medical problem list. Which OMH give's ALL patients on the OMH case load this mental health diagnosis, specifically "African Americans" on their case load.

193. Despite their legal obligation to do so, OMH & DOCCS officials have carried out policies, practices & customs that has systematically failed & refused to consistently provide plaintiff as well as others suffering mental illness with medically necessary mental health care, including but not limited to inpatient hospitalization when needed, & intermediate level mental health care within the prisons. Even when prisoners clearly improved & benefit from treatment in a therapeutic environment, they are returned to non-therapeutic housing & even to SHU, extended confinement. As a result, & as set forth more fully below, the serious mental health needs or prisoners within DOCCS on the OMH case load are not being adequately met.

194. Plaintiff has not begun to experience any mental health issues or have any crisis until he was filing grievances & complaint about his reasonable accommodations for his blindness & DOCCS officials began to retaliate, subjecting him to be placed in SHU. OMH & DOCCS care & treatment of inmates on their case load can be characterized as rudimentary at best. Although a very large number of inmates have some character of mental disorder, very few resources have been devoted by OMH & DOCCS to the provision of mental health services & effective treatment. Professional treatment personnel are virtually non-existent at the prisons. "Treatment" there consist almost exclusively of the administration of medications, usually psychotropic drugs, to establish control over the disturbed inmates. Other options such as counseling, group therapy, individual psycotherapy, or assignment to constructive, therapeutic activities are rarely, if ever, available. Essentially, an inmate with mental disorder is ignored by unit officers until his condition becomes serious. When this occurs he is thrown in OMH observation cells (RTCP).

.[55].

195. The Plaintiff while in the SHU/RMHU, was offered medication by a psychiatrist he seen on a screen, which is assigned to the SHU/RMHTU, who sees the entire mental health case load who most refuse to come out to see the Doctor in a box who is remotely else where and not on site. Defendants do not provide meaningful mental health evaluations, For example the plaintiff was being treated in the streets, & prior to his admission to DOCCS for Schizpherina, (See. Attached. Bronx Lebanon Hospital report, as well as Federal custody medical problem list issue to DOCCS when he came into their custody medical problem list. Which evaluations lack any meaningful histories & observations.

196. At no time do OMH staff provide systematic development of treatment plans for those on their case load, which his therapist Gregory Synder at Five Points SHU/OMH, utilized as boiler-plate template for the plaintiff's treatment plan, which is used on everyone, and there is no individual assessment or treatment, psychotherapy is never offered & difficult to obtain, since virtually no professional staff is on hand to provide care. At present, Five Points OMH employs one person as a psychologist (who does not work the SHU/RMHU, but works in general population, who we do not ever see.

197. These psychologist, who form the back bone of mental health therapy is non-existent in a allege residential mental health program/unit with seriously mentally ill prisoners, cutting up, starting fires & hanging themselves calling mental health crisis every five minutes. The mentally health staff employed at Five Points would not be able to practice in the free world, we have a mental health unit Chief Defendant Dolley, who does not care about the mental health patients, who although she is obligated to make rounds, sit up in her office & ignores the SMI, I.I. in the unit she oversees, Defendant Dolley supervise plaintiff as well as others treatment, & received several e-mails about plaintiff having thoughts of suicide & his conditions in confinement, & over saw the treatment provided by staff. Further Dolley was aware of plaintiff's deteriorating mental health, but repeatedly failed to properly diagnose him, permitting his return from suicide watch directly to solitary confinement.

198. OMH has exhibited an pattern & practice of "cycling its mental health patients between solitary confinement in the SHU/RMHTU, back to mental observation in the [Residential Crisis Treatment Program], which defendants falsely placed these wholesome titles on these units, making it it appear that it is some form of treatment or program when in all actuality they are neither, but just barren cells with no furnishing, which is usually poorly clean, which there is a system wide deliberate indifference which has been a pattern involving inadequate mental health

.[56].

care which has been pointed out by Disability Advocates in their class action captioned Disability Advocates v. OMH, & DOC, which they pursued an unusual class action under the Protection for Individuals with Mental Illness Act ("PAIMI), 42 USC § 10801, et seq., which they brought the action as the Plaintiff on behalf of all mentally ill state prisoners.

199. Plaintiff has been placed in the mental health observations cells at Five Points a few times, which could have been prevented, however mental health staff are forcing inmates to go, when they can easily intervene & stop such placement, which they have started moving SMI cells once they go, placing their property in the day room un-monitored which usually items get stolen, which they are doing purposely to have the SMI patients placed in a dirty nasty poorly clean cell with a dirty nasty soiled stained mattress with blood & urine on it, so that the person can be along, in a smock, with no furnishings which they utilize as punishment for the person saying they are suicidal.

200. The SHU/RMHU's in New York State are over crowded with mentally ill patients serving extended segregation confinement, where they had to open a SHU/RMHU in a facility that never had a mental health unit, or was a level 1 care facility capable of housing mentally ill prisoners name coxsackie, which is not equipped to accommodate seriously mentally ill prisoners as they do not have no mental health unit, or observation cells and was and always an adolescent reception facility for decades, and never housed mentally disturbed persons, which the SHU/RMHTU's in New York state, is nothing more than Special Housing Units, SHU warehousing mentally ill 1-S inmates who are incapable of coping in general population.

201. Plaintiff who was placed in mental health observation was placed there because he was being abused, retaliated against,not fed, or placed on deprivations of his Expanded Vision Panel, EVP being closed because correction custodial defendants "Kemp" or "Laureano" arbitrarily had it closed in violation of the SHU directive for EVP closure for seriously mentally ill prisoners, which shall remain in a open position and not closed unless the inmates is being disruptive during movement, which then it is suppose to be temporarily close until the threat is abated, however defendants Laureano had plaintiff's EVP closed on the day he set him up with a weapon, claiming plaintiff had two spoil milks in his cell, which is not a reason you close a SMI, I.I. window, "Kemp" had it closed claiming plaintiff threaten to sue him, which is not a reason to have it closed, which it was closed for 34 days, until plaintiff began threatening suicide to Lt. Rodrick.

.[57].

202. As currently operated, all SHU/RMHU's in New York State, specifically the one at Five Points, is nothing more than an warehouse for inmates with serious mental disorders, there is no recreational therapy or individual counseling. The only treatment offered or available is medication dispensed by a nurse who makes rounds in the Unit, the Plaintiff stopped a OMH nurse "Mitchell" yesterday, & asked her could she submit a request to see mental health staff, due to it being the weekend, & she told plaintiff ask corrections to put it in, the side effects from & concerns about medication cannot be treated due to the lack of privacy, & because mental health staff who make rounds in the unit devote no time to meeting with patients.

203. Patients who suffer side effects, or feel depressed, who may believe that they no longer need medication like plaintiff often began to refused medication, nothing was done to discuss or to encourage compliance with medication regimes. Plaintiff as well as others who become non-compliant with ordered medication regimes, frequently psychiatrically deteriorate without intervention by OMH staff. The medication is usually discontinued despite their known serious mental health needs.

204. Plaintiff cannot tolerate prolong extended SHU confinement without significant, & often life-threatening exacerbation of his mental illness. Segregated confinement has had a serious adverse impact on him over the years, as he has been going to SHU confinement since 1989, & suffers from depression, schizopherina & other psychiatric disorders causing drastic decompensation, however defendants have only given him a "anti-personality disorder" diagnoses, which they have given mostly to "African American: I.I. on their case load in order for them not to have to treat them in a certain way because of their symptoms. OMH, & DOCCS, & specifically the Chief of Mental Health who are nothing but therapist themselves have persistently identifying & removing Plaintiff as well as Steven Sidbury, & others from SHU confinement, which Sidbury been in SHU since 2018, & have many more years to go, & only has been cycled back & forth from observation & CNYPC, although they are psychiatrically deteriorating as a result of the stringent conditions of SHU confinement and deprivations.

205. Having been punished with SHU sanctions & placed in confinement, plaintiff is less able to conform to prison rules due to the worsening of his mental condition. A result of the additional disciplinary consecutive SHU sanctions & deprivations.

.[58].

Insufficient Mental Health Care in SHU/RMHTU Confinement

206. Once plaintiff as well as others decompensates & becomes increasingly ill, while under SHU segregated confinement, he does not recieve the necessary hospitalization or other treatment for his mental decompensation. Him as well as others may spend lengthy periods of SHU confinement while seriously mentally ill, without receiving necessary treatment necessary or release from this punishment.

207. As a result of DOCCS, & OMH failure to provide adequate mental health care, the disciplinary housing units, including but not limited to the BHU, RMHU, Diversion Units, Step-Down housing areas of New York prisons are disproportionately filled with seriously mentally ill I.I.'s, despite the passing of the HALT Law, & DOCCS is unable to comply with the HALT law provision of only 15 days in a 30 day period, which inmates are suppose to be exempt from SHU or ineligible for any reason.

208. Because DOCCS regulations impose no upper limit on the duration from which plaintiff & others with mental illness may be confined to SHU confinement, many prisoners such as plaintiff spend months & even years under these harmful conditions, virtually untreated & with many more years to go with SHU confinement ahead of them. Plaintiff been in SHU sine 1/24/24, & has until 1/15/25 as of right now, but have been getting 15 days time cuts a month for doing packets in his cell, for incentives, which OMH & DOCCS do not provide I.I. with time cuts until after they have 60 days in the SHU/RMHU, despite them being entitled to time cuts after 30 days in accordance with DOCCS directive, & been in SHU for moths else where.

209. The serious consequences of OMH & DOCCS to restrict the placement of plaintiff as well as others similarly situated suffering from mental illness from SHU confinement & have them remove or intervene to have them removed are evident fom the disproportionate percentage or suicides committed by prisoners throughout the years while confined to SHU confinement.

210. Plaintiff due to the severity of his mental illness while confined to SHU confinement, required long term inpatient care at a psychiatric hosptial, which he is not provided with this essential care, which he sat in mental observation at Sullivan for 90 days, from 1/24/24, until March 22, 2024, when he was at Wende C.F., he also sat for (90) days in a OMH observation cell, which defendants do not have any meaningful program to provide extended psychiatric treatment. The only inpatient psychiatric facility for state prisoners is CNYP, which only has about 190 beds for a population of more than 49,000 prisoners & is operated as a short term placement only, which they operate for a one for one exchange & refused to take prisoners on the observations cells suffering acute mental illness.

.[59].

211. Plaintiff does not wish to be in a mental health program, as it limits and prevents him from being in Eastern C.F, which has a SDU, where he rather be, & is close to his family, & does not permit 1-S designated SMI inmates, but for those who a therapeutic treatment program is clinically appropriate, are barred from participating in the ICP's due to the lack of bed space, their current or prior disciplinary history, or other non-clinical reasons. Plaintiff has been told that Five Points SHU/RMHU allows SMI, I.I. to be confined there for a year, which they are not giving time cuts for sanctions, only SHU time, so therefore SMI, I.I. are being release to population on loss of all privileges.

212. Most of all the SMI patients choose to spend most of their time their cells, with few other options avi_lable and are permitted to do so, because there is really no reason to come out of our cells, due to the program consisting of mental health & DOCCS staff just showing movies. Not only is there no full-time psychologist, but there is no sociologist or psychiatrist as part of the treatment staff, merely proving sustentation & medication, & not treatment, which at that level of care, your talking about just bare maintenance, there is no treatment, which we are only being given medications & then the Doc in the Box come back every 60 days & allegedly evaluate us every couple of months & change our medications.

213. Two weeks ago, the Doc in the Box Abu Burshura called me to see her, & did not even know that the plaintiff was not taking his medications, when she asked him how the medications was working, the plaintiff stated that she should know, as she is the Doctor, doesn't she know that he wasn't taking the medication, then the Doctor looked on the screen, & seen the plaintiff was not taking the medication, & then never asked plaintiff why he wasn't taking it, but just discontinued the medications, when the plaintiff stated he did not want to have anything to do with mental health, and did not need or want to deal with mental health and rather be in the RRU at Five Points, then the RMHTU.

214. The evidence will reveal that Five Points have about Five people if that on the treatment staff, with like sixy SMI inmates, a ratio of 1:4 & about seventeen security guards. At no point does Five Points SHU/RMHU provide systematic development of treatment plans for those whose need individualize assessments. The correction officers who are being assigned to work the SHU/RMHU, are new hires, who just arrived at the facility & have no training on dealing with mental health patients and they even have on the job training officers working steady post on the units with no job experience working any where else except other facilities.

.[60].

A Cycle of Torment: Lack of Adequate Mental Health Care Results in The Placement of Prisoners with Mental Illness in SHU Confinement, Which In Turn Causes Greater Psychiatric Harm

215. Several of the SMI patients in the SHU/RMHTU that are diagnosed as having Schizopherina or as having some form of acute psychosis spent long periods of time in Extended Segregation confinement without receiving treatment for their conditions. The SMI, I.I. "Steven Sidbury #17-A-4920," the plaintiff explained to defendant Miller, the DSMH, who oversee the program about him being in SHU/RMHU since 2018, going back & forth to Central New York Psych Hospital, back to the SHU/RMHTU, & have many more years to go, which units is becoming more punitive & restrictive, & she is not doing anything to help relieve our torment, but actually making conditions worse, & she told plaintiff to "Mind his Business, & worry about himself," then turn around & not try to help the plaintiff out or relieve him of his torment.

216. DOCCS SHU/RMHTU was created after the lawsuit settlement agreement in 2011, in regards to subjecting Serious Mentally Ill, SMI prisoners to SHU confinement. DOCCS now have (3) RMHTU's in NYS at maximum security facilities, (MARCY)_: (COXSACKIE) & (FIVE POINTS), where there is over 60 SMI, I.I. at Five Points alone, who are being warehoused & are level 1-S, who are not receiving no structured therapeutic mental health programming, in an allege "mental health program," Where mental health staff are limited, only show movies, without offering any meaningful incentives to offer a patient or to encourage them to want to come out their cells or participate. The Unit Chief Defendant Dolley, meets with a patient sometimes at his request along with his therapist, but rather stay unseen hiding out in her office, while suicidal, crisis prone patients are being punished and retaliated against by DOCCS staff, which they punish for stating their feeling suicidal, instead of making provisions to counsel them, or otherwise supervise them,

217. SMI, Patients who mental disorders which cannot be dealt with on the units, a re just sent to mental observation to sit in a dirty, nasty RTCP cell, which there is so many SMI patients on suicide watch at any given time or week, that they have to be over loaded to the hospital's & on the units, which there is approximately 15 or more any any given time, on 1-to-1 suicide watch, which officers on over time have to watch, fall a sleep at their post, & CNYP has demonstrated a increase reluctance to accept patients from the SHU/RMHTU, where the patient spends days, weeks, & even months on suicide watch, suffering the effects of mental illness due to SHU confinement Syndrome.

.[61].

218. Another consequence of the limited treatment available inpatient hospital care is that acute care is rarely offered to prisoners with mental illness unless they are deemed to be an imminent danger to self or others. Severely Mentally Ill prisoners may be gravely ill & suffering, exhibiting extreme paranoia, experiencing depression or delusions, but until they actively engage in behavior to injure themselves or pose an imminent threat to others, they often are not even evaluated for admission to CNYPC or are denied admission despite their serious medical needs.

219. This failure to provide appropriate treatment in prison & to provide long-term inpatient care causes many prisoners with serious mental illness to repeatedly cycle back and forth between prison & CNYPC, like Steven Sidbury. The repeated sycyle of deprivation of adequate treatment leading to psychiatric crisis to hospitalization is extremely detrimental to individuals with serious mental illness. It often becomes increasingly difficult to restore these individuals from mentally deteriorated or psychotic state to some semblance of normal functioning, & frequently these individuals become increasingly distrustful of OMH mental health staff who do nothing to interrupt the cycle of their torment.

220. The immediate consequence of the insufficient number of available inpatient beds is two-fold: prisoners with mental illness experiencing grave psychiatric need either suffer an undue delay in admission or are prematurely discharged from CNYPC.

221. While awaiting admission to CNYPC, many prisoners with mental illness are held for twenty-four hours a day, for four and five months in secluded observation cells in the OMH Satellite Mental Health Units for evaluation due to severe psychiatric deterioration or acts of self-harm. Frequently they are held alone in these small cells for weeks waiting to see if CNYPC will eveb except them, or facility staff will send them.

222. Many prisoners like plaintiff suffering SMI, who suffer severe psychiatric deterioration & are admitted to CNYPC, are returned to prison prematurely even though they have a continuing need for inpatient care to stabilize their illness & ensure that they remain stabilized.

223. The problem of the lack of necessary inpatient beds has been so severe that at times CNYPC has operated at or above capacity on a "one-for-one" basis, wherein a facility must take a prisoner back from CNYPC in order to send one in.

.[62].

## Insufficient Mental Health Programs

224. In summary & as set forth above, the inadequacy of the mental health programs & resources to address the serious mental health needs of plaintiff as well as others is deficient across the board. There is insufficient long-term impatient care, intermediate care, & emergency care, & there is a failure to care for, or intervene to remove plaintiff and prisoners in general with serious mental illness housed in harsh confinement housing units like the Residential Mental Health Treatment Units, RMHTU's, when when confinement to these units are clearly exacerbating their illness or causing serious mental deterioration. This cumulative failure, at all levels of need, to provide adequate mental health treatment results in serious & in some cases fatal consequences for plaintiff as well as others similarly situated suffering from mental illness who psychiatric needs are not met.

225. It is a well established fact that inmates serving long term sentences in SHU are likely to decompensate due to extended periods of isolation & sensory deprivation. CNYPC Outpatient Policy & Procedure, in accordance with ACA [American Correctional Association] Standards, states that all SHU inmates are to be evaluated every 90 days for documentation according to standards. The NYS Office of Mental Health, Bureau of Forensics Services is in violation of the Commission in recognition of the 'obvious log-term effects of segregation on inmates.'

226. OMH does not have enough staff to comply with the basic standards & the overall effort to improve care management of prisoners with mental illness in SHU, there is no documentation of evaluation of prisoner safety concerns versus possible hallucinations, & documentation & follow up on referrals to security & on the results of investigations as past of the prisoners treatment plan.

227. The Medical; Review Board indicated that it is unacceptable to have a prsioner on a one-to-one watch by security without mental health intervention until the next business day.]

228. The defendants have failed to contact plaintiff as well as others mental health providers concerning the patient's history. plaintiff came to prison with a treatment plan, & diagnosi, with medications, the defendants ignored this and just gave plaintiff a diagnosis of anti-personality disorder, which personality disorder is given to not only every mental health patient, but specifically African American patients on the OMH case load, & the plaintiff does not trust OMH, or have anything to dowith OMH, and wants the 1-S designation removed & placed back at a 2 to be able to go to Eastern C.F. SDU.

.[63].

229. OMH does not track its patients & former patients in the manner recommended by Mental Health Standards. There are no procedures in place to guarantee that OMH has knowledge about triggering events in the lives of prisoners with a known history of mental illness. OMH is not routinely & systematically informed of misbehavior, disciplinary hearings & decisions, or notifications about deaths, parole decisions or immigration proceedings.

230. OMH have failed to have staff address "effective treatment in a safe environment, including timely use of the Intermediate Care Program, regardless of reception/classification status, for SMI patients with high impulsivity, history of suicide attempt, or propensity for rapid decompensation under stress. These pateints should not be placed in the RCTP, but need "enhanced supervision," "observation or precautions in a therapeutic setting."

231. OMH has failed to take recommendations to review of their policies, customs and procedures "regarding the provision of effective treatment in a safe environment; specifically, those governing timely placement in safer settings of inmates who have experienced difficulty adjusting to, or possess the potential to have problems coping with, general population for psychiatric reasons.

232. According to the State Commission of Corrctions ("SCOC") investigations of suicides, deficient mental health treatment & the stresses of SHU confinement and loss of privileges have been a significant factor leading to suicide.

233. OMH & DOCCS have persistently resisted acknowledging the deleterious effects of long-term or extended SHU confinement on the mental health of prisoners housed under those conditions, with losses of privileges and sanctions.

234. Inadequate mental health treatment in the prison results in prisoners with mental illness suffering serious psychiatric deterioration & engaging in symptomatic behaviors which may include violent or assaultive behavior; acts of self-mutilation & self-harm; attempts or acts of suicide; depression, isolation & withdrawal; failure to keep clean & other unhygienic behavior smearing feces on themselves & their cells; setting fires; screaming; hoarding or refusing food' & flooding their cells with water from the toilet.

235. These behaviors, symptomatic of serious psychiatric deterioration, violate DOCCS rules for prisoner conduct. SMI patients are frequently sentenced to periods of extended segregation confinement for engaging in such sympomatic conduct.

.[64].

236. The extraordinary length of SHU sentences imposed by New York officials 160 days average, some five to ten times longer than the 'maximum' allowable time recommended by mental health, legal & human rights experts-serves no legitimate penological justification. If fact, the overwhelming evidence from other state corrections system is that the use of punitive extreme isolation exacerbate physical violence & psychological harms for both I.I.'s & corrections staff, & that it is counterproductive to legitimate penological goals such as prison safety, deterrence, & rehabilitation.

237. Implementing procedural safeguards-for example, adopting adequate criteria designed to ensure proportionality & curtail the length of SHU sentences, avoid the risk of harm for vulnerable prisoners such as plaintiff, & provide notice to prisoner & staff of the length of SHU punishment that may be imposed for particular misbehavior-would significantly protect against the risk of erroneous deprivation of the most fundamental constitutional rights, & would not unduly interfere with defendants' legitimate interests.

238. Despite all of the above, Defendants Martuscello, Rodriguez, McGrath, McKoy, Dill, & Sullivan before them-personally authorized these policies & customs although they have the authority, ability, & ultimate responsibility to ensure DOCCS' policies, & customs do not inflict unnecessary & avoidable harm on individuals incarcerated in New York prisons. By continuing these policies & practices, these defendants are responsible for the systemic & ongoing violations of the constitutional rights of I.I.'s in New York prisons, including the harms suffered by the Plaintiff, as described more fully below.

State Prisons Are Routinely Violating N.Y.'s Solitary Confinement Law

www.nysfocus.com/2022/09/26/prisons-are-illegally-throwing prople with Disabilities

239. DOCCS has adopted internal policies at odds with HALT that allows prisons to place people with certain disabilities in solitary, New York Focus has found. Whereas HALT defined 'disability' broadly, DOCCS has crafted its own definition, prohibiting solitary only for select populations among the most severely disabled.

240. The plaintiff prior to coming into DOCCS custody diagnose of schizopherina & bipolar disorder, amongst others, however defendant OMH have always only given him the diagnoses of 'personality disorder' which has been that way for the last 30 years, amongst the mental illnesses that DOCCS qualifies as "Serious" is schizopherina & bipolar, raising questions of why mental health & DOCCS sent Jude to SHU confinement sanctions.

.[65].

241. According to DOCCS, "staff are automatically alerted" when a person they want to send to SHU confinement is a member of a "special population" or has a "serious" mental illness, thereby avoiding their placement in" solitary.

242. DOCCS claim that its parameters for solitary exempting disabilities are "based on a number of pre-existing laws & standards," as well as 'consultation' with defendants OMH. Defendants OMH told New York Focus investigative reporter that it "had discussions about HALT" with DOCCS, but "there was no discussion about the interpretation of disability in the legislation.

243. In accordance with DOCCS' regulations Directive #4932 "Standards to Behavior & Allowances" **DEFINITIONS M. "Serious Mental Illness (SMI): An incacerated individual has a SMI when they have been determined by mental health clinician to meet at least one of the following criteria:**

1. They have a current diagnosis of, or have been diagnosed at the initial or any subsequent assessment conducted during the I.I. segregated confinement with, one of more of the following types of Axis I diagnoses, as described in the most recent edition of the Diagnostic & Statistical Manual of Mental Disorders, & such diagnoses shall be made based upon all relevant clinic factors.

a. Schizophrenia (all sub-types)

b. Delusional Disorder

c. Schizopherniform Disorder

d. Schizoaffective Disorder

e. Brief Psychotic Disorder

f. Substance-Induced Psychotic Disorder (excluding intoxication & withdrawal)

g. Psychotic disorder not otherwise specified

h. Major depressive disorders

i. Bipolar Disorder I or II

244. According to the Defendants OMH, the plaintiff only has a diagnoses of "Personality Disorder" which is not even described as 'severe' or manifested by frequent episodes of psychosis of depression, that results in a significant functional impairment involving acts of self-harm or other behavior that have a serious adverse effect on life or on mental or physical health.

245. In fact, the plaintiff never had a 1-S, SMI designation until after the passing of the HALT, when he received SHU extended segregation confinement for allegedly smuggling 'paper' in the mail, due to Wende mail room allegedly placing a piece of mail under a black light & it looking as something was sprayed on it, which was sent to a lab, tested & came up negative for any substance or drugs.

.[66].
66

245. Mental health staff get frustrated with DOCCS correctional staff who mistreats & abuse patients, Defendant Dolley it is said at a treatment team meeting stated DOCCS needed to "back up off of Jude, & open his EVP window, and take him off all these deprivations," when she asked where is the deprivation order to have his EVP closed, his tablet deprived & withheld, & legal work & religious Bible, & all the paperwork in his cell confiscated and withheld, which allegedly defendant Miller ordered Defendant Dumont to do, security personnel could not produce "no deprivation order's," & there was never nothing brought up during the allege dates when the misconduct is alleged to have occurred in the treatment team meetings, or no official log entries in the log books of plaintiff covering his EVP with legal papers, or religious articles.

246. Allegedly according to directive #4932, Standards Behavior & Allowances, L. Residential Mental Health Unit ("RMHU): Housing for I.I.'s with Mental Health illnees (SMI) that is operated jointly by the defendants DOCCS & OMH, & is a therapeutic unit in nature. Such units shall not be operated as disciplinary units, & decisions about treatment & conditions of confinement shall be made based upon a clinic assessment of the therapeutic needs of the I.I. & maintenance of adequate safety & security on the unit.

247. The plaintiff is requesting that the court appoint a "special master" in this case, & make it a class action by appointing counsel with the resources available to give DOCCS & OMH a legal exercise about the law, & the constitution & I would like to make the governor a defendant in this matter, who is responisble for overseeing the DOCCS, & appoint of the Commissioner, who has his whole entire family making more than six figures a years, whereas people have jobs, titles and positions that they should not have, & are basically prevaricator lawbreakers of the worst kind liken to criminals.

248. Not only has DOCCS been sending people to solitary confinement for illegal reasons, but it ha been routinely holding people in solitary confinement for illegally long periods; isolating people with disabilities, despite HALT barring facilities from sending them to solitary confinement. Data suggest that race may also play a role in prisons decisions on whom to send to solitary; DOCCS numbers show that they're significantly more likely to send Black incarcerated people to solitary confinement than any other racial category.

.[67].

Observation Cells (RTCP)
Observation Cells (RTCP)

249. At Wende C.F. & Sullivan, defendants OMH, allowed plaintiff who had decompensated in general population, & cut his throat, arms & body parts both times in 2023, and 2024, spent more than 90 days in a Mental Health Unit nasty dirt (RTCP) cell, for over "90" days, for twenty-four hours a day, with nothing on but a tear resistant green smock, two thin mats that hardly covered his body, & no slippers, & was deprived all property & furnishings.

250. The only treatment available to plaintiff in the observation cell was medication. No rehabilitative acitivities, therapy, or programs were ever offered & basically held there until I stated I was no longer suicidal which was used as a form of torture & punishment for being mentally disturbed & suicidal.

251. Plaintiff, who was suffering from acutely serious mental illness, remained alone, almost naked, under these conditions for three months, without even ever being considered for treatment or transferred to CNYPC for mental health services in a hospital setting to get stable enough to return to general population.

252. Plaintiff, who was suffering from acutely serious mental illness remained alone and the prolonged seclusion under these conditions in the RTCP observation cell presents a substantial risk of serious harm & can cause increased disorienation, delusional thinking, paranoid thoughts, suicidal thoughts, thoughts of self harm, & due to these reasons does not trust mental health staff who seems that they do not care enough to intervene.

253. Having been illegally placed in segregated confinement & sentenced with SHU sanctions, the plaintiff was even less able to conform to prison rules, due to his worsening mental condition. As a result, plaintiff became subject to additional consecutive SHU sanctions, & other deprivations and losses of privileges.

254. Defendants OMH & DOCCS have failed to train & failing to take the simplest preventive measure to minimize RTCP admissions for its SMI patients has cause more than 20 I.I.'s to become suicidal on any given day due to the conditions of their confinement in the SHU/RMHTU, & by failing to prevent mentally ill prisoners from being placed in solitary confinement, which is known to stimulate suicidal impulses has been found to be deliberately indifferent to use the appropriate risk assessments.

.[68].

Outdated Policies

255. In Accordance with the HALT Act, the RMHTU at Five Points, & other facilities which housed SMI patients under the care, custody & control of DOCCS, & OMH, do not "all conform to the same requirements of a RRU," which plaintiff as well as others have been subjected to cruel & unusual conditions of confinement & DOCCS, & OMH have not been able to benefit from HALT's 15 consecutive-day limit, as plaintiff & others are told by OMH & DOCCS staff that in order for us to get discharged from SHU confinement, we have to spent a year in SHU extended segregation confinement, which their internal regulations also implies & states.

256. Defendants have handed out retaliatory disciplinary infractions to plaintiff & others in the SHU/RMHTU, that keep us in extended segregated confinement, & have failed to implement necessary policies & infrastructure changes sine the HALT law went into effect, & have not been accurately reporting on the departments website the number of I.I.'s being held in extended segregated confinement on any given day, & the length of time they are being held in SHU confinement, & have resorted back to their unconstitutional offending conduct which pre-date HALT"s enactment, subjecting plaintiff to cruel & unusual conditions of confinement in SHU confinement.

257. At no points does OMH provide systematic development of treatment plans, for plaintiff or others suffering mental disorders, & OMH staff are not being adequately supervised, & is being theoretically supervised on the unit by defendant Dolley who is nothing but a therapist, who does not spend any time on the unit, but stays upstairs hiding in her office. For that reason, she had little time to supervise the staff technically under her superintendence or to provide treatment to the inmates suffering from serious mental disorders being held under SHU confinement.

258. The OMH staff on the unit are inadequately trained, & most of their time consist of being in classrooms showing movies to patients, & several patients on the unit who are diagnosed with schizopherina or as having some form of acute psychosis, like 'Steven Sidbury' #17-A-4920, spend long periods of time in extended SHU confinement, without receiving treatment for their conditions, which some have been confined to SHU/RMHTU as long as 3 years, which is of little surprise that someone like plaintiff with less acute disorders have likewise been the frequent victim of medical inattention. In which the Plaintiff & others have only been provided with doses of controlled, behavior-altering drugs, which if it did not work, than that is it.

.[69].

## Mr. Judes Life IN SHU Confinement

259. Mr, Jude's life in SHU confinement first at Sullivan, then at Five points, in alleged alternative to confinement housing was nothing more than SHU confinement that pre-dated HALT, just SHU with clothing, and his life was a living hell, & drastically & severely different from his life in general population. While in general population, Mr. Jude was afforded a range of activities & freedoms that he took advantage of to prepare for life after his release. Mr. Jude attended the sensorial disable unit program, & worked on the computers for the blind, & enrolled in business law & anger management.

260. Mr. Jude also has access to social interactions & mental stimulation that helped maintain his psychological & emotional health & stability, particularly important in light of his ADD, & mental illness. Me Jude maintained family ties through regular phone calls & visits, he exercised daily at the outdoor recreation & the gym on Thursdays with the SDU program, he prepared food for himself nearly every day, he ate meals & socialized with other prisoners, & moved around the facility, visited the law library regularly, where he assisted others & obtained assistance with legal issues.

261. Mr. Jude watched the news everyday & other shows he enjoyed watching virtually everyday. He was able to have personal possessions, including his beard trimmers, hot pot, J. Pay table which contained music & games, where he was able to acquire & send e-mails and receive videos and pictures from family & friends, packages, commissary & personal grooming hygiene products.

262. facing more than a year½ in SHU confinement until June 2025, with corresponding severe sanctions, & deprivations of loss of property, cosmetics, commissary, packages, phone, religious bible, tablet, towels, food, & property, Mr. Jude experienced many of the well studied & known risks of extended SHU confinement during the 325 days confinement to SHU, with consecutive more days to go, which he spent first at Sullivan SHU/Diversion Unit, then at Five Points SHU/RMHTU, he felt bored, nervous, lonely, apathetic, lethargic, at times suicidal & often depressed, he often talked to himself, chain smoking whatever he could get his hands on, & thinking of ways that he could take his life without suffering pain, he lost weight & suffered from frequent back, leg & shoulder pain, loss his hair, & begun stressing about not being able to do as he needed for programs and

.[70].

263. appetite, & requested to start taking mental health medication to relieve the stress, tension, anxiety, hostility & depression, & suffered from insomnia of lack of sleep, & experienced painful headaches that only subsided once he felt to sleep. His blood pressure was increased, along with aggressive behavior, & extreme psychological withdrawal, which also increased his disciplinary offenses, & psychiatric commitment's to the Mental Health RTCP suicidal watch observation cells, which effects were all counter-productive to rehabilitation & are creative of serious behavioral & disciplinary problems.

264. Mr. Jude suffered from lower back & leg & foot pain, due to laying in the bed for long periods & not being able to have the appropriate footwear for his custom molded Ankle-to-Foot, Orthotics, which he was unable to attend physical therapy, although he allegedly had been approved of it, but never attended, and is said to have refused inside, but was denied. Mr. Jude was mistreated by correction officers, who violated his property, his cell & religious and legal documents, Mr. Jude was unable to take part in any rehabilitative programs, activities, classes or work, he was unable to attend religious studies & while in the SHU/Diversion he was handcuffed to take a shower three times a week.

265. Mr. Jude was provided with small portions of cold or lukewarm meals prepared by security guards delivered through a slot in the door. When his tablet was taken away, he was only permitted one 15 minute call a week on Sunday, & correction officers arbitrarily had retaliated against him for filing grievances and complaints & had his Expanded Vision Panel, EVP closed as punishment, & his reasonable accommodations were greatly curved, denied or modified and confiscated.

266. Mr. Jude experienced extreme physical discomfort from the long periods of SHU sanctions with other losses, more than the minimum required under law, & the deleterious effects & restrictive harsh restrictive disciplinary unit, in contrast to the significantly ameliorating conditions that were required to be offered in the HALT Act, which the defendants were responsible for, & now suffers from constant worry, physical, psychological & emotional effects, of current and past SHU confinement.

267. Mr. Jude suffers from profound anger that he had not previously felt, & mistreated by corrections officers "Kemp", Laureano, & his long time spent in SHU, and even longer to go, has permanently & have begun not to talk to inmates around him, & was short tempered & less able to conform or control himself, & is less able to respond appropriately to security guards, which the additional SHU sanctions is partially a result of the ongoing effects of his days in the SHU at Sullivan & Five Points.                    .[71].

**Failure to Ameliorate Solitary Confinement Conditions**

268. Defendants & high ranking policy making officials actions in implementing changes, policies & procedures have the effect of substantially defeating the objectives of the HALT Act, by failing to make the necessary changes in it's alternative to SHU's segregated housing units, which suppose to be 'therapeutic' & rehabilitative, & it's policy, practices & customs by actually making conditions worse by taking away commissary buys from every (2) weeks to once a month, making tier II hearings disciplinary sanctions 60 days, from 30 days, by implementing stages & levels again, by preventing I.I. from buying food or limiting access as a punishment, by failing to offer treatment team meeting with the patients or participants to discuss progress & benchmarks with inmates, in these so call programs, & alternatives to SHU.

269. Defendants have failed to change its outdated policies, internal rules & regulations & actually running the RRU's and RMHTU's & other allege alternative to SHU housing units, as an extension of SHU, resorting back to the parameters that caused the HALT Act to be put in place, enhancing stress, tension, anxiety, hostility & depression, & aggressive behavior, taking away the purchasing of tobacco for inmates, offering no real incentives to even want to advance or goals, by making the conditions more physically discomforting by placing more restrictive policies & procedures, by failing to fix the T.V.s in the Five Points RMHTU cells, to afford mentally disturbed inmates confined a television program to occupy their "leisure" time in their cells, & alleviate stress, offering work in the housing units, offer better privileges & incentives, stop subjecting I.I.'s to unremitting restrictions & deprivations, & harsh disciplinary sanctions & losses of privileges while under SHU confinement, to afford I.I.'s packages, & commissary while under SHU confinement.

270. Defendants have failed to offer new parameters for conditions in RRUs, stop relying on the RRU's as an extension to SHU, an adhere to RRU standards, the department does not include alternative housing units, or programs that are subject to RRU standards, stop placing people with vision, hearing & other disabilities in SHU, or issuing them SHU sanctions, especially for conduct which doesn't fall under the specific enumerated offenses in Correction Law 137(6)(k)(i).

271. The defendants are failing to train officers, & staff working in these allege alternative to SHU housing units, & units which are allege to be residential rehabilitation units, which is nothing rehabilitative about the housing units, which are being ran like punitive, restrictive disciplinary housing units.

.[72].

Medical Indifference

272. The medical staff at the Five Points SHU/RMHTU consist of one nurse 'Jill Segar' & Molly Fischer, who was or is the full-time Nurse Practitioner responsible for the primary care of over 60 SMI, I.I. on the housing unit, which Fischer & Segar do not get along with each other, & Fischer has other responsibilities within the prison system dealing with other housing units, & pop's in & out of the RMHTU on irregular basis, which procedures employed by Defendants DOCCS Health Services significantly impedes plaintiff access to adequate medical care, & services, resulting in essential medical services being denied, or unreasonably delayed, & forcing plaintiff, as well as others similarly situated to suffer needless pain./

Sick-Call

273. Of the many hurdles confronting plaintiff seeking adequate medical care, the first, almost insuperable, obstacle stands at placing a sick call request, which needs to be dropped to secure an appointment with a physician, or primary care provider who is responsible for our treatment, in which a sick-call request is submitted at night, & a single-nurse, sometimes Segar, or a traveling nurse, listen to request through a slot in the door, in front of correction officers & other inmates, at the same time dispensing medication on a cart, which contact with us is very minimal, no more than a cursory glance from inside a locked barred, cell door window, this procedure, of course, precluded any opportunity for a physical examination to determine the nature & extent of the patients ailment. Moreover, the nurse spends no more than "5" seconds in front of my door, pushing the medication cart down the gallery passing out medications to each cell.

274. During the brief span of 5 to 10 seconds is hardly time for plaintiff to even describe his aliment, which sometime's the nurse may make cryptic notes of complaints (e.g., "throat," "back," "stomach"), which was later transcribed or transmitted to somebody else, on the basis of this scanty record, assigned priorities in scheduling appointments with Fischer, our only treating physician or primary care provider responsible for our treatment. The screening process or sick call procedures, the gateway to all medical services at Five Points SHU/RMHTU, do not even approach the barest minimum standard of effectiveness. Yet neither Dr. Carol Moore, the Chief Medical Officer, & ultimate arbiter of medical policy for DOCCS, Health Services were sufficiently concerned about its efficacy to observe this operation who plaintiff wrote many complaints to about his pain & suffering & need for adequate treatment.

.[73].

275. The effects of the screening procedure were, & is devastating, which Analysis of my medical records as evidence, & the hope to be testimony of other I,I. persons in the RMHTU, who I expect to call as witnesses will reveal that delays of four to six months in achieving access to Nurse Practitioner Fisher is not uncommon, in which in plaintiff's case, he has been at Five Points for eight (8) months, has dropped numerous sick-call slips, wrote numerous grievances about his medical needs, as well as written Dr. Carol moore, & then Commissioner Anthony Annucci, more than seven letters of complaint, trying to acquire the correct treatment, be seen by a physician or someone to help me stop enduring the unnecessary pain, as a result of delay, & intentionally impeding access by defendants who have continue to chose 'an easier & less efficacious treatment plan, which has been policy, practice & custom for DOCCS Regional Medical Directors for years, allegedly to save the Department money, aggravating my degenerative serious medical condition.

276. There is a class action pending captioned (<u>Allen v. Koengismann</u>, 1:19-cv-08173-LAP, which describes in detail the treatment & medical indifference provided by DOCCS medical health care providers, to prisoners in DOCCS, care, custody & control, which complaint breaks down how the health care is administered to DOCCS prisoners, filed in the Southern District of New York, which allegations make clear, DOCCS has implemented a policy, practice & custom that demands the medical recommendations of outside specialist & treating physicians are completely dismissed or never prescribed due to almost a blanket policycausing patients to suffer the wanton unnecessarily chronic pain suffering in violation of the Eighth Amendment.

277. Defendant Fischer had knowledge of Mr. Jude's medical needs & his successful treatments of a custom Ankle-to-Foot, "AFO" & custom orthopedic footwear, to be able to fit the brace, & need for physical therapy, & pain management, because plaintiff had to sue DOCCS in 2022, due to the inadequate treatment & intentionally impeding access to medical treatment and need for a custom molded "AFO," which DOCCS medical health services consciously ignored a consultant with a specialist for a replacement AFO, which only be provided by Hanger Prosthetics, which DOCCS Regional Medical Director denied the request, without ever examining plaintiff for no justifiable reason, & instead tried to provide plaintiff an off the shelf AFO, issued by a physical therapist choosing 'an easier & less efficacious treatment plan' causing plaintiff condition to worsen, & suffering undue chronic pain, just like in this matter herein with defendants Fischer, & whoever is responsible for this current delay.

.[74].

278. The plaintiff has been unable to see defendant Fischer despite the numerous complaints, & grievances, which was intentional, due to plaintiff filing grievances & complaints, which another nurse "Waker" informed plaintiff that defendant Fischer & plaintiff had an "issue" & that plaintiff needed to apologize to defendant in order to be seen by her, & receive the correct effective treatment, which plaintiff couldn't understand what he was saying, as he did not have any personal problem with Fischer, & never seen her since he been back at Five Points, & nurse 'Jill Segar' informed plaintiff that, she has been ignoring alot of patients needs, that he need to file more grievances & complaints, that her hands were tied, as there has been substantial delays, in some cases extending several months, in scheduling doctor ordered follow up appointments or diagnostic test, resulting in repeated noncompliance with medical orders & failures to properly treat illnesses.

279. The plaintiff require custom orthopedic footwear, a pair of boots, & a pair of sneakers to be able to fit over a fiber-glass custom molded AFO leg brace, which extends from plaintiff foot, to his knee cap, which DOCCS inmates are provided a pair of sneakers and boots to wear, which plaintiff has been waiting fore more than a year ½, to be sent back out to the Hanger Prosthetics to be fitted, which for some reason DOCCS medical health services medical providers keep arranging for plaintiff to be issued over the counter, off the shelf medical boots that is issued to every DOCCS prisoner in need for medical boots, which the plaintiff is unable to wear, or fit, as they do not fit over the Fiber-glass molded boot AFO leg-brace, which defendants have been made been made well aware of on several occasions, as they even have ordered these boots, without ever seeing him.

280. The plaintiff in his grievances & sick calls & complaints, he explains in detail his need for the custom fitted footwear, which defendants have received many complaints of chronic pain, & need for physical therapy, & pain management, due to the plaintiff's condition worsening, which defendant's feel that as long as plaintiff is receiving medications for his chronic pain, & neurological issues, that he is receiving effective treatment, which defendant Fischer has allegedly arranged for P.T., which the plaintiff has never been called for to attend by DOCCS security in the SHU/RMHU, which they have documented plaintiff have refused, which he never was even notified & arranged to see a footwear provider for off the shelf allege medical footwear, without ever seeing or examining him, or scheduling an appointment, despite numerous grievances complaining about this ineffective treatment & denial of adequate care & treatment, causing plaintiff to suffering unnecessarily, & delaying access to proscribe treatment for his serious degenerating medical condition, which has been a series pattern of conduct amounting to deliberate indifference.

.[75].

181. Defendant Fischer know, about the plaintiff's condition & his needs for a custom fitted orthpedic footwear, which would be able to fit over the custom fabricated AFO leg-brace, cause she treated plaintiff in the past, reviewed his medical records when he sued DOCCS in 2022, & his Hanger Specialty care records, & had arranged for his to be sent to the Hanger clinic to be fitted for the custom AFO, which case DOCCS settled cause they tried to issue him an off the shelf AFO, & that without the orthopedic footwear, the plaintiff is unable to wear the brace, which condition causes degeneration, pain, difficulty walking, fatigue, decreased function, discomfort, neurological pain & fatigue, as plaintiff has varus, or valgus deformity.

282. Defendant Fischer know, or should know that DOCCS Medical Health Services providers have continually ordered these off the shelf footwear, which is issued by medical to all I.I.'s claiming medical issues with their feet, who's conditions is unlike plaintiff, who have a custom Orthotic Prosthetic boot like device on his left leg, which on more then (3) occasions these footwear specialist appointments have been arranged, instead of the appointment with the Hanger clinic, which plaintiff's footwear can only be provided by the Hanger Clinic Specialty care, which specializes in the design, construction, & fitting of prostheses.

283. The court should take judicial notice that defendant Fischer, his primary care medical provier has never made an appointment to examine him since he been at Five Points, or pulled him out, or arranged for follow up for pain management, or rescheduling of his physical therapy, which he needed & never was afforded, & alleged to have refused by DOCCS Five points custodial security staff, who interfered with his prescribed treatment, as plaintiff never refused any such therapy, & had been filing grievances & complaints about, which they responded to the grievances stating he was being rescheduled, which was actually never done, which plaintiff was utterly dependent upon defendant Fischer & his custodians for not only his reasonable accommodations for his serious medical condition, but also his orthopedic footwear, pain management, & P.T., in addition the plaintiff requires prescription eye wear for his legal blindness with tint, for his intolerance to light, which eye glasses was lost by DOCCS on 1/24/24, while at Sullivan, which DOCCS were to replaced in accordance with Directive #2612, at no cost to him, which Medical Department has failed to arrange an appointment for stating plaintiff is not due for eye glasses, unless he pays.

284. It is clear from the above that the Eighth Amendment forbids not only deprivations of medical care that produces physical torture, but also less serious denials which causes pain, To assert otherwise would be inconsistent with contemporary standards of human decency. Defendants have delayed & interfered with prescribed treatment by the Hanger clinic, & speciality care provider for pain management.

.[76].

285. Defendants repeated ordering or scheduling of appointments with these footwear specialist which provide off the shelf medical footwear, which plaintiff just returned a pair of boots at Sullivan, to the nurse administrator of a pair of these boots which was ordered & sent from Wende C.F. to Sullivan for plaintiff, which repeated examples of such treatment bespeak a deliberate indifference by prison officials to the agony engendered by haphazard & ill conceived procedures, which there was no justifiable reason why Fischer would make an appointment with this footwear specialist for plaintiff, when it is evident that these specific footwear providers that provide footwear to all prisoners requiring regular medical footwear.

286. On 9/3/24, the plaintiff was informed that he had an appointment to see a medical footwear specialist, which he went into the medical treatment room, & saw a bag on the floor opened up with several regular off the shelf footwear spilling out, which as soon as the footwear specialist see plaintiff's AFO boot, stated that he was unable to provide him with footwear, as he needed custom footwear, which he did not have, that he only had over the counter, off the shelf footwear, which plaintiff's medical records would have informed anyone making an appointment for him and would of seen his need for a appointment with the Hanger Speciality care clinic.

287. In fact, the single biggest impediment to even basic health care within DOCCS is the health care records, which they have poor record keeping, which allows for incomplete, in accurate & chaotic medical records, & inadequate notice procedures which has caused substantial delays, in most cases extending several months, in scheduling doctor-ordered or specialist follow up appointments & diagnostic tests.

288. Patients records are kept in two places: the paper copy ambulatory health record ("AHR") kept at the facility & an electronic rendition maintained on the Facility Health Services Database. ("FHS1"). Nurse or clerks often 'thin' a patients active file & take older materials to be stored in the inactive file.

289. If a provider, RMD, or CMO needs to consult with older specialist recommendations, diagnostic testing or results, he/she must get someone at the facility to go through the inactive file boxes & look for the relevant materials. far more often , the provider, RMD or CMO relies upon inaccurate entries on the FHS1 system. Through the FHS1 system, RMD's have limited access to plaintiffs history of specialty appointments, hospital stays, prescription histories, & medical problem list or specialist recommendations.

290. The FHS1 system entries are input at the facility &, generally are incomplete renditions of the patients medical problems, the recommendations of specialist & provider interactions.

.[77].

291. Defendant Fischer had knowledge of Mr. Jude's medical needs & his successful treatments with a custom Orthotic Ankle-to-Foot "AFO" & custom Orthopedic footwear, & she intentionally impeded access to medical care & treatment, & instead chose to ignored a consultant with a specialist for his serious medical degenerative condition that caused him pain, discomfort, & neurological pain, for no rational, justifiable reason other than to deny it because it has not only been policy, procedure & practice of DOCCS medical providers & Regional Medical Directors going on several years now, allegedly to save the Department money, which she also failed to place plaintiff on a call-out due to his filed grievances, & complaints about the need for treatment, & the need for a follow up appointment for pain management & P.T., & refused to have plaintiff, a 'legally blind' prisoner issued prescription eye glasses, which she denied without evert examining the patient., which he entitled to.

CLAIMS FOR RELIEF

First Cause of Action

(Defendants DOCCS, Martuscello, McGrath, McKoy, Loren, Rodriguez, Adams, Miller, Hodges For Violation of the HALT Act & The Eight, Fifth, & Fourteenth Amendments of the United States Constitution in their individual & official capacities)

292. As a result of the unconstitutional policies, practices, acts & customs authorized & maintained by defendants Martuscello, McGrath, McKoy, Loren, Rodriguez, Adams, Miller, & Hodges, plaintiff have suffered & continue to suffer SHU sentences that violate the HALT, & the Eighth, & Fourteenth Amendment's protection against cruel & unusual punishment. Defendants violate the rights of plaintiff as well as others with mental illness & disabilities to be free from cruel & unusual punishment guaranteed by the Eighth & Fourteenth Amendments to the United States Constitution. The Defendant's actions violate Correction Law §§ 137 (6)(h). Plaintiff seeks declaratory & injunctive relief remedying this ongoing & systemic constitutional violation.

Second Cause of Action

(Defendants DOCCS, Martuscello, McGrath, Mckoy, Loren, Rodriguez, Adams, Miller, Hodges, Dolley, Sullivan, Bishop, Helmicki, Dill, Hill, For Violation of the HALT Act, & The Eighth, Fifth, Fourteenth Amendments to the United States Constitution, Equal Protection & Due Process Clause, & Correction Law § 137[6][h]; Executive Law § 292 (21)-commonly referred to as the New York State Human Rights Law. Plaintiff seeks declaratory & injunctive relief remedying this ongoing & systemic constitutional violation.

.[78].

293. Plaintiff repeat & realleges the allegations contained in paragraphs '1' through '292' as if fully set forth herein.

294. As a result of the unconstitutional policies, practices, acts & customs authorized & maintained by defendants Martuscello, McGrath, McKoy, Loren, Rodriguez, Adams, Miller, Hodges Dolley, Sulllivan, Dill, Bishop, Hill. Plaintiff have suffered & continue to suffer SHU extended segregation sentences that violate the HALT Law & the Eighth, & Fourteenth Amendments protection against cruel & unusual punishment as guaranteed by the Eighth & Fourteenth Amendments to the United States Constitution.

295. HALT specifies that "[p]ersons in a special population... shall not be placed in segregated confinement for any length of time, except in keeplock for a period prior to a disciplinary hearing" (Correction Law § 137[6][h]).

196. As a matter of policy & practice, defendants with deliberate indifference, fail to provide prisoners with mental illness and sensorial disabilities with adequate mental health treatment & therapeutic & disability housing options necessary to treat & to prevent worsening of his disabilities.

197. As a matter of policy & practice, & with deliberate indifference to his mental and disability needs, defendants impose prolong periods of segregated confinement in SHU upon prisoners with mental illness & sensorial disabilities which lead to the deterioration of their mental illness & physical health.

198. Executive Law § 292 (21)-commonly referred to as the New York State Human Rights Law-defines disability as "(a) a physical, mental, or medical impairment resulting from anatomical, physiological, genetic, or neurological condition which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory by others as such an impairment...

199. By imposing periods of prolong extended segregated SHU confinement without regard to the deleterious effect that it will have on plaintiff's mental & physical health, defendants acts with deliberate indifference to the substantial risk of serious harm to plaintiff as well as others similarly situated with mental illness, & medical anomalies with impair bodily integrity.

200. If Defendants are not enjoined & restrained from violating the Federal & State Law, of the United States, plaintiff will continue to suffer irreparable harm. by subjecting plaintiff to conditions of confinement that constitute solitary confinement, & permanently enjoining Defendants from violation the Constitution & § 137 (6)(h) in this matter.

.[79].

Third Cause of Action

(Declaratory & Injunction Relief Against Defendants Martuscello, McGrath, Loren, Rodriguez, Miller, Hodges, Bishop, Hodges, Hill, Delmar, for Violation of the Due Process & Equal Protection Clause & the HALT Act

201. As a result of the unconstitutional policies, practices, acts & customs authorized & maintained by defendants Maruscello, McGrath, Loren, Rodriguez, Miller, Hodges, Bishop, Hodges, Hill Delmar. Plaintiff has suffered & continue to suffer SHU sentences that violate the Due Process Clause of the Fourteenth Amendments.

202. DOCCS & OMH have continuing policies that define which disabilities the agency considers to fall the scope of HALT. The DOCCS & OMH Solitary Policies authorized Defendants to place plaintiff as well as other people with disabilities in solitary confinement despite New York state law barring Defendants from doing so.

203. Solitary confinement involves punishing plaintiff as well as others by separating him from general population & subjecting them to harsh conditions of confinement, severe deprivations, & losses of privileges, & forced idleness, solitary deprives people of meaningful human interactions & mental stimulation, causing severe, long lasting, often irreparable harm.

204. Lawmakers banned solitary confinement for people with disabilities like plaintiff. But the State prisoner agency and its officials has crafted its own policies.

205. For Decades DOCCS imposed extended solitary confinement sanctions & other severe loss or privileges with virtual impunity, exercising broad discretion to subject plaintiff as well as others to lengthy solitary confinement for even relatively minor infractions. DOCCS typically impose this extended confinement in special housing units, ("SHU") where individuals has not meaningful access to rehabilitation or other programming & frequently suffered physical & mental decmpensation worsening of his condition.

206. Defendants violate the HALT, which has federal and state implications of also violating the constitution by subjecting plaintiff as well as others to cruel & unusual punishment, & other constitutional vioaltions, by "failing to perform a duty enjoined upon [them] by law." And their promulgation of & adherence to the Extended Segregation Policy, was & is "affected by an error of law." & "arbitrary & capricious" & an abuse of "authority & discretion." By imposing periods of prolong segregated confinement against plaintiff & others who are exempt from any form of solitary confinement who has a serious mental illness or blindness, which limits their authority to cause plaintiff "significant atypical hardship."

.[80].

Fourth Cause of Action

Violations of the Americans with Disabilities Act (ADA) &
Section 504 of the Rehabilitation Act (Section 504)
Department of Corrections & Community Supervision, (DOCCS); Defendants Hill
OMH; Miller, Jane or John Doe, Loren, McKoy in their
official capacities.

207. Plaintiff repeats & realleges the allegations contained in paragraphs '1' through '206 as if fully set forth herein.

208. Plaintiff is a qualified individual with a disability as defined in the ADA & Section 504 of the Rehabilitation Act. He has mental, & physical impairments that substantially limit's one or more major activities or daily living, including not not limited to thinking, seeing, walking, concentrating, & interacting with others. His medical records documents such impairments, & he is acknowledged as having such an impairment. As a state prisoner Mr. Judes meets the essential requirements for the receipt of services or the participation in programs, activities, or services provided by Defendants DOCCS & OMH, 42 USC §§§§ 12102; 42 USC 12131; 29 USC 794; Executive Law (21).

209. Defendants DOCCS & OMH are public entities as defined under U.S.C. § 12131(1)(B).

210. Defendants Discriminate against mentally ill, & sensorial disable legally blind individuals by failing to provide alternative punishments as reasonable accommodations so that punishments which exacerbate mental illness are not imposed, & that individuals with disabilities do not continue to suffer sentences of SHU by defendants. Defendants discriminate by failing to establish a RRU in one of the SDU designated facilities, & by failing to establish policies, practices & directives which exempt prisoners with serious mental illness, wtc from the stringent conditions of solitary confinement in accordance with the HALT Law.

211. Plaintiff can base his discrimination claim based on 'three available theroies: (1) intentional discrimination (disparate treatment); (2) disparate impact; & (3) failure to make a reasonable accommodation. In addition to outright denial of a reasonable accommodation, "[a] delay in providing a reasonable accommodation violates the ADA. The requested a non-frivolous accommodation, which should not have been denied without an individualized inquiry into the seriousness. Wright v, NYS DOCCS, 831 F.3d 64, 78 (2d Cir. 2016); Moreover, "Title II & Section 504 require [d]efendants to provide safe housing to disable & non-disable inmates alike, & discriminates against disable prisoners soley on the basis of their disabilities in violation of Section 504, 29 U.S.C. § 794; 42 U.S.C. § 12132.

.[81].

## Fifth Cause of Action

Monetary Relief Against Defendants Hearing Officers & Administrators for Violations of Due Process, & Eighth & Fourteenth Amendments to the United States Constitution, defendants Adams, Helmicki, Bishop, Bondarenka, Hodges, Delmar, Hodges, Martuscello, Rodriguez, in their individual capacity

212. Plaintiff repeats & realleges the allegations contained in paragraphs '1' through '211.'

213. The defendants either conducted Tier III Superintendent hearings , & violated clearly established constitutional rights under the Constitution of the United States & the State of New York, & The HALT Law, & Executive Law § 292 (21)-Human Rights Law, when they violated the fundamental due process rights at the hearing of the plaintiff & imposed illegal SHU sanctions, & then authorized & enforced prolong, consecutive extended segregated confinement with SHU & other oppressive sanctions.

214. Defendants violated clearly established due process rights of the plaintiff, causing him to be placed in SHU, denied free use of the law library, SDU, SDP, commissary, packages, phones, communication privileges, proper accommodations, programs, services & activities, & anything other than basic necessities, causing him atypical hardship in relations to the ordinary incidents of prisoner life.

## Fifth Cause of Action

215. ( Physicians & Mid-Level Clinicians send their patients to consultants & specialty care providers when the physicians & Mid-Level Clinicians are not skilled to treat a patients particular condition, & Defendant Fischer showed deliberate indifference to Health & Safety-Policy Implementation & Enforcement)

215. Consultants & specialty care staff & physicians examine the patients, perform the necessary testing, & make recommendations for the patients care, which are then reviewed by physicians & Mid-level Clinicians.

216. Defendant Fischer N.P., sought to prohibit & restrict plaintiff from having custom orthopedic footwear in order to wear with my custom molded AFO, even when it was medically necessary, & prescribed, & refused to examine or treat plaintiff, or send him to the Hanger Clinic Specialist request, instead she sought to arrange the 3rd appointment for a footwear provider which providers over the counter, off the shelf medical footwear, which was wholly inadequate, ineffective, who is unqualified to provide plaintiff custom orthopedic footwear, to fit over his AFO device, leaving plaintiff to suffer unnecessary chronic pain, & condition to worsen & deteriorate, deliberately ignoring & delaying access to treatment.

.[82].

Six Cause of Action
Violations of Equal Protection & Racial Discrimination

217. Defendants violate the Equal Protection Clause, & Racial Discrimination by treating African Americans differently during the disciplinary process subjecting them to long extended sentences in the SHU, then other ethnic groups, & OMH always give African Americans "Anti-Personality" disorders so that they do not have to deal with them differently then other more serious mental health illnesses, and by treating legally blind prisoners differently from persons with out legal blindness or mental illness, who are offered better incentives, privileges, housing opportunities, programs, services, activities, advantages, aids, incentives, treatment, therapy, sanctions, whereas defendants excluded the plaintiff from participation in the Sensorial Disable Unit, SDU, program's & services, facility.

Seven Cause of Action
42 U.S.C. § 1983-Failure to Protect-Discrimination
Sexual Abuse, Harassment, Retaliation, PREA
(Against Defendants Defrusico, Delmar, Dolley, Miller, Laureano, Hawker, Emerson Dumont,Kemp, Martuscello, Hodges, Bishop)

218. Plaintiff repeats & realleges the allegations contained in paragraphs '1' through '217'

219. The aforesaid acts by defendants Defruscio, Delmar, Dolley, Miller, Lureano, Hawker, Emerson, Martuscello, Hodges & Bishop, were undertaken as a part of a policy, practice & custom to discriminate against handicap person, In May 2004, plaintiff filed grievances & complaints against defendant Dennis Laureano, which escalated into sexual harassment & retaliation, which plaintiff filed more than four sexual harassment complaints without being protected from continuing to be targeted, or retaliated against, upon information & belief defendants arranged for plaintiff to be set up with a weapon, assaulted by a dangerous seriously mentally ill prisoner, & failed to protect him, then falsify reports to cover-up their deliberate indifference of failing to protect the plaintiff, who was viciously attacked in a recreation pen from which an officer intentionally walked away from.

220. Nonetheless, defendants did nothing to protect the plaintiff specifically on May 25, 2024, plaintiff was placed in a cage to be viciously attacked on camera while staff knowingly & intentionally walked away, when he was required by law to stay on his post, & provide constant supervision during outside activities of prisoners in his care, custody & control & they breached that duty horribly.

.[83].

221. On May 2024, Defendants Hawker, Defruisco, Laureano, & Kemp upon info & belief, paid Vasquez to assault the plaintiff, called him a "snitch' knowing full well that calling a prisoner a "snitch" whether true or not placed Mr. Jude in imminent danger.

222. Instead of following proper protocol, defendant Defrusico failed to be present in order to supervise the rec run, defendant Hawker failed to maintain his assigned post, along with Laureano & allowed the legally blind elderly plaintiff along in a cage amongst other dangerous seriously ill assaultive prisoners serving SHU sanctions in a disciplinary housing unit.

223. When "Vasquez," viciously attacked Mr. Jude, defendants were no where to be found on video, was not at their assigned post, not providing active supervision, or present, then have the audacity to lodge false disciplinary charges against plaintiff in retaliation for his failure to cease filing grievances & complaints.

224. Defendant's knew, or should have known that SMI, I.I. person Vasquez, was particularly prone to assaulting other prisoners, & should have known that plaintiff was prone to being assaulted, & very vulnerable due to his disabilities, & needed specialized protection & should have been placed on "single" rec-pen status.

225. Defendant Dennis Laureano went into plaintiff cell subsequently afterwards on 6/28/24, allegedly for a random search, when plaintiff cell was just searched on 6/23/24, & after he filed his 3rd PREA complaint & 2nd retaliation & harassment, which Laureano left his assigned post, went into plaintiff cell along with another officer "Guarando," who also worked another post, recreation which was being ran & claimed he found a shank in his cell in his legal work.

226. Defendant failed to prevent Defendants Jeffery Kemp, or Dennis Laureano from retaliating against me, Kemp for writing a MBR for stating plaintiff was going to sue him, & Laureano, from the continued harassment, sexual abuse & harassmentm, which the plaintiff was suppose to be monitored within (90) days after filing the complaints, after making the difficult decision to come forward with the PREA, which Laureano & Kemp acted outside the scope of their duties, & continued to target plaintiff for harassment, & retaliation, which they allowed false disciplinary charges to be lodged against the plaintiff on three different occasions, without adequately protecting the plaintiff, especially after the impermissible sexual conduct & abuse, which defendants facilitated & was aware of, but turned a blind eye to, & allowed Kemp to continue to harass & retaliate against plaintiff placing him on deprivations & alowing him to violate his property in his cell, which plaintiff still want blood from Kemp.

.[84].

Eighth Cause of Action

(Deprivation of Federal Civil Rights)
(General Allegations, Fourth, Fifth, Fourteenth & Eighteenth Amendments)

227. By their policies, practices & acts, defendants violate rights of prisoners with mental illness to be free from cruel and unusual punishment as guaranteed by the Eighth & Fourteenth Amendments to the United States Constitution.

228. As a result of the unconstitutional policies & customs authorized & maintained by defendants Commissioner Martuscello, & Rodreiguez, the named plaintiff have suffered & continue to suffer SHU sentences that violate the Eighth Amendment's protection against cruel and unusual punishment. The plaintiff see declaratory & injunctive relief remedying these ongoing and systemic constitutional violations.

229. Defendants failure to provide plaintiff with handicapped housing, reasonable accommodations or any assistance with his daily living needs, safe housing, auxiliary aids and assistive devices, failure to provide sanitary & safe living conditions & basic human needs, including but not limited to handicapped shower chair, mobility guide, large print, mobility cane,m support cane, properly trained correctional staff, and appropriate access to medical care and treatment, and participation in the sensorial disable unit, and sensorial disable programs benefits, services, & activities, constitutes such punishment & deliberate indifference has caused plaintiff to endure substantial and unnecessary discomfort, pain and humiliation and physical injury.

230. Defendants are aware that plaintiff is being deprived of his constitutional rights to be free from punishments and/or cruel and unusual punishments and either actively participating in the deprivation, failed to remedy the deprivation after being informed of the violations through reports, e-mails, an//d/or grievances, calls, policies or customs under which unconstitutional practices have occurred, allowed the continuance of such policies or customs, were grossly negligent in supervising subordinates who committed wrongful acts and/or exhibited deliberate indifference to plaintiff's rights by failing to respond appropriately indicating that unconstitutional acts were occurring.

231. In retaliation for plaintiffs complaints, grievances and/or filing of a civil action defendants have removed plaintiff from handicapped housing, denied him medical treatment, reasonable accommodations, increasingly hindered access to handicap housing, & adequate medical care, have subjected plaintiff to cruel and unusual punishment, all in violation of the plaintiffs right to petition the government for redress of grievances under the First Amendment to the United States Constitution.

.[85].

232. DOCCS policies and customs put plaintiff at risk of a SHU sentence for a simple misunderstanding between a prisoner and a correction officer. These policies put prisoners at risk of a lengthy SHU sentence for a good-faith mistake in complying with one of DOCC's many regulations. Prisoners can, and are sent SHU for a momentary hesitation in immediately obeying a direct order, a significant risk for prisoners with mental health diagnoses, like Mr. Jude, who illness makes it more difficult for him to comply with correction officers demands. Given DOCCS policies & customs permitting a disciplinary conviction and SHU sentence based on the contested testimony of a single correction officer, prisoners are at risk of SHU confinement for doing nothing culpable at all.

233. All of the aforementioned acts deprived plaintiff of the rights, privileges, and immunities guaranteed of the United States by the Fourth, Fifhth, & Fourteenth Amendments to the U.S. Constitution, including but not limited to:

a. a right to be free from SHU confinement.

b. the right to be free from sexual abuse, or harassment.

c. the right to be free from wrongful confinement.

d. the right to be free from lodging false disciplinary charges against him by correction officers in retaliation.

e. the right to be free from abuse of authority and process.

f. the right to be free from deprivation of liberty without due process of law,

g. the right to equal protection, privileges & immunities under the laws.

h. the right to be free of risk of unjustified SHU confinement.

i. the right to be adequately protected.

234. The plaintiff seeks monetary relief for the violation of his Eight Amendment rights against the following hearing officers and superintendents, Mr. Rodriguez, Superintendent Bishop, CHO Adams, SORC Helmicki, Bondarenka, Hodges, Delmar, Bennet, for the clearly established constitutional rights when they personally imposed and authorized and enforced SHU sentences that violated the Eighth Amendment, for the 365 days he stayed in SHU from 2022 until 2024.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully request that this court enter judgment in his favor as follows:

(A). Declare that Defendants acts, omissions, policies, customs, practices of the Defendants with regard to plaintiff violate the tenets of the HALT Law, & his rights under the Due Process and Equal Protection Clause, & the Eighth & Fourteenth Amendments to the U.S. Constitution; th Americans with Disabilities Act of 1990, 42 U.S.C. § 12131; the Rehabilitation Act, 29 U.S.C. § 794

.[86].

(B). Enter permanent injunctive relief, in the form of policies, procedures, training, supervision, & monitoring, requiring defendants Martuscello to immediately transfer the plaintiff to Eastern Correctional Facility after defendants OMH removed the S-designation to afford the plaintiff safe disability housing close to his family to get visits from family & friends, & to end the ongoing HALT law and constitutional violations, and not send plaintiff to another SHU/Diversion Unit, or SHU/RMHTU, to serve any illegal SHU sentences.

(C). Enter permanent injunction relief prohibiting DOCCS from placing plaintiff in any form of segregated confinement, and wiping away the disciplinary sanctions where he was set up with a weapon, and retaliated against, which plaintiff also want defendants to cease retaliating against him.

(D). enjoin Defendants, their agents, officials, employees, & all persons acting in concert with them, under color of State law or otherwise, from continuing the unconstitutional & illegal acts, conditions, & practices described in this Complaint.

(E). appoint an independent mental health professional or special master to assess the treatment & housing needs of prisoners with mental illness & who is authorized to preclude placement of prisoners with mental illness into SHU confinement housing areas, or alternative such as RMHTU.

(F). Order Defendants, their agents, officials employees, and all persons acting on concert with them, under color of State law or otherwise, to take all necessary steps to:    (Remove The Mental Health level back to a II-& Remove the S- So I can be Eastern.SDUcreate sufficient hospital bedspace to provide short-term & long-term inpatient treatment for prisoners with mental illness in need of inpatient care;

ii. provide sufficient mental health treatment programs & services to prisoners with mental illness in state correctional facilities, including expanded intermediate residential mental health services housing & alternative housing so that prisoners with mental illness are not housed in the SHU/RMHTU or other counter therapeutic settings;

iii. Order defendants to remove the mentalhealth"S" designation to be able to be transferred to Eastern Correctional where it is safer for the plaintiff and has an SDU, and is close to the plaintiffs family & won't be a burden on them;

231. Award compensatory and punitive damages.

232. Awarding Plaintiff reasonable attorney's fees, costs, disursements, & other litigation expenses, pursuant to 29 U.S.C. § 794(b), 42 U.S.C. § 12205, & 42 U.S.C. § 1988(b) .

233. Ordering such other & further relief as the court may deem just & proper.

.[87.].

VERIFICATION

I Steven Jude affirm this 12th day of October 2024, under the penalties of perjury under the laws of New York, which may include a fine or imprisonment, that the foregoing is true, and I understand that this document will be filed in an action or proceeding in a court of law.

I am the Plaintiff in the within action, that I have read the foregoing complaint and knows the contents thereof; that the same is true to complaintants's own knowledge, except as to matters stated to be alleged on information and blief and as to those matters complaintant believes to be true.

Pursuant to 28 U.S.C. § 1746, I hereby declare under the penalty of perjury that the foregoing is true and correct.

Dated: October 12, 2024

Sworn to before me this
13th day of Oct, 2024.

Tyler Chase
Notary Public

TYLER CHASE
Notary Public - State of New York
No. 01CH6381894
Qualified in Seneca County
My Commission Expires October 15, 2026

JS 44 (Rev. 10/20)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Steven Jude

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Pro Se

## DEFENDANTS

NY DOCCS, et al

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

**24 CV 1001**

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☐ 1  U.S. Government Plaintiff | ☒ 3  Federal Question *(U.S. Government Not a Party)* |
| ☐ 2  U.S. Government Defendant | ☐ 4  Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                           *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*          Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY**      **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane   ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product        Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | Liability   ☐ 367 Health Care/ | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel &        Pharmaceutical | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| & Enforcement of Judgment | Slander        Personal Injury | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers'        Product Liability | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted | Liability   ☐ 368 Asbestos Personal | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and |
| Student Loans | ☐ 340 Marine        Injury Product | | ☐ 880 Defend Trade Secrets | Corrupt Organizations |
| (Excludes Veterans) | ☐ 345 Marine Product        Liability | | Act of 2016 | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment | Liability   **PERSONAL PROPERTY** | **LABOR** | | (15 USC 1681 or 1692) |
| of Veteran's Benefits | ☐ 350 Motor Vehicle   ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards | | ☐ 485 Telephone Consumer |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle   ☐ 371 Truth in Lending | Act | **SOCIAL SECURITY** | Protection Act |
| ☐ 190 Other Contract | Product Liability  ☐ 380 Other Personal | ☐ 720 Labor/Management | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal        Property Damage | Relations | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ |
| ☐ 196 Franchise | Injury   ☐ 385 Property Damage | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | Exchange |
| | ☐ 362 Personal Injury -        Product Liability | ☐ 751 Family and Medical | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| | Medical Malpractice | Leave Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS**   **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights   **Habeas Corpus:** | ☐ 791 Employee Retirement | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information |
| ☐ 220 Foreclosure | ☐ 441 Voting   ☐ 463 Alien Detainee | Income Security Act | ☐ 870 Taxes (U.S. Plaintiff | Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment   ☐ 510 Motions to Vacate | | or Defendant) | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/        Sentence | | ☐ 871 IRS—Third Party | ☐ 899 Administrative Procedure |
| ☐ 245 Tort Product Liability | Accommodations  ☐ 530 General | | 26 USC 7609 | Act/Review or Appeal of |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities -  ☐ 535 Death Penalty | **IMMIGRATION** | | Agency Decision |
| | Employment   **Other:** | ☐ 462 Naturalization Application | | ☐ 950 Constitutionality of |
| | ☐ 446 Amer. w/Disabilities -  ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | State Statutes |
| | Other   ☒ 550 Civil Rights | Actions | | |
| | ☐ 448 Education   ☐ 555 Prison Condition | | | |
| | ☐ 560 Civil Detainee - | | | |
| | Conditions of | | | |
| | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | | |
|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer | ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
1983 Prisoner Civil Rights

Brief description of cause:

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
**JURY DEMAND:**   ☐ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*      JUDGE _____   DOCKET NUMBER _____

DATE _____      SIGNATURE OF ATTORNEY OF RECORD _____

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE LJV   MAG. JUDGE LGF

Steven Jude DIN# 17-A-0890
Five Points Correctional Facility
Caller Box 400, Route 96
Romulus, NY 14541

USDC - WDNY
OCT 18 2024
BUFFALO


UNITED STATES
POSTAL SERVICE®



Retail

14202

RDC 03    2 Lb 15.20

EXPECTED DELIVERY DAY:  10/18/24

USPS TRACKING® #



9505 5151 8307 4290 3861 31

TO : UNITE
ROBERT H. JA
WESTERN DIS
2 NIAGARA S
BUFFALO, N


LEGAL MAIL

L

Steven Jude DIN# 17-A-0890
Five Points Correctional Facility
Caller Box 400, Route 96
Romulus, NY 14541

USDC - WDNY
OCT 18 2024
BUFFALO

Retail



14202

RDC 03    2 Lb 15.20

EXPECTED DELIVERY DAY: 10/18/24

USPS TRACKING® #



9505 5151 8307 4290 3861 31

TO: UNITE
ROBERT H. JA
WESTERN DIS
2 NIAGARA S
BUFFALO. N



LEGAL MAIL

L



ve Points

neopost
10/15/2024
US POSTAGE $011.95⁰

PRIORITY MAIL
IMI

U.S. POSTAGE PAID
PM
ROMULUS, NY 14541
OCT 16, 2024

$0.00

Oz  S2324P506586-01

D STATES DISTRICT COURT

CKSON UNITED STATE COURTHOUSE

TRICT OF NEW YORK

SQUARE

NEW YORK 14202

LEGAL MAIL



EGAL MAIL "