Exhibit A

NEW YORK STATE DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION

Sullivan _____ **Correctional Facility**

## INCARCERATED INDIVIDUAL MISBEHAVIOR REPORT ♦ INFORME DE MAL COMPORTAMIENTO DEL INDIVIDUO ENCARCELADO

| 1. NAME OF INCARCERATED INDIVIDUAL (Last, First) ♦ NOMBRE DEL INDIVIDUO ENCARCELADO (Apellido, Nombre) | DIN | HOUSING LOCATION ♦ CELDA |
|---|---|---|
| Jude Steven | 17A0890 | ON 143 |

| 2. LOCATION OF INCIDENT ♦ LUGAR DEL INCIDENTE | INCIDENT DATE ♦ FECHA | INCIDENT TIME ♦ HORA |
|---|---|---|
| Clinic Room #1 | 1/24/24 | 8:30 AM |

**3. RULE VIOLATION(S) ♦ VIOLACIÓN (ES)**

106.10 direct order

102.10 Threats

**4. DESCRIPTION OF INCIDENT ♦ DESCRIPCIÓN DEL INCIDENTE**

On the above date and approximate time I, C.O Murphy, was escorting I/I Jude 17A0890 in the Clinic. During the escort I gave I/I Jude a direct order to sit in a chair in exam room #1 to which he did not comply. A use of force ensued (U.O.F # 24-014). During the use of force I/I Jude made a very clear verbal threat "I have AIDS and I'm going to spit in your face Murphy!" A spit net was applied at the direction of Sgt. Wilson with the authorization of the Watch Commander.

Jude threaten to spit in officer face who used force on him for failing to obey a direct order + Continuing using force ~~threaten to spit is not a 137 (6)(k)(i) offense.~~

| REPORT DATE ♦ FECHA | REPORTED BY ♦ REPORTADO POR | SIGNATURE ♦ FIRMA | TITLE ♦ TÍTULO |
|---|---|---|---|
| 1/24/24 | J. Murphy | | |

**5. ENDORSEMENTS OF OTHER**

Case 1:24-cv-01001-LJV-JJM   Document 1-1   Filed 10/18/24   Page 2 of 71

2. _____

3. _____

**NOTE: Fold back Page 2 on dotted line before completing below.**

DATE AND TIME SERVED UPON INCARCERATED INDIVIDUAL _3/22/24 @_

FECHA Y HORA DADO AL INDIVIDUO ENCARCELADO _____

NAME AND TITLE OF SERVER _C.O. K. Stauch_

NOMBRE Y TÍTULO DEL QUE ENTREGA _____

You are hereby advised that no statement made by you in response to the charges or information derived therefrom may be used against you in a criminal proceeding. ♦ Por este medio se le informa que no se puede usar ninguna declaración hecha por usted como respuesta al cargo o la información derivada de ella en una demanda criminal.

## NOTICE ♦ AVISO

## REVIEWING OFFICER (DETACH BELOW FOR VIOLATION HEARING ONLY)

You are hereby notified that the above report is a formal charge and will be considered and determined at a hearing to be held. ♦ Por este medio se le notifica que el informe anterior es un cargo formal el cual se considerará y determinará en una audiencia a celebrarse.

The incarcerated individual shall be permitted to call witnesses provided that so doing does not jeopardize institutional safety or correctional goals. ♦ Se le permitirá al individuo encarcelado llamar testigos con tal de que al hacerlo no pondrá en peligro la seguridad de la institución ni las metas del Departamento.

If restricted pending a hearing for this misbehavior report, you may write to the Deputy Superintendent for Security or their designee prior to the hearing to make a statement on the need for continued prehearing confinement. ♦ Si está restringido pendiente a una audiencia por este informe de mal comportamiento, puede escribirle al Diputado del Superintendente para Seguridad o su representante antes de la audiencia para que haga una declaración acerca de la necesidad de continuar bajo confinamiento, previo a la audiencia.

Distribution: WHITE - Disciplinary Office CANARY - Incarcerated Individual (After review) ♦ Distribución: BLANCA - Oficina Disciplinaria AMARILLA – Individuo Encarcelado (después de la revisión)

NYS DEPT OF CORRECTIONS & COMMUNITY SUPERVISION          PAGE    6
Sullivan                    CORRECTIONAL FACILITY

SUPERINTENDENT HEARING DISPOSITION RENDERED

DIN: 17A0890  NAME: Steven Jude                      HEARING DATE: 4/5/24

INCIDENT DATE: 01/24/24          TIME: 8:35 am          TIER: 3

G. PURPOSE(S) OF CONFINEMENT SANCTION IMPOSED (IF ANY) - SET FORTH ALL THAT APPLY:

1. INCAPACITATION(Include the specific behaviors that posed a threat to the safety
      of staff or other incarcerated individuals):

No incarcerated individual should threaten a correction officer over not being allowed to violate the procedures and protocols of the facility. That I/I Jude would tell CO Murphy that they were going to spit in CO Murphy's face if CO Murphy didn't comply with I/I Jude's orders is reprehensible and represents a significant and heinous risk to the safety of the staff of the facility and the facility's ability to operate in an orderly manner. I/I Jude's attempt to place C.O. Murphy in fear for his safety requires a confinement sanction that prevents I/I Jude from attempting to cause serious physical injury to staff in order to assert their dominance over the staff of a correctional facility. I/I Jude must learn that the rules and orders of the facility must be followed and that they are not free to disregard the rules simply because they do not like or agree with them.

2. DETERRENCE:

This sanction is sufficiently severe to hopefully deter I/I Jude from threatening or harming staff in the future.

*For threatening to spit she gave plaintiff a sufficiently severe SHU sentence which doesnt fall under 137 (6)(k)(ii) The seven enumerated offenses which would result in SHU confinement*

3. FAIRNESS:

This sanction is appropriate considering I/I Jude's mental health at the time of the incident, the nature of the offense, the heinous and destructive risk to staff that I/I Jude's conduct represented, and the strong likelihood that I/I Jude was going to carry out their threat against CO Murphy.

NEW YORK STATE DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION

**Special Housing Unit (SHU) Custody Review**

Form 2170SHU (07/22)
Photocopy Locally as Needed

Sullivan _____ Correctional Facility

Name: Jude, Steven _____ DIN: 17A0890 _____ Review Date: 02/21/2024

Date placed in SHU: 01/24/2024 _____ Date hearing held: Pending _____

**A. Summary report of the facility three-member committee:**

02/21/20.
Date

Reasons why incarcerated individual was initially determined to be appropriate for SHU :
Refusing a Direct Order.
Threats.

Information on whether there is a continuing need for separation from the general population:
To prevent I/I Jude from making threats or refusing any further direct orders.

Other factors which may favor retaining in or releasing the incarcerated individual from SHU :
Continued placement in SHU is appropriate at this time.

| ORC Hutchins | Sgt. Wilson | DSS Sherman | 02/21/2024 |
|---|---|---|---|
| Offender Rehabilitation Coordinator | Security Supervisor | Committee Chairperson | Date |

**B. Decision of the Superintendent:**

☐ Release from SHU.

☒ A determination has been made to continue your SHU confinement for the following reasons:

After further review, continued SHU confinement will be implemented to prevent I/I Jude from making any further threats or refusing direct orders.
I concur with the Committee's determination.

Prior to your next SHU custody review, you may write to the Superintendent or designee to make a statement regarding the need for continued SHU confinement. The reason(s) stated in this notice, any written statement that you submit, as well as your overall custodial adjustment will be considered during the next scheduled review.

Your next SHU custody review is scheduled for: 02/28/2024

_____  2/22/24
Superintendent                        Date

*Attach incarcerated individual's statement(s) and additional pages as necessary*

DISTRIBUTION: ORIGINAL    INCARCERATED INDIVIDUAL
              COPY        DISCIPLINARY
              COPY        ADS PREA COMPLIANCE MANAGER

NEW YORK STATE DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION
**Special Housing Unit (SHU) Custody Review**

Form 2170SHU (07/22)
Photocopy Locally as Needed

_Sullivan_ _____ Correctional Facility

Name: _Jude, Steven_ _____ DIN: _17A0890_ _____ Review Date: _3/6/2024_

Date placed in SHU: _01/24/2024_ _____ Date hearing held: _Pending_

**A. Summary report of the facility three-member committee:**

Reasons why incarcerated individual was initially determined to be appropriate for SHU :
_Refusing a Direct Order._
_Threats._

Information on whether there is a continuing need for separation from the general population:
_To prevent I/I Jude from making threats or refusing any further direct orders._

Other factors which may favor retaining in or releasing the incarcerated individual from SHU :
_Continued placement in SHU is appropriate at this time._

| _ORC Hutchins_ | _Lt. Rohan_ | _A/DSS Barlow_ | _3/6/2024_ |
|---|---|---|---|
| Offender Rehabilitation Coordinator | Security Supervisor | Committee Chairperson | Date |

**B. Decision of the Superintendent:**

☐ Release from SHU.

☒ A determination has been made to continue your SHU confinement for the following reasons:

_After further review, continued SHU confinement will be implemented to prevent I/I Jude_
_from making any further threats or refusing direct orders._
_I concur with the Committee's determination._

Prior to your next SHU custody review, you may write to the Superintendent or designee to make a statement regarding the need for continued SHU confinement. The reason(s) stated in this notice, any written statement that you submit, as well as your overall custodial adjustment will be considered during the next scheduled review.

Your next SHU custody review is scheduled for: _3/13/2024_

_____      _3/6/24_
Superintendent                              Date

_Attach Incarcerated Individual's statement(s) and additional pages as necessary_

DISTRIBUTION: ORIGINAL    INCARCERATED INDIVIDUAL
COPY    DISCIPLINARY
COPY    ADS PREA COMPLIANCE MANAGER

NEW YORK STATE DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION
**Special Housing Unit (SHU) Custody Review**

Form 21/0SHU (07/22)
Photocopy Locally as Needed

Sullivan _____ Correctional Facility

Name: __Jude, Steven_____ DIN: __17A0890_____ Review Date: __3/13/2024__

Date placed in SHU: __01/24/2024_____ Date hearing held: __Pending_____

**A. Summary report of the facility three-member committee:**

Reasons why incarcerated individual was initially determined to be appropriate for SHU :
__Refusing a Direct Order.__
__Threats.__

Information on whether there is a continuing need for separation from the general population:
__To prevent I/I Jude from making threats or refusing any further direct orders.__

Other factors which may favor retaining in or releasing the incarcerated individual from SHU :
__Continued placement in SHU is appropriate at this time.__

| ORC Hutchins | Lt. Rohan | DSS Sherman | 3/13/2024 |
|---|---|---|---|
| Offender Rehabilitation Coordinator | Security Supervisor | Committee Chairperson | Date |

**B. Decision of the Superintendent:**

☐ Release from SHU.

☒ A determination has been made to continue your SHU confinement for the following reasons:

__After further review, continued SHU confinement will be implemented to prevent I/I Jude__
__from making any further threats or refusing direct orders.__
__I concur with the Committee's determination.__

Prior to your next SHU custody review, you may write to the Superintendent or designee to make a statement regarding the need for continued SHU confinement. The reason(s) stated in this notice, any written statement that you submit, as well as your overall custodial adjustment will be considered during the next scheduled review.

Your next SHU custody review is scheduled for: __3/20/2024__

_____
Superintendent                                    Date  3/15/24

*Attach incarcerated individual's statement(s) and additional pages as necessary*

DISTRIBUTION:  ORIGINAL  INCARCERATED INDIVIDUAL
               COPY      DISCIPLINARY
               COPY      ADS PREA COMPLIANCE MANAGER

FORM 2171B (10/14)          STATE OF NEW YORK-DEPARTMENT OF CORRECTIONS AND CUMMUNITY SUPERVISON

## Five Points
Correctional Facility

### INMATE MISBEHAVIOR REPORT ♦ INFORME DE MAL COMPORTAMIENTO DEL RECLUSO

| 1. NAME OF INMATE (LAST, FIRST) ♦ NOMBRE DEL RECLUSO (Apellido, Nombre)<br>Jude S | NO. ♦ NUM.<br>17A0890 | HOUSING LOCATION ♦ CELDA<br>77-D-7 |
|---|---|---|
| 2. LOCATION OF INCIDENT ♦ LUGAR DEL INCIDENTE<br>RMHU D gallery | INCIDENT DATE ♦ FECHA<br>8/13/2024 | INCIDENT TIME ♦ HORA<br>Approx 545pm |

3. RULE VIOLATION(S) ♦ VIOLACIÓN/ES

106.10 Direct order                          116.10 Property Damage/Loss

107.10 Interference-employee

On 8/13/24 at approximately 545 pm I correction officer J Schmitt was preparing incarcerated individual Jude S 17A0890 (77-D-7) for outdoor recreation and applied mechanical restraints to his wrists. Once wrist restraints were applied I/I Jude refused to pull his arms in and turn around with his back to the door as is proper procedure to exit his cell for recreation. At this time other staff brought down the rolling shield so that I could continue with recreation movement on D gallery in RMHU. Following the conclusion of the recreation run at approximately 750pm I/I Jude returned the cuffs and he had bent them making them no longer usable. At this time RMHU cuffs #29 were secured in the arsenal with a broken tool report. I/I Jude continued to hold the feed up hatch refusing to allow it to be closed. Area supervisor notified no further incidents to report.

| REPORT DATE ♦ FECHA<br>8/13/2024 | REPORTED BY ♦ NOMBRE DE LA PERSONA QUE HACE EL INFORME<br>J Schmitt | SIGNATURE ♦ FIRMA | TITLE ♦ TITULO<br>)RRECTION OFFICE |
|---|---|---|---|

5. ENDORSEMENTS OF OTHER EMPLOYEE WITNESSES (if any)          SIGNATURES:

ENDOSOS DE OTROS EMPLEA DOS TESTIGOS (si hay)          FIRMAS          1 _____

2 _____          3 _____

NOTE: Fold back Page 2 on dotted line before completing below.

DATE AND TIME SERVED UPON INMATE                    NAME AND TITLE OF SERVER
FECHA Y HORA DADO AL RECLUSO _____    NOMBRE Y TITULO DEL QUE ENTREGA _____

You are hereby advised that no statement made by you in response to the charges or information derived therefrom may be used against you in a crimal proceeding. Por este medio se le informa que no se puede usar ninguna declaracio☐☐n hecha por usted como respuesta al cargo o la onformacion derivada de ella en una demanda criminal.

### NOTICE ♦ AVISO

REVIEWING OFFICER ( DETACH BELOW STATEMENT FOR VIOLATION HEARING ONLY)

You are hereby notified that the above report is a formal charge and will be considered and determined at a hearing to be held.
Por este medio se le notifica que el informe anterior es un cargo formal el cual se considerara y determinara en una audiencia a celbrarse

The inmate shall be permitted to call witnesses provided that so doing does not jeopardize institutional safety or correctional goals.
Se le permitira al recluso llamar testigos con tal de que al hacerlo no pondra en peligro la seguridad de la institucion o los objetivos del Departamento.
If restricted pending a hearing for this misbehavior report, you may write to the Deputy Superintendent for Security or his/her designee _____

Distribution:WHITE - Disciplinary Office CANARY - Inmate(After review) ♦ Distribución:BLANCA - Oficinia Discipliaria AMARILLA - Recluso (después de la resión)

Beer

```
09/30/24      SDCP007        DISCIPLINARY SYSTEM       *FPMS*        PAGE 001
                              FIVE POINTS

                           INMATE CURRENT SANCTIONS

   17A0890     JUDE, STEVEN                    LOCATION: FIVE PT RMHU
```

_(handwritten, right margin):_ SHU 197
SHU 165
SHU 210
_____
5.72 Days total SHU.

```
      PENALTY                   LENGTH     START      RELEASE
      -------                   ------     -----      -------

      SPECIAL HOUSING UNIT      0 165     8/03/24     1/15/25
      SPECIAL HOUSING UNIT      0 120     1/15/25     5/15/25

      LOSS OF RECREATION        0  60     8/03/24    10/02/24
      LOSS OF RECREATION        0 210    10/02/24     4/30/25
      LOSS OF RECREATION        0  15     4/30/25     5/15/25

      LOSS OF PACKAGES          0  60     8/03/24    10/02/24
      LOSS OF PACKAGES          0 210    10/02/24     4/30/25
      LOSS OF PACKAGES          0  15     4/30/25     5/15/25
      LOSS OF PACKAGES          0  60     5/15/25     7/14/25

      LOSS OF COMMISSARY        0  60     8/03/24    10/02/24
      LOSS OF COMMISSARY        0 210    10/02/24     4/30/25
      LOSS OF COMMISSARY        0  15     4/30/25     5/15/25
      LOSS OF COMMISSARY        0  60     5/15/25     7/14/25

      LOSS OF PHONE             0 210     8/30/24     3/28/25
      LOSS OF PHONE             0  48     3/28/25     5/15/25

      REC'D LOSS OF GOOD TIME   3   0                        5/22/24 11:35 AM
      REC'D LOSS OF GOOD TIME   3   0                        6/30/24 01:10 PM

      NO TABLET                 0  60     9/01/24    10/31/24
```

***SUCCESSFUL PRINT COMPLETION***

Had 197 Days First for threats to spit after force was used on me unnecessary, then received 165 days then 210 day SHU all does not fall under the specific Halt enumerated Acts that could result in SHU. In violation of HALT, which just got ruled on (Fields V. Martuscello, III) 902997-23. Albany Supreme Court stating Docs violated class action cvvl 78.

```
DIN:  17A0890 NYSID:  05595310P NAME:  JUDE, STEVEN
CURRENT FACILITY:  377 FIVE PT RMHU    CURRENT HOUSING LOCATION:  77-0D-007
```

| PENALTY | LENGTH MO DAY | ST.DATE MO/DA/CCYR | REL.DATE MO/DA/CCYR | | |
|---|---|---|---|---|---|
| SPECIAL HOUSING UNIT | 00 165 | 08/03/2024 | 01/15/2025 | 05/22/2024 | 11:35 AM |
| SPECIAL HOUSING UNIT | 00 120 | 01/15/2025 | 05/15/2025 | 06/30/2024 | 01:10 PM |
| LOSS OF RECREATION | 00 060 | 08/03/2024 | 10/02/2024 | 03/27/2024 | 10:30 AM |
| LOSS OF RECREATION | 00 210 | 10/02/2024 | 04/30/2025 | 05/22/2024 | 11:35 AM |
| LOSS OF RECREATION | 00 015 | 04/30/2025 | 05/15/2025 | 06/30/2024 | 01:10 PM |
| LOSS OF PACKAGES | 00 060 | 08/03/2024 | 10/02/2024 | 03/27/2024 | 10:30 AM |
| LOSS OF PACKAGES | 00 210 | 10/02/2024 | 04/30/2025 | 05/22/2024 | 11:35 AM |
| LOSS OF PACKAGES | 00 015 | 04/30/2025 | 05/15/2025 | 06/30/2024 | 01:10 PM |
| LOSS OF PACKAGES | 00 060 | 05/15/2025 | 07/14/2025 | 08/20/2024 | 11:42 AM |
| LOSS OF COMMISSARY | 00 060 | 08/03/2024 | 10/02/2024 | 03/27/2024 | 10:30 AM |
| LOSS OF COMMISSARY | 00 210 | 10/02/2024 | 04/30/2025 | 05/22/2024 | 11:35 AM |
| LOSS OF COMMISSARY | 00 015 | 04/30/2025 | 05/15/2025 | 06/30/2024 | 01:10 PM |
| LOSS OF COMMISSARY | 00 060 | 05/15/2025 | 07/14/2025 | 08/20/2024 | 11:42 AM |
| LOSS OF PHONE | 00 210 | 08/30/2024 | 03/28/2025 | 05/22/2024 | 11:35 AM |
| LOSS OF PHONE | 00 048 | 03/28/2025 | 05/15/2025 | 06/30/2024 | 01:10 PM |
| REC'D LOSS OF GOOD TIME | 03 000 | | | 05/22/2024 | 11:35 AM |
| REC'D LOSS OF GOOD TIME | 03 000 | | | 06/30/2024 | 01:10 PM |
| NO TABLET | 00 060 | 09/01/2024 | 10/31/2024 | 08/20/2024 | 11:42 AM |

NEW YORK STATE
DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION
THE HARRIMAN STATE CAMPUS - BUILDING 2
1220 WASHINGTON AVENUE
ALBANY, N.Y.  12226-2050

REVIEW OF SUPERINTENDENT'S HEARING

NAME:  JUDE, STEVEN

NO.  17A0890

HEARING FACILITY:  WENDE

ON BEHALF OF THE COMMISSIONER AND IN RESPONSE TO YOUR RECENT LETTER OF APPEAL, PLEASE BE ADVISED THAT YOUR SUPERINTENDENT'S HEARING OF NOVEMBER 21, 2023,  HAS BEEN REVIEWED AND REVERSED ON JANUARY 30, 2024.

_____A. RODRIGUEZ_____
DIRECTOR, SPECIAL HOUSING/
INMATE DISCIPLINARY PROGRAM

CC: FACILITY SUPERINTENDENT
    CENTRAL OFFICE FILES
    A. SPINNELL, ATTORNEY

APPEAL DECISION RENDERED PURSUANT TO SECTION 254.8 OF CHAPTER V AND ELECTRONICALLY PRODUCED UPON THE AUTHORITY OF THE DIRECTOR OF SPECIAL HOUSING/INMATE DISCIPLINE PROGRAM.

NEW YORK STATE
DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION
THE HARRIMAN STATE CAMPUS - BUILDING 2
1220 WASHINGTON AVENUE
ALBANY, N.Y.  12226-2050


REVIEW OF SUPERINTENDENT'S HEARING

NAME:  JUDE, STEVEN                        NO.  17A0890

HEARING FACILITY:  SULLIVAN


ON BEHALF OF THE COMMISSIONER, PLEASE BE ADVISED THAT YOUR

SUPERINTENDENT'S HEARING OF  APRIL 11, 2024,     HAS BEEN REVIEWED AND

ADMINISTRATIVELY REVERSED ON SEPTEMBER 30, 2024.



        A. RODRIGUEZ
        DIRECTOR, SPECIAL HOUSING/
        INMATE DISCIPLINARY PROGRAM


CC: FACILITY SUPERINTENDENT
    CENTRAL OFFICE FILES



APPEAL DECISION RENDERED PURSUANT TO SECTION 254.8 OF CHAPTER V AND
ELECTRONICALLY PRODUCED UPON THE AUTHORITY OF THE DIRECTOR OF SPECIAL
HOUSING/INMATE DISCIPLINE PROGRAM.

# RMHU/BHU/TBU 60 Day Review

The following RMHU/BHU/TBU Incarcerated Individual/Patient is scheduled for a 60-day status review:

| I/I's Name | DIN | Stage | Cell | Admission Date | RMHU Release Date |
|---|---|---|---|---|---|
| Jude | 7A0890 | 1 | 77-D-7 | 1/24/24 | 1/30/2025 |

**Current Period of Review:** 5/23/24 – 7/23/24

| | | |
|---|---|---|
| Number of Negative Informationals: | 4 | Date(s): 5/23-EGB; 6/4-Harass; 6/30-hoard milk; 7/8-Threats |
| Number of Positive Informationals: | 5 | Date(s): 5/30-IOP, 6/12-IOP, 6/3-handled crisis; 6/25-IOP, 7/3-Callout |
| Number of Other Informationals: | 0 | Date(s): |
| Number of Misbehavior Reports: (Tier II or Tier III) | 2 | Date(s): 6/30- Weapon (pending) 5/22-Violent Conduct, Threats, Create Dist. |

**Number of Program Refusal(s):** __12__ Half Day(s) and __6__ Full Day(s) __9__ EC

**Notable improvements:** _____

_____

_____

_____

☐ Successful program completion

☒ Retain in program (provide justification below)

_____

**OMH treatment plan goals remain appropriate for treatment across settings.**

**RMHU program rehabilitation treatment goals for next 60 day review:**

☐    Increase program attendance/participation

☒    Decrease negative Informationals received

☐    Decrease Misbehavior Reports received

☒    Display prosocial interactions with peers and staff.

☐    Utilize positive coping skills to navigate environmental challenges.

☐    Participate/continue to participate in recommended RMHU programming.

☐    Other:_____

I/I Patient Signature:_____ Date: 7-25-24

DSMH/Designee Signature:_____ Date: 07/25/24

OMH Unit Chief/Designee Signature:_____ Date: 7-24-24

cc: Incarcerated Individual and Guidance Folder

# RMHU/BHU/TBU 60 Day Review

The following RMHU/BHU/TBU Incarcerated Individual/Patient is scheduled for a 60-day status review:

| I/I's Name | DIN | Stage | Cell | Admission Date | RMHU Release Date |
|---|---|---|---|---|---|
| Jude | 17A0890 | | | 1/24/24 | 5/15/25 |

Current Period of Review: 7/24/24 - 9/24/24

| | | |
|---|---|---|
| Number of Negative Informationals: | 8 | Date(s): 9/7, 9/4, 8/31, 8/16, 8/13, 8/7, 7/31, 7/28 |
| Number of Positive Informationals: | 2 | Date(s): 8/28, 8/6 |
| Number of Other Informationals: | 0 | Date(s): |
| Number of Misbehavior Reports: (Tier II or Tier III) | 4 | Date(s): 9/14 T2 pend (threats, harassment) 8/20 T2 (lewd conduct and harassment) 8/13 T2 (threats, harassment), 8/13 T2 (damage prop) |

Number of Program Refusal(s): __4__ Half Day(s) and __19__ Full Day(s) _1_ EC  _3_ RCTP

Notable improvements: _____

_____

_____

_____

☐ Successful program completion

☒ Retain in program (provide justification below)

_____

OMH treatment plan goals remain appropriate for treatment across settings.

RMHU program rehabilitation treatment goals for next 60 day review:

☐ Increase program attendance/participation

☐ Decrease negative Informationals received

☒ Decrease Misbehavior Reports received

☐ Display prosocial interactions with peers and staff.

☐ Utilize positive coping skills to navigate environmental challenges.

☒ Participate/continue to participate in recommended RMHU programming.

☐ Other:_____

I/I Patient Signature: _Refuse_ _____ Date:_____

DSMH/Designee Signature: _____ Date: 09/25/24

OMH Unit Chief/Designee Signature: _____ Date: 9/25/24

cc: Incarcerated Individual and Guidance Folder

Exhibit

B

New York State Office of Children and Family Services
Commission for the Blind and Visually Handicapped
80 Maiden Lane, 23rd Floor
New York, NY  10038

## Verification of Legal Blindness

| | |
|---|---|
| Name:<br>STEVEN JUDE<br><br>Address:<br>2225 BRONXWOOD AVENUE,<br>#4-E<br>BRONX, NY 10469 | CBVH Registration No.<br>CF# 162955 |

The above named person is registered as legally blind with the Commission for the Blind and Visually Handicapped in accordance with New York State law, Section 8704.

Signature: _Kenneth Goldman_

Title:      Director, Program Evaluation and Support
Date:      02/02/2010

Opt 4·20·12

# LIGHTHOUSE
## INTERNATIONAL

New York Lighthouse
Vision Rehabilitation Service

August 20, 2008

Re: Steven Jude        10A4771
    DOB: 03/22/1970

To Whom It May Concern,

Please be advised that Mr. Steven Jude is a patient of Lighthouse International. At his last visit on 08/20/08, best corrected VA was found to be 1 foot/300 (20/6000) OD, and HM OS, thereby rendering Mr. Jude Legally Blind from Glaucoma OD, OS. Due to his extremely impaired vision, climbing steps, seeing traffic lights, crossing streets, seeing street signs and reading are all extremely difficult tasks. Mr. Jude is at great risk for injury should he need to use mass transit without the assistance of a sighted guide. Please assist this nice gentleman in any way possible. If you have any questions, please feel free to contact me.

Sincerely,

Andrea Zimmerman

Andrea Zimmerman, OD FAAO
Lighthouse International Low Vision Clinician

111 East 59th Street New York, NY 10022-1202
Tel: (212) 821-9200 Fax: (212) 821-9707 TTY: (212) 821-9713 www.lighthouse.org

```
12/15/20  10:21:19      NYS DEPARTMENT OF CORRECTIONAL SERVICES  Page 1 of PAGE     1
HSC137                      HEALTH SERVICES SYSTEM
PRINTED BY: C430LCS     MEDICAL PROBLEM LIST BY TYPE - INCLUDING COMMENTS
PRINTED AT: WENDE              (ALL PROBLEM TYPES)
                          SAME AS REPORT HSC138
DIN: 17A0890    NAME: JUDE, STEVEN              NYSID: 05595310P    DOB: 03/22/1970
OWN FAC: WENDE          CUR FAC: WENDE           CUR LOC: 0D-26-11S
CURRENT CLASSIFICATIONS - MEDICAL: 3  09/17/2020  OMH: 2  04/23/2020  CELL-ONLY:
```

## *ACTIVE/INACTIVE PROBLEMS*

### ALLERGIES

| CODE | PROBLEM | PR | DATE IDENTIFIED | S | FACILITY | C | DIN @ ENTRY |
|------|---------|----|----|---|----------|---|----|
| A031 | ALLERGY-PENICILLINS | 31 | 03/03/2017 | | DWNSTATE REC | Y | 17A0890 ) |
| | ( NOT OTHERWISE SPECIFIED ... | | | | | | |
| A558 | ALLERGY-RISPERIDONE | 558 | 03/03/2017 | | DWNSTATE REC | Y | 17A0890 ) |
| | ( ERECTILE DYSFUNCTION (NOT TRUE ALLERGY) | | | | | | |
| V149 | ALLERGY DRUG | | 03/03/2017 | | DWNSTATE REC | Y | 17A0890 ) |
| | ( CITALOPRAM (CELEXA) ... ERECTILE DYSFUNCTION (NOT A TRUE ALLERGY) | | | | | | |
| A288 | ALLERGY-HALOPERIDOL & DERIV | 288 | 03/17/2014 | | DWNSTATE REC | Y | 10A4771 ) |
| | ( CLAIMS ALLERGY TO HALDOL | | | | | | |

                                *** TYPE TOTAL:     4

### MEDICAL CONDITIONS

| CODE | PROBLEM | PR | DATE IDENTIFIED | S | FACILITY | C | DIN @ ENTRY |
|------|---------|----|----|---|----------|---|----|
| 365- | GLAUCOMA | 01 | 10/21/2010 | | DWNSTATE REC | | 10A4771 |
| B240 | LEGAL BLINDNESS | 02 | 03/03/2017 | | DWNSTATE REC | Y | 17A0890 ) |
| | ( ADVANCE GLAUCOMA, MYOPIA ... | | | | | | |
| V996 | INFLUENZA VACCINE REFUSAL | | 11/20/2020 | | WENDE | | 17A0890 |
| 0402 | COVID-19 NEGATIVE | | 09/29/2020 | | WENDE | | 17A0890 |
| 0400 | COVID-19 TESTED | | 09/28/2020 | | WENDE | | 17A0890 |
| 4931 | ASTHMA/MILD INTERMITTENT | | 02/20/2020 | I | EASTERN GEN | | 17A0890 |
| V996 | INFLUENZA VACCINE REFUSAL | | 11/26/2018 | | SULLIVAN | | 17A0890 |
| V996 | INFLUENZA VACCINE REFUSAL | | 12/06/2017 | | SULLIVAN | | 17A0890 |
| HL30 | HEARING LOSS/NON-SIGNIFICANT | | 11/22/2017 | | WENDE | Y | 17A0890 ) |
| | ( PER AUDIO CONSULT THIS DATE | | | | | | |
| 7090 | TATTOO | | 03/21/2017 | | DWNSTATE REC | | 17A0890 |
| V794 | CURRENT TOBACCO USE | | 03/03/2017 | | DWNSTATE REC | | 17A0890 |
| 0519 | CHICKENPOX HISTORY OF | | 03/03/2017 | | DWNSTATE REC | | 17A0890 |
| 0994 | URETHRITIS NOS | | 03/03/2017 | I | DWNSTATE REC | Y | 17A0890 ) |
| | ( HISTORY OF TREATED G.C. URETHRITIS ... | | | | | | |
| 2502 | DIABETES TYPE II | | 03/03/2017 | I | DWNSTATE REC | Y | 17A0890 ) |
| | ( METFORMIN ... | | | | | | |
| 279- | HIV LABTEST NEGATIVE | | 03/03/2017 | | DWNSTATE REC | Y | 17A0890 ) |
| | ( HIV NEGATIVE, JANUARY, 2017, ACCORDING TO PATIENT ... | | | | | | |
| 3048 | SUBSTANCE ABUSE/HABIT/ADDICTION NOS | | 03/03/2017 | | DWNSTATE REC | Y | 17A0890 ) |
| | ( OCAINE, OPIATES, ETOH, TOBACCOO, ETC. | | | | | | |
| 315- | LEARNING DISTURBANCE NOS | | 03/03/2017 | | DWNSTATE REC | | 17A0890 |
| 316- | SERIOUS MENTAL DISORDER NOS | | 03/03/2017 | | DWNSTATE REC | Y | 17A0890 ) |

```
            ( ANTISOCIAL PERSONALITY DISORDER, HA/ADD, SCHIZOAFFECTIVE DISORDER, M )
            ( MAJOR DEPRESSIVE DISORDER, HISTORY OF SUICIDE ATTEMPTS X 3, LAST     )
            ( 2005 ... UNSPECIFIED EPISODIC MOOD DISORDER ... PAST USE OF ANTI-    )
            ( PSYCHOTIC MEDICATION ...                                             )
```

* MEDICAL PROBLEM LIST REPORT CONTINUES ON NEXT PAGE

* DISTRIBUTION: CONFIDENTIAL - RESTRICTED TO INMATE MEDICAL FOLDER *

# Bureau of Prisons
## Health Services
### Inmate Intra-system Transfer

**Reg #:** 72469-054                **Inmate Name:** JUDE, STEVEN

SENSITIVE BUT UNCLASSIFIED -- This information is confidential and must be appropriately safeguarded.

**Transfer To:** _____          **Transfer Date:** 02/01/2017

| Health Problems | Status |
|---|---|
| Health Problem | Current |
| Diabetes mellitus, type II (adult-onset) | Current |
| Overweight | Current |
| Unspecified episodic mood disorder | Current |
| Personality Disorder | Current |
| Alcohol dependence, unspec | Current |
| Cannabis dependence | Current |
| Other chronic pain | Current |
| Glaucoma, unspecified | |
|    Galucoma- bilateral 2004 | Current |
| Legal blindness, as defined in U.S.A. | Current |
| Asthma, unspecified | Current |
| Hernia, inguinal , w/o obstruction or gangrene | Current |
| Open wound of elbow, forearm, wrist, w/tendon invl | Current |
| Bipolar disorder | Current |
| Unspecified Depressive Disorder | Current |
| Disruptive Mood Dysregulation Disorder | Current |
| Anxiety disorder | Current |
| Antisocial Personality Disorder | Current |
| Unspecified glaucoma | |
|    OPEN ANGLE | Current |
| Myopia | Current |
| Other disorder of the skin and subcutaneous tissue | Current |
| Pain, unspecified | |
|    LUE- since Jan S/P stabbed with ice pick. | Current |
| Counseling NOS | Current |
| Other specified examination | |
|    Examination request by LT | Current |
| Body Mass Index 28.0-28.9, adult | |
|    MAX IDEAL WT: 173 LBS. | Current |
| Encounter for exam and observation following alleged adult rape [PREA Exam] | Remission |
| Backache, unspecified | |

**Medications:** All medications to be continued until evaluated by a physician unless otherwise indicated. Bolded drugs required for transport.

Albuterol Inhaler HFA (6.7 GM) 90mcg  Exp: 04/05/2017  SIG: Do not use daily. Use only if needed to prevent or relieve an asthma attack. Inhale 2 puffs by mouth four times daily AS NEEDED until symptoms resolve (inhaler to last 90 days. If using more frequently, access sick call)

Aspirin 81 MG EC Tab  Exp: 04/05/2017  SIG: Take one tablet (81 MG) by mouth each day

DULoxetine HCl Delayed Rel 30 MG Cap  Exp: 03/11/2017  SIG: Take one capsule (30 MG) by mouth each day ***pill line*** ***pill line***

Lisinopril 10 MG Tab  Exp: 04/05/2017  SIG: Take one tablet (10 MG) by mouth each day

metFORMIN 500 MG Tab  Exp: 04/05/2017  SIG: Take one tablet (500 MG) by mouth twice daily with food

Mirtazapine 15 MG Tab  Exp: 07/04/2017  SIG: Take one tablet (15 MG) by mouth at bedtime ***pill line*** ***crush/empty*** ***pill line***

Timolol Maleate Ophth Soln 0.25% (10 ML)  Exp: 04/05/2017  SIG: Instill 1 drop into both eyes twice daily as directed

Ziprasidone 80 MG Cap  Exp: 07/04/2017  SIG: Take one capsule (80 MG) at bedtime by mouth ***pill line*** ***pill line***

**OTCs:** Listing of all known OTCs this inmate is currently taking.
None

**Reg #:** 72469-054    **Inmate Name:** JUDE, STEVEN

SENSITIVE BUT UNCLASSIFIED -- This information is confidential and must be appropriately safeguarded.

## Pending Appointments

| Date | Time | Activity | Provider |
|---|---|---|---|
| 01/05/2017 | 00:00 | History/Physical | Mid-Level Provider |
| 03/02/2017 | 00:00 | Chronic Care Visit | Psychiatrist |
| 01/06/2018 | 00:00 | PPD Administration | Nurse |
| 01/06/2017 | 05:30 | 14 Day Dr Eval | Physician 02 |

**TB Clearance:** Yes

Last PPD Date: 01/06/2017                Induration: 0mm
Last Chest X-Ray Date: _____            Results: _____
TB Treatment: _____              Sx free for 30 days: Yes
TB Follow-up Recommended: No

## Sickle Cell:

Sickle Cell Trait/Disease:    No

## Limitations/Restrictions/Diets:

- Cell: lower bunk --- 11/15/2017
  Other Housing Status Restrictions: A NEW HERNIA BELT WAS ISSUED TO
  INMATE ON 6/29/16. --- 11/15/2017
  Other Physical Restrictions: ANKLE FOOT ORTHOTICS AND APEX
  SNEAKERS  ISSUED TO PATIENT.
  ISSUED HIM A PAIR OF A SIZE 11 EEE DR. SCHOLL'S THERAPEUTIC
  SHOES. --- 11/15/2017
  Cleared for Food Service: No
  No Ladders --- 02/02/2018
  No Upper Bunk --- 02/01/2018
  Special instructions: Diabetic diet and snack

## Comments:

## Allergies

No Known Allergies

## Devices / Equipment

Orthotics

Alternate Institutional Shoes

Shoe inserts

Eye Glasses

Shower Protection Bag, Arm

Clothing modified for medical purposes

Cane

## Travel:

Direct Travel: No
Travel Restrictions: None

## UNIVERSAL PRECAUTIONS OBSERVED WHEN TRANSPORTING ANY INMATE:

Transfer From Institution: NEW YORK MCC          Phone Number: 6468366300
Address 1: 150 PARK ROW
Address 2:
City/State/Zip: NEW YORK, New York 10007

Name/Title of Person Completing Form: Yonnone, M. EMT-P/AHSA          Date: 01/31/2017

Inmate Name: JUDE, STEVEN          Reg #: 72469-054    DOB: 03/22/1970    Sex: M

Generated 01/31/2017 14:12 by Yonnone, M. EMT-          Bureau of Prisons - NYM          Page 2 of 2

331 Med CNYPC (5.2021)

| CENTRAL NEW YORK PSYCHIATRIC CENTER<br><br>CORRECTIONS-BASED TREATMENT PLAN<br><br>Date Completed  04/29/24<br>Date of First Review  10/26/24 | Patient's Name (Last, First, M.I.):<br>JUDE, STEVEN<br><br>C#: 33356   DIN: 17A0890<br><br>Unit Name:____Five Points  RMHU___ |
|---|---|

**DIAGNOSIS:** Include current diagnoses. Any change in diagnosis requires a MED 15 (i.e. addition or deletion of diagnosis, or change in principal diagnosis)

Principal Diagnosis: Antisocial personality disorder (Personality Disorders)

Additional Diagnoses :

Medical:  PCN Adverse reaction to Risperdal per DOCCS medical records

**Treatment Issues:** Review all applicable assessments/evaluations (Core History, Psychiatric Progress Notes, Screening Admission Note, Comprehensive Suicide Risk Assessment, etc.) and determine problems and identified needs central to the patient's treatment and recovery. Mental health, physical/medical health, rehabilitation and social support issues should be considered. Prioritize and list problems, issues, and concerns in the table below. Enter disposition code, rationale/reason for Treatment/Non-treatment of each identified issue.

Enter disposition code and date.   T = Treat;   R = Refer;   D = Defer;   I = Inactive;   C = Close

| | Problem | Disposition | Comments: Include rationale for treatment/ non-treatment of   problems. | Date |
|---|---|---|---|---|
| 1 | Patient has been placed in a Residential Mental Health Unit to deal with both psychiatric issues as well as behavioral disturbances which have resulted in disciplinary sanctions. | T | Patient is enrolled in the RMHU to receive specialized treatment related to mental illness and behavior management principles. | 04/29/24 |
| 2 | Patient presents primarily with poor coping skills and impulse control.<br><br>There is no indication of trauma-related issues in the patient's history or self-report.<br><br>There is a record of non-suicidal self-injurious behaviors in the patient's history or self-report.<br><br>There is a record of suicide attempts in the patient's history or self report. | T<br><br>T<br><br>I<br><br>I | Patient has found that the symptoms – such as poor coping skills and impulse control – have interfered with daily functioning.<br><br>History present - not a current treatment focus.<br><br>History present- Not a current focus of treatme<br><br>History present- Not a current focus of treatme | 04/29/24 |
| 3 | There is a history of substance abuse in the patient's record or self-report. | D | Defer to DOCCS for Substance-related treatme | 04/29/24 |
| 4 | Medical Problems: Diabetes Glaucoma, Diabetes, High Blood Pressure, history of head injury as a | D | To be addressed by DOCCS Medical Dept. | 04/29/24 |

OMH - PHI

| 331 Med CNYPC (5.2021) **CORRECTIONS-BASED TREATMENT PLAN** | Patient Name: JUDE, STEVEN<br><br>C#: 33356 |
|---|---|

| child, history of back injury, legal blindness, "drop foot" and ALLERGY TO HALDOL | | | |
|---|---|---|---|

| Patient's preferred language is: English. | Language Line services are not required. |
|---|---|

## PATIENT/FAMILY STATEMENT

Obtain patient and family input for the Treatment Plan, including areas of agreement/disagreement when possible. Obtain the patient's signature if possible or document the reason for no signature.

☐ Patient is in agreement.
☐ Patient disagrees with treatment plan, for the following reasons:
☐ Other situation:

☐ No family input at this time.
☐ Family input is as follows:
☐ Patient does not wish to have family involvement.

| PATIENT SIGNATURE: | DATE:<br>4-30-24 |
|---|---|

**2. PARTICIPANTS**

List all participants, including family members who participate in the Treatment Plan, including participation by telephone.

| Name | Title |
|---|---|
| JUDE, STEVEN | Patient |
| G. Snyder | PSOL2 |
| C. Dolley | Unit Chief |
| Naz, Bushra | Psychiatrist |
| | |

**3. STAFF SIGNATURE/TITLE/DATE:**

_[signature]_ PSOL2 4-30-24

OMH - PHI

| 331A Med CNYPC (5.2021) **CORRECTIONS-BASED TREATMENT PLAN GOAL PLAN** | Patient Name:  JUDE, STEVEN C#:  33356 |
|---|---|

## GOAL PLAN:

Instructions:          Identify the major treatment goals.  Use a separate page for each goal.

| Goal: | No. _2_ Date Established: 04/29/24 | Status/Date A   Attained R   Revised D/C   Discontinued |
|---|---|---|
| **(JUDE, STEVEN)** will be ready for discharge from the RMHU when the SHU time expires or when he completes all of the stages/milestones of the RMHU Program as evidenced by the ability to deal with psychiatric symptoms – specifically poor impulse control - and has developed insight into the role his behavior plays in learning how to develop a successful, healthy lifestyle. | | |

Indicate patient outcomes to be achieved for this goal.

| Letter | Objectives: | Date Established | Target Date | Status/Date A Attained R Revised D/C Discon't | Methods For each objective, indicate staff treatment interventions, including duration, frequency, and responsible staff. |
|---|---|---|---|---|---|
| A | I will complete orientation for the RMHU program. | 04/29/24 | **10/26/24** | A | Orientation consists of 5 days and is facilitated by OMH and DOCCS staff members.  RMHU staff will schedule Pt. to attend all five days to increase knowledge of the therapeutic offerings and program rules/ expectations for the RMHU.  Staff (corrections officers and on OMH) will prompt patient during morning rounds to attend. |
| B | I will engage in the RMHU programming. | 04/29/24 | 10/26/24 | | RMHU staff will offer Pt. 20 hours of weekly programming and will provide SOLUTION FOCUSED |
| B | During each session, I will describe my signs and symptoms that I am experiencing related to poor impulse control. | 04/29/24 | 10/26/24 | | Primary Therapist will schedule Pt. for individual therapy sessions every 1-2 weeks, or as clinically indicted, and will provide supportive therapy. |

OMH - PHI

| 331A Med CNYPC (5.2021)<br><br>**CORRECTIONS-BASED<br>TREATMENT PLAN GOAL PLAN** | **Patient Name: JUDE, STEVEN**<br><br>**C#: 33356** |
|---|---|

| | | | | | RMHU staff will remind Pt. of appointments via memo sent to pt.'s cell, or by OMH staff during rounds. |
|---|---|---|---|---|---|
| C | I will identify any suicidal thoughts, feelings, or plans. | 04/29/24 | 10/26/24 | | At each session, RMHU staff will assess Pt.'s suicide risk as well as current daily functioning. |
| D | I will refrain from any non-suicidal self-injurious behaviors and will reach out to staff when needed. | 04/29/24 | 10/26/24 | | At each session, RMHU staff will assess Pt's risk as well as current daily functioning. |
| E | I will identify existing coping skills, learn new coping skills, and utilize said coping skills for long-term management of the main symptom - poor impulse control. | 04/29/24 | **10/26/24** | | RMHU staff will schedule Pt. for both individual and group therapy. Individual therapy will occur every 1-2 weeks and RMHU staff will provide **SOLUTION FOCUSED** . Group programming will be scheduled for 20 hours a week and will provide **SOLUTION FOCUSED** to assist in development of these coping skills. *Will work on going To a 2S.* |
| F | I will learn and use assertive communication skills to express myself in a healthy, confident, and assertive manner. | 04/29/24 | 10/26/24 | | RMHU staff will schedule Pt. for both individual and group therapy. Individual therapy will occur every 1-2 weeks and RMHU staff will provide **SOLUTION FOCUSED** . Group programming will be scheduled for 20 hours a week and will provide supportive therapy to assist in development and use of these coping communication skills. |
| D | MEDICATION NEXT STEPS | 04/29/24 | **10/26/24** | | Psychiatrist/NP will be scheduled to see Pt. every 30-90 days (or more often if needed) and will |

OMH - PHI

| 331A Med CNYPC (5.2021)<br><br>**CORRECTIONS-BASED<br>TREATMENT PLAN GOAL PLAN** | **Patient Name: JUDE, STEVEN**<br><br>**C#: 33356** |
| --- | --- |

| | | | | | encourage Pt. to be an active participant in the medication review.<br><br>Primary therapist and nursing staff will monitor Pt.'s adherence to the treatment recommendations. |
| --- | --- | --- | --- | --- | --- |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

Case 1:24-cv-01001-LJV-JJM   Document 1-1   Filed 10/18/24   Page 26 of 71
Case 7:22-cv-07441-NSR   Document 28-1   Filed 01/13/23   Page 13 of 22

Page 8 of 14

Fax Server rts04v     8/20/2018 9:52:15 AM   PAGE   10/016   Fax Server



# Clinical Summary

| | |
|---|---|
| **Patient Name:** | Steven Jude |
| **Person Number:** | 1920808 |
| **DOB:** | 03/22/1970 |
| **AGE:** | 45 Years 10 Months |
| **Referring Physician:** | |
| **Visit Date:** | 02/04/2016 09:59 AM |
| **Visit Type:** | continue |
| **Where Seen:** | Office – 776400 Brooklyn NY |
| **Additional Details:** | |
| **Who is with patient at appointment:** | |

**Service Type:** Orthotic

**Device Level/ Type:** Ankle foot orthosis
**Side:** Left
**Date of Onset:** 01/06/1990
**Rx on file**
**Dx 1:** M21.372 Foot drop, left foot

**Allergies:**
No known allergies

**Medications:**

Comments:
metformin for diabetes , Lisinopril for high blood pressure

**Medical History:**
Circulatory/Vascular:
• HBP
• Diabetes

Other:
• glacoma /legally blind

**Device History:**

| | | Description | | Qty | Start Date | End Date | Comments | |
|---|---|---|---|---|---|---|---|---|
| left | LEO | afo and shoes | | 12 | 01/06/2016 | current/pres ent | | |
| left | AFO | | | | 02/04/2016 | | | |

**Two Day Rule:** N/A

Patient Name:  Steven Jude
Visit Date: 02/04/2016 09:59 AM
Encounter Nbr: 208220
WIP Encounter Nbr: 197856



Fax Server rts04v    8/20/2016 8:52:15 AM  PAGE  8/016    Fax Server

| left | LEO | afo and shoes | 12 | 01/06/2016 | current/present |
|------|-----|---------------|-----|------------|-----------------|

## Lower Extremity Evaluation:
Device prescribed: afo.
Last physician visit: 07/30/2015
Patient has received lower extremity orthotic.

Cause of condition: Injury, Gun shot wound

Impact of condition:
* Decreased function
* Decrease in range of motion
* Increase of energy expenditure
* Pain/discomfort
* Increased fall risk

Functional Goals:
* Stabilization
  * Joint - ankle, coronal, sagittal, transverse plane(s)
* Range of motion
  * limit to 90 plantarflexion
* Improve ambulation
* Pain control
* Prevent deformity
* Correct alignment
* Biomechanical assistance leverage to facilitate more energy efficient gait
* Increase ADLs
* Improve ambulation on uneven or variable terrain
Improve safety during ambulation

Suggested orthosis is Custom.

Patients condition is expected to be permanent or to last longer than 6 months. permanent damage to the peroneal nerve

Patient does not have a documented condition which requires tissue injury prevention.

There is a need to control patient's limb in more than one plane.
* Sagittal: ankle
* Coronal: ankle
* Transverse: ankle

The patient cannot fit into a prefab device because:
* Prefab device does not accommodate patient alignment

Patient does not lack normal anatomical integrity or normal anthropometric proportions.

Orthosis will not be exposed to conditions which necessitates use of non-corrosive finish.

Interface is indicated:
* Aid in suspension of device on leg
* Protect skin from pressure generated by use of device

Patient Name: Steven Jude
Visit Date: 01/06/2016 01:30 PM
Encounter Nbr: 197856
WIP Encounter Nbr: 197856



Fax Server rte04v       8/40/2016 8:52:15 AM   PAGE   7/016   Fax Server

- Protect skin from shear forces generated by use of device

Non-standard plastic is not indicated.

Patient has varus or valgus deformity that requires additional support or control:
- Accommodation of an existing deformity
- Maximize appropriate alignment for ambulation
- Stabilization of a weakened joint

Molded inner boot not indicated.

Static AFO is not indicated.

Shoe attachment is not indicated.

**Non-therapeutic Shoes/Inserts Evaluation**
Patient is being evaluated for extra depth shoes.
Patient has not previously received shoes or inserts.

Cause of condition: Injury: Gun shot wound

Impact on patient:
- Decrease in functionality
- Increase in energy expenditure
- Pain/discomfort

Functional Goals:
- Protection of foot
- Reduction in pain
- Accommodation of deformity

Patient's chief complaint/issues:
painful feet, neuropathy, and drop foot

Current shoes/inserts:
- Shoes are not in acceptable condition, because: patient is wearing prison issue canvas shoe
- Shoes are not correctly fitted, because too small
- Style is not appropriate, because not supportive enough
Patient doesn't have an existing foot orthosis.

**Shoe recommendation and design**
Measured with Brannock device for Custom Fit Shoes

Recommended:
**Bilateral:**          Shoe Size: 11      Shoe Width: W

MFG: apex
Style/Part number: v753mx11
Style:
- Extra depth

Patient Name: Steven Jude
Visit Date: 01/06/2016 01:30 PM
Encounter Nbr: 197856
WIP Encounter Nbr: 197856

Fax Server rts04v    07/20/2018  9:52:15 AM  PAGE  8/016  Fax Server

Clinical rationale for recommended footwear:
- Extra depth design necessary for recommended shoes secondary to foot deformities/anomalies
- Extra depth shoes required to allow for use of accommodative/corrective foot orthoses/prostheses

Mold wasn't taken.

Shoes to be ordered
Estimated date of delivery: 01/20/2016

**Two Day Rule: N/A**

**LEG Measurements:**
All left measurements measured in inches.

Measurements were taken.
Impressions were taken by (Left):
- Fiberglass Cast

**Environment:**
Other living status:
- prison

Environmental Barriers:
- Level surfaces

Pre-amputation/Injury dominate side: None

Children at home? No

Consequences of environmental barriers:
- Pain
- Increased efforts/energy costs

**Vocation Information:**
Time spent seated: 70% of time per day
Time spent standing: 30% of time per day

Patient is not employed:
- Other: patient is in prison

**Avocation Activities:**
Time spent seated: 70% of time per day.
Time spent standing: 30% of time per day.

- Walking: 1-3 blocks

**ADL:**

Without device patient has difficulty:
- ascending stairs

Patient Name: Steven Jude
Visit Date: 01/06/2016 01:30 PM
Encounter Nbr: 197856
WIP Encounter Nbr: 197856



- descending stairs
- getting in/out of vehicle
- squatting/kneeling
- standing from seated position
- walking

### Strength:

| | | | |
|---|---|---|---|
| | Dorsiflexion | 5/5 | 1/5 |
| | Plantarflexion | 5/5 | 4/5 |

### Material Selection:

| Manufacturer | Item | Description | L/R | Qty | No. | Value | Auth. Ref. | Notes |
|---|---|---|---|---|---|---|---|---|
| sea fab orlando | | custom afo left side 1 | | | | | | |
| apex | v753mx10 | shoes | 2 | | | | | |
| | 5 | | | | | | | |

The patient tolerated the procedure without incident or problem.

Completed and Reviewed by: Helen Vloylanitis on 01/06/2016

Electronically signed by Helen Vloylanitis CO on 01/06/2016 02:22 PM

Patient Name: Steven Jude
Visit Date: 01/06/2016 01:30 PM
Encounter Nbr: 197856
WIP Encounter Nbr: 197856

Page 5/5


**CLINIC**
*Empowering Human Potential*

443000 Syracuse NY
522 Liberty St Ste 1
Syracuse, NY 132041249
Hanger NPI: 1720152697

## WARRANTY AND VALIDATION OF RECEIPT
## ASSIGNMENT OF BENEFITS / AUTHORIZATION TO RELEASE INFORMATION

Recipient's Name:    Steven Jude
6600 State Route 96 Five Points Correctional
Romulus, NY 14541-9998

Side: Left

Patient took delivery of:

| Dvc Grp | Code | Side | Qty | Description | 2nd Description |
|---|---|---|---|---|---|
| 1 | L3221 | left | 1 | Shoe, Depth Inlay, Mens (Extra Depth) | |
| 1 | L1960 | left | 1 | Afo, Posterior Solid Ankle, Molded To Pt Model | |
| 1 | L2820 | left | 1 | Soft Interface For Bk Section, Molded Plastic, Addition To Lower Ext | |
| 1 | L2275 | left | 1 | Varus/Valgus Correction, Plastic Mod, Padded/Lined, Add To Lower Extremity | |
| 2 | L3221 | right | 1 | Shoe, Depth Inlay, Mens (Extra Depth) | |

The device you received today is warranted to be made to your individual measurements, properly aligned and properly fit, corresponding to your anatomical condition at the time of measurement. Patient evaluation, consultation, design, fitting and follow-up adjustments are provided for 90 days at no additional cost to you, unless there is a change in your physical condition. After 90 days, you are responsible for any charges for adjustments or modifications made to your device. Such services may be necessary for reasons such as changes in your physical condition, functional capabilities, or wear and tear or damage to your device.

*This warranty applies only to parts or devices that are custom-made by Hanger Clinic.* Any part or device custom-made by Hanger is warranted to be free from defective workmanship and/or parts, under normal service and use, for 6 months from the date you receive it. Hanger Clinic obligations under this warranty are limited solely to the no-charge repair or replacement of the part or parts determined defective by Hanger Clinic. Items and parts that are manufactured by outside companies or vendors are warranted for the length of the warranty supplied by that manufacturer. These include, but are not limited to: components or parts not manufactured by Hanger Clinic that are used in the assembly of a device custom made by Hanger Clinic; items that are custom made by other companies but supplied to the patient by Hanger Clinic; or items that are manufactured by other companies but are fit or custom fit to the patient by Hanger Clinic. *This warranty does not cover prosthetic skin coverings; adjustments needed due to anatomical or other medical changes; or accessories, such as prosthetic socks, straps, etc; or refurbished WalkAide units.* Any claim under this warranty shall be limited to the amount received by Hanger Clinic from the patient and/or reimbursing source/payer for the subject device.

**This warranty becomes void immediately, if:**
- The device has been adjusted, repaired or altered by anyone other than an active employee of Hanger Clinic.
- The device or any of its parts have been subjected to misuse, negligence or accident.
- The Patient fails to fulfill "Patient Responsibilities" as outlined below.

**I understand it is my responsibility to:**
- See my prescribing physician if special medical management or further care pertaining to the wearing this device is necessary.

Patient Name: Steven Jude
Encounter Nbr: 1209888
WIP Encounter Nbr: 1197419

Form 2612B (02/23)
PHOTOCOPY LOCALLY AS NEEDED

Page 1 of 2

**RECEIVED**

NEW YORK STATE DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION

### REQUEST FOR REASONABLE ACCOMMODATIONS FOR INCARCERATED INDIVIDUALS WITH SENSORIAL DISABILITIES

Date 8/30/24

Incarcerated Individual's Name **Steven Jude**  DIN **17-A-0890** Facility **Five Points C.F.**

**EXEC. OFFICE**

☐ I do not request reasonable accommodations

☒ I request reasonable accommodations as indicated below for the following program or service. **cell study & Disciplinary law library, RMHU work sheets, legal documents**

Check to indicate request

| HEARING IMPAIRMENT | | | VISUAL IMPAIRMENT | | |
|---|---|---|---|---|---|
| Requested | | Approved | Requested | | Approved |
| ☐ | Qualified Sign Lang. Interpreter | ☐ | ☒ | Large Print | ☒ |
| ☐ | TTD/TTY | ☐ | ☐ | Orientation & Mobility Instruct | ☐ |
| ☒ | Telephone Amplifier | ☒ | ☐ | Mobility Assistants (Sighted Guide) | ☒ |
| ☐ | Closed Caption Television | ☐ | ☒ | Guidance Cane **Correct Size Cane** | ☐ |
| ☐ | Sound Amplification Systems | ☐ | ☒ | Support Cane **Need new Support cane** | ☐ |
| ☐ | Hearing Aids/Batteries | ☐ | ☐ | Braille Print | ☐ |
| ☒ | Notification Systems | ☒ | ☒ | Braille Equipment | ☒ |
| ☐ | Visual Smoke Detector | ☐ | ☐ | Magnifiers | ☐ |
| ☐ | Preferred Seating | ☐ | ☒ | Tape Player/Cassettes **Replacment** | ☒ |
| ☒ | Shake Awake Alarm | ☒ | ☐ | Lamp | ☐ |
| ☐ | Pocket Talker | ☐ | ☒ | Visor/Sunglasses for indoor use | ☒ |
| ☐ | Headphones | ☐ | ☒ | Other **Sara or Omni Scanner** | ☒ → if available |

(Incarcerated Individual's Signature)    **J. Birdsall ORC** (Staff Name/Title)    (Staff Signature)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**MEDICAL VERIFICATION** (Use established definitions)

☐ Severe Visual Impairment (V230)    ☒ Legally Blind (B240)    ☒ Non-Significant Hearing Loss (HL30)
☐ Hard of Hearing (HL20)    ☐ Deaf (HL10)
☐ No Medical Verification on File    Follow-up Appointment Necessary? ☐ Yes ☒ No

Approved as noted above. Jude had his cane confiscated on 8/7/24 because he was using it + phish on the gallery. He has been escorted on a hands on fashion out of his cell.

**Christopher Wright** (Medical Staff - Name/Title)    (Med. Staff Signature)    (Date)

Return this form to the Staff member whose name appears next to the incarcerated individual's signature above.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**REASONABLE ACCOMMODATION DETERMINATION**

The reasonable accommodations requested above have been:

☐ Approved as requested
☒ Modified - accommodations which have been approved are marked above
☐ Denied
☐ Pending medical verification

EXPLANATION of modification or denial: Approved for sighted guide and has CCTV

(DSP or designee)    (Signature)    9/27/24 (Date)

This section is to be completed by the incarcerated individual.

☐ I agree    ☒ I disagree with this determination
☒ I want to meet with the Superintendent or designee during this review.
☐ I want to have an interpreter with me or other assistive device during this meeting.

(Incarcerated Individual's Signature)    10-1-24 (Date)

Form 2612B (02/23)
PHOTOCOPY LOCALLY AS NEEDED                                                    Page **2** of **2**
*********************************************************************************

**SUPERINTENDENT'S REVIEW** (Superintendent's designee may conduct this review)

Date Received _10/2/24_          Date of meeting with incarcerated individual (if necessary) _N/A_
Your request for reasonable accommodation has been:

☐ Approved as requested

☑ Modified                                                                    **RECEIVED**

☐ Denied

                                                                              SEP 20 2024

Explanation: _approval for use of guidance counselor and_
_____ _program_                                              **EXEC OFFICE**

_____

Was sign language interpreter used at meeting?   ☐ Yes   ☐ No   N/A

Was sign language interpreter used to interpret decision?   ☐ Yes   ☐ No?   N/A

If not, explain why not _____

_____               _10/3/24_
Signature of Superintendent or designee                  Date

**This section is to be completed by the incarcerated individual.**

☑ I have been advised of my right to grieve this decision via the Incarcerated Grievance Program.

_____               _10/2/24_
Signature of incarcerated individual                     Date

Distribution:    Original: Guidance File
                 Copies:  Incarcerated Individual
                          Medical
                          OMH
                          Community Supervision
                          ADA Coordinator (Central Office)

Exhibit

C

NYSCEF DOC. NO. 82                                                        RECEIVED NYSCEF: 06/18/2024

STATE OF NEW YORK
SUPREME COURT                                                  ALBANY COUNTY

**FUQUAN FIELDS et al**

Petitioners,          **DECISION & ORDER**
Index No.: 902997-23

-against-

**DANIEL F. MARTUSCELLO III**

Respondent.

Supreme Court, Albany County
Present: Hon. Kevin R. Bryant, J.S.C.

Appearances:

**Petitioners:**
Antony Philip Gemmell / Molly K. Biklen / Ifeyinwa Karen Chikezie
*Attorneys for Petitioners*
New York Civil Liberties Union
125 Broad St. Fl 19
New York, NY 10004

Andrew Austin Stecker / Hallie Elizabeth Mitnick / Elise Marie Czuchna
*Attorneys for Petitioners*
Prisoners' Legal Services of New York
14 Lafayette Sq Ste 510
Buffalo, NY 14203

Fuquan Fields, Inmate # 07-B0-859
Great Meadow Correctional Facility
Comstock, New York

Luis Garcia, Inmate # 18-A-4619
Five Points Correctional Facility
Romulus, New York

Jimmy Barner, Inmate # 18-B-2873
Gouverneur Correctional Facility
Gouverneur, New York

1

**Respondent:**
Letitia James
ATTORNEY GENERAL OF THE STATE OF NEW YORK
NYS ATTORNEY'S OFFICE
By: Ryan W. Hickey
Assistant Attorney General, of Counsel
The Capitol Justice Bldg. 320
Albany, New York 12224

**Bryant, K.:**

On May 26, 2023, an amended Petition and Complaint having been filed by Petitioners Fuquan Fields, Luis Garcia and Jimmy Butler (hereinafter referred to as "Petitioners") identified as a putative class action "hybrid" Article 78 and declaratory judgement proceeding; and

In said proceeding, Petitioners seek to challenge, *inter-alia*, the Department of Corrections and Community Supervision (hereinafter referred to as "DOCCS") confinement policy as being contrary to the provisions of the Humane Alternatives to Long-Term Solitary Confinement Act (hereinafter referred to as "HALT Act"); and

A Motion to Dismiss, Answer and Memorandum of Law in support having been filed by counsel for DOCCS requesting that the relief sought in the petition be denied and that the petition be dismissed in the entirety; and

A further Notice of Motion having been filed requesting that this Court certify the matter as a class-action pursuant to CPLR §901(a); and

By Decision and Order dated September 12, 2023, class certification was granted and the Motion to Dismiss was denied; and

Further submissions having been received by thus Court; and

A purported administrative record having been submitted by counsel for DOCCS; and

2

NYSCEF DOC. NO. 82                                                                RECEIVED NYSCEF: 06/18/2024

A Notice of Motion having been filed by Petitioners requesting an Order directing DOCCS to complete the administrative record, or, in the alternative, determining the Article 78 portion of the proceeding on the allegedly insufficient record presently before the Court; and

Petitioners having further requested an Order directing discovery in the declaratory action portion of the proceeding; and

A response having been received from DOCCS.

NOW, it is the finding of this Court that the petition is granted to the extent outlined herein and the motion seeking supplementation of the record and discovery is hereby denied as moot[1].

Findings of Fact

On January 12, 2023, while incarcerated at the Fishkill Correctional Facility and experiencing a mental-health crisis, Petitioner Fields allegedly exposed himself, urinated on the floor, threatened a Corrections Officer and threw "wet looking sugar packets" at the officer. He was charged with "assault on staff, lewd conduct and unhygienic acts". He was found guilty at a Tier III disciplinary hearing and received a one hundred twenty-day penalty which he served in a "Special Housing Unit" (hereinafter referred to as "SMU"). Petitioners allege that the Presiding Hearing Officer failed to issue a written decision containing findings regarding the conduct at issue rising to the level required under the HALT act[2].

---

[1] In determining this motion, this Court has considered documents filed on NYSCEF as cited herein as well as all other filings in this matter that have been electronically filed with the Court.

[2] Whereas section (H) of the Hearing Disposition Report indicates that reasons "must be found and clearly articulated", the Hearing Officer's report merely makes the conclusory assertion that "[b]eing violent towards, and assaulting, staff members threatens the safety of staff. The imposed confinement sanction will serve to limit incarcerated individual Field's ability to be violent towards staff members".

As correctly argued by Petitioner, there are no specific findings that the acts committed were "so heinous or destructive that placement of the individual in general population creates a significant risk of imminent serious

On or about September 20, 2022, while being held in a Residential Mental Health Unit at Coxsackie Correctional Facility, Petitioner Garcia allegedly threw an "unknown brown feces smelling liquid that purportedly hit two officers". A Tier III disciplinary hearing was held, he was found guilty of two counts of assault on staff and two counts of committing an unhygienic act and sentenced to a seven-hundred-and-thirty-day sanction to be served in a Residential Mental Health Unit ("RMHU"). The Presiding Hearing Officer's written determination did not include a specific determination that the acts that he committed constituted a heinous or destructive act nor that they "created a significant risk of imminent serious physical injury to staff or other incarcerated persons and created an unreasonable risk to the security of the facility" as required by CL §137(6)(k)(ii) (A-G)[3].

On January 13, 2023, while being held at the Gouverneur Correctional Facility, Petitioner Barner allegedly threw a "brown liquid substance [that] had the odor of feces". A Tier III disciplinary hearing was held, wherein he was found guilty of numerous charges, including, but not limited to assault on an inmate, unhygienic act and possession of contraband. Once again, the decision of the Hearing Officer did not include specific determinations as required by the provisions of the Corrections Law[4]. He was sentenced to two-hundred and ten days in a SHU.

---

physical injury to staff or other incarcerated persons and creates an unreasonable risk to the security of the facility" (NYSCEF doc. 28, page 8).

[3] In Section H (2) of the Hearing Disposition report, the Hearing Officer wrote that "assaulting staff while they are dealing with another issue incapacitated them from doing their job. This causes a reduction in security staff, a direct threat to the safety and security of the facility". Again, the Hearing Officer's findings do not include the terms "heinous", "destructive", "imminent" or "serious harm" and no specific findings were made with-regard-to these statutory predicates (NYSCEF doc. 31.)

[4] Section H (2) of the Hearing Disposition report simply states that "assault of other's poses a risk to the safety of everyone". Again, the Hearing Officer's findings do not include the terms "heinous", "destructive", "imminent" or "serious harm" and no specific findings were made with-regard-to these statutory requirements.

4

NYSCEF DOC. NO. 82                                          RECEIVED NYSCEF: 06/18/2024

Each Petitioner claims that he was disciplined in violation of the provisions of the HALT act and that he was placed in a setting that constitutes "segregated confinement" as that term is used in the CL §137. They each argue that DOCCS did not conduct a case-by-case analysis to determine whether the acts committed are "so heinous or destructive that placement of the individual in general population creates a significant risk of imminent serious physical injury to staff or other incarcerated persons and creates an unreasonable risk to the security of the facility". They argue that DOCCS has adopted a "policy" whereby any offense identified as a Tier IIII violation meets the criteria set forth in the HALT act, and that this policy is followed in all Tier III disciplinary proceedings. They further allege that this policy is in violation of the provisions of the HALT Act which require an evidentiary hearing and specific written findings set forth in a decision.

Petitioners argue that as a matter of course, DOCCS exceeds the durational limits by imposing "k (ii) confinement" for acts not specified in the applicable provisions of the Corrections Law and that DOCCS Hearing Officers routinely fail to make individual or written determinations that the statutory requirements have been met. Petitioners argue that they have each been harmed by DOCCS policy as they were each sentenced to lengthy periods of confinement without required individualized written findings regarding their specific acts of misconduct.

The administrative record submitted by DOCCS consists of the Tier III disciplinary records of the three named Petitioners, an affidavit from Anthony Rodriguez and an affidavit from Afsar Ali Khan. In its motion, Petitioners request that this Court direct that DOCCS supplement the record, explaining that "a complete administrative record should encompass, for example, information DOCCS considered in arriving at the k(ii) Confinement Policy; materials

5

describing or explaining the policy DOCCS ultimately adopted, and any alternatives DOCCS considered to the k(ii) Confinement Policy, including the reasons for rejecting those alternatives; and materials DOCCS developed to implement the policy, such as training materials and policy guidance"[5].

With-regard to discovery, Petitioners argue that "[b]locking discovery here would hamstring Petitioners ability to pursue a declaratory judgment, imposing an enormous barrier to meaningful relief for vast swaths of the class. Through their outstanding discovery requests, Petitioners seek information about the existence and scope of the policy both before and after the filing of this suit - - matters of central importance in their challenge [to] the Confinement Policy here"[6]. Petitioners further argue that "[w]ith no evidentiary submission by DOCCS, the Court should not accept DOCCS bald assertion that the challenged policy does not exist; and the Court should reject any attempt by DOCCS on that basis to justify its deficient administrative record". Finally, Petitioners argue that "[a]lternatively, with DOCCS now having confirmed – twice – that its administrative record here is complete, it would be appropriate for the Court to decide Petitioners' Article 78 challenge to the k(ii) Confinement Policy based on that record"[7].

In response to the motion, DOCCS argues that there is no basis to Order them to submit additional documents to complete the record and that the documents that have been submitted establish that the actions on review were neither arbitrary nor capricious. DOCCS does not specifically address Petitioners' claim that a policy has been adopted whereby all Tier III violations are pre-determined to be heinous and destructive and that they pose a risk of imminent serious harm. They have also failed to submit anything to address the claim that DOCCS

---

[5] NYSCEF doc. 71, page 9
[6] Id., page 6
[7] Id., page 10

6

c  -f  1 r

Hearing Officers routinely fail to make specific findings-of-fact to support determinations that are made under the HALT act.

With-regard-to the requested discovery, DOCCS argues that the claim raised is, in-actuality, "in the nature of a writ of mandamus" and that "mandamus is not available to compel a general course of official conduct or a long series of continuous acts, performance of which it would be impossible for a court to oversee". Counsel argues that "the requested disclosures are not material and necessary to the prosecution of Petitioners' claims" and that Petitioners are seeking "a voluminous amount of date and documents related to individual disciplinary claims of each class member". Counsel continues that "[t]o the extent the Court finds that DOCCS violated Section k(ii) at the individual Petitioner's disciplinary hearings, the Court may issue mandamus or declaratory relief stating so" and that "[a]ny relief due to the class members would apply under the principles of stare decisis". According to counsel for DOCCS, "[b]ased on the record before it, the Court can meaningfully review whether the DOCCS complied with Section k(ii) in rendering disciplinary determinations for the individual Petitioners and by extension the class members who they purport to represent"[8].

As addressed below, this Court agrees that the administrative record is sufficient to meaningfully review whether the DOCCS complied with the applicable statutory requirements and it is sufficient to determine Petitioners' requests that this Court "[d]eclare that the k(ii) Confinement Policy violates CL §137(6)(k)(ii)", that this Court compel DOCCS to comply with the requirements of CL §137(6)(k)(ii), that this Court "vacate, annul and enjoin the k(ii) Confinement Policy" and that this Court "vacate and annul DOCCS' determinations to place

_____

[8] NYSCEF doc. 73, page 6

members of the proposed class in extended segregated confinement; a residential rehabilitation unit; or any other unit for which compliance with CL §137(6)(k)(ii) is required.

Applicable Law

The HALT act was enacted by the New York State Legislature in 2021. As set forth in Corrections Law §137, the HALT act imposes specific limits and regulations regarding the placement of individuals in segregated and other specific forms of disciplinary confinement. The HALT Act defines segregated confinement as a type of confinement in which the incarcerated individual is offered less than seven hours out-of-cell programming or other out-of-cell activities daily[9]. HALT limits segregated confinement to not more than fifteen consecutive days or twenty total days in any sixty-day period[10].

Specifically, CL §137[6][k] provides in relevant part that

The department may place a person in segregated confinement beyond the limits of subparagraph (i) of this paragraph or on a residential rehabilitation unit only if, pursuant to an evidentiary hearing, it determines by written decision that the person committed one of the following acts and if the commissioner or his or her designee determines in writing based on specific objective criteria the acts were so heinous or destructive that placement of the individual in general population housing creates a significant risk of imminent serious physical injury to staff or other incarcerated persons, and creates an unreasonable risk to the security of the facility.

Petitioners argue herein that the actions of DOCCS with-regard-to the imposition of solitary confinement are arbitrary and capricious and request that this Court declare as null and void the alleged policy whereby Hearing Officers, as a matter of course, find that all Tier III violations meet the requirements of HALT for solitary confinement. With regard to the argument that DOCCS actions were arbitrary and capricious, as recently explained by the Court of Appeals in Matter of Brookdale Physicians v. Dept. of Finance, City of New York, ___

---

[9] Correction Law § 137 (6)(j)(ii)
[10] Correction Law § 137 (6)(i)

NYSCEF DOC. NO. 82                                              RECEIVED NYSCEF: 06/18/2024

N.Y.3d ____, 2024 NY Slip Op 01593 (2024), "[i]n reviewing an administrative agency determination, courts must ascertain whether there is a rational basis for the action in question or whether is it arbitrary and capricious . . . Arbitrary action is without sound basis in reason and is generally taken without regard to the facts . . . If the reviewing court finds that the determination is supported by a rational basis, then it must sustain the determination even of the court concludes that it would have reached a different result than the one reached by the agency"[11]. See also, C.F. v. NYC Dept. of Health, 191 A.D.3d 52 (2nd Dept., 2022)). When reviewing the DOCCS's actions pursuant to CPLR article 78, "the inquiry is limited to whether the resolution was made in violation of lawful procedure, was effected by an error of law or was arbitrary and capricious or an abuse of discretion" (Matter of East End Hangars v. Town of E. Hampton, N.Y., ____ A.D.3d ____, 2024 NY Slip Op 01708 (2nd Dept., 2024)).

"It is settled that a court's review of the propriety of an agency's determination is confined to the particular grounds invoked by the agency in support of its action . . . neither evidence nor arguments outside the administrative record may be considered" Matter of L&M Bus Corp. v. NYC Dept. of Education, 71 A.D.3d 127 (1st Dept., 2009)). See also, Matter of Yarbough, 95 N.Y.2d 342 (2000). "Judicial review of administrative determinations is limited to the facts adduced and the record made before the administrative agency" (Matter of Nur Ashki Jerahi Comm. v. NYC Loft Board, 80 A.D.3d 323 (1st Dept., 2010)).

"[A]n agency determination is arbitrary and capricious where the agency provides only a perfunctory recitation of relevant statutory factors or other required considerations as a basis for its conclusions . . . provides no reason whatsoever for its determination . . . or provides only a post hoc rationalization therefor" (Helm v. N.Y. State Div. of Hous. And Cmty. Renewal, ____

---

[11] Internal quotations, citations and punctuation omitted from all case quotations herein.

Misc.3d ____, 2023 NY Slip Op 34388(U) (Supreme Court, New York County, Dec. 13, 2023)).

See also, Baychester Payment Ctr. V. N.Y.S. Dept. of Fin. Servs., ____ Misc.3d ____, 2023 NY Slip Op 34262(U) (Supreme Court, New York County, Dec. 7, 2023); Duarte v. Adams, ____ Misc.3d ____, 2023 NY Slip Op 30957(U) (Supreme Court, New York County, March 22, 2023)).

Discovery

With-regard-to the instant motion for discovery, it is well settled that "[u]nder CPLR article 78, a petitioner is not entitled to discovery as of right but must seek leave of court pursuant to CPLR 408. Because discovery tends to prolong a case and is therefore inconsistent with the summary nature of a special proceeding, discovery is granted only where it is demonstrated that there is a need for such relief" (see, Matter of Johnson v. Annucci, 208 A.D.3d 1403 (3rd Dept., 2022)). See also, Matter of Bramble v. New York City Dept. of Education, 125 A.D.3d 856 (2nd Dept., 2015); Pyramid Management Group v. Board of Assessors, 243 A.D.2d 876 (3rd Dept., 1997); Lynch v. Bd. of Education, ____ Misc.3d ____, 2023 NY Slip Op 30250 (Supreme Court, New York County, January 25, 2023)).

With-regard-to discovery in the declaratory portion of the proceeding, "[t]he supervision of discovery, and the setting of reasonable terms and conditions for disclosure, are within the sound discretion of the Supreme Court. The Supreme Court's discretion is broad because it is familiar with the action before it" (Hamed v. Alas Realty Corp., 209 A.D.3d 628 (2nd Dept., 2022))[12]. See also, Umana v. Tower E. Condo., 208 A.D.3d 710 (2nd Dept., 2022)).

---

[12] Internal citations, quotations and punctuation omitted in all quotations contained herein.

NYSCEF DOC. NO. 82                                    RECEIVED NYSCEF: 06/18/2024

Discussion

Petitioners allege that with regard to each named inmate, after the Hearing Officers made findings on the specific charges, the "disposition did not contain a determination that any of the alleged conduct constituted an act defined under CL §137(6)(k)(ii)(A-G) nor did the dispositions contain written determinations that the inmate's conduct 'was so heinous or destructive that . . . placement in general population housing would create a significant risk of imminent serious physical injury to staff or other incarcerated persons and create an unreasonable risk of safety to others'"[13]. While DOCCS denies these specific allegations in their answer and "respectfully refers the Court to the referenced document as the best evidence of its content"[14], DOCCS fails to cite to any specific language in the Hearing Officer's dispositions that satisfy the statutory requirements. Moreover, assertions in the DOCCS submissions are consistent with the claim that fact specific determinations are not being made on a case-by-case basis by Hearing Officers, but rather being made in accordance with a policy or pre-determined outcome dictated by DOCCS[15].

This Court has reviewed the referenced documents as suggested in the answer and finds that contrary to DOCCS' assertions, there are no specific findings as required by the applicable legislation. In point-of-fact, neither the term "heinous" nor the term "destructive" appear anywhere in the referenced documents and there are no specific findings or explanations set forth regarding the apparent conclusion that the acts committed "created a significant risk of imminent serious physical injury to staff or other incarcerated persons" nor that they "create an

---

[13] NYSCEF Doc. 24, page 12
[14] NYSCEF Doc. 41
[15] See, NYSCEF Doc. 45, para. 36 wherein Anthony Rodriguez, the Director of the Special Housing and Incarcerated Individual Disciplinary Program, states that "DOCCS considers the throwing of urine and/or feces to be manifestly heinous or destructive".

11

unreasonable risk of safety to others"[16]. The controlling legislation specifically and unambiguously requires these factual determinations be made in writing prior to the imposition of the extreme measure of solitary confinement. Given the absence of anything in the record to establish that such specific findings were made, this Court is constrained to find that the DOCCS' determinations as challenged were void and unlawful.

Moreover, insofar as Petitioners have alleged that each named member of the class was subjected to an agency wide policy which results in a system wide failure to make findings, and the documents submitted corroborate this allegation, the burden was clearly on the DOCCS to demonstrate that this claim is inaccurate. DOCCS' initial administrative record included nothing to rebut the allegation that a policy exists and is followed by assigned Hearing Officers. Specifically, they failed to offer training materials, memorandum or other documentary evidence to show that Hearing Officers follow the relevant requirements of the HALT Act, nor have they submitted relevant affirmations from individuals with personal knowledge to establish that the alleged policy does not exist nor that it is followed precisely as alleged by Petitioners.

More significantly, even in response to the motion for discovery, when given an opportunity to supplement the record with some documentation to refute Petitioners allegation of a system wide failure to make required findings, DOCCS has provided the Court with nothing persuasive. This Court has reviewed the forms used by the Hearing Officers to elaborate on the findings made regarding the named representatives of the class and finds that the findings are consistent in approach and detail. Specifically, each of the findings are set forth in general conclusory fashion and they do not explain how the specific conduct of the prisoner meets the

---

[16] In reaching this conclusion, this Court is not finding that the circumstances and the offenses that were committed would not support the required findings of fact but rather, that specific findings are required, and they were not made in any of the three proceedings before this Court.

12

IYSCEF DOC. NO. 82                                                           RECEIVED NYSCEF: 06/18/202<

statutory requirements for the imposition of the sanction imposed. Moreover, each individual disposition report fails to articulate the seriousness or imminency of the potential harm that the prisoner's conduct risked or caused.

This Court has considered and herein rejects DOCCS' arguments that these findings are "inherent" in the acts committed. While this Court would generally be required to defer to the findings of the DOCCS as-long-as specific findings are made and supported by a rational explanation, here, no findings were made, and no explanations were set forth in the decisions at issue. Given the language of the statute, it is the finding of this Court that DOCCS cannot rely on alleged inherency or the nature of the offenses at issue. The required fact-specific findings have not been set forth in the documents before the Court and DOCCS presents no basis for this Court to reject the claim that these examples are representative of the entire class.

This Court has also considered the affidavit of Afsar Ali Khan, MD and finds that it does not satisfy DOCCS' burden, as there is no indication that this opinion was placed before the Hearing Officers in the cases presented to the Court. As such, it is not properly part of the administrative record and constitutes a *post hoc* justifications of the actions that are before this Court in this proceeding. With-regard-to the affidavit of Anthony Rodriguez, it is the finding of this Court that there is nothing in the affidavit to contradict the allegation made by Petitioners that DOCCS follows the alleged policy rather than making case specific findings of fact and conclusions as specifically required by the controlling statute.

Conclusions

For the foregoing reasons, it is the finding of this Court that the administrative record and affidavits submitted in support of the agency's action do not adequately refute the allegation in the complaint that DOCCS has failed to follow the mandates of the HALT Act. Moreover,

13

DOCCS has failed to sufficiently refute the claim that the "k(ii) Confinement Policy" has been adopted and is being followed by DOCCS' Hearing Officers. DOCCS has the responsibility to submit an administrative record that supports their actions and they have failed to meet this burden. In this regard, the deficiencies in the agency's record were specifically addressed by Petitioners in their motion seeking this Court's directive that the record be expanded. Despite this opportunity, DOCCS failed to submit any additional documentation or support for the policy at issue. Notably, at this late juncture, other than the general and ambiguous denial in their answer, DOCCS has still failed to specifically admit or deny that the challenged policy exists. They have also failed to outline in any submission the precise process that their Hearing Officer's follow when making required findings under the HALT Act.

It is therefore the finding of this Court, based on the administrative record submitted herein, that DOCCS is following a policy referred to by Petitioners as the "k (2) Confinement Policy" not authorized by statute. It is the finding of this Court that given the complete lack of support or justification for such a policy, it is hereby declared null and void as arbitrary and capricious and not in compliance with the requirements of the HALT Act.

It is the finding of this Court that DOCCS is hereby Ordered to comply with CL S137(6)(k)(ii) and to conduct fact-specific inquiries and make specific findings-of-fact in any hearings requesting an extended segregated confinement.

This Court further finds that any and all determinations made to place members of the certified class in extended segregated confinement, a residential rehabilitation unit, or any other unit requiring compliance with CL §137(6)(k)(ii), made pursuant to the k(2) Confinement Policy, or determinations made without required specific written findings of fact and conclusions, are hereby declared as null and void.

14

NYSCEF DOC. NO. 82

RECEIVED NYSCEF: 06/18/2024

902997-23

With-regard-to the Notice of Motion filed by Petitioners requesting discovery, insofar as this Court has granted the relief requested in the petition and has made findings regarding all stated claims based upon the record submitted, the request for further discovery is denied as moot.

Finally, with-regard-to counsel fees, both parties are hereby granted leave to submit further affirmations and arguments regarding fees and this Court's determination of the fee portion of the petition is hereby held in abeyance pending further submission.

This shall constitute the Decision and Order of the Court.

The signing of this Decision and Order shall not constitute entry or filing under CPLR §2220. Counsel is not relieved from the applicable provisions of that rule regarding notice of entry.

Dated: June 18, 2024
      Kingston, New York

**ENTER,**

_Kevin R. Bryant_

**HON. KEVIN R. BRYANT, J.S.C.**

15

 

ACLU of New York

Prisoners'
Legal Services
of New York

### *Fields v. Martuscello* **Frequently Asked Questions**

(Current as of August 28, 2024)

- **What is the *Fields v. Martuscello* lawsuit about?**
  - This lawsuit is against DOCCS for putting people in segregated confinement or other types of disciplinary confinement (known as "k(ii) confinement") in violation of the HALT Act
  - Under the HALT Act, DOCCS cannot put anyone in k(ii) confinement unless it makes special findings: both (1) a person committed one of seven actions described in the HALT Act, *AND* (2) the action was very dangerous or destructive.
  - We filed this lawsuit because DOCCS has been violating the HALT Act by putting people in k(ii) confinement without making these findings.

- **What is "k(ii) confinement"?**
  - "k(ii) confinement" is named after Correction Law § 137(6)(k)(ii), which is the section of the HALT Act that limits placement in segregation or other types of disciplinary confinement.
  - "k(ii) confinement" includes any of the following:
    - Special Housing Unit placement for *more than three days*
    - Residential Rehabilitation Unit placement for *any* duration
    - *Disciplinary* placement in Residential Mental Health Treatment Units and some other specialized housing settings for *any duration*.

- **Am I part of the *Fields* lawsuit?  How do I know if I'm a member of the *Fields* class?**
  - *Fields* is a class-action lawsuit.  This means the plaintiffs in the lawsuit represent other people with the same legal issue.
  - You are a member of the *Fields* class and part of the lawsuit if any of the following apply to you.
    - 1. You were placed in k(ii) confinement at any time since March 31, 2022
    - 2. You are currently in k(ii) confinement
    - 3. You are placed in k(ii) confinement in the future.

- o You do not need to take any action to join the lawsuit.  If you are in the class, you are automatically part of the lawsuit.

- **What is the status of the lawsuit?**
  - o On June 18, 2024, the court decided that the plaintiffs (the incarcerated people who sued DOCCS) won the lawsuit.
  - o DOCCS did not appeal the court's decision, which means the decision is final and DOCCS must follow the court's ruling.

- **What did the Court's June 18, 2024 decision say?**
  - o The court ruled that DOCCS violated the law by putting people in k(ii) confinement without making the special findings required by the HALT Act.
  - o The court ordered DOCCS to comply with the HALT Act by making the special findings that the law requires before putting anyone in k(ii) confinement.
  - o The court invalidated any decision by DOCCS to place people in k(ii) confinement without making the special findings required by HALT.

- **What does the Court's June 18, 2024 decision mean for me?**
  - o If you were *previously* in k(ii) confinement: DOCCS must remove records of this confinement from your disciplinary history unless DOCCS can show that it made the special findings required by the HALT Act.
  - o If you are *currently* in k(ii) confinement: DOCCS's decision to put you in k(ii) confinement is valid *only* if DOCCS made the special findings required by the HALT Act in writing.  If DOCCS did not make those special findings in writing, DOCCS's decision to put you in k(ii) confinement is invalidated, and DOCCS can only keep you in k(ii) confinement by conducting a new disciplinary hearing and making those special findings.
  - o If you are *not* currently in k(ii) confinement: DOCCS cannot place you in k(ii) confinement without making the special findings required by the HALT Act.

- **Can I receive money from this lawsuit?**
  - o No. This lawsuit did not seek money damages.

- **I believe DOCCS is holding me in k(ii) confinement in violation of the HALT Act. What should I do?**
  - o If you believe DOCCS is violating the court's order and holding you in k(ii) confinement in violation of the HALT Act, please get in contact with our team. You can contact us at:

Fields Case Team
c/o Prisoners' Legal Services of New York
41 State Street, Suite M112
Albany, NY 12207

- **I have a different HALT violation to report.  What should I do?**
    - o If you are experiencing an ongoing HALT violation and wish to request possible legal assistance, you can write to Prisoners' Legal Services of New York and/or the Prisoners' Right Project at the Legal Aid Society.
    - o You can also report violations of HALT to the NYS Justice Center for the Protection of People with Special Needs at 161 Delaware Avenue, Delmar, New York 12054-1310.

- **I want to appeal my Tier III hearing disposition. What should I do?**
    - o You have thirty days after the conclusion of your Tier III Hearing to appeal the hearing disposition.  You should address your appeal to Commissioner Martuscello or Anthony Rodriguez, Director, Special Housing/Incarcerated Individual Disciplinary Programs.

- **My question about the *Fields* case is not addressed above.  What should I do?**
    - o If you have other questions about the *Fields* case, you may contact us in writing at:

Fields Case Team
c/o Prisoners' Legal Services of New York
41 State Street, Suite M112
Albany, NY 12207

Westlaw.

Slip Copy, 2012 WL 2402593 (S.D.N.Y.)
(Cite as: 2012 WL 2402593 (S.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Leroy PEOPLES, Plaintiff,
v.
Brian FISCHER, DOCS Commissioner, Lucien Le-
claire, Jr., DOCS Office of Counsel, William Lee,
Peter A. Crusco, Eric C. Rosenbaum, Richard A.
Brown, Lt. L. Ward, Sgt., O'Connor, Co. Malare,
Co. Drown, Norman Bezio, D. Rock, Lt. Ward, and
Karen Bellamy, Defendants.

No. 11 Civ. 2694(SAS).
June 26, 2012.

LeRoy Peoples, Attica, NY, pro se.

Jeb Harben, Assistant Attorney General, New York,
NY, for Defendants.

**OPINION AND ORDER**

SHIRA A. SCHEINDLIN, District Judge.

**I. INTRODUCTION**

*1 As the Commission on Safety and Abuse in
America's Prisons recently found, Ú[t]he overreli-
ance on and inappropriate use of segregation hurts
individual prisoners and officers. But the con-
sequences are broader than that: The misuse of se-
gregation works against the process of rehabilitat-
ing people and threatens public safety.ú FN1 In
2010, the American Bar Association approved its
Criminal Justice Standards on the Treatment of
Prisoners, which recommend that Ú[s]egregated
housing should be for the briefest term and under
the least restrictive conditions practicable and con-
sistent with the rationale for placement and with the
progress achieved by the prisoner.ú FN2 The ABA
emphasized that

FN1. John J. Gibbons and Nicholas de B.
Katzenbach, *Confronting Confinement: A
Report of the Commission on Safety and*

*Abuse in America's Prisons* at 53ŧ54
(2006) (explaining that Úthe actual risk
someone presents to the prison community
should be carefully considered before se-
gregating the person,ú that segregation
should be Úa last resort and a more pro-
ductive form of confinement,ú and that the
use of isolation should be ended). *Accord*
Stuart Grassian, *Psychiatric Effects of Sol-
itary Confinement,* 22 Wash. U. J.L. &
Pol'y 325, 327 (2006). *See also* Jamie
Goldberg, *Solitary confinement 'is driving
men insane,' exonerated convict testifies,*
L.A. Times, June 19, 2012 (describing
Senate Judiciary Committee hearing on
solitary confinement); Editorial, *The Abuse
of Solitary Confinement,* N.Y. Times, June
20, 2012.

FN2. Standard 23ŧ2.6 Rationales for se-
gregated housing.

Correctional authorities should use long-term se-
gregated housing sparingly and should not place
or retain prisoners in such housing except for
reasons relating to:

(i) discipline after a finding that the prisoner has
committed a very severe disciplinary infraction,
in which safety or security was seriously
threatened; [or]

(ii) a credible continuing and serious threat to the
security of others or to the prisoner's own safety. FN3

FN3. Standard 23ŧ2.7 Rationales for long-
term segregated housing.

As to disciplinary segregation, the ABA recom-
mended that Úonly the most severe disciplinary of-
fenses, in which safety or security are seriously
threatened, ordinarily warrant a sanction that ex-
ceeds 30 days placement in disciplinary housing,

à 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 2402593 (S.D.N.Y.)
(Cite as: 2012 WL 2402593 (S.D.N.Y.))

and *no placement in disciplinary housing should exceed one year.*" [FN4] These ABA standards are not radical or fringe views: on the contrary, "[t]he Standards' unique contribution ... is to address all the aspects of long-term segregation by presenting solutions that embody *a consensus view of representatives of all segments of the criminal justice system* who worked on them together in the exhaustive and collaborative ABA Standards process." [FN5]

> FN4. Standard 23‑4.3 Disciplinary sanctions (emphasis added).

> FN5. Margo Schlanger, *Regulating Segregation: The Contribution of the ABA Criminal Justice Standards on the Treatment of Prisoners,* 47 Am.Crim. L.Rev. 1421, 1423 (2010) (emphasis added).

Leroy Peoples was housed in segregation for over two years, even though there was never any finding that he posed a threat to the safety of others or the security of the prison. His placement in the SHU for such a time period was grossly disproportionate to the non-violent violation that he was found to have committed. He has therefore stated a plausible claim that defendants violated his Eighth Amendment right to be free from cruel and unusual punishment.

## II. PROCEDURAL POSTURE

On May 3, 2012, this Court issued an Opinion and Order (the "May 3, 2012 Order") dismissing, in part, plaintiff's Complaint for failure to state a claim. [FN6] Defendants now seek reconsideration on the following grounds: (1) defendants Ward, Bezio and Rock are entitled to qualified immunity; and (2) Ward was not personally involved. For the reasons stated below, defendants' motion for reconsideration is granted in part and denied in part.

> FN6. *See Peoples v. Fischer,* No. 11 Civ. 2694, 2012 WL 1575302 (S.D.N.Y. May 3, 2012).

## III. FACTUAL BACKGROUND

Peoples is currently an inmate at Upstate Correctional Facility and was previously an inmate at Green Haven Correctional Facility. [FN7] On October 5, 2009, while Peoples was at Green Haven, Sergeant O'Connor and Corrections Officer ("CO.") Malare approached him while he was working and performed a pat and frisk search. [FN8] Peoples was then escorted to his cell, F‑Block 150, which O'Connor and Malare then searched. [FN9] Peoples alleges that certain papers were seized and that his personal and legal mail, family photos, clothing, and other miscellaneous property was scattered all over his cell. [FN10]

> FN7. *See* Compl., I(A) and II(A).

> FN8. *See id.* III(D) ¶ 2.

> FN9. *See id.*

> FN10. *See id.* ¶¶ 1, 11.

*2 Peoples was immediately taken to the Special Housing Unit ("SHU") and placed in solitary confinement. [FN11] The next day, October 6, 2009, Peoples was served with an Inmate Misbehavior Report (the "Report"), which alleged that he violated Rules 107.21 [FN12] and 113.30 [FN13] of the Standards of Inmate Behavior rule book (hereafter "Rules"). The Report further states that on October 5, 2009, prior to the cell search, CO. O'Connor received a packet of papers from the Queens County District Attorney's Office. [FN14] The accompanying cover letter identified the papers as "U.C.C. [and] other financial claims that are bogus [and] without legal basis." [FN15] The Report states that the subsequent search of Peoples' cell "produced approx [imately] 148 documents which all also appear to violate the above referenced charges." [FN16]

> FN11. *See id.* ¶ 2.

> FN12. *See id.* Rule 107.21 states that "[a]n inmate shall not file or record any document or instrument of any description which purports to create a lien or record a security interest of any kind against the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 2402593 (S.D.N.Y.)
(Cite as: 2012 WL 2402593 (S.D.N.Y.))

person or property of any officer or employee of the Department, the State of New York, or the United States, absent prior written authorization from the superintendent or a court order authorizing such filing.û 7/24/09 Inmate Rule Book Additions, Ex. A to Compl., at 6.

FN13. Rule 113.30 provides that Û[a]n inmate shall not possess any Uniform Commercial Code (ÛUCCû) Article 9 Form, including but not limited to any financing statement, ... correction statement ..., or information request whether printed, copied, typed or hand written, or any document concerning a scheme involving an inmate's t'strawman.Û Û 7/24/09 Inmate Rule Book Additions, Ex. A to Compl., at 6.

FN14. *See* Compl., III(D) ï 1.

FN15. *Id.*

FN16. *Id.*

On October 13, 2009, a misbehavior report hearing was conducted which Peoples alleges, had the Ûnormal formalities of a hearing.û [FN17] At the end of the hearing, Peoples was sentenced to three years confinement in the SHU, a three-year loss of phone, package, and commissary privileges, and seventy-two months recommended loss of good time credit.[FN18] Peoples appealed the hearing disposition to SHU Director Bezio who denied his appeal.[FN19] In November of 2009, while still confined in the SHU and under Superintendent Rock's watch, Peoples was involved in a fist fight with fellow inmate Larry Allen and lost a tooth.[FN20]

FN17. Compl., III(D) ï 3.

FN18. *See id. See also* Superintendent Hearing Disposition Report, Ex. A to Compl., at 2. At the time of the hearing, Peoples had not yet accrued seventy-two months of good time credit. *See* Compl., III(D) ï 3.

FN19. *See* Compl., III(D) ï 4.

FN20. *Id.* ïï 8, 9.

On March 7, 2011, Peoples filed a grievance in connection with the alleged violations of his constitutional rights.[FN21] The grievance referenced violations of his rights under the First, Sixth, and Fourteenth Amendments of the Constitution of the United States.[FN22] Peoples complained about the addition of Rules 107.21 and 113.30 and complained that he was affected by these Rules by being placed in the SHU for three years, along with three years of lost phone, package and commissary privileges.[FN23]

FN21. *See* 3/7/11 Inmate Grievance, Ex. A to Compl., at 4.

FN22. *See id.*

FN23. *See id.*

On March 9, 2011, Peoples received a response from the Inmate Grievance Review Committee (ÛIGRCû) and simultaneously appealed to the Superintendent of the Department of Correctional Services (ÛDOCSû).[FN24] On March 15, 2011, Superintendent Rock responded to Peoples' appeal.[FN25] Two days later, on March 17, 2011, Peoples appealed to the Central Office Review Committee (ÛCORCû).[FN26] On April 18, 2011, Peoples commenced the instant action. On June 8, 2011, he received a response from the CORC affirming the denial of his grievance.[FN27]

FN24. *See* Compl., III(D) ï 8. *See also* 3/9/11 IGRC Response, Ex. A to Compl., at 5.

FN25. *See* 3/15/11 Response from Inmate Grievance Program Superintendent, Ex. A to Compl., at 6.

FN26. *See id.*

FN27. *See* 6/8/11 CORC Response, Ex. B

à 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 4

Slip Copy, 2012 WL 2402593 (S.D.N.Y.)
(Cite as: 2012 WL 2402593 (S.D.N.Y.))

to Plaintiff's Memorandum in Opposition to Defendants' Motion to Dismiss ("Opp.Mem.") at 1.

Peoples generally suffers from "stress, fear ... depression and other psychological impacts" of his confinement in the SHU, which he has described as "psychological torture." [FN28] Peoples alleges that Superintendent Rock was personally involved in the deprivation of Peoples' constitutional rights because Rock confined Peoples in the SHU, upheld the CORC's determination of Peoples' appeal, and was in a supervisory role at the time Peoples was involved in a fist fight with Allen. [FN29] SHU Director Bezio is personally involved in his deprivation, Peoples argues, as he "affirmed and confirmed the disposition of unlawful confinement and revoked privileges" in violation of Peoples' constitutional rights. [FN30] Peoples alleges that Lieutenant Ward was personally involved because he authorized the seizure of Peoples and his papers as well as his unlawful confinement in the SHU. [FN31]

FN28. Compl., III(D) ¶¶ 7, 9.

FN29. See id. ¶¶ 1, 8.

FN30. Id. ¶ 4.

FN31. See id. ¶¶ 1, 10. In April 2010, Peoples drafted a request for an Article 78 proceeding addressing some of the issues raised in the instant Complaint. Upon his return from state court, however, the Article 78 motion was confiscated by corrections officers acting under Rock's orders. See id. ¶ 17(g).

IV. LEGAL STANDARD

A. Motion for Reconsideration

*3 Motions for reconsideration are governed by Local Rule 6.3 and are committed to the sound discretion of the district court. [FN32] A motion for reconsideration is appropriate where "the moving party can point to controlling decisions or data that

the court overlooked-matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." [FN33] A motion for reconsideration may also be granted to "correct a clear error or prevent manifest injustice." [FN34]

FN32. See Patterson v. United States, No. 04 Civ. 3140, 2006 WL 2067036, at *1 (S.D.N.Y. July 26, 2006) ("The decision to grant or deny a motion for reconsideration is within the sound discretion of the district court.") (citing McCarthy v. Manson, 714 F.2d 234, 237 (2d Cir.1983)).

FN33. In re BDC 56 LLC, 330 F.3d 111, 123 (2d Cir.2003) (quotation marks omitted).

FN34. RST (2005) Inc. v. Research in Motion Ltd., No. 07 Civ. 3737, 2009 WL 274467, at *1 (S.D.N.Y. Feb. 4, 2009) (quoting Virgin Atl. Airways, Ltd. v. National Mediation Bd., 956 F.2d 1245, 1255 (2d Cir.1992)).

The purpose of Local Rule 6.3 is to "ensure the finality of decisions and to prevent the practice of a losing party examining a decision and then plugging the gaps of a lost motion with additional matters." [FN35] Local Rule 6.3 must be "narrowly construed and strictly applied so as to avoid repetitive arguments on issues that have been considered fully by the Court." [FN36] Courts have repeatedly been forced to warn litigants that such motions should not be made reflexively to reargue "those issues already considered when a party does not like the way the original motion was resolved." [FN37] A motion for reconsideration is not an "opportunity for making new arguments that could have been previously advanced," [FN38] nor is it a substitute for appeal. [FN39]

FN35. Grand Crossing, L.P. v. United States Underwriters Ins. Co., No. 03 Civ. 5429, 2008 WL 4525400, at *3 (S.D.N.Y. Oct. 6, 2008) (quoting S.E.C v. Ashbury

à 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 5

Slip Copy, 2012 WL 2402593 (S.D.N.Y.)
(Cite as: 2012 WL 2402593 (S.D.N.Y.))

*Capital Partners,* No. 00 Civ. 7898, 2001 WL 604044, at *1 (S.D.N.Y. May 31, 2001)). *Accord Commerce Funding Corp. v. Comprehensive Habilitation Servs., Inc.,* 233 F.R.D. 355, 361 (S.D.N.Y.2005) ("[A] movant may not raise on a motion for reconsideration any matter that it did not raise previously to the court on the underlying motion sought to be reconsidered.").

FN36. *United States v. Treacy,* No. 08 CR 366, 2009 WL 47496, at *1 (S.D.N.Y. Jan. 8, 2009) (quotation marks and citation omitted). *Accord Shrader v. CSX Transp. Inc.,* 70 F.3d 255, 257 (2d Cir.1995) (holding that a court will deny the motion when the movant "seeks solely to relitigate an issue already decided").

FN37. *Makas v. Orlando,* No. 06 Civ. 14305, 2008 WL 2139131, at *1 (S.D.N.Y. May 19, 2008) (quoting *In re Houbigant, Inc.,* 914 F.Supp. 997, 1001 (S.D.N.Y.1996)).

FN38. *Associated Press v. United States Dep't of Defense,* 395 F.Supp.2d 17, 19 (S.D.N.Y.2005).

FN39. *See Grand Crossing,* 2008 WL 4525400, at *3.

**B. Qualified Immunity**

Agency officials performing discretionary functions are generally granted qualified immunity and are immune from suit provided that "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." " FN40 The Second Circuit has held that "[a] right is clearly established if (1) the law is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has recognized the right, and (3) a reasonable defendant [would] have understood from the existing law that [his] conduct was unlawful." FN41

FN40. *Luna v. Pico,* 356 F.3d 481, 490 (2d Cir.2004) (quoting *Wilson v. Layne,* 526 U.S. 603, 614 (1999)).

FN41. *Id.* (quotation marks and citations omitted).

To prevail on a motion to dismiss on the basis of qualified immunity "[n]ot only must the facts supporting the defense appear on the face of the complaint, but as with all Rule 12(b)(6) motions ... the plaintiff is entitled to all reasonable inferences from the facts alleged, not only those that support his claim, but also those that defeat the immunity defense." FN42

FN42. *McKenna v. Wright,* 386 F.3d 432, 436 (2d Cir.2004). *Accord Percinthe v. Mien,* No. 08 Civ. 893, 2008 WL 4489777, at *3 (S.D.N.Y. Oct. 4, 2008).

**V. DISCUSSION**

**A. Personal Involvement of Ward**

Defendants point out that although Lt. Ward authorized the seizure of Peoples and his papers as well as his initial confinement in the SHU, Peoples does not allege that Ward was personally involved in the SHU sentence following the disciplinary hearing or the denial of Peoples' appeal of that sentence. Defendants are correct. Because the only remaining claim relates to Peoples' three-year SHU sentence and not to the initial search, seizure and SHU confinement, there is no assertion that Lt. Ward was personally involved in the alleged constitutional violations.FN43 Because Ward's involvement was limited to the initial search, seizure and SHU confinement pending Peoples' disciplinary hearing, reconsideration is warranted. As such, defendants' motion to dismiss Lt. Ward for lack of personal involvement is granted.

FN43. *See Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1948‡ 49 (2009).

**B. Bezio and Rock are Not Entitled to Qualified**

à 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 6

Slip Copy, 2012 WL 2402593 (S.D.N.Y.)
(Cite as: 2012 WL 2402593 (S.D.N.Y.))

**Immunity at This Stage of the Proceedings**

*4 Defendants request reconsideration of the May 3, 2012 Order denying qualified immunity to Bezio and Rock as to the remaining Eighth Amendment claim.[FN44] To succeed on their claim for qualified immunity, Bezio and Rock must show that from the "face of the complaint they did not violate a clearly established right of which they should have known." [FN45] Defendants maintain that there is no clearly established law indicating that the length of a SHU sentence alone can be considered cruel and unusual punishment.

> FN44. Because Lt. Ward has now been dismissed from this lawsuit due to lack of personal involvement, there is no need to do a qualified immunity analysis as to him.

> FN45. *Percinthe,* 2008 WL 4489777, at *3 . *Accord McKenna,* 386 F.3d at 436 (internal citations omitted).

The Supreme Court has noted that "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution" and that " '[w]hen a prison ... practice offends a fundamental constitutional guarantee, federal courts will discharge their duty to protect constitutional rights.' " [FN46] "Confinement in a prison or in an isolation cell is a form of punishment subject to scrutiny under Eighth Amendment standards" and "the length of confinement cannot be ignored in deciding whether the confinement meets constitutional standards." [FN47] The Eighth Amendment "prohibits punishments which, although not physically barbarous, 'involve the unnecessary and wanton infliction of pain,' or are grossly disproportionate to the severity of the crime." [FN48]

> FN46. *Turner v. Safley,* 482 U.S. 78, 85 (1987) (quoting *Procunier v. Martinez,* 416 U.S. 396, 405–06 (1974)).

> FN47. *Hutto v. Finney,* 437 U.S. 678, 685–86 (1979).

> FN48. *Rhodes v. Chapman,* 452 U.S. 337, 346 (1981) (quoting *Gregg v. Georgia,* 428 U.S. 153, 173 (1976)).

The Supreme Court and Second Circuit have clearly established that lengthy durations of SHU confinement can constitute an "atypical and significant" hardship for purposes of determining an inmate's liberty interest within the context of a due process claim.[FN49] Moreover, the Second Circuit has held that

> FN49. See *Sandin v. Conner,* 515 U.S. 472, 484 (1995); *Sims v. Artuz,* 230 F.3d 14, 22–24 (2d Cir.2000); *Colon v. Howard,* 215 F.3d 227, 230–31 (2d Cir.2000).

lengthy segregated confinement of the type considered herein, after an inordinate lapse of time, may necessitate periodic review to insure that conditions once constitutional have not become cruel and unusual[.] [FN50]

> FN50. *Smith v. Coughlin,* 748 F.2d 783, 787 (2d Cir.1984) ( "Restraints on an inmate do not violate the amendment unless they are 'totally without penological justification,' 'grossly disproportionate,' or 'involve the unnecessary and wanton infliction of pain.' ") (quoting *Rhodes,* 452 U.S. at 346).

Here, the defendant served twenty-six months of a thirty-six month sentence imposing SHU confinement. Whether twenty-six or thirty-six months is the starting point, a sentence of either duration could be considered "atypical and significant" in determining whether an inmate had a liberty interest for due process purposes under *Sandin* and its progeny.[FN51]

> FN51. See *Sandin,* 515 U.S. 472, 484 (1995); *Sims,* 230 F.3d at 23 (sentence of one year was "of sufficient length to be atypical and significant"); *Colon,* 215 F.3d at 229 (a prisoner's SHU confinement for

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 2402593 (S.D.N.Y.)
(Cite as: 2012 WL 2402593 (S.D.N.Y.))

305 days was 'atypical' and a 'severe hardship').

Although the due process analysis is conceptually distinct from that of the Eighth Amendment, a finding of atypicality is, by analogy, indicative of whether a sentence is grossly disproportionate to the underlying offense. Numerous courts have found that long stretches of segregation can constitute cruel and unusual punishment.[FN52] Furthermore, courts have repeatedly determined that conditions of segregated confinement are unconstitutional if they do not meet certain minimum standards.[FN53] Thus, prison officials were arguably put on sufficient notice that a sentence of three years of SHU confinement for a non-violent infraction of prison rules could well be found to be grossly disproportionate and, therefore, in violation of the Eighth Amendment. Accordingly, the conduct of the CO defendants could be found to have violated Peoples's clearly established right to be free from cruel and unusual punishment. Further development of the record during discovery will assist in determining whether Peoples' conditions of confinement in the SHU violated a clearly established Eighth Amendment right.[FN54] Thus, Bezio and Rock's motion for reconsideration based on qualified immunity is denied at this stage in the proceedings, without prejudice and with leave to renew.

FN52. *See Morris v. Travisono,* 549 F.Supp. 291 (D.R.I.1982) *aff'd* 707 F.2d 28 (1st Cir.1983) (solitary confinement for 8.5 years of prisoner who murdered a prison guard and then engaged in minor acts of disobedience was without sufficient penological justification and constituted cruel and unusual punishment) *Silverstein v. Bureau of Prisons,* 704 F.Supp.2d 1077 (D.Colo.2010) (twenty-seven years of solitary confinement for prisoner who murdered three people while in prison stated a claim under the Eighth Amendment); *Carothers v. Follette,* 314 F.Supp. 1014, 1026 (S.D.N.Y.1970) (stating, in

dicta, that placing a prisoner in solitary confinement for 4.5 months for writing a letter to a judge criticizing the prison administration would constitute grossly disproportionate and therefore unconstitutional punishment); *Ruiz v. Johnson,* 37 F.Supp.2d 855 (S.D.Tex.1999) (administrative segregation of inmates unconstitutional because of its impact on their mental health).

FN53. *See Spain v. Procunier,* 600 F.2d 189, 199 (9th Cir.1979) (Kennedy, J.) (Eighth Amendment requires that prisoners confined to segregation be allowed regular exercise); *Keenan v. Hall,* 83 F.3d 1083 (9th Cir.1996) (collecting cases holding that the level of noise, ventilation, temperature, cell size, lighting and the access to personal hygiene items, food, water, and medical care all implicate the Eighth Amendment analysis).

FN54. *See Colon v. Howard,* 215 F.3d 227, 232 (2d Cir.2000).

VI. CONCLUSION
*5 For the foregoing reasons, defendants' motion for reconsideration is granted in part and denied in part. The Clerk of the Court is directed to close this motion [Docket No. 50]. Additionally, Peoples attached an Amended Complaint to his opposition papers, which this Court now accepts for filing. A status conference has been scheduled for July 23, 2012, at 4:30 p.m., in Courtroom 15C.

SO ORDERED:

S.D.N.Y.,2012.
Peoples v. Fischer
Slip Copy, 2012 WL 2402593 (S.D.N.Y.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

# THE HUMANE ALTERNATIVES TO LONG-TERM SOLITARY CONFINEMENT ACT

## "HALT" Limits on Confinement Sanctions

Prepared by Prisoners' Legal Services of New York

October 2022

# THE HUMANE ALTERNATIVES TO LONG-TERM SOLITARY CONFINEMENT ACT

## HALT Limits on Confinement Sanctions

## Prepared by Prisoners' Legal Services of New York

The Humane Alternatives to Long-Term Solitary Confinement Act (HALT) was passed by the New York State Legislature during the 2021 session and signed into law on March 31, 2021. The law took effect one year later on March 31, 2022. It is now binding in all DOCCS facilities throughout the state. This memo addresses HALT provisions that limit how long DOCCS can hold people in settings that are more restrictive than general population.

## I.    What is "Segregated Confinement" Under the HALT Act?

The HALT Act does not specifically address placement in Special Housing Units (SHUs). Instead, it more broadly imposes limits on DOCCS' use of "segregated confinement." Correction Law §2(23) now defines segregated confinement as placement in "any form of cell confinement for more than seventeen [17] hours a day."

Even in segregated confinement, people have to be offered at least four hours of out-of-cell programming every day, including at least one hour of recreation. Note that DOCCS is prohibited from holding people in segregated confinement for purposes of protective custody.[1] All units used for protective custody must, at minimum, conform to the standard for Residential Rehabilitation Units (RRUs), which are addressed in more detail below.

There are two contexts in which confinement for more than 17 hours a day is not considered to be segregated confinement under the Correction Law:

- confinement during a facility-wide emergency; and

- confinement for the purpose of providing medical or mental health treatment.

Page 1

Situations such as facility lockdowns, or admissions to mental health crisis observation units (such as OBS/RCTP), are therefore not limited by HALT.

## II.   How Long Can DOCCS Hold a Person in Segregated Confinement Under HALT?

The HALT Act strictly limits the length of time that a person may be held in segregated confinement. The specific amount of segregated confinement time allowed depends upon the specific offenses involved and how much time a person has recently spent in segregation.

### A. Prehearing Confinement

DOCCS is required to conduct an evidentiary hearing to determine if a person may be placed in segregated confinement. The hearing must be held before the person is placed in segregation unless a security supervisor, with written approval of the superintendent or their designee, reasonably believes that the person fits the demanding criteria under Correction Law §137(6)(k)(ii). Those criteria are discussed in more detail in Section II(C) below.

If DOCCS does not hold a hearing before placing someone in segregated confinement, the hearing must take place "as soon as reasonably practicable." Where an individual is placed in segregated confinement, there is a five-day deadline for completing the hearing. The only way that DOCCS can extend this deadline is if the charged individual seeks a postponement of the hearing.

### B. The Three-Day Limit

If DOCCS determines at an evidentiary hearing that a person violated a rule that allows a segregated confinement penalty to be imposed, such person can be placed in segregation for up to three consecutive days.[2]  Unless additional criteria are met, a person cannot be held in segregated confinement for more than six days total during any 30-day period.

### C. The Fifteen-Day Limit

**No one may be placed in segregated confinement for more than 15 consecutive days.**[3] After a person has spent 15 days in a row in segregation, they must either be released or moved to a Residential Rehabilitation Unit (RRU). People in RRU are entitled to at least six hours of out-of-cell time each day and programming at least five days each week.[4]

405:00 The Humane Alternatives to Long-Term Solitary Confinement Act
MMcGowan/BHutchings 2022

## 1. The "Seven Acts" Under Correction Law §137(6)(k)(ii)

DOCCS officials must make several specific written findings in order to hold someone in any of the following settings:

1) in segregated confinement for more than three consecutive days;

2) in segregated confinement for more than six days total during any 30-day period; or

3) in an RRU for any period of time.

First, DOCCS officials must make a written determination pursuant to an evidentiary hearing that a person committed one of the seven specific acts ("seven acts"). Those acts include the following:

**A.    Causing or attempting to cause serious physical injury or death to another person or making an imminent threat of such serious physical injury or death if the person has a history of causing such physical injury or death and the commissioner and, when appropriate, the commissioner of mental health or their designees reasonably determine that there is a strong likelihood that the person will carry out such threat**

Importantly, this category does not include *all* assaults or attempted assaults. For example, it is not enough for someone merely to be found guilty of violating DOCCS' rules prohibiting violent conduct, assault on staff, or assault on an incarcerated individual. There must also be a specific finding that the person caused or attempted to cause "serious physical injury or death."

The HALT Act does not define "serious physical injury," but Penal Law §10.00(10) offers guidance on what that term means in the context of criminal offenses: "physical injury which creates a substantial risk of death, or which causes death or serious and protracted disfigurement, protracted impairment of health or protracted loss or impairment of the function of any bodily organ." If DOCCS does not determine that a person caused or attempted to cause the level of injury defined under Penal Law §10.00(10), there is an argument that the individual has not committed an act that allows the more severe penalties permitted by Correction Law §137(6)(k)(ii)(A).

Page 3

Similarly, the statute does not include all threats. Finding that a person violated DOCCS' general rule prohibiting threats is not enough to allow extended confinement sanctions. To fall within this provision under the statute, the threat must:

1) be **imminent** (about to happen very soon);

2) threaten serious physical injury or death;

3) be made by a person who has a history of causing serious physical injury or death; and

4) be reasonably determined by a DOCCS official to have a strong likelihood that the person will actually carry out the threat. Additionally, if a person is or has ever been on the Office of Mental Health (OMH) caseload, or otherwise appears to need psychiatric attention, an OMH official must be involved in determining if there is a strong likelihood the person will carry out the threat.

**B.    Compelling or attempting to compel another person, by force or threat of force, to engage in a sexual act**

**C.    Extorting another, by force or threat of force, for property or money**

**D.    Coercing another, by force or threat of force, to violate any rule**

**E.    Leading, organizing, inciting, or attempting to cause a riot, insurrection, or other similarly serious disturbance that results in the taking of a hostage, major property damage, or physical harm to another person**

As with assaults or threats above, it is not enough for a person merely to be found guilty of violating DOCCS' rule prohibiting "demonstration" for this provision of the HALT Act to apply. First, the incident must result in the taking of a hostage, major property damage, or physical harm to others. Second, in instances of attempt, DOCCS officials must make a clear finding that the person intended to cause a serious disturbance *and* "completed significant acts" that advanced their plan. A person cannot be found to have intended to cause a disturbance if there is evidence they withdrew from or abandoned the plan.

### F. Procuring a deadly weapon or other dangerous contraband that poses a serious threat to the security of the institution

The HALT Act does not define the terms "deadly weapon" or "dangerous contraband," but provisions in other statutes offer guidance on what the terms mean for HALT purposes. For instance, Penal Law §10.00(12) provides that "deadly weapon" means:

- "any loaded weapon from which a shot, readily capable of producing death or other serious physical injury, may be discharged; or

- a switchblade knife, gravity knife, pilum ballistic knife, metal knuckle knife, dagger, billy, blackjack, plastic knuckles, or metal knuckles."

While DOCCS will not necessarily be bound by the Penal Law definition, and eventual litigation may clarify the meaning of a "deadly weapon" in this context, the Penal Law provides a point of reference.

Similarly, Penal Law §205.00(4) defines contraband and dangerous contraband in the context of criminal offenses relating to prisons. There, "dangerous contraband" is "contraband which is capable of such use as may endanger the safety or security of a detention facility or any person therein." In *People v. Finley*, 10 N.Y.3d 647, 657 (2008), the New York Court of Appeals held that small amounts of marijuana are not "dangerous contraband" within the meaning of Penal Law §205.00(4). The Court further held that "the test for determining whether an item is *dangerous* contraband is whether its particular characteristics are such that there is a substantial probability that the item will be used in a manner that is likely to cause death or other serious injury, to facilitate an escape, or to bring about other major threats to a detention facility's institutional safety or security."

### G. Escaping, attempting to escape or facilitating an escape from a facility or escaping or attempting to escape while under supervision outside such facility

In instances of attempted escape, DOCCS officials must make a clear finding that a person intended to escape *and* "completed significant acts" that advanced their plan. A person cannot be found to have intended to escape if there is evidence they withdrew from or abandoned the plan.

Page 5

### 1.  The heinousness and destructiveness requirement

In addition to finding that a person committed one of the "seven acts" outlined above, DOCCS officials must also make additional written determinations in order to place a person in segregated confinement for more than three days (or in an RRU for any amount a time). Specifically, officials must determine, based on specific objective criteria, that the person's actions were "so heinous or destructive" that placing them in general population housing would create "a significant risk of imminent serious physical injury" to others and create an unreasonable risk to the security of the facility.[5]

### H.      The Twenty-Day Limit

DOCCS is also generally barred from placing anyone in segregated confinement for more than 20 days during any 60-day period. There is only one situation in which a person can be held in segregated confinement for more than 20 days within a span of 60 days: if DOCCS determines at a hearing that the person committed one of several specific violent felonies more than once in a 60-day period.[6] Under those circumstances, such person can be placed in segregated confinement for up to 15 additional days for each additional incident, even if the placement would result in them spending more than 20 days in segregation within a 60-day period. It is not enough, however, for DOCCS to simply find that a person committed *any* violent felony more than once within 60 days. The offense must also be one of the "seven acts" discussed above in Section II(C)(1) of this memo.

Even if someone is already in segregated confinement when:

1) they commit a second (or third, etc.) violent felony within 60 days that allows for additional time in segregation; and

2) their actions result in physical injury to another person;

DOCCS still must move them to an RRU for 15 days before they can be returned to segregation for up to 15 additional days.

### III.    Additional Limits on Residential Rehabilitation Unit (RRU) Confinement

As noted in Section II(C) above, DOCCS cannot place a person in an RRU for any amount of time unless officials determine that the person committed one of the "seven acts" and make the required written findings. Once a person is in an RRU, however, there are additional restrictions on how long DOCCS may hold them there.

When someone is first admitted to an RRU, program staff and mental health staff must develop an "individual rehabilitation plan" (IRP) that identifies specific goals and programs, treatment, and services to be offered.[7] If a person successfully completes their rehabilitation plan before their confinement sanctions expire, the person has the right to be discharged from RRU.[8] Every person confined to RRU is also entitled to a meaningful periodic review every 60 days to assess their progress and determine if they should be discharged from the unit. If they are not discharged after the review, DOCCS and OMH staff must give a written reason for the determination not to discharge. Staff must also specify in writing what program, treatment, service, and/or corrective action is required before discharge.[9]

A person generally has a right to be discharged from RRU in two additional situations:

1) if they are not discharged from RRU within one year of admission; or

2) if they are within 60 days of their fixed release date from DOCCS custody (such as the maximum expiration of their sentence or the end of a determinate parole time assessment) or within 60 days of a tentatively-approved release date from DOCCS custody (such as a parole open date or a conditional release date after being granted good time by a Time Allowance Committee).

In both of the situations above, a person may continue to be held in RRU only if they have committed one of the "seven acts" within the prior 180 days *and* they pose "a significant and unreasonable risk" to safety or security.[10]

In any case where a person continues to be held in RRU beyond the above timelines, both DOCCS and OMH officials must immediately and automatically conduct an independent review of the ongoing RRU placement. The person can remain in RRU only if officials from both agencies approve the decision. In "extraordinary circumstances," a person in RRU who has *not* committed one of the "seven acts" within the prior 180 days can remain in RRU beyond the ordinary time limits, but only if the DOCCS Commissioner and the OMH Commissioner each *personally* determine that the person "poses an extraordinary and unacceptable risk of imminent harm to the safety or security of incarcerated persons or staff."

### IV.    Special Populations: A Total Bar on Segregated Confinement

Anyone in a "special population," cannot be placed in segregated confinement for any length of time.[12] Members of special populations may, however, be placed in keeplock prior to a disciplinary hearing. Their placement in keeplock prior to a

Page 7

hearing is subject to the same limits and requirements outlined above in Section II(A).

While in keeplock for purposes of a disciplinary hearing, members of special populations must be offered seven hours of daily out-of-cell time or be transferred to an RRU or RMHTU as soon as possible—in any event, no more than 48 hours from the time they were admitted to keeplock.

Special populations include anyone:

- Twenty-one years of age or younger;

- Fifty-five years of age or older;

- With a disability as defined under Executive Law §292(21); or

- Who is pregnant, has given birth within the past eight weeks, or is caring for a child within a DOCCS facility as allowed by Correction Law §611(2) or (3).[13]

The definition of a "disability" under HALT's special population provision is very broad. It includes:

(a)  a physical, mental or medical impairment resulting from anatomical, physiological, genetic or neurological conditions which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques, or

(b)  a record of such an impairment, or

(c)  a condition regarded by others as such an impairment.

As of the writing of this memo, DOCCS has issued regulations and directives that use a significantly narrower definition of the term "disability." Because the HALT Act is a state statute, however, DOCCS does not have authority to narrow the plain terms of the law.

Page 8

## V.   Individuals With Serious Mental Illness Designations Confined to Residential Mental Health Treatment Units (RMHTUs)

Even prior to the HALT Act, the SHU Exclusion Law limited DOCCS' ability to hold anyone in segregated confinement if they were designated by the Office of Mental Health as a person with a Serious Mental Illness (SMI). The SHU Exclusion Law provides that anyone with an SMI-designation who receives a segregated confinement sanction that could potentially last more than 30 days must be diverted to a Residential Mental Health Treatment Unit (RMHTU)—such as a Residential Mental Health Unit (RMHU) or Behavioral Health Unit (BHU).[14]

The SHU Exclusion Law remains in effect; HALT imposes additional limits on DOCCS' authority to issue confinement sanctions to people already confined to RMHTUs. Correction Law §401(5)(a) provides that a person in an RMHTU cannot be sanctioned with segregated confinement for misconduct on the unit unless two factors are met. First, the person's conduct must present an "exceptional circumstance" that poses a significant and unreasonable risk to safety or security. Second, the person must be found to have committed one of the "seven acts."[15]

Any segregated confinement sanctions imposed against a person confined to an RMHTU for misconduct on the unit must be reviewed by the joint case management committee before the person will be required to serve them. In extraordinary circumstances where a person's conduct "poses an immediate unacceptable threat" to safety or security, however, such person may be immediately moved to an RRU. The decision to immediately transfer someone from an RMHTU to an RRU must be made by the highest-ranking facility security supervisor, in consultation with a mental health clinician.

## VI.   Considerations During HALT's Ongoing Implementation

As with any new statute, DOCCS is permitted to **promulgate** (enact) regulations to implement the law, as well as issue policies through agency directives. Those processes are still ongoing as of the writing of this memo. Any regulations or directives that DOCCS creates, however, cannot alter the plain text of the HALT Act. A statute passed by the Legislature and signed by the governor **preempts** (overrides) any contradictory rules and regulations issued by a state agency. The text of the HALT Act therefore remains a binding source of incarcerated people's rights with respect to segregated confinement in DOCCS custody. As is also the case with any new statute, the specific interpretation of both the HALT Act itself and DOCCS' relevant rules and regulations will be further defined over time by the courts in response to litigation.

Page 9

The law concerning DOCCS' ability to hold people in segregated confinement is therefore likely subject to change over time.

---

[1] Correction Law §137(6)(k)(iv)
[2] Correction Law §137(6)(k)(i)
[3] Correction Law §137(6)(i)(ii)
[4] You can refer to Correction Law §137(6)(j) for additional information on the minimum conditions that RRUs must satisfy.
[5] Correction Law §137(6)(k)(i)
[6] Correction Law §137(6)(i)(ii)
[7] Correction Law §137(6)(j)(iv)
[8] Correction Law §137(6)(m)(i)
[9] Correction Law §137(6)(m)(iii)
[10] Correction Law §137(6)(m)(ii)
[12] Correction Law §137(6)(h)
[13] Correction Law §2(33)
[14] There are limited circumstances in which a person with an SMI designation may remain in segregated confinement or an RRU. For more information, refer to Correction Law §137(6)(d)(ii)(E).
[15] As defined in Correction Law §137(6)(k)(ii).

*This and other informational memos prepared by the staff at Prisoners' Legal Services are intended to keep New York State incarcerated individuals informed of their rights and responsibilities. While Prisoners' Legal Services attempts to keep its memos accurate and up-to-date, because of new legislation and court decisions, the law may have changed since this memo was prepared. The Prisoners' Legal Services' publication, Pro Se, is available to incarcerated individuals on their tablets.    If you do not have a tablet, or cannot access your tablet because you are in SHU or have a vision impairment, you can write to Pro Se to request paper copies. To stay current with legal developments, you should also review the resources available in your prison law library.*

*This memo is for educational purposes only. Receipt of this memo does not make you a client of Prisoners' Legal Services.*

405:00 The Humane Alternatives to Long-Term Solitary Confinement Act
MMcGowan/BHutchings 2022

Exhibit

D