Exhibit

D

FORM 2171B (11/2021)
Side 2

NEW YORK STATE DEPARTMENT OF CORRECTIONAL SERVICES

## Five Points Correctional Facility

### INCARCERATED INDIVIDUAL MISBEHAVIOR REPORT ♦ INFORME DE MAL COMPORTAMIENTO DEL INDIVIDUO ENCARCELADO

| 1. NAME OF INCARCERATED INDIVIDUAL (Last, First) ♦ NOMBRE DEL INDIVIDUO ENCARCELADO (Apellido, Nombre) | NO. ♦ NUM | HOUSING LOCATION ♦ CELDA |
|---|---|---|
| Jude, S | 17A0890 | 77-D-07 |

| 2. LOCATION OF INCIDENT ♦ LUGAR DEL INCIDENTE | INCIDENT DATE ♦ FECHA | INCIDENT TIME ♦ HORA |
|---|---|---|
| RMHU D-Gallery Rec Pen 6 | May 25, 2024 | 8:30am Approximately |

3. RULE VIOLATION(S) ♦ VIOLACION/ES

| | |
|---|---|
| 100.13 Fighting | 106.10 Direct Order |
| 104.11 Violent Conduct | 107.10 Interference |
| 104.13 Creating a Disturbance | |

4. DESCRIPTION OF INCIDENT ♦ DESCRIPCION DEL INCIDENTE

On the above date I, CO Hawker was on duty as the RMHU D-Gallery Rec Officer. At approximately 8:30am, while in RMHU D-Gallery Rec Pen 6, I observed I/I Jude 17A0890 (77-D-07) exchanging closed fist punches to the head and torso of I/I Vasquez 21A1339 (77-D-12). I ordered both I/I's to stop fighting, to which they both complied and separated. Mechanical restraints were applied to both I/Is who remained compliant while they were escorted out of the Rec Pen without incident. Area supervisor notified and responded to the area. Both I/I's interferfered with RMHU Rec Run.

| REPORT DATE ♦ FECHA | REPORTED BY ♦ REPORTADO POR | SIGNATURE ♦ FIRMA | TITLE ♦ TITULO |
|---|---|---|---|
| 05/25/24 | M. Hawker | | C.O. |

5. ENDORSEMENTS OF OTHER EMPLOYEE WITNESSES (if any)       SIGNATURES :

ENDOSOS DE OTROS EMPLEADOS TESTIGOS (si hay)       FIRMAS:    1

2 _____       3 _____

**NOTE:** Fold back Page 2 on dotted line before completing below.

DATE AND TIME SERVED UPON INCARCERATED INDIVIDUA __1-26-24 9:45 am__      NAME AND TITLE OF SERVER __C.O. R. Miller__

FECHA HORA DADO AL INDIVIDUO ENCARCELADO _____      NOMBRE Y TITULO DEL QUE ENTREGA _____

You are hereby advised that no statement made by you in response to the charges or information derived therefrom may be used against you in a criminal proceeding. ♦ Por este medio se le informa que no se puede usar ninguna declaracion hecha por usted como respuesta al crgoo informacion derivada de ella en una demanda criminal.

## NOTICE ♦ AVISO

REVIEWING OFFICER (DETACH BELOW FOR VIOLATION HEARING ONLY)

You are hereby notified that the above report is a formal charge and will be considered and determined at a hearing to be held. ♦ Por este medio se le notifica que el informe anterior es un cargo formal el cual se considerara y determinara en una audiencia a celebrarse.

The incarcerated individual shall be permitted to call witnesses provided that so doing does not jeopardized institutional safety or correctional goals. ♦ Se le permitira al reclus llamar testigos con tal de que al hacerlo no pondra en peligro la seguridad de la institucion o los objetivos del Departamento.

If restricted pending a hearing for this misbehavior report, you may write to the Deputy Superintendent for Security or his/her designee prior to the hearing to make a statement on the need for continued prehearing confinement. ♦ Si esta restringido pendiente a una audiencia por este informe de mal compartamiento, puede escribirle al Diputado del Superintendente para Seguridad o su respresentante antes de la audiencia para que haga una declaracion acerca de la necesidad de continuar bajo confinamiento , previo a la audiencia.

Distribution:  WHITE - Disciplinary Office  CANARY - I/I (After review) ♦ Distribucion:  BLANCA - Oficinia Disciplinaria  AMARILLA - Recluso (despues de la resion)

```
05/26/2024                NYS DEPT OF CORRECTIONS & COMMUNITY SUPERVISION          PAGE    1
DCP004                        DISCIPLINARY  HEARING DISPOSITION RENDERED
```

                    FIVE PT RMHU                                   TAPE NUMBER  D-29

DIN: 17A0890 NAME: JUDE, STEVEN                                LOCATION: 77-0D-007
                                                        SHU CELL INELIGIBLE
INCIDENT DATE & TIME:         05/25/2024    08:30 AM      TIER 2

REVIEW DATE:                  05/26/2024            BY:  LT   LAMPMAN, P P

DELIVERY DATE & TIME:    5/26/24  9:45 am  BY:  CO R.Miller

HEARING START DATE & TIME:  6/4/24  :__ __  BY:  LT. Cordway

HEARING END DATE & TIME:    6/4/24  :__ __  BY:  LT. Cordway

DOES THIS MISCONDUCT MEET THE CRITERIA FOR WORKPLACE VIOLENCE?  Y / N

CHARGE
NUMBER        DESCRIPTION OF CHARGES              REPORTED BY            DISPOSITION

104.11    VIOLENT CONDUCT                    CO   HAWKER, M A            Not guilty
------    -------------------------------    ----  -------------------
104.13    CREATING A DISTURBANCE                                        Not guilty
------    -------------------------------
100.13    FIGHTING                                                      -Not guilty
------    -------------------------------
107.10    INTERFERENCE WITH EMPLOYEE                                    -Not guilty
------    -------------------------------
106.10    REFUSING DIRECT ORDER                                         -Not guilty
------    -------------------------------                               -Not guilty


ANY GUILTY DISPOSITION WILL RESULT IN A MANDATORY DISCIPLINARY SURCHARGE IN THE
AMOUNT OF FIVE($5.00) DOLLARS BEING ASSESSED AUTOMATICALLY AGAINST THE I/I.
SANCTION DATES BELOW ARE SUBJECT TO REVIEW/CHANGE, AND WILL BE CONSECUTIVELY ADDED TO
ANY SIMILAR CURRENT SANCTION.


PENALTY                      PENALTY  START   RELEASE  SUSPEND    DEFERRED  RESTITUTION
 CODE    DESCRIPTION         MO DAYS  DATE      DATE   MO DAYS    MO DAYS   $$$$ . ¢¢

05/26/2024                 NYS DEPT OF CORRECTIONS & COMMUNITY SUPERVISION                PAGE    2
DCP004                       DISCIPLINARY  HEARING DISPOSITION RENDERED

DIN: 17A0890 NAME: JUDE, STEVEN                              HEARING DATE: 6|4|24

                                                SHU CELL INELIGIBLE
A. STATEMENT OF EVIDENCE RELIED UPON:
----------------------------------------

① mBR

② Video

B. REASONS FOR DISPOSITION:
----------------------------

- Per video evidence, I/I was the Victim

C. SPECIAL INSTRUCTION ON CORRESPONDENCE RESTRICTIONS AND REFERRALS

                None

## AFFIRMATION

I Joshua Vasquez, #21-A-1339, affirm this 10th day of July, 2024, under the penalties of perjury, under the laws of New York, which may include a fine, or imprisonment, that the foregoing is true, and I understand that this document will be filed in an action or a proceedings in a court of law, and I am willing to testify to such in open court, or speak to a attorney or OSI, in regards to this matter.

On or about May 25, 2024, during the morning recreation in Five Points RMU, pen #6, I attacked a elderly, legally blind guy who locked in 7 cell, who I know as Steven Jude, at the direction of correctional staff D. Laureano, who paid me with tobacco, as he told me Mr. Jude was a snitch, because he filed complaints on him, and he wanted me to kick his ass, which this officer told me that the officer assigned to monitor the rec. will walk away, which will be the time to do it.

When this officer walked away, and went inside the RMU, building, I pushed Mr. Jude, who easily fell off balance, and commenced to punching him in the face, and head several times, which he was already on the ground, then I kicked him in the face like two times, and walked away before the officers responded, which they allowed to occur, I feel bad about what I did, as it was wrong, and I only did it, cause the officers agreed to pay with tobacco, which I needed, and we both received misbehavior reports for fighting, even though he never fought back, or even had the chance, as I finished him, and kicked his ass, just like the officers, wanted me to do.

If they can arrange for this to happen to me, then they can easily arrange to have it done to me, also the area supervisor stated he would allow me to get a package, however when a package was sent for me, they returned to sender it, due to being on loss of my packages, which he lied to me, but I suffer from mental illnesses and they took advantage of me, and even have abused and use force on me unnecessarily.

x _Joshua Vasquez_

Joshua Vasquez #21-A-1339

Sworn to before me this

12 day of Jun , 2024

NOTARY PUBLIC

Jonathan M. Hall
Notary Public, State of New York
Registration No. 01HA6241732
Qualified in Monroe County
Commission Expires July 16, 2027

Exhibit
E

2





# INTRODUCTION

The Justice Center for the Protection of People with Special Needs is responsible for monitoring compliance with the Humane Alternatives to Long-Term (HALT) Solitary Confinement Act as well as the quality of mental health care provided to people who are incarcerated in New York State correctional facilities.[1]

This report summarizes the Justice Center's monitoring activities in 2023 and includes recommendations to improve the programming, treatment, and conditions in segregated confinement, residential rehabilitation, and mental health units.

# HISTORY AND JURISDICTION

The Justice Center began monitoring compliance with the HALT Act on April 1, 2022.  Prior to that, the Justice Center was charged with monitoring compliance with the Special Housing Unit (SHU) Exclusion Law[2] and had been doing so since it began operations in 2013. This involves monitoring the quality of mental health care provided by the Office of Mental Health (OMH) to people who are incarcerated in correctional facilities operated by the New York State Department of Corrections and Community Supervision (DOCCS).  The Justice Center is guided in this work by its Psychiatric Correctional Advisory Committee.[3]

**The HALT Act:**

- Strictly limits the type of conduct that can result in segregated confinement sanctions
- Limits placement in segregated confinement to 15 days.
- Requires  alternative rehabilitative measures, including the creation of residential rehabilitation units (RRU) focused on therapy, treatment and rehabilitation.
- Prohibits the use of segregated confinement for vulnerable incarcerated populations.
- Establishes guidelines for humane conditions in segregated confinement.
- Outlines reporting requirements for DOCCS and the Justice Center.
- Provides due process protections in disciplinary hearings for individuals who are incarcerated.

**To fulfill its responsibilities, the Justice Center:**

- Reviews the programs, treatment, and conditions of confinement for incarcerated individuals placed in segregated confinement and residential rehabilitation units.
- Conducts systemic reviews of mental health programs in New York State correctional facilities.

---

[1] Correction Law §§137(6)(d)(e) (h), (i), (j), (k), (l), (m), (n), and (o) and §§138 (7), 401.
[2] Chapter 1 of the Laws of 2008.
[3] Psychiatric Correctional Advisory Committee members are listed in the appendix.

3

- Reviews the care provided by DOCCS and OMH to incarcerated individuals who are in need of mental health services as well as those who die by suicide and were receiving mental health services at the time of their death.
- Publishes reviews of the programs, treatment, and conditions of confinement for incarcerated individuals placed in segregated confinement and quality of mental health care on the Justice Center's website.
- Issues an annual report with recommendations regarding all aspects of segregated confinement and residential rehabilitation units.

This work is done by visiting correctional facilities and speaking with incarcerated individuals cell-side and in private interviews. All individuals residing in a disciplinary unit at the time of the Justice Center's visit are given a programming and recreation survey and can submit their responses to the Justice Center. The Justice Center also reviews DOCCS and OMH records for individuals who are placed in segregated confinement, residential rehabilitation units, or who die by suicide. All final reviews with responses from OMH and DOCCS are posted on the Justice Center website.[4]

# 2023 HIGHLIGHTS

**In 2023, the Justice Center:**

- Visited 21 correctional facilities[5] to monitor compliance with New York State Correction Law concerning segregated confinement and residential rehabilitation units and the quality of mental health care provided to incarcerated individuals.
- Finalized a quality of mental health care review of the Intermediate Care Program at Sullivan Correctional Facility operated by DOCCS and OMH.
- Initiated eight mental health service reviews of individuals who died by suicide at five facilities[6].
- Received 457 surveys from incarcerated individuals about the programming and recreation they were offered and received while in segregated confinement and RRU. Survey results can be found on the Justice Center's website here.

In total, the Justice Center completed 1,854 cell-side and 118 private interviews with incarcerated individuals and referred 153 people for evaluation by OMH. Records from 352 individuals were reviewed for compliance with the requirements of the HALT law and the quality of mental health care provided to 290 individuals receiving mental health services was also reviewed. Sixteen[7] compliance reviews were finalized in 2023 and all, the facilities were having difficulties adhering to the provisions of   the HALT Act.[8]

---

[4] A report is considered to be final once OMH and DOCCS respond to the report or within 45 days of the draft report being issued, whichever comes first.

[5] The list of facilities visited can be found in the appendix.

[6] Clinton, Greenhaven, Great Meadow, Upstate, and Wende Correctional Facilities

[7] Albion, Attica, Auburn, Bare Hill, Cape Vincent, Clinton, Coxsackie, Great Meadow, Lakeview, Mid-State, Mohawk, Riverview, Shawangunk, Sing Sing, Sullivan, Wyoming

[8] One facility review was finalized in 2023 but was reviewed prior to April 1, 2022, so compliance was assessed based on the SHU Exclusion Law and that facility was not found to be in compliance with the SHU Exclusion Law.

4



# FINDINGS + RECOMMENDATIONS

**① Placement in Segregated Confinement and Residential Rehabilitation Units (RRU)**

*Findings*

<u>Vulnerable Populations</u>

The HALT Act eliminated the use of segregated confinement for vulnerable populations. As a result, individuals who are age 21 or younger, age 55 or older, have a disability, or who are pregnant, up to eight weeks postpartum, or caring for children in a facility, cannot be placed in segregated confinement.

According to the monthly HALT reports published on the DOCCS website[9], no one under the age of 21, over the age of 55, or who was pregnant or post-partum was placed in segregated confinement in 2023 and none of these special populations were found in any of the facilities visited by the Justice Center in 2023. The Justice Center also did not find any individuals with a physical, sensory, or cognitive disability placed in segregated confinement.

DOCCS monthly reports and Justice Center site visits show that no one with a serious mental illness designation[10] was placed in segregated confinement in 2023. However, almost 40 percent of incarcerated individuals in segregated confinement have been determined by OMH to need ongoing mental health services[11] and over 10% of incarcerated individuals in SHU have been determined by OMH to have a major mental illness. [12]

There were 88 individuals on the mental health caseload in the SHU, RRU, BHU, or an RMHU at the facilities visited by the Justice Center in 2023. Of those 88 individuals, 34 of them were admitted to the Residential Crisis Treatment Program (RCTP) because they were experiencing a mental health crisis at least once during the six months reviewed by the Justice Center. During the Justice Center's six-month review period, these 34 individuals resulted in 54 admissions to the RCTP and 36 of the transfers to the RCTP were directly from segregated confinement. While some individuals were transferred to the RCTP more than one time in the six months reviewed, no one was transferred to the RCTP three or more times.

*Recommendations*

---

[9] DOCCS online reports on HALT can be found here.
[10] See appendix for the definition of a serious mental illness designation.
[11] Based on the number of individuals with a mental health service level of 1, 2, 3 or 4.
[12] Based on the number of individuals with a mental health service level of 1 or 2.

The Justice Center continues to recommend that DOCCS and OMH divert all individuals on the mental health caseload to a residential rehabilitation unit or another program that will provide more timely access to therapeutic programming than they will receive in segregated confinement.

Further, given the high number of people in need of mental health services in segregated confinement and RRU, OMH must be involved in the development and provision of programming in these units. More than 10% of the individuals responding to the Justice Center's programming survey requested mental health groups and services in SHU and RRU.[13]

Segregated confinement poses well documented, serious risks to an individual's mental health. People with ongoing mental health needs should be provided with more access to therapeutic trauma-informed programming aimed at addressing individual rehabilitation needs and underlying causes of problematic behaviors, as is required under HALT.

 **Length of Time in Segregated Confinement and RRU**

*Findings*
According to DOCCS' monthly HALT reports, the number of individuals who remained in segregated confinement for more than 15 days decreased from a high of 189 in July 2023 to six in January 2024. There was only one month in 2023 where no individuals were reported to be in segregated confinement more than 15 days. The Justice Center found 42 individuals who were in segregated confinement for longer than 15 days. In response to the Justice Center's findings, DOCCS reported that they were offering anyone who remained in SHU longer than 15 days the same amount of daily programming they would have been offered if they were in the RRU.

Individuals placed in an RRU and who have been there for more than one year are to be assessed independently by OMH and DOCCS to determine if the person should remain in the RRU. Data on the DOCCS website indicates that there are individuals who have been in RRU for more than one year. For example, in May 2023, the maximum length of stay reported was 385 days. None of the individuals whose records were reviewed by the Justice Center included individuals who had been in the RRU for more than a year.

*Recommendations*
In addition to continuing efforts to move people out of segregated confinement within 15 days as required by law, DOCCS should undertake regular reviews of disciplinary sanctions that result in placement in segregated confinement to ensure that the sanction meets the defined conduct in the HALT Act for placement in segregated confinement.

DOCCS and OMH should undertake regular reviews to ensure that people in the RRU, especially those in need of mental health services, do not remain there any longer than necessary. Since it is apparent that that some individuals are staying in the RRUs for longer than 365 days, DOCCS should include the number of individuals who spend more

---

[13] The Justice Center received 47 responses to the survey requesting more mental health services.



than 365 days in RRU in their monthly HALT reports published on their website. HALT requires that all individuals be released from the RRU within 365 days unless they engage in another act of violent conduct or pose a significant and unreasonable risk to the safety and security of other individuals or staff.

**3  Disciplinary Hearings**

*Findings*
The Justice Center found that hearings were conducted within the timeframes required in the HALT Act. Most of the records reviewed by the Justice Center described violations of rules that permit a penalty of segregated confinement under the HALT law.

However, the Justice Center found seven instances when individuals did not appear to have engaged in acts that met the threshold for segregated confinement defined in the law as:
- Compelling or attempting to compel another person, by force or threat of force, to engage in a sexual act.
- Causing or attempt to cause serious physical injury or death to another individual or making an imminent threat of same.
- Leading, organizing, inciting, or attempting to cause a riot, insurrection, or other similar serious disturbance.

In each instance, the Justice Center requested that DOCCS review the sanction and each time, DOCCS supported the findings of the hearing. For example, there were two individuals who were charged with a sex offense at a correctional facility. There were no violations or history of sexual misconduct alleged by either participant and based on the documentation provided, it did not appear that either individual involved in the incident was compelled or compelled by force, or threat of force to engage in the sexual act. In response to this finding, DOCCS did not provide any additional information and instead stated, "All mitigating factors are reviewed by the review officer, may be presented at the hearing, and reviewed by the Superintendent. Additionally, an appeal may be filed for consideration of the circumstances for modification or dismissal."

HALT also permits incarcerated individuals to have legal representation at disciplinary hearings. Seven incarcerated individuals reported to the Justice Center that they were never offered assistance, or were denied assistance, and disciplinary records did not indicate whether support was received when requested.

*Recommendations*
DOCCS should:
- Ensure through training and oversight that disciplinary dispositions are in compliance with the definition of conduct that permits a segregated disciplinary sanction.
- Provide information to incarcerated individuals about how to request and obtain legal representation during disciplinary hearings and provide representation when requested.

**4** **Programs, Treatment, and Conditions of Confinement**

*Findings*

Programs
The HALT Act requires DOCCS to offer six hours of daily out-of-cell congregate programming, services, treatment, recreation, and/or meals to individuals housed in RRUs with an additional one hour of recreation. In segregated confinement, DOCCS is required to offer four hours of daily out-of-cell programming plus an additional hour for recreation. The law requires that programming be comparable to the programming offered for the general population.

The Justice Center found that most individuals, especially those in SHU, are not attending out-of-cell programming.  Further, according to the 2023 survey responses from incarcerated individuals received by the Justice Center:
- Fifty percent indicated that programming is offered daily.
- Fifty-eight percent of respondents housed in an RRU, and 45% of respondents housed in a SHU indicated that programming is only offered two to four hours daily.
- Forty percent said they were offered less than two hours of programming daily.

Of the 323 incarcerated individuals who responded that they have attended programming at least once, 53% felt the programs were helpful while 47% felt it was not helpful. One of the most frequent responses from those that found programming helpful was that it provided an opportunity to get out of their cell and interact with others. Those who said they did not find programming helpful said that there were not sufficient incentives offered for attending programs, such as time cuts to disciplinary sanctions, and that the programming did not help them finish mandatory programs needed before they can be released into the community. These programs include Aggression Replacement Treatment (ART) and Alcohol and Substance Abuse Treatment (ASAT) which are offered in general population, but not in RRU.

Individuals at Albion and Sing-Sing who were interviewed by the Justice Center reported that they enjoyed attending programming.  In the Albion RRU, out-of-cell programming occurs for three hours in the morning. In the afternoon, two hours of indoor recreation and one-hour outdoor recreation are offered. Eight out of 10 individuals interviewed participated in programming and two individuals participated in an hour-long congregate lunch in the programming area during the site visit. Programming in the Sing Sing SHU occurs in the morning for three hours.  In private interviews with the Justice Center, three incarcerated individuals said they attended programming daily and preferred to attend out-of-cell programming instead of receiving the tablet in the morning. This contrasts with other programs, where incarcerated individuals are choosing the tablet instead of out-of-cell programming because they do not find value in the programming offered.

Incarcerated individuals interviewed by the Justice Center also asked for more programming options.  In addition to ART and ASAT, they requested mental health groups,

 NEW YORK STATE OF OPPORTUNITY | Justice Center for the Protection of People with Special Needs

161 Delaware Avenue. Delmar. NY 12054
www.justicecenter.ny.gov

school, stress reduction, employment, how to communicate, and activities that lead to group discussion.

*Recommendations*
*Increase out-of-cell participation in programming*
As noted by the individuals who responded to the Justice Center's survey, out-of-cell programming provides incarcerated individuals with an opportunity to interact with others in positive ways and helps develop self-regulation and other skills to avoid future disciplinary sanctions. While access to tablets is helpful, exclusive use of tablets and other forms of cell study are not conducive to promoting the development of self-regulation, symptom management, social, recreational, and habilitative skills that would benefit individuals with segregated confinement sanctions. To increase participation in this programming, the Justice Center recommends the following:

- DOCCS should ensure consistent compliance statewide for out-of-cell programming requirements and offer therapeutic programming consistent with what is offered in general population.
- OMH and DOCCS should work together to encourage and support out-of-cell programming in segregated confinement and RRUs.

Increasing incentives for attending out-of-cell programming would encourage participation. DOCCS should offer more meaningful time cuts to disciplinary sanctions and consider paying incarcerated individuals for program attendance in RRUs.  Payment for program attendance has been successful in Residential Mental Health Units.

*Expand Programming Options and Include Mental Health Services and Support*
OMH is currently not involved in programming in SHU or RRU. A high percentage of the people in SHU and RRU have mental health needs.  DOCCS and OMH should develop and provide increased programming options that includes mental health groups and topics. Every effort should be made to educate and support people with mental health needs so that they can manage their symptoms and underlying behaviors to avoid conduct that places them in segregated confinement.

DOCCS and OMH should also consider developing peer-led groups in RRUs to expand the array of mental health supports and programming. In response to the Justice Center's survey, DOCCS reported that they are developing a plan to pilot the use of "inmate program assistants" as facilitators in RRU.  The Justice Center supports this initiative and urges that OMH be involved in this pilot.

As noted, many incarcerated individuals have requested Aggression Replacement Treatment (ART) and Alcohol and Substance Abuse Treatment (ASAT).  The Justice Center acknowledges that it is not feasible to offer this programming in segregated confinement settings due to the limited time an individual spends there but it should be more seriously considered in RRU, especially for incarcerated individuals who have shown an improvement in behavior.  An opportunity to participate in these programs could serve as an effective incentive for incarcerated individuals to cease engaging in maladaptive behaviors and attend out-of-cell programming.



<u>Treatment</u>
*Mental Health Services*
The amount of mental health services that an incarcerated individual receives while in segregated confinement and RRU is determined by the mental health service level of the facility they are in.[14]

Currently, OMH provides the following services in SHU and RRU:

| Service | Level 1 and 2 Facilities | Level 3 and 4 Facilities | Level 6 Facilities |
|---|---|---|---|
| ***Intake Mental Health Interview*** | Completed by OMH staff in private space within one day of placement | Completed by OMH within 7 days of placement | Within 7 days of placement in RRU ONLY |
| ***Re-evaluation*** | Re-evaluated in 7 days and then every 30 days | Re-evaluated within 30 days and then every 90 days | Re-evaluated within 30 days and then every 90 days – RRU ONLY |
| ***Suicide Prevention Screening*** | DOCCS Staff complete upon placement in SHU | DOCCS Staff complete upon placement in SHU | DOCCS Staff complete upon placement in SHU |
| ***SHU Rounds by dedicated mental health clinician*** | Level 1 Facilities – Daily Level 2 Facilities – at least once a week | At least once every two weeks | None |

While anyone can be referred for mental health services at any point, individuals who are on the mental health caseload are seen monthly by a mental health clinician. They also meet with a psychiatrist or nurse practitioner one time within their first month and every three months thereafter even if they are prescribed medication.

*Findings*

The Justice Center reviews six months of mental health records for compliance with OMH policies. Out of the 290 records reviewed in 2023, the Justice Center found 15 instances where there was missing documentation or documentation discrepancies in DOCCS and OMH records. This includes noting that there were no mental health concerns for someone who was on the mental health caseload, missing progress notes, delayed assessments for mental health referrals, and suicide assessments in segregated confinement.

In addition to instances of missing, incomplete, or inconsistent documentation, the Justice Center found that documentation by mental health staff was often lacking individualized information that would be informative to treatment team members and other mental health staff who may provide future treatment to individuals following a transfer to another correctional facility. Examples include instances of the exact same progress notes or recommendations for multiple months, lack of documentation about an individual's

---

[14] See appendix for the definitions of facility mental health levels

progress, and progress notes that did not memorialize any notable concerns an individual had as well as an overall lack of documentation on attempts to engage someone in treatment and the outcome of those attempts

*Exceptional Circumstances*
If DOCCS determines that an incarcerated individual in SHU or RRU is a threat to safety or security, they can place the person on exceptional circumstances and reduce the amount of out-of-cell programming and treatment that individual can receive. In 2023, the Justice Center found three individuals placed on exceptional circumstances for less than seven days. "Increased cell-side contact and programming" was used as an alternative to out-of-cell mental health treatment and/or therapeutic programming for these individuals.

*Recommendations*
More mental health services must be provided in these disciplinary settings. The Justice Center appreciates the difficulties of recruiting and training staff in corrections-based mental health settings. However, there are ways to utilize existing resources more efficiently. For example, OMH and DOCCS could support mental health clinicians so they can lead groups remotely.

Providing timely mental health assessments and opportunities to meet with clinical staff regularly is critical to treatment. The Justice Center appreciates OMH's efforts to ensure that documentation is completed but documentation should also reflect all efforts to engage with and understand the mental health concerns of incarcerated individuals. The failure to engage in treatment and programming or to work to understand what is really going on with an individual can lead to disciplinary sanctions. They can also cycle in and out of mental health crisis treatment programs and segregated confinement. In rare cases, the result can be suicide.

To address these issues, the Justice Center continues to recommend that OMH and DOCCS assess the case conferencing process for individuals at risk of self-harm or decompensation, and for those who seem to cycle endlessly between crisis treatment programs and disciplinary confinement.

Conditions of Confinement

*Findings*
Program space in the SHU units is in cell block hallways and consists of a single row of Reduced Security Therapy and Recreation Table (RESTART) chairs. The chairs are bolted to the floor and do not offer the opportunity for face-to-face contact, group discussion, or classroom collaboration. Residential rehabilitation units have designated classroom space.

The HALT Act requires that DOCCS offer out-of-cell congregate recreation to all individuals in RRUs, unless exceptional circumstances exist. In both RRU and SHU, recreation must be offered for a minimum of one hour per day.

Recreation at most facilities visited was offered outdoors in individual recreation pens and not in a congregate setting. Some facilities provide recreation in a screened area just


NEW YORK
STATE OF
OPPORTUNITY
Justice Center for the
Protection of People
with Special Needs

161 Delaware Avenue, Delmar, NY 12054
www.justicecenter.ny.gov

outside of the cell in which the incarcerated individual resides. One facility offered a congregate lunch space.

None of the individuals interviewed in the 15 facilities visited by the Justice Center reported participating in congregate recreation as required under the law. Over 50% of those responding to the Justice Center's programming and recreation survey said they participated in recreation alone; 26% reported that recreation was a combination of congregate and alone; and only six percent reported that they always participated in congregate recreation.

In three facilities visited, every incarcerated individual in both the segregated confinement and residential rehabilitation units were observed to be mechanically restrained in shackles while being escorted to programming and recreation.[15]   During programming, individuals are seated in RESTART chairs and the restraints on their ankles are attached to the RESTART chair.  This is contrary to HALT's goal of requiring DOCCS to offer out-of-cell therapeutic programming and does not allow for assessment of an individual's progress and participation in programming.

*Recommendations*
Wherever possible, offer programming in classrooms rather than in segregated confinement hallways. Programming in cell block hallways is not conducive to learning and group discussion. Additionally, ensure that classroom space supports learning and group work.

Expand congregate recreational offerings so that these incarcerated individuals have a chance to interact with others safely.

The use of restraints should be based upon an individualized assessment and should only be used for incarcerated individuals who pose a significant and unreasonable risk to safety and security.  DOCCS should consider offering different programming for those individuals who have been determined to need restraints and those who do not need restraints so that not all incarcerated individuals are restrained.

**⑤ Assessments, rehabilitation plans and discharge determinations**

*Findings*

The Justice Center found that most mental health and suicide assessments occur as required by law, but not all. The Justice Center found nine instances where mental health assessments or mental health callouts did not occur within the timeframes outlined in the HALT Act.

As stated previously, this report is based upon reports that were finalized in 2023.  Most of those reports were from site visits that were made in 2022 and in the early months of 2023. As a result, the Justice Center is not able to offer meaningful findings and recommendations about rehabilitation plans and discharge determinations at this time.

---

[15]Albion (RRU), Great Meadow, Attica

12

*Recommendation*
OMH should make every effort to conduct assessments and mental health callouts in accordance with requirements in the HALT legislation.



# CONCLUSION



The implementation of the HALT Act provides an opportunity for New York to enhance rehabilitative measures and humane treatment of incarcerated individuals. There are still significant areas outlined in the law where actions must be taken to increase the availability of therapeutic and rehabilative programming options that incarcerated individuals will attend and benefit from. This can only happen if DOCCS and OMH work together to develop and provide programs that help people understand and manage their symptoms and underlying behaviors that place them in segregated confinement. Further, the large number of people in segregated confinement and RRU with mental health needs makes it imperative that OMH become more involved in the development and provision of programming in these settings.

There are real challenges to serving incarcerated individuals in need of mental health services that will require thoughtful solutions, including how to recruit and retain staff at correctional facilities to carry out this important work. The Justice Center remains committed to assisting DOCCS and OMH in their important roles through its monitoring activities.

HALT ANNUAL REPORT 2023

13



# APPENDIX



## Psychiatric Correctional Advisory Committee Members

Stuart Grassian, MD
Martin Horn
Jack Beck
Charlie Giglio
Dr. Lisa Callahan Ph.D.
Diane Vanburen
Jayette Lansbury

## Facilities Visited in 2023

Adirondack
Attica
Bare Hill
Cape Vincent
Cayuga
Collins
Eastern
Five Points
Franklin
Gouverneur
Greene
Groveland
Lakeview
Mohawk
Riverview
Sing Sing
Upstate
Washington
Wende
Wyoming
Woodbourne

14

**Serious Mental Illness Designation**

An incarcerated individual receives a serious mental illness designation when they have been determined by a mental health clinician to meet at least one of the following criteria:

1. A current diagnosis of, one or more of the following types of Axis I diagnoses, as described in the most recent edition of the Diagnostic and Statistical Manual of Mental Disorders, and such diagnoses shall be made based upon all relevant clinical factors, including but not limited to systems related to such diagnoses:

    a. Schizophrenia (all sub-types)

    b. Delusional disorder

    c. Schizophreniform disorder

    d. Schizoaffective disorder

    e. Brief psychotic disorder

    f. Substance-induced psychotic disorder (excluding intoxication and withdrawal)

    g. Psychotic disorder not otherwise specified

    h. Major depressive disorders

    i. Bipolar disorder I and II.

2. Actively suicidal or has engaged in a recent, serious suicide attempt.

3. Diagnosed with a mental condition that is frequently characterized by breaks with reality, or perceptions of reality, that lead the individual to experience significant functional impairment involving acts of self-harm or other behavior that have a seriously adverse effect on life or on mental or physical health.

4. Diagnosed with an organic brain syndrome that results in a significant functional impairment involving acts of self-harm or other behavior that have a seriously adverse effect on life or on mental or physical health.

5. Diagnosed with a severe personality disorder that is manifested by frequent episodes of psychosis or depression, and results in a significant functional impairment involving acts of self-harm or other behavior that have a seriously adverse effect on list or on mental or physical health.

6. Been determined by a mental health clinician to have otherwise substantially deteriorated mentally or emotionally while confined in segregated confinement and is experiencing significant functional impairment indicating a diagnosis of serious mental illness and involving acts of self-harm or other behavior that have a serious adverse effect on life or on mental or physical health.

15

## Mental Health Levels

| Level | Level of Mental Health Need | DOCCS Facility Classification Level |
|---|---|---|
| 1 | Major/serious mental illness, active symptoms, six months of instability | Full-time mental health staff, treatment of major mental health disorders and specialized services including Residential Crisis Treatment Programs |
| 2 | Major/serious mental illness, no significant active symptoms, treatment and medication-compliant for one year, six months stability | Full-time mental health staff, treatment of inmates with less acute mental health disorders |
| 3 | Short-term medication needs or can function in setting with part-time mental health staff. | Part-time mental health staff, treatment and medication for moderated mental health disorders |
| 4 | Mild disorders, no medication needs | Part-time mental health staff, treatment for limited interventions, no medication monitoring |
| 6 | Does not require mental health services | No onsite mental health staff |

# Exhibit F

# PLS Prisoners' Legal Services of New York

114 Prospect Street • Ithaca, NY 14850
Tel: 607-273-2283 • Fax: 607-272-9122

**Executive Director**
Karen L. Murtagh

**Of Counsel**
Betsy Hutchings

**Managing Attorney**
Krin Flaherty

**Senior Staff Attorney**
Hallie E. Mitnick

**Staff Attorneys**
Ann Ferrari
Megan P. Welch

September 19, 2024

Steven Jude
17-A-0890
Caller Box 119, State Route 96
Romulus, NY 14541

Dear Mr. Jude:

We received your letter about the difficulties you are having in SHU. It appears that you are having a mental health crisis. Based on the information that you provided about your mental state, we determined that it was advisable to inform the Superintendent and the OMH Unit Chief of your difficulties and to ask that your mental health needs be assessed.

Receiving information of this nature is always troubling. While we do not want to cause additional pain to incarcerated individuals, we also want to ensure that those who are struggling get the help that they may need. For this reason, when we learn of incarcerated individuals in solitary who are experiencing a mental health crisis and appear to be in danger of self-harm, we have a policy of notifying prison officials and mental health providers who are in a position to assist with such issues

The plight of incarcerated individuals in solitary confinement has been receiving a lot of media attention recently. We hope that it brings you a measure of comfort to know that there are many people on the outside who are concerned about incarcerated individuals in solitary and are working to put an end to this abhorrent prison management tool.

We are enclosing materials about Prisoner Express, an organization that coordinates a number of projects that help incarcerated individuals feel more engaged with others, and a booklet of yoga and breathing exercises that may be useful to you in handling the stress of the conditions of your confinement.

Sincerely,

Aleta Albert
Director of Advocacy

Enc.:   Prisoner Express
        Meditation and Yoga Exercises (from *We're All Doing Time*)
        Rights of Incarcerated People with Disabilities Under the Americans With Disabilities Act



October 2, 2024

**<u>CONFIDENTIAL LEGAL MAIL</u>**

Steven Jude
DIN 17A0890
Five Points Correctional Facility
6600 State Route 96, Caller Box 119
Romulus, NY 14541

Dear Mr. Jude,

I write in response to your letter we received on September 23, 2024. I am so sorry that you are continuing to suffer in RMHU. I hope that you will not take any actions to harm yourself.

I have enclosed some information that may be useful to you in your litigation, including the complaint in a lawsuit that the Legal Aid Society's Prisoners' Rights Project filed earlier this year. It will probably take a while for the litigation to be resolved, but if the lawsuit is successful, it could improve your situation. You may want to be in touch with the Legal Aid Society if you aren't already.

Have you been in touch with Prisoners' Legal Services about violations of your rights under the Americans with Disabilities Act? I know that they are not able to represent all the people who write to them, but you may want to reach out to them about Five Points not having the assistive devices you need. Also, their case about people being placed in SHU, RRU, and RMHU for conduct that doesn't fall within HALT's enumerated offenses was successful. So you may also want to tell them about the sentence you received.

Finally, we are going to be sending a letter to the Governor's office as well as the Justice Center, OMH, and DOCCS about the problems with the RMHU, and we may also be including some of this material in an amicus brief to the Appellate Division. The description of the RMHU which you provide in your letter is quite powerful. Would you want us to include it? We would not use your name or any identifying information about you. The following excerpt from your letter is what we may want to include about RMHU:

40 Rector St, 9th Fl, New York, NY 10006
Tel: 646.602.5600 | Fax: 212.533.4598
urbanjustice.org | @urbanjustice

"...I am not actually receiving mental health care or treatment, in a mental health SHU, which is being ran like a restrictive punitive SHU, where we are being deprived of commissary food buys as punishment, our cosmetics have been taken away, our property, static tablet, electronics, and other oppressive deprivations are being placed on us, and there is no therapeutic program being run, mental health and correctional staff only show movies, and play scramble and nobody come out of their cells to participate, as there isn't no real incentive or reason to and the mental health staff allow correctional staff with no training or experience to abuse us, retaliate against us by having our tablets taken away..."

Thanks for corresponding with me. I hope that you are moved out of the RMHU soon.

Sincerely,

Jennifer J. Parish
Director of Criminal Justice Advocacy
Mental Health Project
(646) 602-5644

# PLS

## Prisoners' Legal Services
## of New York

114 Prospect Street • Ithaca, NY 14850
Tel: 607-273-2283 • Fax: 607-272-9122

**Executive Director**
Karen L. Murtagh

**Of Counsel**
Betsy Hutchings

**Managing Attorney**
Krin Flaherty

**Senior Staff Attorney**
Hallie E. Mitnick

**Staff Attorneys**
Ann Ferrari
Megan P. Welch

September 19, 2024

Steven Jude
17-A-0890
Caller Box 119, State Route 96
Romulus, NY 14541

Dear Mr. Jude:

We recently received your letter seeking legal assistance. Regrettably, we have determined that we cannot provide you with the assistance you requested. If you have asked for some form materials or we believe we have form materials that may be helpful to you, we are enclosing these materials with this letter. We are also returning any papers you sent.

You wrote that you are in SHU for 500 days. If part of your disposition is not loss of phone or tablet, you could file a grievance about being denied your phone or tablet and for the other issues you wrote about. You could try speaking to your ORC about these problems as well. You wrote that you were not being fed but then wrote that you were holding the feed up slot closed. If you were to file a grievance about not being fed but it is true that you held the feed up slot closed, it is unlikely to be successful.

We can understand that you are frustrated by the treatment you are receiving but maybe you could speak to OMH to try to find other ways to deal with your frustration that are not harmful to yourself.

Sincerely,

Aleta Albert
Director of Advocacy

Enc.: Incarcerated Grievance Program

# PLS    Prisoners' Legal Services of New York

41 State Street, Suite M112 • Albany, New York 12207
Tel: (518) 438-8046 • Fax: (518) 438-6643

**Executive Director**
Karen L. Murtagh
**Interim Deputy Director**
Krin Flaherty

**Managing Attorney**
Sophia Heller
**Senior Supervising Attorney**
James Bogin

**Senior Staff Attorney**
Matthew McGowan
**Staff Attorneys**
Sara Jensen
Madison Levin
Kevin Nelson

October 7, 2024

**PRIVILEGED AND CONFIDENTIAL**
**LEGAL MAIL**

Steven Jude
17-A-0890
Five Points Correctional Facility
Caller Box 119, State Route 96
Romulus, NY 14541

Dear Mr. Jude:

We received your letter seeking legal assistance. Regrettably, we have determined that we cannot provide you with the assistance you requested. We do not have the complaints from the DAI case or the Peoples case. I am enclosing a decision from the Peoples case. In the Fields case the court ruled that DOCCS had an illegal policy that resulted in SHU sanctions in violation of HALT. We are working to obtain meaningful relief for people who were affected.

We have form materials that may be helpful to you, however, and we are enclosing these materials with this letter.

Sincerely yours,

James Bogin
Senior Supervising Attorney

Encl.:    Fields FAQs
         The Humane Alternatives to Long-Term Solitary Confinement Act: "HALT" Limits on
           Confinement Sanctions
         Peoples decision

**NEW YORK STATE** | **Justice Center for the Protection of People with Special Needs**

**KATHY HOCHUL**
Governor

**MARIA LISI-MURRAY**
Acting Executive Director

Steven Jude
DIN#: 17A0890
Five Points Correctional Facility
State Route 96
P.O. Box 119
Romulus, New York 14541

Mr. Jude,

The Justice Center is in receipt of your letter dated June 30, 2024.

The Justice Center is an oversight agency that monitors the quality of mental health care provided to incarcerated individuals and reviews the programs, treatment, and conditions of confinement for incarcerated individuals placed in segregated confinement or residential rehabilitation units in New York State correctional facilities. We focus our efforts on assessing the overall quality of mental health services and programming provided to incarcerated individuals and monitoring compliance with the HALT Legislation at correctional facilities. We are unable to review and respond to every individual complaint. However, please be assured that the Justice Center will refer your concerns to DOCCS and OMH for review and action. We will also use the information which you have shared with us to guide us in our reviews and recommendations on the programs, treatment, and conditions of confinement for incarcerated individuals in the care and custody of the State correctional system.

Sincerely,

The Forensic Unit

 **Justice Center for the Protection of People with Special Needs**

**KATHY HOCHUL**
Governor

**MARIA LISI-MURRAY, ESQ.**
Acting Executive Director

Steven Jude
DIN#: 17A0890
Five Points Correctional Facility
State Route 96; P.O. Box 119
Romulus, New York 14541

Mr. Jude,

The Justice Center is in receipt of your letter.

The Justice Center is an oversight agency that monitors the quality of mental health care provided to incarcerated individuals and reviews the programs, treatment, and conditions of confinement for incarcerated individuals placed in segregated confinement or residential rehabilitation units in New York State correctional facilities. We focus our efforts on assessing the overall quality of mental health services and programming provided to incarcerated individuals and monitoring compliance with the HALT Legislation at correctional facilities. We are unable to review and respond to every individual complaint. However, please be assured that the Justice Center will refer your concerns to DOCCS and OMH for review and action. We will also use the information which you have shared with us to guide us in our reviews and recommendations on the programs, treatment, and conditions of confinement for incarcerated individuals in the care and custody of the State correctional system.

Sincerely,

The Forensic Unit

---



**NEW YORK STATE | State Police**

**KATHY HOCHUL**
Governor

**STEVEN G. JAMES**
SUPERINTENDENT

August 22, 2024

Five Points Correctional Facility
Steven Jude
DIN: 17A-0890
St Rte 96, PO Box 119
Romulus, New York 14541

Dear Steven Jude:

      I am in receipt of your correspondence dated 8/12/2024 and have forwarded it to the N.Y.S. Department of Corrections and Community Supervision – Office of Special Investigations, as the matter would come under their jurisdiction.

Sincerely,

Capt. *Jim N. Browne*

James M. Browne
Captain
Bureau of Criminal Investigation

Building 22, 1220 Washington Avenue, Albany, NY 12226 | www.troopers.ny.gov

 **Corrections and Community Supervision**

**KATHY HOCHUL**
Governor

**ANTHONY J. ANNUCCI**
Acting Commissioner

July 13, 2022

Steven Jude
#17A0890
Sullivan Correctional Facility
325 Riverside Drive
PO Box 116
Fallsburg, NY 12733-0116

This is in response to your recent correspondence regarding your mental health concerns, program concerns, and claims of staff misconduct. In regard to your mental health and program concerns, I have forwarded your letter to the Deputy Superintendent of Mental Health and OMH Unit Chief. In regard to your claims of staff misconduct, I have forwarded your letter to the Office of Special Investigation (OSI). I encourage you to work positively with facility staff so that you may reach your goals.

Sincerely,

Bryan Hilton
Associate Commissioner



**NEW YORK STATE** | **Corrections and Community Supervision**

**KATHY C. HOCHUL**
Governor

**ANTHONY J. ANNUCCI**
Acting Commissioner

August 25, 2022

Incarcerated Individual Steven Jude
17-A-0890
Five Points Correctional Facility
6600 State Route 96
Caller Box 119
Romulus, New York 14541

Incarcerated Individual Jude:

Acting Commissioner Annucci has asked me to respond to your letter to him regarding current sanctions for the loss of privileges.

Please be advised that a review of your records show that your current sanctions are correct.

I have enclosed copies of your disciplinary history and current sanction sheet for your records. Any further questions regarding the service dates of your current sanctions should be directed to facility officials.

Sincerely,

Joseph H. Noeth
Deputy Commissioner for Correctional Facilities

Enclosure
cc:    Superintendent Lamanna, Five Points Correctional Facility
       Central Files

 **Corrections and Community Supervision**

**KATHY HOCHUL**
Governor

**ANTHONY J. ANNUCCI**
Acting Commissioner

August 31, 2022

Jude, Steven
Five Points Correctional Facility
6600 State Route 96
Caller Box 400
Romulus, NY 14541

Acting Commissioner Annucci has asked me to respond to your letter regarding mental health concerns, program concerns, and claims of staff misconduct. Regarding mental health and program concerns, I have forwarded your letter to the Deputy Superintendent of Mental Health and OMH Unit Chief. Regarding your claims of staff misconduct, I have forwarded your letter to the Office of Special Investigation (OSI). Our records indicate you have recently transferred to Five Points RMHU. I encourage you to work positively with facility staff so that you may reach your goals.

Sincerely,

Elhadji Gueye
Director DOCCS Bureau of Mental Health

The Harriman State Campus, 1220 Washington Avenue, Albany, NY 12226-2050 | (518) 457-8126 | www.doccs.ny.gov

 **Corrections and Community Supervision**

**KATHY HOCHUL**
Governor

**ANTHONY J. ANNUCCI**
Acting Commissioner

October 27, 2022

Jude, Steven
Five Points Correctional Facility
6600 State Route 96
Caller Box 400
Romulus, NY 14541

Acting Commissioner Annucci has asked me to respond to your letter regarding mental health concerns, program concerns, and claims of staff misconduct.

Regarding mental health and program concerns, I have forwarded your letter to the Deputy Superintendent of Mental Health Miller and OMH Unit Chief Dolley. Regarding your claims of staff misconduct, I have forwarded your letter to the Office of Special Investigation (OSI). I encourage you to work positively with facility staff so that you may reach your goals.

Sincerely,

El Hadji Gueye
Director DOCCS Bureau of Mental Health



## NEW YORK STATE | Corrections and Community Supervision

**ANDREW M. CUOMO**
Governor

**ANTHONY J. ANNUCCI**
Acting Commissioner

November 22, 2022

Steven Jude
#17-A-0890
Five Points Correctional Facility
6600 State Route 96
Caller Box 400
Romulus, NY 14541

In response to your recent letter about your loss of privileges despite your program participation and time cuts while in the RMHU, have you appealed to DSMH Miller? DSMH Miller will work with you on a plan, so you can progress in the program. Regarding your request for transfer, I would prefer you speak with DSMH Miller and see if a plan can be worked out then let me know. I appreciate your willingness to reach out to DSMH Miller.

I will look into your claims about the programming or lack of programming.

Sincerely,

an Hilton
e Commissioner

 **NEW YORK STATE** | **Corrections and Community Supervision**

**KATHY HOCHUL**
Governor

**ANTHONY J. ANNUCCI**
Acting Commissioner

November 28, 2022

Jude, Steven
#17-A-0890
Five Points Correctional Facility (RMHU)
6600 State Route 96
Caller Box 400
Romulus, NY 14541

Associate Commissioner Hilton has asked me to respond to your letter regarding mental health concerns, program concerns, and claims of staff misconduct. Regarding mental health and program concerns, I have forwarded your letter to the Deputy Superintendent of Mental Health Miller and OMH Unit Chief Dolley. Regarding your claims of staff misconduct, I have forwarded your letter to the Office of Special Investigation (OSI). I continue encouraging you to work positively with facility staff so that you may reach your goals.

Sincerely,

El Hadji Gueye
Director DOCCS Bureau of Mental Health

 **Corrections and Community Supervision**

**ANDREW M. CUOMO**
Governor

**ANTHONY J. ANNUCCI**
Acting Commissioner

November 30, 2022

Steven Jude
#17-A-0890
Five Points Correctional Facility
6600 State Route 96
Caller Box 400
Romulus, NY 14541

In response to your letter dated November 11, 2022, you were placed at five Points RMHU due to your need for reasonable accommodations. I will reach out to the facility to provide me status on your 60-day review and plan for you to earn back your loss of privileges.

Sincerely,

Bryan Hilton
Associate Commissioner

 **Corrections and Community Supervision**

**KATHY HOCHUL**
Governor

**ANTHONY J. ANNUCCI**
Acting Commissioner

December 14, 2022

Jude, Steven
#17-A-0890
Five Points Correctional Facility (RMHU)
6600 State Route 96
Caller box 400
Romulus, NY 14541

Associate Commissioner Hilton asked me to respond to your letter regarding your request for reinstatement of privileges. Please be advised, I have forwarded your letter to Deputy Superintendent for Security and Deputy Superintendent for Mental Health for their review. I encourage you to continue working positively with staff and the Treatment Team so that you may reach your goals.

Sincerely,

El Hadji Gueye, Director
DOCCS Bureau of Mental Health



**NEW YORK STATE** | **Corrections and Community Supervision**

**KATHY HOCHUL**
Governor

**DANIEL F. MARTUSCELLO III**
Acting Commissioner

May 2, 2024

Steven Jude, 17A0890
Five Points Correctional Facility
6600 State Route 96
Caller Box 400
Romulus, NY 14541

Dear Steven Jude:

Deputy Commissioner Moores has asked me to respond to your recent letter written while you were housed at Sullivan Correctional Facility. I understand that you have since been transferred to Five Points Correctional Facility.

The Division of Health Services has investigated your concerns with the Health Services staff at Five Points Correctional Facility. Please be advised that your primary care provider is the determinant of your medical care and treatment plan.

It is suggested that you bring your medical concerns to the attention of the health care staff at your current location using the existing sick call procedure.

Sincerely,

Stephen Ash

Stephen M. Ash
Regional Health Services Administrator
Division of Health Services

cc: FHSD, Five Points Correctional Facility

 **Corrections and Community Supervision**

NEW YORK STATE

**KATHY HOCHUL**
Governor

**DANIEL F. MARTUSCELLO III**
Commissioner

June 4, 2024

Steven Jude, 17A0890
Five Points Correctional Facility
6600 State Route 96
Caller Box 400
Romulus, NY 14541

Dear Steven Jude:

Deputy Commissioner Moores has asked me to respond to your recent letters.

The Division of Health Services has investigated your concerns with the Health Services staff at Five Points Correctional Facility. I've been informed that a referral for prescription footwear has been entered by staff. Please be advised that your primary care provider is the determinant of your medical care and treatment plan.

It is suggested that you continue to bring your medical concerns to the attention of the health care staff using the existing sick call procedure.

Sincerely,

*Stephen Ash*

Stephen M. Ash
Regional Health Services Administrator
Division of Health Services

Facility

0 Washington Avenue, Albany, NY 12226-2050 | (518) 457-8126 | www.doc

 **Corrections and Community Supervision**

KATHY HOCHUL
Governor

DANIEL F. MARTUSCELLO III
Commissioner

August 8, 2024

Steven Jude, 17A0890
Five Points Correctional Facility

Dear Mr. Jude:

Commissioner Martuscello has asked me to respond to your letter alleging assault by staff at Five Points Correctional Facility.

Thank you for sharing your concerns. The Department's Office of Special Investigations (OSI) takes all complaints we receive very seriously, and we review each one to assess the best course of action. Regarding your complaint, OSI has opened an investigation into these allegations. At the conclusion of the investigation, it is OSI's practice to notify the victim / aggrieved individual of OSI's finding(s) based upon the evidence.

If you have additional information, or another complaint, please contact us by dialing "444" or by writing a letter to New York State Department of Corrections and Community Supervision, Office of Special Investigations, Building No. 4, 1220 Washington Avenue, Albany, New York 12226-2050.

Sincerely,

Darren T. Miller
Deputy Commissioner/Chief
Office of Special Investigations

cc:    Superintendent Lowerre, Five Points C.F.
       Central Files



**NEW YORK STATE** | **Corrections and Community Supervision**

KATHY C. HOCHUL
Governor

ANTHONY J. ANNUCCI
Acting Commissioner

August 25, 2022

Incarcerated Individual Steven Jude
17-A-0890
Five Points Correctional Facility
6600 State Route 96
Caller Box 119
Romulus, New York 14541

Incarcerated Individual Jude:

Acting Commissioner Annucci has asked me to respond to your letter to him regarding current sanctions for the loss of privileges.

Please be advised that a review of your records show that your current sanctions are correct.

I have enclosed copies of your disciplinary history and current sanction sheet for your records. Any further questions regarding the service dates of your current sanctions should be directed to facility officials.

Sincerely,

Joseph H. Noeth
Deputy Commissioner for Correctional Facilities

Enclosure
cc:     Superintendent Lamanna, Five Points Correctional Facility
        Central Files

 **Corrections and Community Supervision**

**KATHY HOCHUL**
Governor

**ANTHONY J. ANNUCCI**
Acting Commissioner

December 14, 2022

Jude, Steven
#17-A-0890
Five Points Correctional Facility (RMHU)
6600 State Route 96
Caller box 400
Romulus, NY 14541

Associate Commissioner Hilton asked me to respond to your letter regarding your request for reinstatement of privileges. Please be advised, I have forwarded your letter to Deputy Superintendent for Security and Deputy Superintendent for Mental Health for their review. I encourage you to continue working positively with staff and the Treatment Team so that you may reach your goals.

Sincerely,

El Hadji Gueye, Director
DOCCS Bureau of Mental Health



**Department of Corrections and Community Supervision**

KATHY HOCHUL
Governor

DANIEL F. MARTUSCELLO III
Commissioner

October 1, 2024

Incarcerated Individual Steven Jude
17-A-0890
Five Points Correctional Facility
6600 State Route 96
Caller Box 119
Romulus, NY 14541

Incarcerated Individual Jude:

Commissioner Martuscello has asked me to respond to your letter regarding medical concerns at Five Points Correctional Facility.

A copy of your correspondence was forwarded to facility officials at Five Points Correctional Facility for investigation and response. Facility officials reported, an investigation was conducted which included an interview with you and a review of facility records. During your interview, you provided no additional information or witnesses. Facility officials reported your request for reasonable accommodations was processed in accordance with Directive #2612, "Incarcerated Individuals with Sensorial Disabilities," and you receive all services and amenities related to your disability while housed at Five Points Correctional Facility. After a review of the information contained in this investigation, facility officials reported that your concerns have been addressed.

If you have any further concerns regarding this matter, direct them to facility officials as they are in the best position to assist you.

Sincerely,

Dawn Di Cairano

Dawn Di Cairano
Acting Deputy Commissioner for Correctional Facilities

Cc:    Superintendent Bishop, Five Points Correctional Facility
       Central Files



| | |
|---|---|
| **KATHY HOCHUL**<br>Governor | **DANIEL F. MARTUSCELLO III**<br>Commissioner |

June 4, 2024

Steven Jude, 17A0890
Five Points Correctional Facility
6600 State Route 96
Caller Box 400
Romulus, NY 14541

Dear Steven Jude:

Deputy Commissioner Moores has asked me to respond to your recent letters.

The Division of Health Services has investigated your concerns with the Health Services staff at Five Points Correctional Facility. I've been informed that a referral for prescription footwear has been entered by staff. Please be advised that your primary care provider is the determinant of your medical care and treatment plan.

It is suggested that you continue to bring your medical concerns to the attention of the health care staff using the existing sick call procedure.

Sincerely,

*Stephen Ash*

Stephen M. Ash
Regional Health Services Administrator
Division of Health Services

Facility



**NEW YORK STATE** | Corrections and Community Supervision

KATHY HOCHUL
Governor

DANIEL F. MARTUSCELLO III
Commissioner

July 31, 2024

Steven Jude, 17A0890
Five Points Correctional Facility
6600 State Route 96
Caller Box 400
Romulus, NY 14541

Dear Steven Jude:

Deputy Commissioner Moores has asked me to respond to your recent letter.

The Division of Health Services has investigated your concerns with the Health Services staff at Five Points Correctional Facility. I've been informed that a referral for prescription footwear has been approved and is in the process of being scheduled. Please be advised that your primary care provider is the determinant of your medical care and treatment plan.

It is suggested that you continue to bring your medical concerns to the attention of the health care staff using the existing sick call procedure.

Sincerely,

Stephen Ash

Stephen M. Ash
Regional Health Services Administrator
Division of Health Services

cc: FHSD, Five Points Correctional Facility



# Corrections and Community Supervision

KATHY HOCHUL
Governor

DANIEL F. MARTUSCELLO III
Commissioner

September 9, 2024 $\quad$ MOD-007



Mr. Steven Jude, 17A0890
~~Sullivan~~ Correctional Facility

Dear Mr. Jude:

Commissioner Martuscello has asked me to respond to your letter alleging assault and misconduct by staff at multiple facilities.

Thank you for sharing your concerns. The Department's Office of Special Investigations (OSI) takes all complaints we receive very seriously, and we review each one to assess the best course of action. Regarding your complaint, OSI has opened an investigation into these allegations. At the conclusion of the investigation, it is OSI's practice to notify the victim / aggrieved individual of OSI's finding(s) based upon the evidence.

If you have additional information, or another complaint, please contact us by dialing "444" or by writing a letter to New York State Department of Corrections and Community Supervision, Office of Special Investigations, Building No. 4, 1220 Washington Avenue, Albany, New York 12226-2050.

Sincerely,

Darren T. Miller
Deputy Commissioner/Chief
Office of Special Investigations

cc:    Superintendent Bennett, Sullivan C.F.
       Superintendent Yehl, Wende C.F.
       Central Files

---

The Harriman State Campus, 1220 Washington Avenue, Albany, NY 12226-2050 | (518) 457-8126 | www.doccs.ny.gov



**NEW YORK STATE OF OPPORTUNITY.** | **Central New York Psychiatric Center**

| KATHY HOCHUL | ANN MARIE T. SULLIVAN, M.D. | DANIELLE DILL, PSY.D. |
|---|---|---|
| Governor | Commissioner | Executive Director |

July 14, 2022

Mr. Steven Jude
DIN # 17A0890
Sullivan Correctional Facility
325 Riverside Drive
P.O. Box 116
Fallsburg, New York 12733

Dear Mr. Jude:

The Central New York Psychiatric Center (CNYPC) Risk Management department is writing in response to your letter dated July 10, 2022.

This department has consulted with the mental health staff at Sullivan Correctional Facility and reviewed your mental health record regarding your noted concerns. You have been receiving outpatient mental health services per policy guidelines. You were assessed by a clinician on July 12, 2022 and had an opportunity to discuss your concerns. You are strongly encouraged to work with your treatment team at your facility to address your mental health needs. Should you feel you are in crisis, please request to speak with the mental health staff.

Your concerns regarding Humane Alternatives to Long Term (HALT) Solitary Confinement Act guidelines and disciplinary sanctions are ultimately handled by the Department of Corrections and Community Supervision (DOCCS), and therefore, are outside the jurisdiction of mental health staff and services. Should you still wish to discuss these matters, you will need to contact the appropriate DOCCS personnel at your facility.

Any further concerns you may have related to mental health services can be forwarded to the Risk Management department for review and response. Thank you.

Sincerely,

Risk Management Specialist

CC: File

**A FACILITY OF THE OFFICE OF MENTAL HEALTH**

 **Central New York Psychiatric Center**

| KATHY HOCHUL | ANN MARIE T. SULLIVAN, M.D. | DANIELLE DILL, PSY.D. |
|---|---|---|
| Governor | Commissioner | Executive Director |

July 12, 2024

Mr. Steven Jude
DIN # 17A0890
Five Points Correctional Facility
Residential Mental Health Unit
6600 State Route 96
Caller Box 119
Romulus, New York 14541

Dear Mr. Jude:

Your letter addressed to the New York State Office of Mental Health Commissioner, dated June 30, 2024, was forwarded to the Central New York Psychiatric Center (CNYPC) Risk Management department for review and response.

This department has consulted with the mental health staff at Five Points Correctional Facility's Residential Mental Health Unit (RMHU) and reviewed your record regarding the concerns noted in your correspondence. You have been receiving mental health services per policy guidelines. In addition, your concerns regarding the mental health staff were investigated and there was no evidence found to support staff operated unprofessionally or outside of policy guidelines. You are encouraged to work with mental health staff at your facility to address your treatment needs. Should you feel you are in crisis, please request to speak with the mental health staff.

Regarding your Prison Rape Elimination Act (PREA) concerns, due to the nature of your allegations, your letter has been forwarded to the appropriate personnel for further review.

Matters pertaining to correctional officer staff, disciplinary sanctions, and deprivation orders are ultimately handled by the Department of Corrections and Community Supervision (DOCCS), and therefore are outside the jurisdiction of mental health staff. Your letter was forwarded to the appropriate personnel for further review. Should you still wish to discuss these matters, you will need to contact the appropriate DOCCS personnel at your facility.

Any further concern you may have related to mental health services can be forwarded to the Risk Management department for review and response. Thank you.

Sincerely,

Risk Management Specialist

CC: File



**Central New York Psychiatric Center**

| KATHY HOCHUL | ANN MARIE T. SULLIVAN, M.D. | DANIELLE DILL, PSY.D. |
|---|---|---|
| Governor | Commissioner | Executive Director |

April 26, 2024

Mr. Steven Jude
DIN # 17A0890
Five Points Correctional Facility
Residential Mental Health Unit
6600 State Route 96
Caller Box 119
Romulus, New York 14541

Dear Mr. Jude:

Your letter addressed to the New York State Office of Mental Health, dated April 3, 2024, was forwarded to the Central New York Psychiatric Center (CNYPC) Risk Management department for review and response.

This department has consulted with the mental health staff at Sullivan Correctional Facility and reviewed your record regarding the concerns noted in your correspondence. You have been receiving mental health services per policy guidelines. Your treatment needs have been thoroughly assessed and treated as indicated. In addition, your concerns regarding the mental health staff were investigated and there was no evidence found to support staff operated unprofessionally or outside of policy guidelines. Since receipt of your letter, you have transferred to Five Points Correctional Facility's Residential Mental Health Unit (RMHU). Please work with your treatment team to address your mental health needs.

Matters pertaining to correctional officer staff and cell conditions are ultimately handled by the Department of Corrections and Community Supervision (DOCCS), and therefore, are outside the jurisdiction of mental health staff. Should you still wish to discuss these matters, you will need to contact the appropriate DOCCS personnel at your current facility for resolution.

Any further concerns you may have related to mental health services can be forwarded to the Risk Management department for review and response. Thank you.

Sincerely,

Risk Management Specialist

CC: File

**A FACILITY OF THE OFFICE OF MENTAL HEALTH**

**NEW YORK** STATE OF OPPORTUNITY. | **Central New York Psychiatric Center**

| KATHY HOCHUL | ANN MARIE T. SULLIVAN, M.D. | DANIELLE DILL, PSY.D. |
|---|---|---|
| Governor | Commissioner | Executive Director |

September 11, 2024

Mr. Steven Jude
DIN # 17A0890
Five Points Correctional Facility
Residential Mental Health Unit
6600 State Route 96
Caller Box 119
Romulus, New York 14541

Dear Mr. Jude:

The Executive Director's office at Central New York Psychiatric Center (CNYPC) is writing in response to your letter addressed to the New York State Justice Center, received on September 9, 2024, appealing the CNYPC Risk Management department's July 12, 2024 response.

This office has reviewed the investigation conducted by the Risk Management department and concurs with the determination described in the July 12, 2024 response letter. You have been receiving mental health services per policy protocols and as needed. I strongly encourage you to work with your treatment team to address your mental health needs and make progress toward your treatment goals.

Your concerns regarding correctional officer staff, disciplinary sanctions, and meal procedures are ultimately handled by the Department of Corrections and Community Supervision (DOCCS). Therefore, these are outside the purview of mental health staff. Your letter has been forwarded to the appropriate personnel for review. To further discuss these matters, please contact the appropriate DOCCS personnel at your facility.

Thank you for sharing your concerns with this office. If you wish to appeal this response, you may contact OMH Customer Relations at 44 Holland Ave., Albany, New York 12229.

Sincerely,

Danielle Dill, Psy.D.
Executive Director

CC: File

**A FACILITY OF THE OFFICE OF MENTAL HEALTH**

P.O. Box 300, Marcy, NY 13403-0300  |  (315) 765-3600  |  Fax: (315) 765-3629  |  omh.ny.gov



**NEW YORK STATE OF OPPORTUNITY.** | **Central New York Psychiatric Center**

| KATHY HOCHUL | ANN MARIE T. SULLIVAN, M.D. | DANIELLE DILL, PSY.D. |
|---|---|---|
| Governor | Commissioner | Executive Director |

April 26, 2022

Mr. Steven Jude
DIN # 17A0890
Sullivan Correctional Facility
325 Riverside Drive
P.O. Box 116
Fallsburg, New York 12733

Dear Mr. Jude:

Your letter addressed to the New York State Office of Mental Health Commissioner, dated April 20, 2022, was forwarded to the Central New York Psychiatric Center (CNYPC) Risk Management department for review and response.

This department has reviewed your mental health record regarding your noted concerns. Your admission to the Residential Crisis Treatment Program (RCTP) at Wende Correctional Facility from January 20, 2022 to April 20, 2022 was clinically indicated. The RCTP can be utilized for thorough assessment of patients, if determined by your treatment team to be necessary. Since receipt of your letter, you have transferred to Sullivan Correctional Facility. You are strongly encouraged to work with your treatment team at your facility to address your mental health needs.

Your concerns regarding disciplinary tickets and procedures are ultimately handled by the Department of Corrections and Community Supervision (DOCCS), and therefore, are outside the jurisdiction of mental health staff and services. Should you still wish to discuss these matters, you will need to contact the appropriate DOCCS personnel.

Any further concerns you may have related to mental health services can be forwarded to the Risk Management department for review and response. Thank you.

Sincerely,

Risk Management Specialist

CC: File

**A FACILITY OF THE OFFICE OF MENTAL HEALTH**



**Central New York**
**Psychiatric Center**

| KATHY HOCHUL | ANN MARIE T. SULLIVAN, M.D. | DANIELLE DILL, PSY.D. |
|---|---|---|
| Governor | Commissioner | Executive Director |

August 23, 2022

Mr. Steven Jude
DIN # 17A0890
Five Points Correctional Facility
Residential Mental Health Unit
6600 State Route 96
Caller Box 119
Romulus, New York 14541

Dear Mr. Jude:

The Central New York Psychiatric Center (CNYPC) Risk Management department is writing in response to your letter dated August 17, 2022.

This department has reviewed your mental health record and consulted with the staff at Five Points Correctional Facility's Residential Mental Health Unit regarding your concerns. Your admission to the Residential Crisis Treatment Program (RCTP) from August 16, 2022 to August 17, 2022 was clinically indicated. The RCTP can be utilized for thorough assessment of patients, if determined by your treatment team to be necessary. Additionally, your concerns regarding the mental health staff were investigated and there was no evidence found to support staff operated unprofessionally or outside of policy guidelines. You are strongly encouraged to work with your treatment team at your facility to address your mental health needs.

Matters pertaining to disciplinary sanctions and Humane Alternatives to Long Term Solitary Confinement Act (HALT) procedures are ultimately handled by the Department of Corrections and Community Supervision (DOCCS), and therefore, are outside the jurisdiction of mental health staff and services. Should you still wish to discuss these matters, you will need to contact the appropriate DOCCS personnel at your facility.

Any further concerns you may have related to mental health services can be forwarded to the Risk Management department for review and response. Thank you.

Sincerely,

Risk Management Specialist

CC: File

**A FACILITY OF THE OFFICE OF MENTAL HEALTH**

P.O. Box 300, Marcy, NY 13403-0300  |  (315) 765-3620  |  Fax: (315) 765-3629  |  omh.ny.gov

**CHAIR**
CRIME, VICTIMS, CRIME & CORRECTION

**COMMITTEE MEMBER**
FINANCE
HEALTH
HOUSING, CONSTRUCTION &
COMMUNITY DEVELOPMENT
MENTAL HEALTH
WOMEN'S ISSUES

**MEMBER**
LEGISLATIVE WOMEN'S CAUCUS
SELECT MAJORITY TASK FORCE ON
DIVERSITY IN THE JUDICIARY
SUBCOMMITTEE ON STATE-NATIVE
AMERICAN RELATIONS
BLACK, PUERTO RICAN, HISPANIC &
ASIAN LEGISLATIVE CAUCUS

**SENATOR**
**JULIA C. SALAZAR**
18TH SENATORIAL DISTRICT
STATE OF NEW YORK

ALBANY OFFICE:
511 STATE CAPITOL
ALBANY, NY 12247
PHONE: 518-455-2177

DISTRICT OFFICE:
212 EVERGREEN AVENUE
BROOKLYN, NY 11221
PHONE: 718-573-1726

Website:
salazar.nysenate.gov

Hello,

Thank you for writing to my office. As you may know, I am the Chair of the Senate Committee on Crime Victims, Crime and Correction. I am dedicated to improving conditions in New York's correctional facilities and to reducing rates of incarceration. To be as knowledgeable and as effective as possible in this work, I depend on hearing first-hand information from incarcerated individuals and their families to learn about the current conditions in New York State prisons. So, I appreciate hearing from you.

In this letter, you will find resources and contact information for organizations that provide services to incarcerated individuals in New York. I also included summaries of a few of the bills I have introduced to address some of the most pervasive issues within NYS prisons and jails.

**Legal Representation & Grievances**
As a Senate Office, we do not have the jurisdiction to provide legal representation and are unable to set up legal calls. If you are writing about ongoing issues of abuse or harassment, or unanswered grievances, I am truly sorry to hear this. It is unacceptable. Please know that my office and I are doing what we can to change the laws though the legislative process to make reporting these instances easier, and to hold DOCCS accountable for any misconduct. With this in mind, I introduced the following bills, and am fighting hard to get them passed:

- **S7672**: Creates the office of the correctional ombudsman to achieve transparency, fairness, impartiality and accountability in New York state correctional facilities.
- **S8480**: Authorizes the DOCCS commissioner to discipline certain employees for acts of serious misconduct. (Currently, even if DOCCS wishes to discipline an employee for serious misconduct, they often are unable to because of the existing arbitration system.)
- **S6975**: Authorizes the state inspector general (an independent agency) to receive and investigate complaints of sexual assault in correctional facilities.

Additionally, if you are looking for legal representation for your case, please contact one of the following legal services organizations for assistance:

- Prisoners' Legal Services (Albany)
  - For those housed in: Adirondack, Altona, Bare Hill, Clinton, CNYPC, Coxsackie, Eastern, Edgecombe, Franklin, Gouverneur, Great Meadow, Greene, Hale Creek, Hudson, Marcy, Mid-State, Mohawk, Otisville, Queensboro, Riverview, Shawangunk, Sullivan, Ulster, Upstate, Wallkill, Washington, Woodbourne
  - **Address:** 41 State Street, Suite M112, Albany, New York 12207
  - **Phone:** (518) 438-8046

- Prisoners' Legal Services (Buffalo)
  - o For those housed in: Albion, Attica, Collins, Groveland, Lakeview, Orleans, Rochester, Wende, Wyoming
  - o **Address:** 14 Lafayette Square, Suite 510, Buffalo, NY 14203
  - o **Phone:** (716) 854-1007
- Prisoners Legal Services (Ithaca)
  - o For those housed in: Auburn, Cape Vincent, Cayuga, Elmira, Five Points
  - o **Address:** 114 Prospect Street, Ithaca, New York, 14850
  - o **Phone:** (607) 273-2283
- Prisoners' Legal Services (Newburgh)
  - o For those housed in: Bedford Hills, Fishkill, Green Haven, Sing Sing, Taconic
  - o **Address:** 10 Little Britain Road, Suite 204, Newburgh, New York, 12550
  - o **Phone:** (845) 391-3110
- Legal Aid Society — Prisoner. Rights Project
  - o Provides services to all correctional facilities, and has particular interest in HALT violations
  - o **Address:** 49 Thomas Street, 10th Floor, New York, NY 10013
  - o **Phone:** (212) 577-3300

**Wrongful Convictions & Sentence Reduction**

If you're writing about being wrongfully convicted, or for any matter relating to your sentence, please know that I am aware of the faults that exist in our courts and the legal process, and I support your attempts to fight any injustices you may have experienced in your sentencing or conviction. I introduced the following bill on this topic, and am fighting hard to get it passed:

- **S321 (The Second Look Act):** This bill provides incarcerated individuals who have been sentenced to lengthy prison sentences of a decade or longer the chance to obtain a "second look" at their sentences.
  - o If you're interested in getting involved in advocacy efforts for this bill, there is an excellent coalition that supports and advocates for it. Please feel welcome to reach out to them: Center for Community Alternatives — Communities Not Cages Coalition (25 Chapel Street, 7th Floor, Brooklyn, NY 11201).

Additionally, if you are looking for specific review of your case, unfortunately, as a Senate Office, we do not have the jurisdiction to perform this type of task. However, you can contact one of the following resources for assistance:

- Innocence Project
  - o **Address:** 40 Worth St., Suite 701, New York, NY 10013
  - o **Phone:** (212) 364-5340
- Legal Aid Society — Wrongful Conviction Unit
  - o **Address:** 199 Water Street, New York, NY 10038

**Parole & Clemency**

I strongly believe in improving the parole system to grant parole to individuals who have served their minimum sentence, regardless of their crime of conviction, if they are ready to return to the community. With this in mind, I introduced the following legislation:

- **S307 (Fair and Timely Parole):** Provides that the Board of Parole shall release incarcerated persons who are eligible for release on parole, unless the parole case record


**Crime**
**Victims**
**Treatment**
**Center**

Mr. Steven Jude
17A0890
Five Points Correctional Facility
6600 State Route 96
Caller Box 119
Romulus, NY 14541

July 10, 2024

Dear Steven,

     I hope this letter finds you well. My name is Mark Leonida, and I am a social worker and therapist at the Crime Victims Treatment Center (CVTC) where we do follow up with people who have called the PREA hotline. We spoke briefly in March 2023 after you called the PREA hotline that month and you had politely declined additional services then after I had answered your questions about how to make a PREA complaint. I am writing to follow up after your recent hotline call on July 3rd to ask about any follow-up you were hoping for and if it is anything we are able to provide before possibly scheduling a legal call. Since you had a previous call, we usually communicate by writing first to confirm that a client wants and needs something different than last time before we schedule another legal call. We'll wait to hear back from you in writing before scheduling with the facility:

     CVTC
     40 Exchange Place, Suite 510
     New York, New York 10005

Best,

Mark Leonida, LCSW
Staff Therapist
Crime Victims Treatment Center

Exhibit

G

FORM 2171B (11-21)
Side 2

NEW YORK STATE DEPARTMENT OF CORRECTIONAL SERVICES

## Five Points Correctional Facility

### INCARCERATED INDIVIDUAL MISBEHAVIOR REPORT ♦ INFORME DE MAL COMPORTAMIENTO DEL INDIVIDUO ENCARCELADO

| 1. NAME OF INCARCERATED INDIVIDUAL (Last, First) ♦ NOMBRE DEL INDIVIDUO ENCARCELADO (Apellido, Nombre) | NO. • NUM | HOUSING LOCATION ♦ CELDA |
|---|---|---|
| Jude | 17A0890 | 77-D-07 |

| 2. LOCATION OF INCIDENT ♦ LUGAR DEL INCIDENTE | INCIDENT DATE ♦ FECHA | INCIDENT TIME ♦ HORA |
|---|---|---|
| 77-D-07 | September 14, 2024 | 8:10am  Approximately |

**3. RULE VIOLATION(S) ♦ VIOLACION/ES**

102.10 - THREATS

107.10 - INTERFERENCE

107.11 - HARASSMENT

**4. DESCRIPTION OF INCIDENT ♦ DESCRIPCION DEL INCIDENTE**

On the above date and approximate time, I Sgt Absalon was assigned grievance # FPT-1810-24 submitted by I/I Jude 17A0890 to investigate. Upon reviewing I/I's grievance, I observed I/I Jude made several threats "to pay other I/Is to do something" to Officer Laureano who was mention in I/Is Jude grievance. I/I Jude blatantly state in his grievance that he is going to put a contract on Officer Laureano. I/I Jude is utilizing the grievance process to threaten and harass staff working in RMHU. At approximately 8:10 am while interviewing I/I Jude in D gallery interview room, I/I Jude repeated his threat agaist Officer Laureano. I/I Jude is utilizing the grievance prcess to harass and intefere

| REPORT DATE ♦ FECHA | REPORTED BY ♦ REPORTADO POR | SIGNATURE ♦ FIRMA | TITLE ♦ TITULO |
|---|---|---|---|
| 09/14/24 | C. Absalon | | Sergeant |

**5. ENDORSEMENTS OF OTHER EMPLOYEE WITNESSES (if any)**    SIGNATURES :

ENDOSOS DE OTROS EMPLEADOS TESTIGOS (si hay)    FIRMAS:    1

2 _____    3 _____

**NOTE:  Fold back Page 2 on dotted line before completing below.**

DATE AND TIME SERVED UPON INCARCERATED INDIVIDUAL 9/17/24  9:53am    NAME AND TITLE OF SERVER  C.O. Dietsere

FECHA HORA DADO AL INDIVIDUO ENCARCELADO    NOMBRE Y TITULO DEL QUE ENTREGA

You are hereby advised that no statement made by you in response to the charges or information derived therefrom may be used against you in a criminal proceeding. ♦ Por este medio se le informa que no se puede usar ninguna declaracion hecha por usted como respuesta al crgoo informacion derivada de ella en una demanda criminal.

## NOTICE ♦ AVISO

### REVIEWING OFFICER (DETACH BELOW FOR VIOLATION HEARING ONLY)

You are hereby notified that the above report is a formal charge and will be considered and determined at a hearing to be held. ♦ Por este medio se le notifica que el informe anterior es un cargo formal el cual se considerara y determinara en una audiencia a celebrarse.

The inmate shall be permitted to call witnesses provided that so doing does not jeopardized institutional safety or correctional goals. ♦ Se le permitira al recluso llamar testigos con tal de que al hacerlo no pondra en peligro la seguridad de la institucion o los objetivos del Departamento.

If restricted pending a hearing for this misbehavior report, you may write to the Deputy Superintendent for Security or his/her designee prior to the hearing to make a statement on the need for continued prehearing confinement. ♦ Si esta restringido pendiente a una audiencia por este informe de mal compartamiento, puede escribirle al Diputado del Superintendente para Seguridad o su representante antes de la audiencia para que haga una declaracion acerca de la necesidad de continuar bajo confinamiento, previo a la audiencia.

Distribution:  WHITE - Disciplinary Office  CANARY - I/I (After review) ♦ Distribucion:  BLANCA - Oficinia Discipliaria  AMARILLA - Recluso (despues de la resion)

FORM 2187R (06/22)

*confiscated All legal work bible etc.
claiming he covered EVP + window.*

## NEW YORK STATE DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION

_Five Points_ _____ Correctional Facility

## DEPRIVATION ORDER RENEWAL

INCARCERATED INDIVIDUAL'S NAME: _Juele, S_ ___ DIN: _17A0890_ ___ Cell Location: _77-D-7_

In accordance with Directive #4933, "Special Housing Units," on this date of _8/19/24_ , you are being deprived of the

following specific item(s), privilege(s), or service(s): _Personal Papers (including Legal)_

This order has been reviewed and renewed because it has been determined that a threat to the safety or security of staff, incarcerated individuals, or State property continues to exist for the following specific reasons:

_I/I used personal paper and legal mail to cover EVP & window_

| Daily Review | Date | Cell # | Reason(s) for continuing this order (Based on current evaluation): |
|---|---|---|---|
| 1. | 9/2 | | I/I used personal paper and legal mail to cover EVP & window – |
| | | | Recommended by (Sgt.): _//_     Authorized by: _//_ |
| 2. | 9/3 | | I/I used personal paper and legal mail to cover EVP & window |
| | | | Recommended by (Sgt.): _//_     Authorized by: _//_ |
| 3. | 9/4 | | I/I used personal property + legal mail to cover EVP/window on 8/19/24 |
| | | | Recommended by (Sgt.): _S_     Authorized by: _//_ |
| 4. | 9/5 | | I/I used personal paper and legal mail to cover EVP & window |
| | | | Recommended by (Sgt.): _//_     Authorized by: _//_ |
| 5. | 9/6 | | I/I used personal property/legal papers to cover EVP/window |
| | | | Recommended by (Sgt.): _S_     Authorized by: _//_ |
| 6. | 9/7 | | I/I used personal papers/legal papers to cover EVP/window |
| | | | Recommended by (Sgt.): _S_     Authorized by: _//_ |
| 7. | 9/8 | | I/I used personal property & legal mail to cover EVP & window |
| | | | Recommended by (Sgt.): _S_     Authorized by: _//_ |

*After seven (7) days, deprivation orders will be reviewed and can be renewed by the Superintendent*

## SUPERINTENDENT'S REVIEW:

COMMENTS: _____

_____

RENEW: ☐ YES   ☒ NO   SIGNATURE: _C___ A/Supt_ DATE: _9/11/24_

---

**NOTICE TO INCARCERATED INDIVIDUAL:**
You may write to the Deputy Superintendent for Security or their designee to
make a statement on the need for continuing this deprivation order.

---

NOTES: Upon signature (authorization), copy and deliver to the incarcerated individual.

cc: Superintendent, SHU Sergeant, Housing Unit, Guidance Unit, Incarcerated Individual

FORM 2187 (06/22)

NEW YORK STATE DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION

_Five Points_ Correctional Facility

## DEPRIVATION ORDER

INCARCERATED INDIVIDUAL'S NAME: _Jude, S_    DIN: _17A0890_    Cell Location: _77-00-07_

In accordance with Directive #4933, "Special Housing Units," on this date of _9/4/24_, you are being deprived of the following specific item(s), privilege(s), or service(s): _Styrofoam tray_

because it is determined that a threat to the safety or security of staff, incarcerated individuals, or State property exists and for the following specific reason(s): _I/I refused multiple direct orders to return feed up tray to staff._

Recommended by: _S DeFrancico_, Sergeant    Authorized by: _DSS Delmer_, Date: _9/4/24_
(DSS, OD, or Other Authorized Staff)

| Daily Review | Date | Cell # | Reason(s) for continuing this order (based on current evaluation): | |
|---|---|---|---|---|
| DAY 2. | 9/5 | | I/I refused multiple direct orders to return feed up tray to Staff | |
| | | | Recommended by (Sgt.): | Authorized by: |
| DAY 3. | 9/6 | | I/I Refused multiple direct orders to return feed up tray to Staff | |
| | | | Recommended by (Sgt.): | Authorized by: |
| DAY 4. | 9/7 | | I/I Refused multiple Direct orders to return feed up tray | |
| | | | Recommended by (Sgt.): | Authorized by: |
| DAY 5. | 9/8 | | I/I refused multiple direct orders to return F/U tray | |
| | | | Recommended by (Sgt.): | Authorized by: |
| DAY 6. | 9/9 | | I/I Refuse multiple direct orders to Return feed-up tray | |
| | | | Recommended by (Sgt.): | Authorized by: |
| DAY 7. | 9/10 | | | |
| | | | Recommended by (Sgt.): | Authorized by: |

*After seven (7) days, deprivation orders will be reviewed and can be renewed by the Superintendent*

**SUPERINTENDENT'S REVIEW:**

COMMENTS: _____

RENEW: ☑ YES    ☐ NO    SIGNATURE: _C. Alsept_ DATE: _9/16/24_

| **NOTICE TO INCARCERATED INDIVIDUAL:** |
|---|
| You may write to the Deputy Superintendent for Security or their designee to make a statement on the need for continuing this deprivation order. |

NOTES: Upon signature (authorization), copy and deliver to the incarcerated individual.

cc: Superintendent, SHU Sergeant, Housing Unit, Guidance Unit, Incarcerated Individual

Case 1:24-cv-01001-LJV-JJM   Document 1-2   Filed 10/18/24   Page 63 of 157

| FILE # | COD | DATE FILED | NAME | DIN NUMBER | LOCATION | GRIEVANCE TITLE   (LIKES) | INFORMAL DATE IGRC | IGRC HEARING DATE | IGRC RESP | DATE TO SUPT | DATE SUPT RESP | SUPT RESP | DATE TO CORC | DATE CORC RESP | CORC RESP |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 753 | 50 | 4/26/2024 | JUDE, S | 17A0890 | 77-D-07 | PROVIDE RA'S | | 6/18/2024 | UA | 6/24/2024 | 8/12/2024 | U | | | |
| 754 | 24.1 | 4/26/2024 | JUDE, S | 17A0890 | 77-D-07 | ORDER MORE TABLETS | | 5/31/2024 | DC | | | | | | |
| 755 | 22 | 4/26/2024 | JUDE, S | 17A0890 | 77-D-07 | DELAYING ACCESS TO CARE | | 6/11/2024 | UA | 6/17/2024 | 7/31/2024 | U | 8/12/2024 | | |
| 817 | 24.1 | 5/2/2024 | JUDE, S | 17A0890 | 77-D-07 | CO THROWING AWAY TABLETS | | 8/12/2024 | U | | | | | | |
| 818 | 3 | 5/2/2024 | JUDE, S | 17A0890 | 77-D-07 | ILLEGALLY OPENED MAIL | | 6/4/2024 | UA | 6/17/2024 | 7/25/2024 | U | 8/6/2024 | | |
| 819 | 50 | 5/2/2024 | JUDE, S | 17A0890 | 77-D-07 | SEND RA'S FROM SULLIVAN CF | | 6/4/2024 | UA | 6/17/2024 | 8/5/2024 | U | 8/20/2024 | | |
| 820 | 50 | 5/2/2024 | JUDE, S | 17A0890 | 77-D-07 | PROVIDE RA'S (1) | | 6/12/2024 | UA | 6/21/2024 | 8/12/2024 | U | | | |
| 830 | 49 | 5/7/2024 | JUDE, S | 17A0890 | 77-D-07 | HARASSMENT | | 5/7/2024 | PT | 5/7/2024 | 7/27/2024 | U | 8/12/2024 | | |
| 886 | 22 | 5/10/2024 | JUDE, S | 17A0890 | 77-D-07 | PROVIDE MEDS/PERMITS | | 6/19/2024 | UA | 6/24/2024 | 7/17/2024 | U | 7/30/2024 | | |
| 887 | 34 | 5/10/2024 | JUDE, S | 17A0890 | 77-D-07 | PROVIDE CLOTHING | | 6/18/2024 | UA | 6/24/2024 | 8/14/2024 | U | | | |
| 915 | 50 | 5/17/2024 | JUDE, S | 17A0890 | 77-D-07 | VIOLATING ADA RULES (1) | | 6/18/2024 | UA | 6/24/2024 | 7/26/2024 | U | 8/6/2024 | | |
| 987 | 44 | 5/29/2024 | JUDE, S | 17A0890 | 77-D-07 | NOT CODING CORRECTLY | | 6/28/2024 | UA | 7/5/2024 | | | | | |
| 991 | 27 | 6/4/2024 | JUDE, S | 17A0890 | 77-D-07 | FABRICATED MBR | | 6/4/2024 | DC | | | | | | |
| 1003 | 36 | 6/4/2024 | JUDE, S | 17A0890 | 77-D-07 | DENIED "STOP PAYMENT" | | 7/2/2024 | S | | | | | | |
| 1009 | 22 | 6/4/2024 | JUDE, S | 17A0890 | 77-D-07 | PROVIDE BETTER OMH TREATMENT | | 6/4/2024 | PT | 6/4/2024 | 6/12/2024 | U | | | |
| 1054 | 24.1 | 6/13/2024 | JUDE, S | 17A0890 | 77-D-07 | MOVE I/I OFF GALLERY | | | | | | | | | |
| 1150 | 49 | 6/21/2024 | JUDE, S | 17A0890 | 77-0D-007 | HARASSMENT/RETALIATION | | 6/21/2024 | PT | 6/21/2024 | 7/24/2024 | U | 8/5/2024 | | |
| 1151 | 49.2 | 6/21/2024 | JUDE, S | 17A0890 | 77-0D-007 | SEXUAL HARASSMENT | 6/21/2024 | | I | | | | | | |
| 1184 | 50 | 6/26/2024 | JUDE, S | 17A0890 | 77-D-07 | DENIED RA'S | | 7/24/2024 | SA | 8/1/2024 | | | | | |
| 1248 | 49.2 | 7/3/2024 | JUDE, S | 17A0890 | 77-D-07 | SEXUAL HARASSMENT (2) | 7/3/2024 | | I | | | | | | |
| 1249 | 49 | 7/3/2024 | JUDE, S | 17A0890 | 77-D-07 | RETALIATION | | 7/3/2024 | PT | 7/3/2024 | | | | | |
| 1258 | 24.1 | 7/3/2024 | JUDE, S | 17A0890 | 77-D-07 | INCREASE COMMISSARY LIMIT | | 8/1/2024 | UA | 8/7/2024 | | | | | |

| | | | | |
|---|---|---|---|---|
| SATISFACTORY | S | | SATISFACTORY APPEALED | SA |
| DENIED | U | | DENIED APPEALLED | UA |
| PASS-THROUGH/UNTIMELY | PT | | WITHDRAWN | W |
| DISMISSED AND CLOSED | DC | | REFERRED | R |
| INFORMALLY RESOLVED/PREA | I | | DEADLOCKED | DL |

Case 1:24-cv-01001-LJV-JJM   Document 1-2   Filed 10/18/24   Page 64 of 157

| FILE # | COD | DATE FILED | NAME | DIN NUMBER | LOCATION | GRIEVANCE TITLE   (LIKES) | INFORMAL DATE IGRC | IGRC HEARING DATE | IGRC RESP | DATE TO SUPT | DATE SUPT RESP | SUPT RESP | DATE TO CORC | DATE CORC RESP | CORC RESP |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1259 | 22 | 7/3/2024 | JUDE, S | 17A0890 | 77-D-07 | INADEQUATE CARE | | 7/18/2024 | UA | 8/6/2024 | 8/22/2024 | U | | | |
| 1279 | 24.1 | 7/5/2024 | JUDE, S | 17A0890 | 77-D-07 | UNSECURE MAIL HANDLING | | | | | | | | | |
| 1305 | 50 | 7/10/2024 | JUDE, S | 17A0890 | 77-D-07 | PROCESS FOIL REQUEST | | 8/6/2024 | U | | | | | | |
| 1306 | 50 | 7/10/2024 | JUDE, S | 17A0890 | 77-D-07 | NOT DELIVERING RA'S | | 8/1/2024 | UA | 8/7/2024 | | | | | |
| 1307 | 31 | 7/10/2024 | JUDE, S | 17A0890 | 77-D-07 | DSMH NOT MAKING ROUNDS | | 8/16/2024 | U | | | | | | |
| 1310 | 49.2 | 7/10/2024 | JUDE, S | 17A0890 | 77-D-07 | RETALIATION FOR REPORTING SH | 7/10/2024 | | I | | | | | | |
| 1311 | 24.1 | 7/10/2024 | JUDE, S | 17A0890 | 77-D-07 | FAILURE TO PROTECT/SUPERVISE | | | | | | | | | |
| 1312 | 49.2 | 7/10/2024 | JUDE, S | 17A0890 | 77-D-07 | SEXUAL HARASSMENT | 7/10/2024 | | I | | | | | | |
| 1313 | 24.1 | 7/10/2024 | JUDE, S | 17A0890 | 77-D-07 | REMOVE CELL SHIELD | | 8/12/2024 | U | | | | | | |
| 1421 | 25 | 7/24/2024 | JUDE, S | 17A0890 | 77-D-07 | IMPROPER PAT FRISK | | | | | | | | | |
| 1422 | 49.1 | 7/24/2024 | JUDE, S | 17A0890 | 77-D-07 | SEXUAL ABUSE | 7/24/2024 | | I | | | | | | |
| 1459 | 49.2 | 7/31/2024 | JUDE, S | 17A0890 | 77-D-07 | SEXUAL HARASSMENT | 7/31/2024 | | I | | | | | | |
| 1460 | 24.1 | 7/31/2024 | JUDE, S | 17A0890 | 77-D-07 | REMOVE DEPRIVATION ORDERS (2) | | | | | | | | | |
| 1463 | 24.1 | 8/1/2024 | JUDE, S | 17A0890 | 77-D-07 | FIX L/L TABLETS | | 8/5/2024 | DC | | | | | | |
| 1464 | 28 | 8/1/2024 | JUDE, S | 17A0890 | 77-D-07 | EXCESSIVE SHU TIME | | 8/5/2024 | DC | | | | | | |
| 1483 | 50 | 8/1/2024 | JUDE, S | 17A0890 | 77-D-07 | DENIED RA'S | | | | | | | | | |
| 1484 | 22 | 8/1/2024 | JUDE, S | 17A0890 | 77-D-07 | SEE PROVIDER | | | | | | | | | |
| 1504 | 40 | 8/5/2024 | JUDE, S | 17A0890 | 77-D-07 | RETURN DOCUMENTS (2) | | 8/16/2024 | U | | | | | | |
| 1567 | 50 | 8/13/2024 | JUDE, S | 17A0890 | 77-D-07 | SEND DISC IN BUBBLE WRAP | | 8/21/2024 | U | | | | | | |
| 1587 | 6 | 8/15/2024 | JUDE, S | 17A0890 | 77-D-07 | UNTIMELY RA SUPPLIES | | | | | | | | | |
| 1588 | 39 | 8/15/2024 | JUDE, S | 17A0890 | 77-D-07 | FIX WALL JACKS | | | | | | | | | |
| 1589 | 50 | 8/15/2024 | JUDE, S | 17A0890 | 77-D-07 | DENIED RA IN YARD (1) | | | | | | | | | |

| | | | | |
|---|---|---|---|---|
| SATISFACTORY | S | | SATISFACTORY APPEALED | SA |
| DENIED | U | | DENIED APPEALLED | UA |
| PASS-THROUGH/UNTIMELY | PT | | WITHDRAWN | W |
| DISMISSED AND CLOSED | DC | | REFERRED | R |
| INFORMALLY RESOLVED/PREA | I | | DEADLOCKED | DL |

Case 1:24-cv-01001-LJV-JJM   Document 1-2   Filed 10/18/24   Page 65 of 157

| FILE # | COD | DATE FILED | NAME | DIN NUMBER | LOCATION | GRIEVANCE TITLE  (LIKES) | INFORMAL DATE IGRC | IGRC HEARING DATE | IGRC RESP | DATE TO SUPT | DATE SUPT RESP | SUPT RESP | DATE TO CORC | DATE CORC RESP | CORC RESP |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1590 | 24.1 | 8/15/2024 | JUDE, S | 17A0890 | 77-D-07 | CLOSE CELL SHIELD (1) | | | | | | | | | |
| 1596 | 49.2 | 8/20/2024 | JUDE, S | 17A0890 | 77-D-07 | SEXUAL HARASSMENT | 8/20/2024 | | I | | | | | | |
| 1597 | 49 | 8/20/2024 | JUDE, S | 17A0890 | 77-D-07 | HARASSMENT/RETALIATION | | 8/20/2024 | PT | 8/20/2024 | | | | | |
| 1655 | 28 | 8/22/2024 | JUDE, S | 17A0890 | 77-D-07 | DENIED HEARING ASSISTANCE | | | | | | | | | |

| | | | | |
|---|---|---|---|---|
| SATISFACTORY | S | SATISFACTORY APPEALED | SA | |
| DENIED | U | DENIED APPEALLED | UA | |
| PASS-THROUGH/UNTIMELY | PT | WITHDRAWN | W | |
| DISMISSED AND CLOSED | DC | REFERRED | R | |
| INFORMALLY RESOLVED/PREA | I | DEADLOCKED | DL | |

RECEIVED

JUN 2 1 2024

6-14-24

## IGRC

FIVE POINTS CORRECTIONAL

49. 2-Sexual Harassment

GRIEVANCE

Steven Jude #17-A-0890

77-D-7   6/14/24

APT-1151-24

On the above date, as well as other days when he worked, he continues to retaliate against me for writing other complaints against him & harass me, making offensive & sexual comments, in an effort to annoy, or irritate me, & try to get a reaction out of me, when he searches me for programs, he is constantly grabbing my penis, & testicles & always try to engage me into a argument or trying to get under my skin, which I am starting to feel unsafe, & fear for my life & safety, & if he grabs me again like he has, then there is going to be a problem, & a use of force.

This officer is allowed to continue to harass me, & keeps speaking about him answering prior complaints, as if he is upset, & I am a man, & WILL NOT continue to allow this, which peace officer Dennis M. Laureano, can not resist saying something when I come by, or stopping when I walk by, which has to stop, as it is messing with my mental health, & it is going to be a problem, if it continues, as I am entitled not to be sexually harassment & retaliated against, & it seems like this is pattern & practice with this guy, & if he grope my penis again, I am going to react.

ACTION REQUESTED: That Peace Officer Dennis M. Laureano cease with the harassment, & sexual harassment & retaliation, as If he does it again, there is going to be a reaction, as he keeps making sexual & other stupid comment's when I walk by, or when he comes to get me from program's. (2) That a area supervisor be present at my cell, when he comes to get me for program, or that another officer is sent to search me. (3) That I not be charged with an assault on staff, if he does it again, & I react, being that DOCCS supervisory staff is unable to keep him in line & in control. (4) That Dennis Laureano, steady post of working the RMHU, be changed or placed in the officers station to avoid continue harassment of me, as well as others similarly situated in the RMHU, as it is messing with our Mental Health.

Cc: File, Prea Dept
DOCCS Counsel, Andrew J. Spinnell, Esq.

Truly Yours,

[signature]



**KATHY HOCHUL**
Governor

**DANIEL F. MARTUSCELLO III**
Commissioner

## MEMORANDUM

**TO:**    NAME _Jude, S_____, DIN _17A0890_, Housing Location _77-0D-007_

**FROM:**  _M. Schultz_____, IGP Supervisor

**DATE:**  _6/21/24_____

**SUBJ:**  Complaint Concerning Sexual Abuse, Sexual Harassment, or Unauthorized Relationship

---

In accordance with Directive #4040, § 701.3 (i), any grievance complaint filed concerning sexual abuse and/or sexual harassment (PREA complaint) shall be immediately reported by the IGP Supervisor to the Watch Commander for further handling in accordance with Departmental policies. Additionally, complaints concerning unauthorized relationships will not be investigated through the grievance mechanism. A grievance complaint concerning sexual abuse, sexual harassment, or an unauthorized relationship shall be deemed exhausted upon filing for Prison Litigation Reform Act (PLRA) purposes. If the complaint does not set forth any additional timely matters that require a response, it shall be closed.

Your grievance complaint # _FPT-1151-24_, dated _6/21/24_____, has been forwarded for handling in accordance with Directive #4040, § 701.3 (i), and Directive #4027.

☐ Your grievance complaint contains only concerns of sexual abuse, sexual harassment, or an unauthorized relationship. Accordingly, it has been deemed exhausted and has been closed. You will not receive a response to this grievance complaint through the Incarcerated Grievance Program mechanism.

☑ Your grievance complaint contains concerns of sexual abuse, sexual harassment, or an unauthorized relationship, as well as additional timely matters unrelated to those allegations. Therefore, the complaint will be treated as two separate grievances. The sexual abuse/sexual harassment/unauthorized relationship concerns have been reported in accordance with Department policy. The other timely matters unrelated to those concerns will be treated as a separate grievance under log #_FPt-1150-24____, which will be processed in accordance with Directive #4040. You will not receive a response to your sexual abuse/sexual harassment/unauthorized relationship concerns through the Incarcerated Grievance Program mechanism.

cc:  SA/SH/UAR Grievance # _FPT-1151-24_ file

(Grievant Notification)
Rev. 06/2024

FORM #2077 (REV. 6/21)

## NEW YORK STATE DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION

### CELL FRISK/CONTRABAND RECEIPT

| Original – Incarcerated Individual |
| Copy    – DSS |

_Five Points_ **CORRECTIONAL FACILITY**

Date: **6/30/24**    Frisk Start Time: _Apprx 12:55 pm_    Frisk End Time: _Apprx 1:10 pm_

Incarcerated Individual Name: _Jude_    DIN: _17A0890_

CELL/CUBE/ROOM: _77 D7_

Officer Conducting Search: _D. Laureano_    _V. Gentile_

**Print Name Legibly**    **Badge #**    **Signature**

| ITEMS CONFISCATED OR DAMAGED | WHERE FOUND | DISPOSITION OF ITEMS LISTED |
|---|---|---|
| Fishing Line / Pole | By cell bed | Disposed of |
| Extra State Sheet | By cell bed | in Trash |
| Excess Rotten Milk Cartons | Back of toilet | |
| 5½" x 1" Sharpened Plastic with Cloth Handle and Paper Sheath | Back of cell in Legal work | Watch Commander Drop Box |

_____ NO CONTRABAND FOUND         _____ NO PROPERTY DAMAGED DURING SEARCH

**NOTICE TO INCARCERATED INDIVIDUAL:** YOU MAY WRITE TO THE DEPUTY SUPERINTENDENT FOR SECURITY WITHIN 7 DAYS OF THIS RECEIPT REGARDING THE CONFISCATION OR DISPOSITION OF THESE ITEMS.

**NOTE:** DURING THIS CELL FRISK, MY INITIALS BELOW INDICATE THAT THE CELL INTEGRITY CHECK HAS BEEN COMPLETED AS FOLLOWS:

FLOORS: _✗_                    SINK/TOILET: _✗_

AIR VENT: _✗_                  WINDOW CHECKED/INTACT: _✗_

CEILING: _✗_                   WALLS: _✗_

BARS: _✗_                      MISC: _✗_

**IN ADDITION:** THE FOLLOWING ITEMS WERE CHECKED FOR COMPLIANCE:
PROPERTY LIMITS (No more than 4 bags of property) _✗_
PHOTOGRAPH/PICTURE COMPLIANCE (No nudes visible from the front of cell. All photos/pictures confined in the appropriate 2' x 4' section.) _✗_
INCARCERATED INDIVIDUAL ID MATCHES CURRENT APPEARANCE (Checked ID to incarcerated individual's current appearance, if the incarcerated individual was present for the search.) _✗_

Comments: _Weapon found and reported, ticket was written._

```
07/01/2024          NYS DEPT OF CORRECTIONS & COMMUNITY SUPERVISION          PAGE   1
DCP004              SUPERINTENDENT  HEARING DISPOSITION RENDERED
```

FIVE PT RMHU                          TAPE NUMBER ___ 8

DIN: 17A0890 NAME: JUDE, STEVEN                        LOCATION: 77-0D-007
                                          SHU CELL INELIGIBLE
INCIDENT DATE & TIME:    06/30/2024    01:10 PM    TIER 3

REVIEW DATE:             06/30/2024              BY: LT  RORICK, J A

DELIVERY DATE & TIME:    07/01/2024 10:48 AM BY: C.O. B. Johns

HEARING START DATE & TIME: 7/9/24 11:30 AM BY: UC0 Adams

HEARING END DATE & TIME: 8/13/24 4:20 PM BY: C4o Adams
WAS THERE NEED FOR A FORMAL MENTAL HEALTH/INTELLECTUAL CAPACITY ASSESSMENT? Y / N

```
CHARGE
NUMBER      DESCRIPTION OF CHARGES            REPORTED BY           DISPOSITION

113.10      WEAPON                     CO    LAUREANO, D M          Guilty
------      ------------------------   ----  ------------------
113.11      ALTERED ITEM                                           Guilty
------      ------------------------
113.23      CONTRABAND                                             Guilty
------      ------------------------
```

ANY GUILTY DISPOSITION WILL RESULT IN A MANDATORY DISCIPLINARY SURCHARGE IN THE
AMOUNT OF FIVE($5.00) DOLLARS BEING ASSESSED AUTOMATICALLY AGAINST THE I/I.
SANCTION DATES BELOW ARE SUBJECT TO REVIEW/CHANGE, AND WILL BE CONSECUTIVELY ADDED TO
ANY SIMILAR CURRENT SANCTION.

| PENALTY CODE | DESCRIPTION | PENALTY MO DAYS | START DATE | RELEASE DATE | SUSPEND MO DAYS | DEFERRED MO DAYS | RESTITUTION $$$$ . ¢¢ |
|---|---|---|---|---|---|---|---|
| A000 | SHU (RMHU) | 38/20 | 1/15/25 | 5/13/25 | | | |
| D000 | Loss of Rec | 15 | 4/30/25 | 5/15/ | | | |
| L000 | Loss of Packages | 15 | 4/30/25 | 5/15/25 | | | |
| F000 | Loss of Commissary | 15 | 4/30/25 | 5/15/25 | | | |
| G000 | Loss of Phone | 48 | 3/28/25 | 5/15/25 | | | |
| H000 | Rec Loss Good | 3 | | | | | |

Case 1:24-cv-01001-LJV-JJM    Document 1-2    Filed 10/18/24    Page 70 of 157



**NEW YORK STATE** | **Corrections and Community Supervision**

KATHY HOCHUL
Governor

DANIEL F. MARTUSCELLO III
Commissioner

TO:          Superintendent Lowerre
FROM:        Sgt W DuMont
DATE:        6/30/2024
SUBJECT:     UI#24-0244 I/I Jude, S #17A0890 77-D-7

DSS Delmar authorized a random daily cell frisk of incarcerated individual Jude, S #17A0890 77-D-7. At approximately 1:10pm, Officer Laureano recovered a shank type weapon found in legal paperwork in the back of I/I Jude's cell. The weapon is a shank type weapon made of broken feed up tray lid sharpened at one end with a toilet paper handle, cloth lanyard and paper sheath measuring 5 1/2" x 1". The weapon was photographed and secured per Directive 4910A. No other reportable contraband found. Area Supervisor notified.
I, Sgt DuMont will ensure all pertinent paperwork and photos are submitted.

Respectfully Submitted,

Sgt W DuMont

No Retaliation
FPT-1249-24

FIVE POINTS CORRECTIONAL: FACILITY

GRIEVANCE

RECEIVED
JUL 0 3 2024
IGRC

STEVEN JUDE #17-A-0890                      77-D-7    6/30/24

On or about 1:10PM, a Peace Officer Dennis Laureano, & (3) other correction officer went into my cell, when I left & went to recreation & trashed my cell by ripping up legal documents, destroying brand new cosmetics, & kicking all my legal papers I had on the floor under my bed, in retaliation for me filing a second, PREA, Harassment Complaint against Dennis Laureano on 6/28/30, when I had previously filed one the a week ½ ago, & these officer set me up with a "5½ X-1" inch Plastic shank, claiming it was in the back of my cell, & then had my window closed, which suppose to be opened in the Mental Health Unit, & had a box placed on my cell, due to having (3) closed milk cartons in my cell & a feed up tray, which I never did anything to warrant having my window closed, & I am not know to throw anything, or unhygenic acts. The area Supervisor Demount, allowed these peace officers to go into my cell, which there was no logical reason to pick my cell to go into, & search, as nothing was ever searched, cause all my legal work, & other items were not even searched or disturbed or moved, however another officer told me that they were in my cell for awhile, where several of the grievances I filed against Lauerano was missing, & personal books, & magazines was ripped as well as personal pictures, which they trashed my legal papers that was on the floor by kicking them under my bed.

On 6/28/24, I had my lawyer file a PREA COMPLAINT, harassment, retaliation complaint against Laureano, which I also had OMH staff DOMINIC C, SEIDEL, file a complaint by e-mail to the watch commander, which he claimed he did, as DOCCS keeps an elaborate reporting data system, & it is documented that I just filed a harassment PREA complaint against this officer a week½ ago, & then again a week after I received a copy of the complaint, which the area Supervisor Dumount was aware of as well, & they waited until the Sgt. Dumount worked, who would allow them to go into my cell & set me up with a shank, which I would have on my person, not left in the cell, which Dennis Laureano told me that he was going to get me at recreation on 6/28/24, after medical pulled me out to examine me, which Five Points Executive team, security, & supervisors have turned an blind eye to the retaliation & harassment of I.I. by the particular officer, which NO OTHER RMHU peace officer, harasses, or are involved in as many unusual incidents as this officer who displays an



NEW YORK STATE | Corrections and Community Supervision

KATHY HOCHUL
Governor

DANIEL F. MARTUSCELLO III
Commissioner

## MEMORANDUM

**TO:**    IGP Supervisor, Five Points C.F.

**FROM:**    ADS PREA Emerson

**DATE:**    10/1/24

**SUBJ:**    Complaint Concerning Sexual Abuse, Sexual Harassment, or Unauthorized Relationship Received in IGP Office

---

I/I Name: Jude, Steven _____    DIN: 17A0890 ____    Complaint Date: 9/27/24 _____

☑ The complaint <u>contains only</u> concerns of sexual abuse (including a fear of imminent sexual abuse, an incident of sexual abuse, or mishandling of a report of sexual abuse), sexual harassment, and/or retaliation for reporting a prior sexual abuse or sexual harassment incident. Accordingly, the entire complaint should be processed in accordance with Directive #4040, § 701.3 (i), reported to the Watch Commander, and closed. No further action or investigation shall be taken through the Incarcerated Grievance Program mechanism.

☐ The complaint contains concerns of sexual abuse, sexual harassment, and/or retaliation for reporting a prior sexual abuse or sexual harassment incident **AND** other issues. The allegations of sexual abuse, sexual harassment, and/or retaliation for reporting a prior sexual abuse or sexual harassment incident have been highlighted and should be reported to the Watch Commander and closed. The other timely issues should be processed and investigated through the Incarcerated Grievance Program mechanism as outlined in Directive #4040.

☐ The complaint <u>contains only</u> concerns of an unauthorized relationship and/or retaliation for reporting an unauthorized relationship. Accordingly, the entire complaint will be handled by the ADS PREA and closed. No further action or investigation shall be taken through the Incarcerated Grievance Program mechanism.

☐ The complaint contains concerns of an unauthorized relationship and/or retaliation for reporting an unauthorized relationship **AND** other issues. The allegations of an unauthorized relationship and/or retaliation for reporting an unauthorized relationship have been highlighted and will be handled by the ADS PREA and closed. The other timely issues should be processed and investigated through the Incarcerated Grievance Program mechanism as outlined in Directive #4040.

☐ The complaint <u>does not contain</u> any concerns of sexual abuse, sexual harassment, an unauthorized relationship, and/or retaliation for reporting such an incident. Accordingly, the entire complaint should be processed and investigated through the Incarcerated Grievance Program mechanism as outlined in Directive #4040.

The IGP Supervisor is required to obtain the Report of Sexual Victimization Log number (PREA log number) from the ADS PREA, if applicable, for documentation in the grievance file to confirm the complaint was properly reported and closed in accordance with Directive #4027. Please provide the log number below and return a copy of this memorandum to the facility IGP Supervisor.

PREA Log Number: FPT-24-144 ____

cc: SA/SH/UAR Grievance # FPT-1422-24 file

(ADS PREA Notification)
Rev. 06/2024

FPT-1422-24

## FIVE POINTS CORRECTIONAL FACILITY

### GRIEVANCE

STEVEN JUDE #17-A-0890

9/27/24

On 9/24/24, Dennis Laureano once again came to pull me out for programs, after having sexually harassed and abused me three prior times, harassed me on several occasions, and even after setting grievant up with a weapon, I do not wish to continue to be harassed, sexually abused or retaliated against, & do not know what I have to do for it to stop.

While pat frisking me, this aggressive overt homosexual man keep rubbing my inner thigh, making sexual offensive comments, trying to get a reaction out of me, & have continue to target me, Morgan Emerson, the ADS has failed to protect me from retaliation, & the continued sexual abuse and harassment, which this is my fourth PREA complaints against this guy which DOCCS suppose to have zero tolerance for this type of behavior.

ACTION REQUESTED: THAT A SEPARATION BE PLACED BETWEEN ME AND DENNIS LAUREANO, WHO KEEPS SEXUALLY HARASSING AND ABUSING ME, TOUCHING MY PRIVATE PARTS AND SQUEEZING MY PENIS AND SCROTUM, WHICH HE IS DOING TO TRY TO INTIMIDATE ME, AND CAUSE ME MENTAL ANGUISH, AND I NEED TO BE MOVED TO THE RRU, AND HAVE HIM REMOVE OR PLACED WHERE HE CAN NOT ACCESS ME BY KEEP BEING ALLOWED TO DO WHAT HE DOING...

RECEIVED
OCT 03 2024
IGRC

Respectfully Yours,

Cc: OST/Federal Court
State Police

FORM 2171 B (11/21)
Side 2

NEW YORK STATE DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION

Five Points _____ **Correctional Facility**

## INCARCERATED INDIVIDUAL MISBEHAVIOR REPORT ♦ INFORME DE MAL COMPORTAMIENTO DEL INDIVIDUO ENCARCELADO

| 1. NAME OF INCARCERATED INDIVIDUAL (Last, First) ♦ NOMBRE DEL INDIVIDUO ENCARCELADO (Apellido, Nombre) | DIN | HOUSING LOCATION ♦ CELDA |
|---|---|---|
| Jude S | 17A0890 | 77-D-07 |

| 2. LOCATION OF INCIDENT ♦ LUGAR DEL INCIDENTE | INCIDENT DATE ♦ FECHA | INCIDENT TIME ♦ HORA |
|---|---|---|
| RMHU | 8/13/24 | Approx 8 AM / 12 pm |

**3. RULE VIOLATION(S) ♦ VIOLACIÓN (ES)**

102.10 - Threats          106.10 - Direct Order
104.13 - Creating a Disturbance    107.10 - Interference
104.11 - Violent Conduct      107.11 - Harassment

**4. DESCRIPTION OF INCIDENT ♦ DESCRIPCIÓN DEL INCIDENTE**

On the above date and approximate time while working RMHU D-Gallery. I CO Kemp was collecting feed up trays from morning Chow. I CO Kemp ordered I/I Jude #17A0890 of 77-D-07 Cell to return his feed up tray. I/I Jude refused stating that he did not have to. I informed I/I Jude that he needed to return his feed up tray, and if not then he would not be fed in the afternoon. I/I Jude continued to argue with this writer delaying my time to pick up feed up trays from the remaing I/I on the gallery. I/I Jude then said to this writer "I don't fucking care. Suck my dick. I/I Jude then proceeded to yell out on the gallery to the other 12 I/I on the gallery to "Shut this motherfucker down" Later in the day. I C.O Kemp escorted I/I Jude to his tier hearing. Once in the hearing room I/I Jude once again made threats to this writer in front of the hearing officer, along with OMH Snyder saying "Just wait. I got something for you Kemp, and I'm going to sue the shit out of you.

| REPORT DATE ♦ FECHA | REPORTED BY ♦ REPORTADO POR | SIGNATURE ♦ FIRMA | TITLE ♦ TÍTULO |
|---|---|---|---|
| 8/13/24 | J Kemp | J Kemp | CO |

**5. ENDORSEMENTS OF OTHER EMPLOYEE WITNESSES (if any)**     SIGNATURES:
ENDOSOS DE OTROS EMPLEADOS TESTIGOS (si hay)     FIRMAS:   1. A. Snyder /SORC

2. _____          3. _____

**NOTE: Fold back Page 2 on dotted line before completing below.**

DATE AND TIME SERVED UPON INCARCERATED INDIVIDUAL 8-15-24  10:35am  NAME AND TITLE OF SERVER  CO Coche

FECHA Y HORA DADO AL INDIVIDUO ENCARCELADO_____ NOMBRE Y TÍTULO DEL QUE ENTREGA_____

You are hereby advised that no statement made by you in response to the charges or information derived therefrom may be used against you in a criminal proceeding. ♦ Por este medio se le informa que no se puede usar ninguna declaración hecha por usted como respuesta al cargo o la información derivada de ella en una demanda criminal.

## NOTICE ♦ AVISO

**REVIEWING OFFICER (DETACH BELOW FOR VIOLATION HEARING ONLY)**

You are hereby notified that the above report is a formal charge and will be considered and determined at a hearing to be held. ♦ Por este medio se le notifica que el informe anterior es un cargo formal el cual se considerará y determinará en una audiencia a celebrarse.

The incarcerated individual shall be permitted to call witnesses provided that so doing does not jeopardize institutional safety or correctional goals. ♦ Se le permitirá al individuo encarcelado llamar testigos con tal de que al hacerlo no pondrá en peligro la seguridad de la institución ni las metas del Departamento.

If restricted pending a hearing for this misbehavior report, you may write to the Deputy Superintendent for Security or their designee prior to the hearing to make a statement on the need for continued prehearing confinement. ♦ Si está restringido pendiente a una audiencia por este informe de mal comportamiento, puede escribirle al Diputado del Superintendente para Seguridad o su representante antes de la audiencia para que haga una declaración acerca de la necesidad de continuar bajo confinamiento, previo a la audiencia.

FORM 2187R (06/22)

## NEW YORK STATE DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION

_____Five Points_____ Correctional Facility

## DEPRIVATION ORDER RENEWAL

INCARCERATED INDIVIDUAL'S NAME: Jude          DIN: 17A0890   Cell Location: 77-DFB

In accordance with Directive #4933, "Special Housing Units," on this date of  8/13/24 , you are being deprived of the following specific item(s), privilege(s), or service(s): Static tablet.

This order has been reviewed and renewed because it has been determined that a threat to the safety or security of staff, incarcerated individuals, or State property continues to exist for the following specific reasons:

I/I refused to return static tablet when directed

| Daily Review | Date | Cell # | Reason(s) for continuing this order (Based on current evaluation): |
|---|---|---|---|
| 1. | 8/20 | | I/I refused to return Static tablet when directed |
| | | | Recommended by (Sgt.): ___   Authorized by: Lt. Caldway |
| 2. | 8/22 | | I/I Refused to Return Static tablet when directed |
| | | | Recommended by (Sgt.): CW   Authorized by: Lt. Caldway |
| 3. | 8/23 | | I/I Refused to return Static tablet |
| | | | Recommended by (Sgt.): McIntyre   Authorized by: Lt Caldway |
| 4. | 8/24 | | I/I Refused to return Tablet Static |
| | | | Recommended by (Sgt.): ___   Authorized by: ___ |
| 5. | 8/25 | | I/I refused to return Static tablet when directed |
| | | | Recommended by (Sgt.): ___   Authorized by: ___ |
| 6. | 8/26 | | I/I refused to return Static tablet when directed. |
| | | | Recommended by (Sgt.): ___   Authorized by: ___ |
| 7. | 8/27 | | I/I refused to return static tablet w/ directed |
| | | | Recommended by (Sgt.): ___   Authorized by: ___ |

*After seven (7) days, deprivation orders will be reviewed and can be renewed by the Superintendent*

## SUPERINTENDENT'S REVIEW:

COMMENTS: _____

RENEW: ☑ YES   ☐ NO   SIGNATURE: CHun ASupt   DATE: 9/9/24

---

**NOTICE TO INCARCERATED INDIVIDUAL:**
You may write to the Deputy Superintendent for Security or their designee to make a statement on the need for continuing this deprivation order.

---

NOTES: Upon signature (authorization), copy and deliver to the incarcerated individual.

cc: Superintendent, SHU Sergeant, Housing Unit, Guidance Unit, Incarcerated Individual

FORM 2187R (06/22)

## NEW YORK STATE DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION

_Five Points_ Correctional Facility

## DEPRIVATION ORDER RENEWAL

INCARCERATED INDIVIDUAL'S NAME: _Jude, S_    DIN: _17AC890_    Cell Location: _77-D-7_

In accordance with Directive #4933, "Special Housing Units," on this date of _8/13/24_, you are being deprived of the following specific item(s), privilege(s), or service(s): _State Tablet_

This order has been reviewed and renewed because it has been determined that a threat to the safety or security of staff, incarcerated individuals, or State property continues to exist for the following specific reasons: _I/I refused to return state tablet when directed._

| Daily Review | Date | Cell # | Reason(s) for continuing this order (Based on current evaluation): |
|---|---|---|---|
| 1. | 9/4 | | I/I refused to return state tablet when directed |
| | | | Recommended by (Sgt.): _(S)_    Authorized by: |
| 2. | 9/5 | | I/I refused to return state tablet when directed |
| | | | Recommended by (Sgt.): _(A)_    Authorized by: |
| 3. | 9/6 | | I/I refused to return state tablet when directed on 8/13 |
| | | | Recommended by (Sgt.): _(Q)_    Authorized by: |
| 4. | 9/7 | | I/I refused to return state tablet when directed / I/I refused to return state tablet when |
| | | | Recommended by (Sgt.): _(S)_    Authorized by: |
| 5. | 9/8 | | I/I refused to return state tablet when directed |
| | | | Recommended by (Sgt.): _(C)_    Authorized by: |
| 6. | 9/9 | | I/I refused to return state tablet when directed. |
| | | | Recommended by (Sgt.): _(SR)_    Authorized by: |
| 7. | 9/10 | | I/I in OBS |
| | | | Recommended by (Sgt.): _(QA)_    Authorized by: |

*After seven (7) days, deprivation orders will be reviewed and can be renewed by the Superintendent*

## SUPERINTENDENT'S REVIEW:

COMMENTS: _____

RENEW: ☒ YES    ☐ NO    SIGNATURE: _Chris A/Supt_    DATE: _9/16/24_

> **NOTICE TO INCARCERATED INDIVIDUAL:**
> You may write to the Deputy Superintendent for Security or their designee to make a statement on the need for continuing this deprivation order.

NOTES: Upon signature (authorization), copy and deliver to the incarcerated individual.

cc: Superintendent, SHU Sergeant, Housing Unit, Guidance Unit, Incarcerated Individual

FORM #2077 (REV. 6/21)

## NEW YORK STATE DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION

### CELL FRISK/CONTRABAND RECEIPT

| Original – Incarcerated Individual |
| Copy    – DSS |

Fivepoints  CORRECTIONAL FACILITY

Date: 6-23-24 _____     Frisk Start Time: _____     Frisk End Time: _____

Incarcerated Individual Name: Jude _____     DIN: 17A0890 _____

CELL/CUBE/ROOM: 77-D-7 _____

Officer Conducting Search: Gurdele        6053       [signature]
_____
            **Print Name Legibly**          **Badge #**          **Signature**

| ITEMS CONFISCATED OR DAMAGED | WHERE FOUND | DISPOSITION OF ITEMS LISTED |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

_____ NO CONTRABAND FOUND          _____ NO PROPERTY DAMAGED DURING SEARCH

**NOTICE TO INCARCERATED INDIVIDUAL:** YOU MAY WRITE TO THE DEPUTY SUPERINTENDENT FOR SECURITY WITHIN 7 DAYS OF THIS RECEIPT REGARDING THE CONFISCATION OR DISPOSITION OF THESE ITEMS.

_____          _____

**NOTE:** DURING THIS CELL FRISK, MY INITIALS BELOW INDICATE THAT THE CELL INTEGRITY CHECK HAS BEEN COMPLETED AS FOLLOWS:

FLOORS: ____C_____          SINK/TOILET: ____C_____

AIR VENT: ____C_____          WINDOW CHECKED/INTACT: ____C____

CEILING: ____C_____          WALLS: ____C_____

BARS: ____C_____          MISC: ____C_____

IN ADDITION: THE FOLLOWING ITEMS WERE CHECKED FOR COMPLIANCE:
PROPERTY LIMITS (No more than 4 bags of property): ____C_____
PHOTOGRAPH/PICTURE COMPLIANCE (No nudes visible from the front of cell. All photos/pictures confined in the appropriate 2' x 4' section.) ____C_____
INCARCERATED INDIVIDUAL ID MATCHES CURRENT APPEARANCE (Checked ID to incarcerated individual's current appearance, if the incarcerated individual was present for the search.) ____N/A_____

Comments: _____

FORM #2077 (REV. 6/21)

## NEW YORK STATE DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION

### CELL FRISK/CONTRABAND RECEIPT

| Original – Incarcerated Individual |
| Copy – DSS |

*Five Point* CORRECTIONAL FACILITY

Date: 8/13/24          Frisk Start Time: Appr 130 pm   Frisk End Time: 15 pm

Incarcerated Individual Name: Jude                    DIN: 17A0890

CELL/CUBE/ROOM: 77-D-7

Officer Conducting Search: Kemp   26327
                    **Print Name Legibly**          **Badge #**        **Signature**

| ITEMS CONFISCATED OR DAMAGED | WHERE FOUND | DISPOSITION OF ITEMS LISTED |
|---|---|---|
| Paperwork w/officers names on it | on bed | Disposed |
| fishing line | in cell | Disposed |
| Excess Garbage | in cell | Disposed |
| Excess Toilet Paper | in cell | Disposed |
| | | |

_____ NO CONTRABAND FOUND          _____ NO PROPERTY DAMAGED DURING SEARCH

**NOTICE TO INCARCERATED INDIVIDUAL:** YOU MAY WRITE TO THE DEPUTY SUPERINTENDENT FOR SECURITY WITHIN 7 DAYS OF THIS RECEIPT REGARDING THE CONFISCATION OR DISPOSITION OF THESE ITEMS.

**NOTE:** DURING THIS CELL FRISK, MY INITIALS BELOW INDICATE THAT THE CELL INTEGRITY CHECK HAS BEEN COMPLETED AS FOLLOWS:

**FLOORS:** _____        **SINK/TOILET:** _____

**AIR VENT:** _____       **WINDOW CHECKED/INTACT:** _____

**CEILING:** _____        **WALLS:** _____

**BARS:** _____           **MISC:** _____

IN ADDITION: THE FOLLOWING ITEMS WERE CHECKED FOR COMPLIANCE:
PROPERTY LIMITS (No more than 4 bags of property): _____
PHOTOGRAPH/PICTURE COMPLIANCE (No nudes visible from the front of cell. All photos/pictures confined in the appropriate 2' x 4' section.) _____
INCARCERATED INDIVIDUAL ID MATCHES CURRENT APPEARANCE (Checked ID to incarcerated individual's current appearance, if the incarcerated individual was present for the search.) _____

Comments: _____

FORM #2077 (REV. 6/21)

## NEW YORK STATE DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION

### CELL FRISK/CONTRABAND RECEIPT

| Original − Incarcerated Individual |
| Copy   − DSS |

_Five Points_ **CORRECTIONAL FACILITY**

Date: _9/10/24_ Frisk Start Time: _3:05p_ Frisk End Time: _3__

Incarcerated Individual Name: _Jude, S_ DIN: _17A0890_

CELL/CUBE/ROOM: _77-D-07_

Officer Conducting Search: _Ken_ _36821_

**Print Name Legibly**     **Badge #**     **Signature**

| ITEMS CONFISCATED OR DAMAGED | WHERE FOUND | DISPOSITION OF ITEMS LISTED |
|---|---|---|
| Trash / Empty Toilet paper rolls | Cell | Disposed of |
| | | |
| | | |
| | | |

_✓_ NO CONTRABAND FOUND     _✓_ NO PROPERTY DAMAGED DURING SEARCH

**NOTICE TO INCARCERATED INDIVIDUAL:** YOU MAY WRITE TO THE DEPUTY SUPERINTENDENT FOR SECURITY WITHIN 7 DAYS OF THIS RECEIPT REGARDING THE CONFISCATION OR DISPOSITION OF THESE ITEMS.

**NOTE:** DURING THIS CELL FRISK, MY INITIALS BELOW INDICATE THAT THE CELL INTEGRITY CHECK HAS BEEN COMPLETED AS FOLLOWS:

FLOORS: _____     SINK/TOILET: _____

AIR VENT: _____     WINDOW CHECKED/INTACT: _____

CEILING: _____     WALLS: _____

BARS: _____     MISC: _____

IN ADDITION: THE FOLLOWING ITEMS WERE CHECKED FOR COMPLIANCE:

PROPERTY LIMITS (No more than 4 bags of property): _____

PHOTOGRAPH/PICTURE COMPLIANCE (No nudes visible from the front of cell. All photos/pictures confined in the appropriate 2' x 4' section.) _____

INCARCERATED INDIVIDUAL ID MATCHES CURRENT APPEARANCE (Checked ID to incarcerated individual's current appearance, if the incarcerated individual was present for the search.) _____

Comments: _____

_____

FORM #2077 (REV. 6/21)

## NEW YORK STATE DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION

### CELL FRISK/CONTRABAND RECEIPT

| | |
|---|---|
| Original – Incarcerated Individual | |
| Copy – DSS | |

_Fisc Pant_ **CORRECTIONAL FACILITY**

Date: __9/4/24__   Frisk Start Time: __12:30pm__  Frisk End Time: __1:05pm__

Incarcerated Individual Name: __Jude__   DIN: __17A0890__

CELL/CUBE/ROOM: __77-D-007__

Officer Conducting Search: __M cTussell__   __34046__   ___

**Print Name Legibly**          **Badge #**          **Signature**

| ITEMS CONFISCATED OR DAMAGED | WHERE FOUND | DISPOSITION OF ITEMS LISTED |
|---|---|---|
| Excess Feed up tray Cups | cell | Destroyed / Return to shuk |
| light bulb (extra) | | |
| extra Sheets | | |
| | | |
| | | |

_____ NO CONTRABAND FOUND       __X__ NO PROPERTY DAMAGED DURING SEARCH

**NOTICE TO INCARCERATED INDIVIDUAL:** YOU MAY WRITE TO THE DEPUTY SUPERINTENDENT FOR SECURITY WITHIN 7 DAYS OF THIS RECEIPT REGARDING THE CONFISCATION OR DISPOSITION OF THESE ITEMS.

**NOTE:** DURING THIS CELL FRISK, MY INITIALS BELOW INDICATE THAT THE CELL INTEGRITY CHECK HAS BEEN COMPLETED AS FOLLOWS:

FLOORS: _____          SINK/TOILET: _____

AIR VENT: _____          WINDOW CHECKED/INTACT: _____

CEILING: _____          WALLS: _____

BARS: _____          MISC: _____

___ON: THE FOLLOWING ITEMS WERE CHECKED FOR COMPLIANCE:
___TS (No more than 4 bags of property): _____
___ COMPLIANCE (No nudes visible from the front of cell. All photos/pictures confined in the _____
___ ID MATCHES CURRENT APPEARANCE (Checked ID to incarcerated individual's current ___d individual was present for the search.) _____

FORM #2077 (REV. 6/21)

## NEW YORK STATE DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION

### CELL FRISK/CONTRABAND RECEIPT

Original – Incarcerated Individual
Copy    – DSS

Five Points **CORRECTIONAL FACILITY**

Date: 9/7/24                    Frisk Start Time: APPROX 11:55A    Frisk End Time: APPROX 12:05P

Incarcerated Individual Name: Jude                    DIN: 17A0890

CELL/CUBE/ROOM: 77 D7

Officer Conducting Search: J. Dornaison 62255

| Print Name Legibly | Badge # | Signature |

| ITEMS CONFISCATED OR DAMAGED | WHERE FOUND | DISPOSITION OF ITEMS LISTED |
|---|---|---|
| 4 trays | 77 - D7 | Confiscated 77 - D7 |
| 4 spoons | Confiscated | confiscated |
| | | |
| | | |
| | | |

__X__ NO CONTRABAND FOUND          __X__ NO PROPERTY DAMAGED DURING SEARCH

**NOTICE TO INCARCERATED INDIVIDUAL:** YOU MAY WRITE TO THE DEPUTY SUPERINTENDENT FOR SECURITY WITHIN 7 DAYS OF THIS RECEIPT REGARDING THE CONFISCATION OR DISPOSITION OF THESE ITEMS.

**NOTE:** DURING THIS CELL FRISK, MY INITIALS BELOW INDICATE THAT THE CELL INTEGRITY CHECK HAS BEEN COMPLETED AS FOLLOWS:

FLOORS: _____          SINK/TOILET: _____

AIR VENT: _____          WINDOW CHECKED/INTACT: _____

CEILING: _____          WALLS: _____

BARS: _____          MISC: _____

IN ADDITION: THE FOLLOWING ITEMS WERE CHECKED FOR COMPLIANCE:
PROPERTY LIMITS (No more than 4 bags of property): _____
PHOTOGRAPH/PICTURE COMPLIANCE (No nudes visible from the front of cell. All photos/pictures confined in the appropriate 2' x 4' section.) _____
INCARCERATED INDIVIDUAL ID MATCHES CURRENT APPEARANCE (Checked ID to incarcerated individual's current appearance, if the incarcerated individual was present for the search.) _____

Comments: _____

FORM 2171 B (11/21)
Side 2

NEW YORK STATE DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION

__Five Points__ **Correctional Facility**

## INCARCERATED INDIVIDUAL MISBEHAVIOR REPORT ♦ INFORME DE MAL COMPORTAMIENTO DEL INDIVIDUO ENCARCELADO

| 1. NAME OF INCARCERATED INDIVIDUAL (Last, First) ♦ NOMBRE DEL INDIVIDUO ENCARCELADO (Apellido, Nombre) | DIN | HOUSING LOCATION ♦ CELDA |
|---|---|---|
| Jude S | 17A0890 | 77-D-07 |

| 2. LOCATION OF INCIDENT ♦ LUGAR DEL INCIDENTE | INCIDENT DATE ♦ FECHA | INCIDENT TIME ♦ HORA |
|---|---|---|
| RMHU | 8/13/24 | Approx 8 AM/1 pm |

**3. RULE VIOLATION(S) ♦ VIOLACIÓN (ES)**

102.10 - Threats          106.10 - Direct Order
104.13 - Creating a Disturbance     107.10 - Interference
104.11 - Violent Conduct       107.11 - Harassment

**4. DESCRIPTION OF INCIDENT ♦ DESCRIPCIÓN DEL INCIDENTE**

On the above date and approximate time while working RMHU D-Gallery. I CO Kemp was collecting feed up trays from morning Chow. I CO Kemp ordered I/I Jude #17A0890 of 77-D-07 cell to return his feed up tray. I/I Jude refused stating that he did not have to. I informed I/I Jude that he needed to return his feed up tray, and if not then he would not be fed in the afternoon. I/I Jude continued to argue with this writer delaying my time to pick up feed up trays from the remaing I/I on the gallery I/I Jude then said to this writer "I don't fuckey care. Suck my dick." I/I Jude then proceeded to yell out on the gallery to the other 12 I/I on the gallery to "Shut this motherfucker down". Later in the day. I CO Kemp escorted I/I Jude to his tier hearing. Once in the hearing room I/I Jude once again made threats to this writer in front of the hearing officer, along with OMH Snyder saying, "Just wait. I got something for you Kemp, and I'm going to sue the shit out of you."

| REPORT DATE ♦ FECHA | REPORTED BY ♦ REPORTADO POR | SIGNATURE ♦ FIRMA | TITLE ♦ TÍTULO |
|---|---|---|---|
| 8/13/24 | J Kemp | J Kemp | CO |

**5. ENDORSEMENTS OF OTHER EMPLOYEE WITNESSES (if any)**  SIGNATURES:
ENDOSOS DE OTROS EMPLEADOS TESTIGOS (si hay)   FIRMAS:  1. _Ann Snyder / SORC_

2. _____   3. _____

**NOTE: Fold back Page 2 on dotted line before completing below.**

DATE AND TIME SERVED UPON INCARCERATED INDIVIDUAL _8-15-24_  _10:35am_  NAME AND TITLE OF SERVER _CO Cooke_

FECHA Y HORA DADO AL INDIVIDUO ENCARCELADO_____NOMBRE Y TÍTULO DEL QUE ENTREGA_____

You are hereby advised that no statement made by you in response to the charges or information derived therefrom may be used against you in a criminal proceeding. ♦ Por este medio se le informa que no se puede usar ninguna declaración hecha por usted como respuesta al cargo o la información derivada de ella en una demanda criminal.

### NOTICE ♦ AVISO

**REVIEWING OFFICER (DETACH BELOW FOR VIOLATION HEARING ONLY)**

You are hereby notified that the above report is a formal charge and will be considered and determined at a hearing to be held. ♦ Por este medio se le notifica que el informe anterior es un cargo formal el cual se considerará y determinará en una audiencia a celebrarse.

The incarcerated individual shall be permitted to call witnesses provided that so doing does not jeopardize institutional safety or correctional goals. ♦ Se le permitirá al individuo encarcelado llamar testigos con tal de que al hacerlo no pondrá en peligro la seguridad de la institución ni las metas del Departamento.

If restricted pending a hearing for this misbehavior report, you may write to the Deputy Superintendent for Security or their designee prior to the hearing to make a statement on the need for continued prehearing confinement. ♦ Si está restringido pendiente a una audiencia por este informe de mal comportamiento, puede escribirle al Diputado del Superintendente para Seguridad o su representante antes de la audiencia para que haga una declaración acerca de la necesidad de continuar bajo confinamiento, previo a la audiencia.

FORM 2171B (10/14)          STATE OF NEW YORK-DEPARTMENT OF CORRECTIONS AND CUMMUNITY SUPERVISON

## Five Points
_____          Correctional Facility

## INMATE MISBEHAVIOR REPORT ♦ INFORME DE MAL COMPORTAMIENTO DEL RECLUSO

| 1. NAME OF INMATE (LAST, FIRST) ♦ NOMBRE DEL RECLUSO (Apellido, Nombre) | NO. ♦ NUM. | HOUSING LOCATION ♦ CELDA |
|---|---|---|
| Jude S | 17A0890 | 77-D-7 |

| 2. LOCATION OF INCIDENT ♦ LUGAR DEL INCIDENTE | INCIDENT DATE ♦ FECHA | INCIDENT TIME ♦ HORA |
|---|---|---|
| RMHU D gallery | 8/13/2024 | Approx 545pm |

3. RULE VIOLATION(S) ♦ VIOLACIÓN/ES

106.10 Direct order                              116.10 Property Damage/Loss

107.10 Interference-employee

On 8/13/24 at approximately 545 pm I correction officer J Schmitt was preparing incarcerated individual Jude S 17A0890 (77-D-7) for outdoor recreation and applied mechanical restraints to his wrists. Once wrist restraints were applied I/I Jude refused to pull his arms in and turn around with his back to the door as is proper procedure to exit his cell for recreation. At this time other staff brought down the rolling shield so that I could continue with recreation movement on D gallery in RMHU. Following the conclusion of the recreation run at approximately 750pm I/I Jude returned the cuffs and he had bent them making them no longer usable. At this time RMHU cuffs #29 were secured in the arsenal with a broken tool report. I/I Jude continued to hold the feed up hatch refusing to allow it to be closed. Area supervisor notified no further incidents to report.

| REPORT DATE ♦ FECHA | REPORTED BY ♦ NOMBRE DE LA PERSONA QUE HACE EL INFORME | SIGNATURE ♦ FIRMA | TITLE ♦ TITULO |
|---|---|---|---|
| 8/13/2024 | J Schmitt | | )RRECTION OFFICE |

5. ENDORSEMENTS OF OTHER EMPLOYEE WITNESSES (if any)       SIGNATURES:

ENDOSOS DE OTROS EMPLEA DOS TESTIGOS (si hay)          FIRMAS      1 _____

2 _____                    3 _____

**NOTE: Fold back Page 2 on dotted line before completing below.**

DATE AND TIME SERVED UPON INMATE                                    NAME AND TITLE OF SERVER

FECHA Y HORA DADO AL RECLUSO _____          NOMBRE Y TITULO DEL QUE ENTREGA _____

You are hereby advised that no statement made by you in response to the charges or information derived therefrom may be used against you in a crimal proceeding. Por este medio se le informa que no se puede usar ninguna declaracio☐☐n hecha por usted como respuesta al cargo o la onformacion derivada de ella en una demanda criminal.

## NOTICE ♦ AVISO

REVIEWING OFFICER ( DETACH BELOW STATEMENT FOR VIOLATION HEARING ONLY)

You are hereby notified that the above report is a formal charge and will be considered and determined at a hearing to be held.
Por este medio se le notifica que el informe anterior es un cargo formal el cual se considerara y determinara en una audiencia a celbrarse

The inmate shall be permitted to call witnesses provided that so doing does not jeopardize institutional safety or correctional goals.
Se le permitira al recluso llamar testigos con tal de que al hacerlo no pondra en peligro la seguridad de la institucion o los objetivos del Departamento.

If restricted pending a hearing for this misbehavior report, you may write to the Deputy Superintendent for Security or his/her designee _____

Distribution:WHITE - Disciplinary Office CANARY - Inmate(After review) ♦ Distribución:BLANCA - Oficinia Disciplinaria AMARILLA - Recluso (después de la resión)

49 Harassment/Retaliation
officer Kemp walked out my cell with
Several legal documents in folder on [illegible]

RECEIVED
AUG 2 0 2024
IGRC

FPT-1599-24

## FIVE POINTS CORRECTIONAL FACILITY

STEVEN JUDE #17-A-0890                                    August 13, 2024    77-D-7

On or about 8:15am, a officer J. Kemp, who I just filed an harassment grievance on last week, came into work, and gave out the breakfast trays, during the time that counselors and mental health were making rounds, which me as well as other SMI RMU patients had to be on our gates to caught the staff walking by our cells, once I was able to speak to staff, I proceeded to start eating my breakfast, which I get a styro foam tray, while sitting down eating Kemp came to pick up the trays and seen that I was eating, he demanded I give him my tray, I told him you see that I am eating, you can get the tray at lunch, its a styro, he said O.K., you are not eating lunch, & left, he proceeded to another I.I. cell name Megason in 5 cell, and did the same thing to him, who went off, & proceeded to curse Kemp out, & threatened him, stating that he was tired of the harassment, held his slot, & begun squirting some kind of unknown substance out his cell, when the officer walking with the medication nurse tried to bring a "bus stop" shield in front of his cell, he begun to squirt him as well, stating he is tried of this shit, & that he wanted to get out of Five Points, he couldn't take it anymore.

At lunch time, Officer Kemp around 12:30pm proceeded to roll the food cart pass my cell, without feeding me, I didn't say anything, as I had a legal call coming up with my lawyer for a disciplinary hearing, which I would make the complaint to my lawyer, to file with the watch commander, around 1:20pm, a officer Kemp & Jenkins come to my cell to get me for a hearing, where he proceeded verbally harass me, while on camera, which I want preserved & as he already had threaten me the week before in recreation, from which I filed the grievance in which I asked the IGRC supervisor on Tuesday when they made rounds whether she filed my grievance and she stated that she didn't even open the mail, this particular officer has repeated threaten me, and has attempted to taunt me, ████████████████████████████

████████████████████████ and told officer "Jenkins" not to handcuff me leaving recreation in order that he could physically assault me, which the officer stated that he was kind off crazy, from being in the military, when recreation was over, this officer came and walked close to me, stating that I am not talking all that shit now, make a move which he walked closely by me, causing me to fear for my life and safety, so I had stopped in front of my cell, so that he wouldn't try to push me in my cell and assault me off camera, and claim I did something, and falsified reports.

Exhibit

H

NYS DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION
TABLE 1A. DEMOGRAPHICS OF INDIVIDUALS
HOUSED IN SEGREGATED CONFINEMENT
May 1, 2023 - April 1, 2024
BOB First Day of Each Month

| DEMOGRAPHICS & STATUS | May 1, 2023 | | June 1, 2023 | | July 1, 2023 | | August 1, 2023 | | September 1, 2023 | | October 1, 2023 | | November 1, 2023 | | December 1, 2023 | | January 1, 202 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Count | Percent | Count | Percent | Count | Percent | Count | Percent | Count | Percent | Count | Percent | Count | Percent | Count | Percent | Count | Percel |
| **SEX** | | | | | | | | | | | | | | | | | | |
| Male | 355 | 96.5% | 347 | 98.0% | 440 | 99.8% | 402 | 99.0% | 299 | 99.0% | 263 | 98.9% | 253 | 99.6% | 266 | 97.8% | 306 | 98.7 |
| Female | 13 | 3.5% | 7 | 2.0% | 1 | 0.2% | 4 | 1.0% | 3 | 1.0% | 3 | 1.1% | 1 | 0.4% | 6 | 2.2% | 4 | 1.3 |
| Total | 368 | 100.0% | 354 | 100.0% | 441 | 100.0% | 406 | 100.0% | 302 | 100.0% | 266 | 100.0% | 254 | 100.0% | 272 | 100.0% | 310 | 100.0 |
| **RACE/ETHNICITY** [1] | | | | | | | | | | | | | | | | | | |
| Black | 228 | 62.0% | 217 | 61.3% | 254 | 57.6% | 256 | 63.1% | 185 | 61.3% | 167 | 62.8% | 155 | 61.0% | 171 | 62.9% | 190 | 61.3 |
| White | 45 | 12.2% | 36 | 10.2% | 64 | 14.5% | 36 | 8.9% | 36 | 11.9% | 32 | 12.0% | 25 | 9.8% | 21 | 7.7% | 34 | 11.0 |
| Hispanic | 84 | 22.8% | 84 | 23.7% | 104 | 23.6% | 95 | 23.4% | 76 | 25.2% | 58 | 21.8% | 58 | 22.8% | 67 | 24.6% | 76 | 24.5 |
| Other/Unknown | 11 | 3.0% | 17 | 4.8% | 19 | 4.3% | 19 | 4.7% | 5 | 1.7% | 9 | 3.4% | 16 | 6.3% | 13 | 4.8% | 10 | 3.2 |
| Total | 368 | 100.0% | 354 | 100.0% | 441 | 100.0% | 406 | 100.0% | 302 | 100.0% | 266 | 100.0% | 254 | 100.0% | 272 | 100.0% | 310 | 100.0 |
| **AGE IN YEARS** | | | | | | | | | | | | | | | | | | |
| 21 and Under | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0 |
| 22-30 | 179 | 48.6% | 192 | 54.2% | 212 | 48.1% | 183 | 45.1% | 128 | 42.4% | 106 | 39.8% | 106 | 41.7% | 127 | 46.7% | 127 | 41.0 |
| 31-40 | 132 | 35.9% | 116 | 32.8% | 169 | 38.3% | 169 | 41.6% | 110 | 36.4% | 112 | 42.1% | 104 | 40.9% | 97 | 35.7% | 133 | 42.9 |
| 41-50 | 47 | 12.8% | 43 | 12.1% | 48 | 10.9% | 49 | 12.1% | 56 | 18.5% | 43 | 16.2% | 41 | 16.1% | 43 | 15.8% | 42 | 13.5 |
| 51 - 54 | 10 | 2.7% | 3 | 0.8% | 12 | 2.7% | 5 | 1.2% | 8 | 2.6% | 5 | 1.9% | 3 | 1.2% | 5 | 1.8% | 8 | 2.6 |
| 55 Plus | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0 |
| Total | 368 | 100.0% | 354 | 100.0% | 441 | 100.0% | 406 | 100.0% | 302 | 100.0% | 266 | 100.0% | 254 | 100.0% | 272 | 100.0% | 310 | 100.0 |
| Average Age | 32 years | | 31 years | | 32 years | | 32 years | | 33 years | | 33 years | | 33 years | | 33 years | | 33 years | |
| **OMH LEVEL** [2] | | | | | | | | | | | | | | | | | | |
| 1 | 7 | 1.9% | 15 | 4.2% | 11 | 2.5% | 12 | 3.0% | 4 | 1.3% | 8 | 3.0% | 8 | 3.1% | 14 | 5.1% | 12 | 3.9 |
| 1S | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0 |
| 2 | 32 | 8.7% | 35 | 9.9% | 30 | 6.8% | 43 | 10.6% | 20 | 6.6% | 24 | 9.0% | 26 | 10.2% | 21 | 7.7% | 34 | 11.0 |
| 2S | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0 |
| 3 | 71 | 19.3% | 55 | 15.5% | 84 | 19.0% | 73 | 18.0% | 47 | 15.6% | 48 | 18.0% | 49 | 19.3% | 44 | 16.2% | 57 | 18.4 |
| 4 | 20 | 5.4% | 21 | 5.9% | 34 | 7.7% | 21 | 5.2% | 18 | 6.0% | 11 | 4.1% | 12 | 4.7% | 16 | 5.9% | 14 | 4.5 |
| 6 | 238 | 64.7% | 228 | 64.4% | 282 | 63.9% | 257 | 63.3% | 213 | 70.5% | 175 | 65.8% | 159 | 62.6% | 177 | 65.1% | 193 | 62.3 |
| 7 | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0 |
| Total | 368 | 100.0% | 354 | 100.0% | 441 | 100.0% | 406 | 100.0% | 302 | 100.0% | 266 | 100.0% | 254 | 100.0% | 272 | 100.0% | 310 | 100.0 |
| **MEDICAL LEVEL** [3] | | | | | | | | | | | | | | | | | | |
| 1 | 10 | 2.7% | 12 | 3.4% | 7 | 1.6% | 14 | 3.4% | 10 | 3.3% | 5 | 1.9% | 9 | 3.5% | 14 | 5.1% | 11 | 3.5 |
| 2 | 124 | 33.7% | 127 | 35.9% | 47 | 10.7% | 143 | 35.2% | 108 | 35.8% | 113 | 42.5% | 107 | 42.1% | 91 | 33.5% | 118 | 38.1 |
| 3 | 232 | 63.0% | 213 | 60.2% | 274 | 62.1% | 248 | 61.1% | 183 | 60.6% | 147 | 55.3% | 138 | 54.3% | 165 | 60.7% | 181 | 58.4 |
| Unassigned | 2 | 0.5% | 2 | 0.6% | 113 | 25.6% | 1 | 0.2% | 1 | 0.3% | 1 | 0.4% | 0 | 0.0% | 2 | 0.7% | 0 | 0.0 |
| Total | 368 | 100.0% | 354 | 100.0% | 441 | 100.0% | 406 | 100.0% | 302 | 100.0% | 266 | 100.0% | 254 | 100.0% | 272 | 100.0% | 310 | 100.0 |
| **PREGNANCY STATUS** | | | | | | | | | | | | | | | | | | |
| Pregnant | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0 |
| 8 Weeks Post-Partem | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0 |
| Not pregnant | 368 | 100.0% | 354 | 100.0% | 441 | 100.0% | 406 | 100.0% | 302 | 100.0% | 266 | 100.0% | 254 | 100.0% | 272 | 100.0% | 310 | 100.0 |
| Total | 368 | 100.0% | 354 | 100.0% | 441 | 100.0% | 406 | 100.0% | 302 | 100.0% | 266 | 100.0% | 254 | 100.0% | 272 | 100.0% | 310 | 100.0 |
| **SUBSTANCE ABUSE TREATMENT NEED** [4] | | | | | | | | | | | | | | | | | | |
| No | 76 | 20.7% | 75 | 21.2% | 84 | 19.0% | 89 | 21.9% | 69 | 22.8% | 56 | 21.1% | 61 | 24.0% | 43 | 15.8% | 67 | 21.6 |
| Yes | 283 | 76.9% | 275 | 77.7% | 334 | 75.7% | 309 | 76.1% | 231 | 76.5% | 207 | 77.8% | 191 | 75.2% | 222 | 81.6% | 239 | 77.1 |
| Unknown | 9 | 2.4% | 4 | 1.1% | 23 | 5.2% | 8 | 2.0% | 2 | 0.7% | 3 | 1.1% | 2 | 0.8% | 7 | 2.6% | 4 | 1.3 |
| Total | 368 | 100.0% | 354 | 100.0% | 441 | 100.0% | 406 | 100.0% | 302 | 100.0% | 266 | 100.0% | 254 | 100.0% | 272 | 100.0% | 310 | 100.0 |
| **SUBSTANCE ABUSE PROGRAM PARTICIPATION STATUS** | | | | | | | | | | | | | | | | | | |
| Satisfied | 27 | 9.5% | 31 | 11.3% | 51 | 15.3% | 32 | 10.4% | 26 | 11.3% | 22 | 10.6% | 17 | 8.9% | 24 | 10.8% | 24 | 10.0 |
| In Program | 33 | 11.7% | 17 | 6.2% | 43 | 12.9% | 18 | 5.8% | 6 | 2.6% | 6 | 2.9% | 9 | 4.7% | 10 | 4.5% | 17 | 7.1 |
| Incomplete participation | 27 | 9.5% | 60 | 21.8% | 34 | 10.2% | 53 | 17.2% | 48 | 20.8% | 31 | 15.0% | 20 | 10.5% | 39 | 17.6% | 44 | 18.4 |
| Did Not Participate | 196 | 69.3% | 167 | 60.7% | 206 | 61.7% | 206 | 66.7% | 151 | 65.4% | 148 | 71.5% | 145 | 75.9% | 149 | 67.1% | 154 | 64.4 |
| Total with a Need | 283 | 100.0% | 275 | 100.0% | 334 | 100.0% | 309 | 100.0% | 231 | 100.0% | 207 | 100.0% | 191 | 100.0% | 222 | 100.0% | 239 | 100.0 |

1 For reporting purposes, Hispanic ethnicity (either self-reported or based on country of descent per Correction Law) is prioritized over self-reported race. For example, someone who is
Black and of Hispanic descent is reported as Hispanic.

2 Level 1 indicates the highest level of mental health service needs. "S" designates individuals designated with a Serious Mental Illness.

3 Level 1 indicates the highest level of medical needs.

4 An indicator of Substance Abuse treatment need does not represent an official diagnosis of a substance use disorder.

**NYS DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION**
**TABLE 1B. DEMOGRAPHICS OF INDIVIDUALS**
**HOUSED IN RRU**
**May 1, 2023 - April 1, 2024**
**BOB First Day of Each Month**

| DEMOGRAPHICS & STATUS | May 1, 2023 | | June 1, 2023 | | July 1, 2023 | | August 1, 2023 | | September 1, 2023 | | October 1, 2023 | | November 1, 2023 | | December 1, 2023 | | January 1, 2024 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Count | Percent | Count | Percent | Count | Percent | Count | Percent | Count | Percent | Count | Percent | Count | Percent | Count | Percent | Count | Percent |
| **SEX** | | | | | | | | | | | | | | | | | | |
| Male | 1,774 | 99.0% | 1,836 | 99.1% | 1,847 | 98.9% | 1,712 | 99.1% | 1,813 | 98.9% | 1,839 | 99.3% | 1,901 | 99.1% | 1,853 | 98.8% | 1,924 | 98.9% |
| Female | 18 | 1.0% | 17 | 0.9% | 20 | 1.1% | 16 | 0.9% | 20 | 1.1% | 13 | 0.7% | 17 | 0.9% | 22 | 1.2% | 21 | 1.1% |
| Total | 1,792 | 100.0% | 1,853 | 100.0% | 1,867 | 100.0% | 1,728 | 100.0% | 1,833 | 100.0% | 1,852 | 100.0% | 1,918 | 100.0% | 1,875 | 100.0% | 1,945 | 100.0% |
| **RACE/ETHNICITY** [1] | | | | | | | | | | | | | | | | | | |
| Black | 1,152 | 64.3% | 1,190 | 64.2% | 1,163 | 62.3% | 1,035 | 59.9% | 1,112 | 60.7% | 1,149 | 62.0% | 1,174 | 61.2% | 1,139 | 60.7% | 1,201 | 61.7% |
| White | 167 | 9.3% | 171 | 9.2% | 171 | 9.2% | 172 | 10.0% | 176 | 9.6% | 165 | 8.9% | 193 | 10.1% | 200 | 10.7% | 189 | 9.7% |
| Hispanic | 416 | 23.2% | 429 | 23.2% | 462 | 24.7% | 452 | 26.2% | 476 | 26.0% | 468 | 25.3% | 480 | 25.0% | 464 | 24.7% | 480 | 24.7% |
| Other/Unknown | 57 | 3.2% | 63 | 3.4% | 71 | 3.8% | 69 | 4.0% | 69 | 3.8% | 70 | 3.8% | 71 | 3.7% | 72 | 3.8% | 75 | 3.9% |
| Total | 1,792 | 100.0% | 1,853 | 100.0% | 1,867 | 100.0% | 1,728 | 100.0% | 1,833 | 100.0% | 1,852 | 100.0% | 1,918 | 100.0% | 1,875 | 100.0% | 1,945 | 100.0% |
| **AGE IN YEARS** | | | | | | | | | | | | | | | | | | |
| 21 and Under | 140 | 7.8% | 154 | 8.3% | 174 | 9.3% | 146 | 8.4% | 146 | 8.0% | 146 | 7.9% | 146 | 7.6% | 143 | 7.6% | 136 | 7.0% |
| 22-30 | 743 | 41.5% | 777 | 41.9% | 789 | 42.3% | 743 | 43.0% | 792 | 43.2% | 783 | 42.3% | 786 | 41.0% | 787 | 42.0% | 809 | 41.6% |
| 31-40 | 596 | 33.3% | 631 | 34.1% | 593 | 31.8% | 559 | 32.3% | 607 | 33.1% | 604 | 32.6% | 623 | 32.5% | 603 | 32.2% | 656 | 33.7% |
| 41-50 | 216 | 12.1% | 202 | 10.9% | 212 | 11.4% | 195 | 11.3% | 215 | 11.7% | 254 | 13.7% | 280 | 14.6% | 263 | 14.0% | 254 | 13.1% |
| 51 - 54 | 40 | 2.2% | 37 | 2.0% | 38 | 2.0% | 30 | 1.7% | 31 | 1.7% | 36 | 1.9% | 45 | 2.3% | 36 | 1.9% | 42 | 2.2% |
| 55 Plus | 57 | 3.2% | 52 | 2.8% | 61 | 3.3% | 55 | 3.2% | 42 | 2.3% | 29 | 1.6% | 38 | 2.0% | 43 | 2.3% | 48 | 2.5% |
| Total | 1,792 | 100.0% | 1,853 | 100.0% | 1,867 | 100.0% | 1,728 | 100.0% | 1,833 | 100.0% | 1,852 | 100.0% | 1,918 | 100.0% | 1,875 | 100.0% | 1,945 | 100.0% |
| Average Age | 32 years | | 32 years | | 32 years | | 32 years | | 32 years | | 32 years | | 32 years | | 32 years | | 32 years | |
| **OMH LEVEL** [2] | | | | | | | | | | | | | | | | | | |
| 1 | 55 | 3.1% | 48 | 2.6% | 36 | 1.9% | 35 | 2.0% | 50 | 2.7% | 43 | 2.3% | 47 | 2.5% | 48 | 2.6% | 62 | 3.2% |
| 1S | 2 | 0.1% | 5 | 0.3% | 2 | 0.1% | 3 | 0.2% | 6 | 0.3% | 4 | 0.2% | 5 | 0.3% | 4 | 0.2% | 8 | 0.4% |
| 2 | 160 | 8.9% | 164 | 8.9% | 146 | 7.8% | 131 | 7.6% | 148 | 8.1% | 152 | 8.2% | 161 | 8.4% | 161 | 8.6% | 165 | 8.5% |
| 2S | 2 | 0.1% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 2 | 0.1% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| 3 | 327 | 18.2% | 372 | 20.1% | 384 | 20.6% | 361 | 20.9% | 365 | 19.9% | 377 | 20.4% | 392 | 20.4% | 375 | 20.0% | 393 | 20.2% |
| 4 | 103 | 5.7% | 68 | 3.7% | 95 | 5.1% | 100 | 5.8% | 89 | 4.9% | 95 | 5.1% | 83 | 4.3% | 84 | 4.5% | 94 | 4.8% |
| 6 | 1,143 | 63.8% | 1,196 | 64.5% | 1,204 | 64.5% | 1,098 | 63.5% | 1,172 | 63.9% | 1,181 | 63.8% | 1,227 | 64.0% | 1,201 | 64.1% | 1,222 | 62.8% |
| 7 | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 1 | 0.1% | 0 | 0.0% | 3 | 0.2% | 2 | 0.1% | 1 | 0.1% |
| Total | 1,792 | 100.0% | 1,853 | 100.0% | 1,867 | 100.0% | 1,728 | 100.0% | 1,833 | 100.0% | 1,852 | 100.0% | 1,918 | 100.0% | 1,875 | 100.0% | 1,945 | 100.0% |
| **MEDICAL LEVEL** [3] | | | | | | | | | | | | | | | | | | |
| 1 | 55 | 3.1% | 52 | 2.8% | 50 | 2.7% | 43 | 2.5% | 56 | 3.1% | 62 | 3.3% | 70 | 3.6% | 65 | 3.5% | 73 | 3.8% |
| 2 | 621 | 34.7% | 632 | 34.1% | 680 | 36.4% | 624 | 36.1% | 614 | 33.5% | 626 | 33.8% | 685 | 35.7% | 657 | 35.0% | 697 | 35.8% |
| 3 | 1,111 | 62.0% | 1,165 | 62.9% | 1,130 | 60.5% | 1,060 | 61.3% | 1,161 | 63.3% | 1,161 | 62.7% | 1,160 | 60.5% | 1,151 | 61.4% | 1,175 | 60.4% |
| Unassigned | 5 | 0.3% | 4 | 0.2% | 7 | 0.4% | 1 | 0.1% | 2 | 0.1% | 3 | 0.2% | 3 | 0.2% | 2 | 0.1% | 0 | 0.0% |
| Total | 1,792 | 100.0% | 1,853 | 100.0% | 1,867 | 100.0% | 1,728 | 100.0% | 1,833 | 100.0% | 1,852 | 100.0% | 1,918 | 100.0% | 1,875 | 100.0% | 1,945 | 100.0% |
| **PREGNANCY STATUS** | | | | | | | | | | | | | | | | | | |
| Pregnant | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| 8 Weeks Post-Partem | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 1 | 0.1% | 1 | 0.1% | 0 | 0.0% | 0 | 0.0% |
| Not pregnant | 1,792 | 100.0% | 1,853 | 100.0% | 1,867 | 100.0% | 1,728 | 100.0% | 1,833 | 100.0% | 1,851 | 99.9% | 1,917 | 99.9% | 1,875 | 100.0% | 1,945 | 100.0% |
| Total | 1,792 | 100.0% | 1,853 | 100.0% | 1,867 | 100.0% | 1,728 | 100.0% | 1,833 | 100.0% | 1,852 | 100.0% | 1,918 | 100.0% | 1,875 | 100.0% | 1,945 | 100.0% |
| **SUBSTANCE ABUSE TREATMENT NEED** [4] | | | | | | | | | | | | | | | | | | |
| No | 357 | 19.9% | 359 | 19.4% | 357 | 19.1% | 329 | 19.0% | 357 | 19.5% | 351 | 19.0% | 360 | 18.8% | 357 | 19.0% | 390 | 20.1% |
| Yes | 1,416 | 79.0% | 1,480 | 79.9% | 1,478 | 79.2% | 1,380 | 79.9% | 1,463 | 79.8% | 1,487 | 80.3% | 1,550 | 80.8% | 1,506 | 80.3% | 1,545 | 79.4% |
| Unknown | 19 | 1.1% | 14 | 0.8% | 32 | 1.7% | 19 | 1.1% | 13 | 0.7% | 14 | 0.8% | 8 | 0.4% | 12 | 0.6% | 10 | 0.5% |
| Total | 1,792 | 100.0% | 1,853 | 100.0% | 1,867 | 100.0% | 1,728 | 100.0% | 1,833 | 100.0% | 1,852 | 100.0% | 1,918 | 100.0% | 1,875 | 100.0% | 1,945 | 100.0% |
| **SUBSTANCE ABUSE PROGRAM PARTICIPATION STATUS** | | | | | | | | | | | | | | | | | | |
| Satisfied | 125 | 8.8% | 117 | 7.9% | 138 | 9.3% | 138 | 10.0% | 140 | 9.6% | 140 | 9.4% | 150 | 9.7% | 136 | 9.0% | 139 | 9.0% |
| In Program | 34 | 2.4% | 7 | 0.5% | 49 | 3.3% | 10 | 0.7% | 5 | 0.3% | 6 | 0.4% | 3 | 0.2% | 7 | 0.5% | 9 | 0.6% |
| Incomplete participation | 500 | 35.3% | 671 | 45.3% | 529 | 35.8% | 635 | 46.0% | 707 | 48.3% | 716 | 48.2% | 772 | 49.8% | 759 | 50.4% | 771 | 49.9% |
| Did Not Participate | 757 | 53.5% | 685 | 46.3% | 762 | 51.6% | 597 | 43.3% | 611 | 41.8% | 625 | 42.0% | 625 | 40.3% | 604 | 40.1% | 626 | 40.5% |
| Total with a Need | 1,416 | 100.0% | 1,480 | 100.0% | 1,478 | 100.0% | 1,380 | 100.0% | 1,463 | 100.0% | 1,487 | 100.0% | 1,550 | 100.0% | 1,506 | 100.0% | 1,545 | 100.0% |

1 For reporting purposes, Hispanic ethnicity (either self-reported or based on country of descent per Correction Law) is prioritized over self-reported race. For example, someone who is Black and of Hispanic descent is reported as Hispanic.

2 Level 1 indicates the highest level of mental health service needs. "S" designates individuals designated with a Serious Mental Illness.

3 Level 1 indicates the highest level of medical needs.

4 An indicator of Substance Abuse treatment need does not represent an official diagnosis of a substance use disorder.

TABLE 2A. HOUSING BY FACILITY FOR INDIVIDUALS IN SEGREGATED CONFINEMENT
May 1, 2023 - April 1, 2024
BOB First Day of Each Month

| FACILITY | May 1 | Jun 1 | Jul 1 | Aug 1 | Sept 1 | Oct 1 | Nov 1 | Dec 1 | Jan 1 | Feb 1 | Mar 1 | Apr 1 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ADIRONDACK | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| ALBION | 11 | 4 | 1 | 4 | 3 | 3 | 1 | 6 | 4 | 1 | 4 | 5 |
| ATTICA | 21 | 42 | 20 | 38 | 34 | 9 | 23 | 33 | 19 | 27 | 33 | 22 |
| AUBURN | 26 | 15 | 20 | 31 | 24 | 12 | 9 | 18 | 18 | 11 | 15 | 13 |
| BARE HILL | 9 | 6 | 10 | 10 | 5 | 7 | 4 | 7 | 6 | 7 | 5 | 10 |
| BEDFORD HILL | 2 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 |
| CAPE VINCENT | 8 | 9 | 5 | 6 | 5 | 4 | 4 | 1 | 6 | 4 | 1 | 1 |
| CAYUGA | 11 | 10 | 14 | 4 | 1 | 11 | 4 | 9 | 4 | 8 | 7 | 4 |
| CLINTON | 22 | 46 | 39 | 40 | 18 | 21 | 19 | 22 | 27 | 25 | 20 | 17 |
| COLLINS | 14 | 4 | 16 | 13 | 15 | 7 | 4 | 9 | 5 | 13 | 9 | 7 |
| COXSACKIE | 14 | 13 | 10 | 6 | 8 | 3 | 9 | 11 | 7 | 14 | 4 | 7 |
| EASTERN | 8 | 7 | 14 | 5 | 4 | 8 | 8 | 2 | 4 | 13 | 7 | 4 |
| ELMIRA | 9 | 13 | 16 | 14 | 9 | 14 | 6 | 12 | 14 | 8 | 12 | 11 |
| FISHKILL | 8 | 15 | 32 | 23 | 11 | 8 | 19 | 16 | 22 | 41 | 11 | 8 |
| FIVE POINTS | 14 | 11 | 9 | 18 | 7 | 13 | 4 | 14 | 22 | 8 | 10 | 5 |
| FRANKLIN | 10 | 9 | 9 | 10 | 7 | 7 | 7 | 8 | 7 | 6 | 5 | 6 |
| GOUVERNEUR | 9 | 9 | 16 | 5 | 8 | 4 | 2 | 3 | 4 | 15 | 12 | 15 |
| GREAT MEADOW | 8 | 6 | 14 | 13 | 10 | 5 | 6 | 7 | 3 | 7 | 5 | 0 |
| GREEN HAVEN | 14 | 19 | 21 | 17 | 12 | 13 | 6 | 5 | 21 | 19 | 11 | 21 |
| GREENE | 14 | 12 | 15 | 12 | 8 | 8 | 6 | 9 | 9 | 6 | 2 | 11 |
| GROVELAND | 9 | 10 | 15 | 6 | 14 | 4 | 11 | 5 | 7 | 4 | 6 | 4 |
| HUDSON | 0 | 0 | 0 | 0 | 3 | 0 | 0 | 1 | 2 | 1 | 0 | 0 |
| LAKEVIEW | 6 | 2 | 3 | 1 | 2 | 0 | 1 | 0 | 0 | 1 | 0 | 0 |
| MARCY | 10 | 12 | 13 | 14 | 4 | 13 | 6 | 6 | 5 | 7 | 8 | 9 |
| MIDSTATE | 11 | 6 | 22 | 8 | 8 | 17 | 14 | 10 | 15 | 10 | 2 | 10 |
| MOHAWK | 13 | 2 | 9 | 14 | 10 | 14 | 17 | 5 | 11 | 22 | 10 | 10 |
| ORLEANS | 15 | 4 | 11 | 7 | 10 | 9 | 13 | 2 | 1 | 2 | 3 | 3 |
| RIVERVIEW | 7 | 9 | 10 | 5 | 4 | 5 | 1 | 5 | 2 | 6 | 4 | 2 |
| SHAWANGUNK | 6 | 3 | 6 | 7 | 6 | 2 | 1 | 0 | 1 | 6 | 0 | 1 |
| SING SING | 11 | 5 | 12 | 14 | 6 | 13 | 12 | 11 | 14 | 12 | 8 | 12 |
| SULLIVAN | 4 | 4 | 1 | 6 | 4 | 3 | 1 | 1 | 1 | 5 | 2 | 1 |
| ULSTER | 2 | 6 | 10 | 7 | 3 | 3 | 2 | 5 | 4 | 1 | 4 | 2 |
| UPSTATE | 19 | 9 | 18 | 6 | 12 | 3 | 4 | 6 | 19 | 15 | 3 | 7 |
| WASHINGTON | 3 | 11 | 9 | 9 | 8 | 6 | 10 | 3 | 6 | 5 | 3 | 3 |
| WENDE | 9 | 10 | 7 | 8 | 9 | 6 | 6 | 8 | 7 | 2 | 7 | 8 |
| WOODBOURNE | 3 | 2 | 4 | 5 | 2 | 1 | 4 | 2 | 6 | 5 | 1 | 6 |
| WYOMING | 8 | 6 | 10 | 20 | 8 | 10 | 10 | 10 | 7 | 5 | 7 | 17 |
| TOTAL | 368 | 354 | 441 | 406 | 302 | 266 | 254 | 272 | 310 | 342 | 243 | 262 |

Case 1:24-cv-01001-LJV-JJM    Document 1-2    Filed 10/18/24    Page 88 of 157

**NYS Department of Corrections and Community Supervision**
**Table 1. Demographics of Individuals**
**Housed in Segregated Confinement or RRU**
**BOB September 1, 2024**

| DEMOGRAPHICS AND STATUS | Seg. Conf. | | RRU | |
|---|---|---|---|---|
| | Count | Percent | Count | Percent |
| **SEX** | | | | |
| Male | 249 | 94.7% | 2,021 | 99.2% |
| Female | 14 | 5.3% | 16 | 0.8% |
| Total | 263 | 100.0% | 2,037 | 100.0% |
| **RACE/ETHNICITY** [1] | | | | |
| Black | 162 | 61.6% | 1,258 | 61.8% |
| White | 41 | 15.6% | 181 | 8.9% |
| Hispanic | 48 | 18.3% | 529 | 26.0% |
| Other/Unknown | 12 | 4.6% | 69 | 3.4% |
| Total | 263 | 100.0% | 2,037 | 100.0% |
| **AGE IN YEARS** | | | | |
| 21 and Under | 0 | 0.0% | 159 | 7.8% |
| 22-30 | 106 | 40.3% | 823 | 40.4% |
| 31-40 | 117 | 44.5% | 687 | 33.7% |
| 41-50 | 33 | 12.5% | 260 | 12.8% |
| 51 - 54 | 7 | 2.7% | 41 | 2.0% |
| 55 Plus | 0 | 0.0% | 67 | 3.3% |
| Total | 263 | 100.0% | 2,037 | 100.0% |
| Average Age | 33 years | | 32 years | |
| **OMH LEVEL** [2] | | | | |
| 1 | 8 | 3.0% | 71 | 3.5% |
| 1S | 0 | 0.0% | 5 | 0.2% |
| 2 | 27 | 10.3% | 165 | 8.1% |
| 2S | 0 | 0.0% | 1 | 0.0% |
| 3 | 52 | 19.8% | 397 | 19.5% |
| 4 | 20 | 7.6% | 117 | 5.7% |
| 6 | 156 | 59.3% | 1,281 | 62.9% |
| 7 | 0 | 0.0% | 0 | 0.0% |
| Total | 263 | 100.0% | 2,037 | 100.0% |
| **MEDICAL LEVEL** [3] | | | | |
| 1 | 7 | 2.7% | 87 | 4.3% |
| 2 | 106 | 40.3% | 750 | 36.8% |
| 3 | 148 | 56.3% | 1,197 | 58.8% |
| Unassigned | 2 | 0.8% | 3 | 0.1% |
| Total | 263 | 100.0% | 2,037 | 100.0% |
| **PREGNANCY STATUS** | | | | |
| Pregnant | 0 | 0.0% | 0 | 0.0% |
| 8 Weeks Post-Partum | 0 | 0.0% | 0 | 0.0% |
| Not pregnant | 263 | 100.0% | 2,037 | 100.0% |
| Total | 263 | 100.0% | 2,037 | 100.0% |
| **SUBSTANCE ABUSE TREATMENT NEED** [4] | | | | |
| No | 49 | 18.6% | 408 | 20.0% |
| Yes | 205 | 77.9% | 1,603 | 78.7% |
| Unknown | 9 | 3.4% | 26 | 1.3% |
| Total | 263 | 100.0% | 2,037 | 100.0% |
| **SUBSTANCE ABUSE PROGRAM PARTICIPATION  STATUS** | | | | |
| Satisfied | 18 | 8.8% | 114 | 7.1% |
| In Program | 16 | 7.8% | 27 | 1.7% |
| Incomplete participation | 29 | 14.1% | 636 | 39.7% |
| Did Not Participate | 142 | 69.3% | 826 | 51.5% |
| Total with a Need | 205 | 100.0% | 1,603 | 100.0% |

[1] For reporting purposes, Hispanic ethnicity (either self-reported or based on country of descent per Correction Law) is prioritized over self-reported race.  For example, someone who is Black and of Hispanic descent is reported as Hispanic.

[2] Level 1 indicates the highest level of mental health service needs.  "S" designates individuals designated with a Serious Mental Illness.

[3] Level 1 indicates the highest level of medical needs.

[4] An indicator of Substance Abuse treatment need does not represent an official diagnosis of a substance use disorder.

| NYS Department of Corrections and Community Supervision Table 2. Housing by Facility for Individuals in Segregated Confinement or RRU BOB September 1, 2024 | | | |
|---|---|---|---|
| FACILITY | Seg. Conf. | RRU | TOTAL |
| ADIRONDACK | 0 | 11 | 11 |
| ALBION | 10 | 7 | 17 |
| ATTICA | 22 | 66 | 88 |
| AUBURN | 20 | 19 | 39 |
| BARE HILL | 3 | 0 | 3 |
| BEDFORD HILLS | 4 | 9 | 13 |
| CAPE VINCENT | 5 | 0 | 5 |
| CAYUGA | 10 | 168 | 178 |
| CLINTON | 22 | 0 | 22 |
| COLLINS | 3 | 83 | 86 |
| COXSACKIE | 4 | 52 | 56 |
| EASTERN | 5 | 0 | 5 |
| ELMIRA | 17 | 18 | 35 |
| FISHKILL | 5 | 155 | 160 |
| FIVE POINTS | 10 | 105 | 115 |
| FRANKLIN | 8 | 0 | 8 |
| GOUVERNEUR | 10 | 173 | 183 |
| GREAT MEADOW | 4 | 108 | 112 |
| GREEN HAVEN | 7 | 0 | 7 |
| GREENE | 5 | 165 | 170 |
| GROVELAND | 10 | 0 | 10 |
| HUDSON | 0 | 13 | 13 |
| LAKEVIEW | 0 | 0 | 0 |
| MARCY | 4 | 0 | 4 |
| MIDSTATE | 18 | 12 | 30 |
| MOHAWK | 7 | 0 | 7 |
| ORLEANS | 6 | 174 | 180 |
| RIVERVIEW | 2 | 0 | 2 |
| SHAWANGUNK | 0 | 0 | 0 |
| SING SING | 10 | 11 | 21 |
| SULLIVAN | 1 | 0 | 1 |
| ULSTER | 4 | 0 | 4 |
| UPSTATE | 4 | 688 | 692 |
| WASHINGTON | 6 | 0 | 6 |
| WENDE | 4 | 0 | 4 |
| WOODBOURNE | 3 | 0 | 3 |
| WYOMING | 10 | 0 | 10 |
| Total | 263 | 2,037 | 2,300 |

**NYS Department of Corrections and Community Supervision**
**Table 3. Individuals Housed in Segregated Confinement or RRU**
**BOB on September 1, 2024**

|  | Segregated Confinement*** | RRU |
|---|---|---|
| 1-3 Days | 64 | 97 |
| 4-6 Days | 69 | 86 |
| 7-15 Days | 130 | 206 |
| 16-20 Days | 0 | 165 |
| 21-30 Days | 0 | 173 |
| 31-90 Days | 0 | 822 |
| 91-180 Days | 0 | 328 |
| 181+ Days | 0 | 160 |
| Total | 263 | 2,037 |
|  |  |  |
| Average LOS | 6.9 | 66.8 |
| Median LOS | 6.0 | 47.0 |
| Maximum LOS | 14.0 | 353.0 |
| Individuals with over 15 days | 0 | 1,648 |

**Table 4. Time Served\* During Past Two Months as of September 1, 2024**
**Individuals Housed in Segregated Confinement or RRU at any Point**
**between July 1, 2024 and August 31, 2024\*\***

|  | Segregated Confinement*** | RRU |
|---|---|---|
| 1-3 Days | 179 | 208 |
| 4-6 Days | 164 | 141 |
| 7-15 Days | 1,277 | 512 |
| 16-20 Days | 85 | 247 |
| 21-30 Days | 5 | 450 |
| 31-62 Days | 0 | 2,040 |
| Total | 1,710 | 3,598 |
|  |  |  |
| Average LOS | 10.8 | 35.3 |
| Median LOS | 13.0 | 36.0 |
| Maximum LOS | 30.0 | 61.0 |
| Individuals with over 20 days | 5 | 2,490 |

*Time served represents total time served during the past two months, which is not necessarily continuous time served.

** In cases where movement into SHU/RRU and out of SHU/RRU occurred on the same day, that is counted as 0.5 days

***Effective October 24, 2022, individuals who are incarcerated in a SHU cell for more than 15 days are offered three additional hours of outdoor recreation for a total of seven hours out of cell time daily.

Exhibit

I

Assessing the Early Months of

# Implementation of the HALT Solitary Confinement Law in New York State Prisons

March 2023



GANY INDEPENDENT PRISON OVERSIGHT SINCE 1844

Correctional Association of New York

# Executive Summary

The Humane Alternatives to Long-Term (HALT) Solitary Confinement Law (hereinafter "the HALT Law" or "the HALT Solitary Law") passed on March 31, 2021, and went into effect on March 31, 2022, following years of grassroots organizing and advocacy. The Correctional Association of New York (CANY) – an organization that has been monitoring prison conditions since its founding in 1844 and is the only independent organization in New York State with authority to monitor state prisons and publicly report findings – has been monitoring implementation of the HALT Law in state prisons.[1]

The HALT Law is considered the most expansive and progressive legislative change in the United States concerning the practice of solitary confinement, known more generally as segregation. HALT dictates fundamental shifts in the duration and definition of segregation; perhaps even more significantly, the law prescribes a sea change in the philosophical underpinnings of behavior management in prisons. Implementation of the law has been met with harsh critique and resistance by some staff within the Department of Corrections and Community Supervision (DOCCS), who have linked the law to reported increases in violence in the prisons; various data outlined in this report raise questions about the connection between any increase in violence and the implementation of HALT. Other corrections staff acknowledge that the Department had relied too heavily on segregation in the past and embrace the opportunity to expand programming, even as they navigate the challenges.

This report presents CANY's findings and recommendations regarding implementation of the law in state prisons thus far, based on CANY's prison monitoring activities in the time leading up to implementation and between April and December 2022. The findings presented here should be considered in that context: CANY has monitored the first eight months of implementation of a law that seeks to transform practices that have been in place for decades.

In anticipation of the HALT Law taking effect, DOCCS ended the practice of keeplock (a form of segregation or solitary confinement) starting in late 2021. The HALT Law has also led to a reduction in the use of Special Housing Units (SHU), another form of segregation or solitary confinement, and a reduction in the amount of time people are kept in SHU. In addition, some incarcerated people who had spent years and decades in SHU have been moved to alternative units or to general population. Moreover, DOCCS is operating alternative units, known under the law as Residential Rehabilitation Units (RRUs), that are providing opportunities for out-of-cell programming and engagement. DOCCS has also published a variety of administrative data and reports in compliance with the law, representing an increase in information-sharing, transparency, and accountability.

---

[1]    Most provisions in the HALT Law apply to all local jails throughout New York State in addition to the state prisons. This report focuses on implementation of the law in state prisons and does not address implementation in local jails.

CANY's monitoring and DOCCS' publicly released administrative data have documented numerous departures from basic adherence to the HALT Solitary Law, including:

- holding people in SHU for upwards of six times the legal limit

- holding people in special populations who are prohibited from placement in segregated confinement in such confinement

- providing as little as three hours of out-of-cell time in some RRUs

- not providing access to mandatory DOCCS programming in RRUs

- automatically placing all people in RRUs in restraints during programming

- operating various units outside of the requirements of both segregated confinement and RRUs

- sending people to SHU and RRUs for reasons not allowed under the law

- holding nearly everyone in confinement prior to a disciplinary hearing and not providing meaningful opportunities for representation

CANY urges the state to take further steps to achieve compliance with both the language and the intent of the law. To support this transformation, CANY makes the following recommendations.

- **Implementation of the Law:**
  - o DOCCS must publicly articulate explanations for lack of adherence to or full implementation of each of HALT's requirements and outline steps that can be taken now to follow the law's requirements.
  - o Both DOCCS and the Office of Mental Health (OMH, which operates mental health services and programs inside DOCCS facilities) should publish and adopt regulations in line with the requirements of HALT.

- **Programs for People Incarcerated in Prison:**
  - o DOCCS should build on its success in operating programs for incarcerated people by increasing the level of programming systemwide, including by offering rehabilitative programs toward the beginning, rather than toward the end, of an individual's sentence (i.e., "front-loading" mandatory programs); expanding college, peer-led, and volunteer led programs; implementing more opportunities for incentives; and seek external support to resolve recruitment challenges for program and clinical staff.
  - o OMH should articulate its role and needs in the operation of RRUs and expand its important partnership with DOCCS to provide additional mental health services and establish programs in these units.
  - o DOCCS should continue to develop meaningful program opportunities for people in SHU and RRU that inspire robust participation.

- **Safety and Violence:**

    o CANY calls upon DOCCS to increase transparency regarding how the agency is assessing, understanding, and responding to violence in the prisons including by publishing recommendations from the Prison Violence Task Force and publicly releasing data analysis on incidents of violence.

    o DOCCS should engage research partners to study causes of violence and mechanisms for reducing violence and increasing safety; the results of these studies should be made public and should lead to partnerships with experts on violence reduction to implement evidence-based, model interventions.

- **Promote Culture Change:**

    o CANY encourages DOCCS to continue to increase and diversify training, professional development, and wellness opportunities for all staff; to engage with external experts in solutions that build workforce morale; and to continue to develop innovative recruitment strategies and partnerships to adequately staff facilities, particularly in medical and program areas.

    o CANY calls upon the Governor's Office to establish a multidisciplinary advisory committee that works cooperatively with DOCCS to inform and support philosophical shifts in culture in prisons.

    o CANY urges the Legislature to pass laws that create incentives for incarcerated people to engage in productive activities that lead to opportunities for release, including expanded parole release, sentencing credits, and earned time off.

Assessing the Early Months of Implementation of the
HALT Solitary Confinement Law in New York State Prisons

# Table of Contents

| | | |
|---|---|---|
| Executive Summary | | 2 |
| Introduction | | 6 |
| A. | Background on the Risks of Segregated Confinement and Other Forms of Solitary Confinement | 6 |
| B. | Background on the Use of Segregated Confinement and Other Forms of Solitary Confinement in New York State Prisons | 8 |
| C. | Summary of the Core Components of the HALT Law | 10 |
| Methodology | | 13 |
| A. | In-Person Monitoring Visits | 13 |
| B. | Data Published by the Department of Corrections and Community Supervision | 14 |
| Conflicting Perceptions of Safety and Violence | | 15 |
| The First Eight Months of HALT Law Implementation | | 19 |
| A. | Observed Benefits | 19 |
| 1. | Reductions in the Use of Segregated Confinement | 19 |
| 2. | Operation of Out-of-Cell Group Programming and Engagement | 20 |
| B. | Observed Challenges | 21 |
| 1. | Location and Approach to the RRUs | 21 |
| 2. | Program and Treatment Staff for RRUs | 22 |
| 3. | Segregated Confinement in SHUs and RRUs | 22 |
| a. | 15 Day Limit | 22 |
| b. | Special Populations | 24 |
| c. | Disciplinary Tickets Resulting in SHU Sanctions | 25 |
| d. | Racial Disparities | 25 |
| 4. | RRU Environment | 27 |
| a. | Out-of-Cell Group Programs and Activities | 27 |
| b. | Core Programs and Program Quality | 29 |
| c. | Shackling | 31 |
| d. | Congregate Recreation | 31 |
| e. | Disciplinary Sanctions and Mechanisms for Release | 32 |
| 5. | Other Units | 35 |
| a. | Step-down units | 35 |
| b. | Residential Mental Health Treatment Units | 36 |
| c. | Protective Custody and Other Units | 37 |
| 6. | Other Implementation | 38 |
| a. | Out-of-Cell Programming in the SHU | 38 |
| b. | Due Process Protections | 38 |
| Recommendations | | 40 |
| Conclusion | | 41 |

Assessing the Early Months of Implementation of the
HALT Solitary Confinement Law in New York State Prisons

# Introduction

## Background on the Risks of Segregated Confinement and Other Forms of Solitary Confinement

There is a large and ever-growing body of evidence showing that solitary confinement causes suffering, significant physical and mental health risks, and counterproductive impacts on safety.[2] As early as the 1800s, when segregated confinement was originally introduced, people quickly realized the devastating effects it can have. In 1890, the United States Supreme Court described the impact of segregated confinement in the case In re Medley, writing that "a considerable number of the [people in segregated confinement] fell, after even a short confinement, into a semi-fatuous condition, from which it was next to impossible to arouse them, and others became violently insane; others still, committed suicide; while those who stood the ordeal better were not generally reformed, and in most cases did not recover sufficient mental activity to be of any subsequent service to the community."[3]

In recent decades, myriad studies have shown that segregated confinement can cause psychosis, anxiety, depression, and even a particular "solitary confinement syndrome." Forty years ago, in 1983, based on interviews conducted with people in segregated confinement, Dr. Stuart Grassian described this particular syndrome caused by segregated confinement as involving "anxiety", "perceptual changes", "generalized hyperresponsivity to external stimuli", "perceptual distortions, hallucinations, and derealization experiences", "affective disturbances", "difficulties with thinking, concentration, and memory", "disturbances of thought content", "emergence of primitive, ego-dystonic fantasies", "ideas of reference, paranoia", and "problems with impulse control."[4]

---

2        A note on terminology throughout this report. Prior to the passage of the HALT Solitary Confinement Law, the term "segregated confinement" had a specific meaning in New York State law that only included people who were in disciplinary confinement in a SHU or long-term keeplock unit and did not include, for instance, people in administrative segregation, people in keeplock, or people in other forms of isolation or solitary confinement. As discussed in this report, HALT's passage redefined "segregated confinement" to include any form of cell confinement beyond 17 hours a day. As such, segregated confinement could include people in SHU, an alternative unit, or general population if the conditions of confinement involve being in any form of cell confinement beyond 17 hours a day. DOCCS's publicly reported data on the use of "segregated confinement" includes people who are in segregated confinement in a SHU, and does not include people who may be in other forms of cell confinement for more than 17 hours a day, such as people in an RRU, other alternative unit, or general population. For ease of use for discussing these inter-related terms, this report generally: a) utilizes the term of "segregated confinement" in the introduction to the report when discussing the history and impacts of the use of all forms of solitary confinement – rather than just the previously narrow definition in New York Law; b) utilizes the term "segregated confinement" throughout the rest of the report when discussing the use of SHU after HALT's enactment, as DOCCS is currently reporting; and c) utilizes the terms "RRU" or "alternative unit" to describe those units, while pointing out when those conditions are in practice segregated confinement.

3        In re Medley, 134 U.S. 160 (1890).

4        Stuart Grassian, Psychopathological Effects of Solitary Confinement, American Journal of Psychiatry, Am J Psychiatry, 140:11, p. 1452-1453, Nov. 1983, available at: https://ajp.psychiatryonline.org/doi/epdf/10.1176/ajp.140.11.1450. See also Stuart Grassian, Psychiatric Effects of Solitary Confinement, 22 WASH. U. J. L. & POL'Y 325 (2006), available at: https://openscholarship.wustl.edu/cgi/viewcontent.cgi?article=1362&context=law_journal_law_policy.

Numerous studies in subsequent decades have consistently documented how the social isolation and sensory deprivation of segregated confinement leads to significant mental health harm and particular psychiatric and psychological symptoms, including psychosis, paranoia, depression, anxiety, hallucinations, post-traumatic stress disorder (PTSD), self harm, suicide, and more.[5] The evidence indicates that the harm of segregated confinement is not the particular cell a person is in, the size of the cell, or the name or purpose of the unit, but rather stems from the social isolation it imposes and the lack of regular meaningful human interaction.[6] People in segregated confinement are upwards of seven to 12 times more likely to engage in self-harm and six times more likely to die by suicide.[7] These harms of segregated confinement are "now a largely settled scientific fact."[8] More recent research has also shown that segregated confinement additionally causes significant harm to neurological and physical health as well. For example, research shows that segregated confinement can physically cause changes to a person's brain.[9] In addition, segregated confinement has been shown to cause heart disease and increase the risk of heart attacks and strokes.[10]

Even after a person is released from incarceration, a study of hundreds of thousands of people released from North Carolina prison during a 15-year period shows that any time spent in segregated confinement significantly increases the risk of death by all causes, including suicide and overdose, with such risks increasing if a person was placed in segregated confinement on more than one occasion or was held for longer periods of time.[11] Additional research shows that even spending one or two days in segregated confinement

---

5    See, e.g., Stuart Grassian, Psychiatric Effects of Solitary Confinement, 22 WASH. U. J. L. & POL'Y 325 (2006), available at: https://openscholarship.wustl.edu/cgi/viewcontent.cgi?article=1362&context=law_journal_law_policy; Kayla James & Elena Vanko, The Impacts of Solitary Confinement, Vera Institute of Justice, April 2021, available at: https://www.vera.org/downloads/publications/the-impactsof-solitary-confinement.pdf;

6    Terry Allen Kupers, Solitary Confinement by Any Other Name is Still Solitary, and Needs to End, City Limits, Aug. 6, 2021, available at: https://citylimits.org/2021/08/06/opinion-solitary-confinement-by-any-other-name-is-still-solitary-and-needs-to-end/.

7    Fatos Kaba et al., Disparities in Mental Health Referral and Diagnosis in the New York City Jail Mental Health Service, 105 Am. J. Pub. Health 1911-1916 (2015), available at: http://ajph.aphapublications.org/doi/full/10.2105/AJPH.2015.302699; The Walls are Closing in on Me: Suicide and Self-Harm in New York State's Solitary Confinement Units, 2015-2019, #HALTsolitary Campaign, May 2020, available at: http://nycaic.org/wp-content/uploads/2020/05/The-Walls-Are-Closing-in-On-Me_For-Distribution.pdf.

8    Craig Haney, The Science of Solitary: Expanding the Harmfulness Narrative, Northwestern Law Review, Vol. 115, No. 1, 2020, available at: https://scholarlycommons.law.northwestern.edu/cgi/viewcontent.cgi?article=1431&context=nulr.

9    Elena Blanco-Suarez, The Effects of Solitary Confinement on the Brain, Psychology Today, Feb. 27, 2019, available at: https://www.psychologytoday.com/us/blog/brain-chemistry/201902/the-effects-solitary-confinement-the-brain; Dana G. Smith, Neuroscientists Make a Case against Solitary Confinement, Scientific American, Nov. 9, 2018, available at: https://www.scientificamerican.com/article/neuroscientists-make-a-case-against-solitary-confinement/; Jules Lobel & Huda Akil, Law & Neuroscience: The Case of Solitary Confinement, Daedalus (2018) 147 (4), p. 61-75, available at: https://direct.mit.edu/daed/article/147/4/61/27222/Law-amp-Neuroscience-The-Case-of-Solitary.

10    Brie Williams, Amanda Li, et. al., The Cardiovascular Health Burdens of Solitary Confinement, J Gen Intern Med 34(10):1977-80, June 21, 2019, available at: https://link.springer.com/content/pdf/10.1007/s11606-019-05103-6.pdf; Tasfia Jahangir, Solitary confinement is bad for the heart too, Massive Science, Jan. 20, 2020, available at: https://massivesci.com/notes/cardiovascular-health-comparison-solitary-confinementprison-health/.

11    Lauren Brinkley-Rubinstein, Josie Sivaraman, and David L. Rosen, Association of Restrictive Housing During Incarceration With Mortality After Release, JAMA Netw Open. 2019;2(10):e1912516, Oct. 4, 2019, available at: https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2752350.

increases the risk of death after release from incarceration.[12] In a related manner, segregated confinement also worsens safety for everyone, both in prisons and in outside communities. Because segregated confinement causes people to deteriorate mentally and physically, it makes it more likely that a person will have outbursts of aggression and engage in harmful acts.[13] Studies indicate that after release from prison, people who have spent time in segregated confinement are more likely to return to incarceration.[14]

By contrast, programs that involve full days of out-of-cell group programming have led to far greater safety and health outcomes. For example, the Merle Cooper program, which is no longer in operation at Clinton Correctional Facility, involved people being separated from the general prison population, but in a unit comparable to the general population, with full days of out-of-cell time, group programming, peer-led programming, and even the ability to earn the right to have unlocked cells at night.[15] This program was highly praised by staff, administrators, and participants, and continues to receive positive appraisals from security staff during CANY monitoring visits.[16]

# Background on the Use of Segregated Confinement and Other Forms of Solitary Confinement in New York State Prisons

New York State utilized segregated confinement and other forms of solitary confinement in a widespread and racially disproportionate manner in recent decades.[17] Indeed, administrators with whom CANY representatives have spoken with over the past eight

---

12    James Dean, Solitary confinement heightens post-incarceration death risk, Cornell Chronicle, Feb. 5, 2020, available at: https://news.cornell.edu/stories/2020/02/solitary-confinement-heightens-post-incarceration-death-risk; Christopher Wildeman and Lars H Andersen, Solitary confinement placement and post-release mortality risk among formerly incarcerated individuals: a population-based study, The Lancet Public Health, Vol. 5, Issue 2, Feb. 2020, pp. e107-e113, available at: https://www.sciencedirect.com/science/article/pii/S2468266719302713.

13    Stuart Grassian, Psychiatric Effects of Solitary Confinement, 22 WASH. U. J. L. & POL'Y 325 (2006), available at: https://openscholarship.wustl.edu/cgi/viewcontent.cgi?article=1362&context=law_journal_law_policy.

14    See, e.g., Lauren Brinkley-Rubinstein, Josie Sivaraman, and David L. Rosen, Association of Restrictive Housing During Incarceration With Mortality After Release, JAMA Netw Open. 2019;2(10):e1912516, Oct. 4, 2019, available at: https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2752350; Lonnie Burton, Solitary to the Streets: Studies Find Such Releases Result in Higher Recidivism Rates, Violent Behavior, Jan. 8, 2018, available at: https://www.prisonlegalnews.org/news/2018/jan/8/solitarystreets-studies-find-such-releases-result-higher-recidivism-rates-violent-behavior/; James Gilligan, Punishment Fails. Rehabilitation Works, The New York Times, Dec. 19, 2012, available at: https://www.nytimes.com/roomfordebate/2012/12/18/prison-could-be-productive/punishment-fails-rehabilitation-works.

15    Clinton Correctional Facility, Correctional Association of New York, 2014, p. 56-63, available at: https://drive.google.com/file/d/1DXcZOz1cKK1sLUj2-kU5XmQvNJgmVTvM/view?usp=sharing.

16    For example, a security union representative at one of the prisons CANY monitored in 2022 who raised concerns about the HALT Law described the success of the former Merle Cooper program and the positive aspects of the program and its impact on safety.

17    Lockdown New York: Disciplinary Confinement in New York State Prisons, Correctional Association of New York, October 2003, available at: https://static1.squarespace.com/static/5b2cd7e2e9e02d51fb3874f7/t/5c4f8cbfaa4a982c9a98dc29/1548709012139/2003+Lockdown+in+New+Yorks+Prisons.pdf; Mental Health in the House of Corrections, Correctional Association of New York, June 2004, available at: http://www.antoniocasella.eu/archipsy/Mental-Health_NY-2004.pdf; The Solitary Confinement of Youth in New York: A Civil Rights Violation, New York Advisory Committee to the U.S. Commission on Civil Rights, December 2014, available at: https://www.usccr.gov/files/pubs/docs/NYSAC-Solitary-Confinement-Report-without-Cover.pdf; viva Stahl, Transgender Women in New York State Prisons Face Solitary Confinement and Sexual Assault, Solitary Watch, Aug. 7, 2014, available at: https://solitarywatch.org/2014/08/07/transgender-women-in-new-york-state-prisons-face-solitary-confinement-and-sexual-assault/.

months have acknowledged the historical overuse of segregation in state prisons. Numerous earlier reforms have sought to unwind the overreliance on the practice. The SHU Exclusion Law was passed by the New York State legislature in January 2008 – expanding upon a 2007 litigation settlement in Disabilities Advocates, Inc. v. NYS Office of Mental Health – and took full effect in July 2011.[18] While that law led to some relief for some people with the most serious mental health needs, the overall use of segregated confinement and other forms of isolation continued. In 2012, the New York Civil Liberties Union (NYCLU) documented, for instance, that roughly 4,500 people were in Special Housing Units (SHU) on a given day at the time for 23 to 24 hours a day, for months, years, and decades.[19]

While the 2016 settlement of the Peoples v. Annucci lawsuit resulted in some additional relief, the use of segregated confinement and isolation continued in New York's prisons. CANY documented the continued risks of people being held in segregated confinement in a 2018 report on the Southport Correctional Facility,[20] which was a prison exclusively used for segregated confinement that closed in March 2022, and documented the particular risks of segregated confinement for women.[21] A 2019 NYCLU report found that while the number of sanctions to SHU had some decreases as a result of the settlement, the state prisons increased the total number of sanctions to isolating disciplinary confinement by increasing the number of sanctions to keeplock, where people were locked in a cell 23 to 24 hours per day.[22] Specifically, there were still over 38,000 disciplinary confinement sanctions imposed during the course of one year in 2018, including 10,466 SHU sanctions and 27,783 keeplock sanctions. A 2020 report documented that the rate of self-harm in New York's prisons was 12 times higher in SHU than the rest of the prison population, with suicide attempts in the prisons as a whole occurring, on average, almost once every two days, and the rate of death by suicide was five times higher in SHU and keeplock.[23] During CANY's visit to Upstate in March 2022, just prior to HALT implementation, people interviewed in SHU continued to report long stays in SHU.

The HALT Solitary Confinement Act was considered during the course of eight legislative sessions from 2014 through 2021. During that time, the state legislature weighed evidence,

18      SHU Exclusion Law of 2008, 2008 N.Y. Laws 1 (codified as amended at N.Y. CORRECT. LAW §§ 137 & 401-a and N.Y. MENTAL HYG. LAW § 45.)

19      Boxed In: The True Cost of Extreme Isolation in New York Prisons, New York Civil Liberties Union, 2012, available at: https://www.nyclu.org/sites/default/files/publications/nyclu_boxedin_FINAL.pdf.

20      Solitary at Southport, Correctional Association of New York, 2017, available at: https://static1.squarespace.com/static/5b2c07a2a9e02851fb387477/t/5c4f5bd8562fa7fb256c550d/1548704748745/2017+Solitary+at+Southport.pdf.

21      Prison within Prison: Voices of Women Held in Isolated Confinement in New York, Correctional Association of New York, 2018, available at: https://static1.squarespace.com/static/5b2c07a2a9e02851fb387477/t/5c4f5c297c98acb2776942ac/1548704320918/2018+Voices+of+Women+in+Isolated+Confinement.pdf; Reproductive Injustice: The State of Reproductive Health Care for Women in New York State Prisons, Women in Prison Project of the Correctional Association of New York, 2015, available at: https://static1.squarespace.com/static/5b2c07a2a9e02851fb387477/t/5c4f6d01758d466ad03c0a97/1548706033102/2015+Reproductive+Injustice+in+New+Yorks+Prisons.pdf.

22      Trapped Inside: The Past, Present, and Future of Solitary Confinement in New York, New York Civil Liberties Union, Oct. 2019, available at: https://www.nyclu.org/sites/default/files/field_documents/20191.0_nyclu_solitary_web.pdf.

23      The Walls are Closing in on Me: Suicide and Self-Harm in New York State's Solitary Confinement Units, 2015-2019, #HALTsolitary Campaign, May 2020. http://nycaic.org/wp-content/uploads/2020/05/The-Walls-Are-Closing-in-On-Me_For-Distribution.pdf. The response by the Office of Mental Health, appended here, cites a footnote that was missing in an earlier review copy, and which has since been updated.

heard testimony, and spoke directly with stakeholders. The HALT Act was amended twice in order to address issues raised by corrections administrators. Ultimately, a supermajority in the New York State Senate and the New York State Assembly voted to pass the HALT Solitary Confinement Act and Governor Andrew Cuomo signed it into law.

# Summary of the Core Components of the HALT Solitary Law

The overall intended purposes of the HALT Solitary Law are to restrict the use of segregated confinement, restrict the use of disciplinary confinement and isolation, and require the use of alternative interventions, including alternative forms of separation, that have been shown to better protect people's health and well-being and better support institutional and public safety. By defining segregated confinement as any form of cell confinement beyond 17 hours a day, restricting the criteria of conduct that can result in placement in segregated confinement or alternative Residential Rehabilitation Units (RRUs), excluding some groups of people from segregated confinement entirely, limiting segregated confinement for all other people to a maximum limit of 15 consecutive days, and creating various mechanisms for release from RRUs, the HALT Law aims to reshape the use and scale of segregated confinement in prisons in New York. At the same time, the HALT Law aims to create alternative environments rooted in best practices and proven models that utilize separation without isolation.

More specifically, to achieve these overall aims, some of the core components of the HALT Solitary Law include the following.

### 1. HALT places strict limits on the use of segregated confinement.

The HALT Law expands the definition of segregated confinement to any form of cell confinement beyond 17 hours a day, regardless of the form of the confinement unit or status of the confined person, other than in a facility-wide emergency or for the purposes of providing medical or mental health care in a clinic area or close proximity. HALT prohibits any person from being held in segregated confinement beyond 15 consecutive days and generally 20 days in any 60-day period. HALT also prohibits any person who fits within a defined "special population" from spending any time in segregated confinement, including people 21 and younger, people 55 and older, pregnant and post-partum people, people with mental health diagnoses, and people with physical or cognitive disabilities.

### 2. HALT requires out-of-cell programming in segregated confinement.

The HALT Law requires that people in segregated confinement, up until the limits above, be in the least restrictive environment necessary and have access to at least four hours of daily out-of-cell programming, including access to at least one hour of recreation.

### 3. HALT provides clear out-of-cell programming and activity requirements in alternative forms of separation.

HALT requires that at the end of 15 consecutive days of segregated confinement, or if a person is in a special population, a person must either be released to the general facility population or be placed in an alternative rehabilitative and therapeutic unit, named Residential Rehabilitation Units (RRUs). The HALT Law requires that such units be "therapeutic and trauma-informed", provide "therapy, treatment, and rehabilitative programming", and "aim to address individual treatment and rehabilitation needs and underlying causes of problematic behaviors". In such units, the law requires that people be in the least restrictive environment necessary and generally have access to seven hours of daily out-of-cell congregate programs, recreation, and activities. People in RRUs must have access to programs comparable to the "mandatory" programs available to the general population and therapeutic programming aimed at addressing the reasons for their separation. There must be staff-led programs, and other out-of-cell time may include peer-led and volunteer-led programs. There is also a presumption against the use of restraints during programming, meaning that the decision to use restraints for safety should be determined on an individualized basis.

### 4. HALT strictly limits the sanctions criteria of conduct that can result in segregated confinement or alternatives.

HALT has multiple provisions to limit the use of disciplinary confinement sanctions. HALT requires the use of de-escalation and non-disciplinary interventions as the preferred methods for responding to misbehavior and requires that disciplinary sanctions be imposed only as a last resort. In addition, HALT requires that no person be subject to more than three consecutive days of segregated confinement or to time in an RRU unless that person has committed one act from a list of specifically defined acts and the act was "so heinous or destructive" that keeping the person in general population would pose "a significant risk of imminent serious physical injury" and create "an unreasonable risk" to security. HALT does not allow for people to be placed in segregated confinement for more than three days or placement in an RRU for any reasons other than conduct matching those criteria.

### 5. HALT provides for multiple mechanisms of release from RRUs.

While continuing to allow time cuts to take place for people who have received disciplinary confinement sanctions, the HALT Law provides for various additional mechanisms for release from RRUs. Specifically, HALT requires that people be released from an RRU if their disciplinary sanction expires. The law additionally requires that all people in the RRUs have a rehabilitation plan developed, receive 60-day reviews, and have the right to be discharged from the RRU if they complete what is required of them. Further, the HALT Law generally imposes a one-year limit on confinement in an RRU, unless the person has committed one

of the very serious acts listed in the law within the previous six months or in extraordinary circumstances if the commissioners of corrections and mental health both determine that the person poses an "extraordinary and unacceptable risk of imminent harm".

## 6. HALT requires that all housing units comport with the requirements for segregated confinement and RRUs.

Because HALT defines segregated confinement as any form of cell confinement beyond 17 hours a day, every type of housing unit and location in a prison is subject to HALT's requirements for either segregated confinement or an RRU. In addition, HALT specifically prohibits protective custody as a reason for placing a person in segregated confinement (i.e., cell confinement for more than 17 hours a day) and any protective custody unit must, at a minimum, follow the RRU requirements. Similarly, HALT requires that all Residential Mental Health Treatment Units (RMHTUs) – alternative units for people with serious mental health needs – follow the RRU requirements in addition to other requirements for RMHTUs.

## 7. HALT enhances due process protections.

The HALT Law creates a presumption against the use of segregated confinement before a disciplinary hearing and requires that, when a person is confined pre-hearing, that the disciplinary hearing be held within five days of confinement unless the person charged seeks a postponement. HALT also permits all people facing segregated confinement or placement in an RRU to have legal representation.

## 8. HALT has various other requirements, including regarding reporting, oversight, training, services, and other protections.

Among other provisions, the HALT Law requires DOCCS to publish on its website monthly, semi-annual, and annual reports on the use of segregated confinement and RRUs. The law also requires the Justice Center for the Protection of People with Special Needs – a state entity outside of DOCCS – to assess and report on state prisons' implementation of all aspects of the HALT Law. Further, the HALT Law requires all hearing officers and all people who work in SHU or RRU to undergo specialized training. The law also prohibits any limitations on services, treatment, or basic needs as punishment.

# Methodology

This report makes use of two primary sources of data: 1) data collected during CANY prison monitoring activities, including in-person prison monitoring visits and communications with or on behalf of people in prison; and 2) data published by DOCCS.

# In-Person Monitoring Visits and Activities

This report includes information gathered during monitoring visits to seven New York State prisons: Upstate Correctional Facility in March 2022 and again in November 2022, Elmira Correctional Facility in April 2022, Albion Correctional Facility in June 2022, Orleans Correctional Facility in June 2022, Coxsackie Correctional Facility in July 2022, Marcy Correctional Facility in October 2022, and Midstate Correctional Facility in October 2022.

During an in-person monitoring visit, the CANY delegation is typically comprised of 6-12 representatives who meet with each prison's executive staff, incarcerated individuals who serve as representatives from the Incarcerated Liaison Committee (ILC) and the Incarcerated Grievance Review Committee (IGRC), employee union representatives, medical staff, staff from the state Office of Mental Health (OMH), and academic and vocational staff. During these meetings, CANY staff and volunteers ask targeted questions and take notes to document experiences and issues identified at each prison. Visual observation by CANY representatives, in addition to information provided by the Department of Corrections and Community Supervision staff, are used to corroborate reports made by incarcerated people, with the aim of ensuring that findings presented in CANY reports are sufficiently triangulated.

When not meeting in the groups described above, CANY representatives walk throughout each prison and speak with incarcerated people who are either in housing units (i.e., cellblocks or dorms), clinical facilities, or in program areas. During interviews with incarcerated people, CANY representatives utilize a protocol form for each person interviewed. At the conclusion of each monitoring visit, CANY representatives compile data, review notes made during the monitoring visit, and compare them to relevant historical data. The information is then synthesized to develop high level findings and recommendations.

In addition to prison monitoring visits, this report contains information gathered from communications with people in prisons across New York State and their family members and loved ones, including communications by letter, email, and phone call.

# Data Published by the Department of Corrections and Community Supervision

Pursuant to requirements under the HALT Solitary Law, DOCCS is required to publicly report on the use of segregated confinement and alternatives on a monthly, semi-annual, and annual basis. At the time of the drafting of this report, DOCCS had published monthly reports with relevant data at a snapshot in time for May 1, 2022; June 1, 2022; July 1, 2022; August 1, 2022; September 1, 2022; October 1, 2022; and December 1, 2022; as well as a semi-annual report with that same data from May 1 through October 1. DOCCS also had published a monthly and semi-annual list of incidents that resulted in SHU sanctions from April through September and November.

The monthly reporting data includes information and demographic breakdowns on the number of people DOCCS has designated as being in segregated confinement and the number of people in Residential Rehabilitation Units. As required under the HALT Law, demographic breakdowns include race and ethnicity, sex, age, OMH level, medical level, pregnancy status, substance abuse treatment need, and substance abuse program participation status. The data also breaks down the use of segregated confinement and RRUs by state prison, and the length of time people have been in segregated confinement and RRUs.

The release of this information represents a major increase in information-sharing on the part of DOCCS. CANY commends this significant step forward in transparency and accountability. In addition to the data published pursuant to the HALT Law, this report has also analyzed data from other DOCCS reports and DOCCS' monthly fact sheets, including data related to assaults, data related to SHU cell occupants, and data related to the overall prison population.

# Conflicting Perceptions Regarding Safety and Violence

The New York State Correctional Officers and Police Benevolent Association (NYSCOPBA), the union representing correction officers across the state, along with some security staff and administrators during CANY monitoring visits, have raised concerns about the impact of HALT on violence in the prisons. They have argued that HALT is contributing to an escalation in violence because of an inaccurate perception that HALT has eliminated consequences for violent behavior. As Acting Commissioner Anthony Annucci testified before the legislature, when asked about why he felt confident HALT would not have a negative impact on safety, "our ability to separate is still intact. The theme going forward is separation, not isolation. … [People will] get out-of-cell structured programming and treatment."[24] In December 2021, before HALT went into effect, Commissioner Annucci established the Prison Violence Task Force in response to rising reports of assaults on staff by incarcerated people. The Task Force is comprised of prison superintendents, security line staff, civilian staff, and administrators. In October 2022, at the invitation of DOCCS, CANY attended a meeting of the Task Force to observe the discussion, which included a discussion of a variety of factors contributing to violence; a presentation of wideranging recommendations and suggestions made by Task Force members; new initiatives that have been undertaken in 2022, including changes to Directive 4911, which restricts the ability of incarcerated people to receive packages from family or friends; and discussions, held via WebEx with union representatives and representatives of the Incarcerated Liaison Committees at four correctional facilities, which were aimed at identifying factors that may contribute to rates of violence. Following the October meeting, CANY presented DOCCS with suggestions for further analysis of its administrative data to identify possible drivers of violence inside the prisons.

Any incident involving violence in prison should provoke serious concern and a strong response aimed at preventing further violence. However, it is important to consider that over 98% of staff involved in all reported assaults on staff since HALT went into effect between April and November 2022[25] had either no injury (73%) or minor injury (25%).[26] Similarly, between April and November 2022, over 99% of staff involved in reported assaults

---

24    New York State Joint Budget Hearing – Public Protection, Transcript, p. 376, January 25, 2022, available at: https://legislation.nysenate.gov/pdf/hearings/PublicProtection2022.txt/.

25    DOCCS Fact Sheets, April 1, 2022 through December 1, 2022, available at:
https://doccs.ny.gov/system/files/documents/2022/04/doccsfact-sheet-april-2022_0.pdf;
https://doccs.ny.gov/system/files/documents/2022/05/doccs-fact-sheet-may-2022.pdf;
https://doccs.ny.gov/system/files/documents/2022/06/doccs-fact-sheet-june-2022_0.pdf;
https://doccs.ny.gov/system/files/documents/2022/07/doccs-fact-sheet-july-2022.pdf;
https://doccs.ny.gov/system/files/documents/2022/08/doccs-fact-sheet-august-2022.pdf;
https://doccs.ny.gov/system/files/documents/2022/09/doccs-fact-sheet-september-2022.pdf;
https://doccs.ny.gov/system/files/documents/2022/10/doccs-fact-sheet-october-2022_0.pdf;
https://doccs.ny.gov/system/files/documents/2022/11/doccs-fact-sheet-november-2022.pdf;
https://doccs.ny.gov/system/files/documents/2022/12/doccs-fact-sheet-december-2022_0.pdf;.

26    For purposes of these statistics, minor injuries are defined by DOCCS as "injuries that require either no treatment, minimal treatment (scratch, bruise, aches/pain) or precautionary treatment."

between incarcerated people had either no injury (97.8%) or minor injury (1.9%), and over 99% of staff involved in staff use of force incidents had either no injury (81.5%) or minor injury (17.5%).[27]

For January through July 2022,[28] roughly 81% of incarcerated people involved in assaults between incarcerated people had either no injury (39%) or minor injury (41%), similar percentages as in 2021 (81%) and 2020 (80%), while 15% had moderate injury, 4% had serious injury, and 0.17% had severe injury.[29] While the majority of people CANY interviewed did not raise any safety concerns stemming from HALT, some incarcerated people have expressed concerns about safety since the advent of HALT— including a few people reporting concerns about safety among incarcerated people and a much higher number of people reporting concerns about staff violence, false tickets, and retaliation. OMH staff at one prison CANY monitored described their perception of fear of violence among both incarcerated individuals and DOCCS staff, while other OMH staff have described their positive views of HALT's impact. Because CANY is not an investigatory body and does not have access to the security level or scale of administrative data that would be necessary to research these concerns thoroughly, CANY encourages DOCCS to continue to engage facility staff, incarcerated people, external experts, and other organizations with a vested interest in prison safety to explore causes and implement evidence-based solutions to promote everyone's safety. In the meantime, any claims about reported violence should be evaluated in light of data presented below.

## 1. 10+ Year Increase in Reported Assaults, Staffing Ratios, and Use of Force Incidents

The increase in reported assaults on staff and assaults between incarcerated people is part of a longterm trend over at least the past decade. Starting 10 years before the HALT Law and four years before the Peoples litigation settlement, there has been a steady increase in reported assaults on staff and assaults between incarcerated people every year.[30] Also during this decade-long, there was a dramatic increase in the number of staff use of force incidents. Specifically, according to the latest available DOCCS data, staff use of force unusual incidents increased by more than 212% between 2011 and 2020.[31]

---

27      DOCCS Fact Sheets, April 1, 2022 through December 1, 2022.

28      DOCCS only publicly reports data on the degree of injury to staff during assault on staff and assault on incarcerated people unusual incidents and does not publicly report data on the degree of injury to incarcerated people during such incidents. Information obtained through a FOIL request provided information on the degree of injury to incarcerated people through July 31, 2022.

29      DOCCS Unusual Incident Reports data obtained through a FOIL request.

30      DOCCS Unusual Incident Report, January – December 2020, with Ten-Year Trends from 2011 – 2020, available at: https://doccs.ny.gov/system/files/documents/2022/01/annual-ui-report-2020-fina_0.pdf; DOCCS Fact Sheet, Dec. 1, 2022, available at: https://doccs.ny.gov/system/files/documents/2022/12/doccs_fact_sheet-december_2022_0.pdf

31      DOCCS Unusual Incident Report, January – December 2020, with Ten-Year Trends from 2011 – 2020, available at: https://doccs.ny.gov/system/files/documents/2022/01/annual_ui-report-2020_fina_0.pdf

| Unusual Incidents[32] | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Assault on Staff by Incarcerated Person | 563 | 524 | 645 | 747 | 895 | 759 | 800 | 972 | 1034 | 1048 | 1177 | 1351 |
| Assaults between Incarcerated People | 666 | 652 | 767 | 860 | 915 | 1135 | 1225 | 1165 | 1264 | 1205 | 1108 | 1340 |
| Weapons Used by Staff | 170 | 143 | 203 | 191 | 205 | 293 | 714 | 1217 | 1847 | 1930 | | |
| Staff Use of Force | 835 | 847 | 1011 | 1111 | 1261 | 1106 | 1541 | 2084 | 2678 | 2607 | | |
| Use of Force with Chemical Agents | 51 | 56 | 65 | 55 | 55 | 191 | 590 | 1089 | 1716 | 1793 | | |

In a case dismissing NYSCOPBA's lawsuit to block implementation of the HALT Law, the United States District Court judge in the Northern District of New York found that an "upward trend beginning in 2012, when changes to solitary confinement practices did not begin until 2016, offers little persuasive value."[33]

During the same 10 year period that has seen a continuous increase in reported violence, the ratio of staff to incarcerated people has increased to one security staff person for every 1.77 incarcerated people, as the number of people incarcerated has declined at a faster rate than security staff.[34] This increase follows a longer trend over the last more than two decades that has seen the staff to incarcerated person ratio nearly double compared to 1999 when there was one security staff person for every 3.29 people in prison.[35]

| Staffing[35] | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Incarcerated People | 55,979 | 54,865 | 54,142 | 53,103 | 52,344 | 51,466 | 50,271 | 47,459 | 44,334 | 34,446 | 30,746 |
| Security Staff | 19,647 | 19,192 | 19,145 | 19,002 | 19,360 | 19,233 | 19,242 | 19,295 | 19,072 | 18,541 | 17,415 |
| Ratio | 2.85 | 2.86 | 2.83 | 2.79 | 2.70 | 2.68 | 2.61 | 2.46 | 2.32 | 1.86 | 1.77 |

---

32    Data in this chart between 2011 and 2020 comes directly from DOCCS Unusual Incident Report, January – December 2020, with Ten-Year Trends from 2011 – 2020, available at: https://doccs.ny.gov/system/files/documents/2022/01/annual-ui-report-2020-final_0.pdf. Data in this chart for 2021 and 2022 comes from DOCCS Fact Sheet, Dec. 1, 2022, available at: https://doccs.ny.gov/system/files/documents/2022/12/doccs-fact-sheet-december-.

33    Mae A. D'Agostino U.S. District Judge, NYSCOPBA v. Hochul et. al., 2022 WL 2180050, June 16, 2022.

34    DOCCS Fact Sheet, Oct. 1, 2022, available at: https://doccs.ny.gov/system/files/documents/2022/10/doccs-fact-sheet-october-2022_0.pdf.

35    The data in this chart comes directly from DOCCS monthly fact sheets. DOCCS Fact Sheet, Oct. 1, 2022, available at: https://doccs.ny.gov/system/files/documents/2022/10/doccs-fact-sheet-october-2022_0.pdf.

New York prisons have a much higher security staff to incarcerated person ratio than the national average. According to the latest data from the national Bureau of Justice Statistics: in federal facilities there is a ratio of one security staff person to every 10 incarcerated people, in private facilities there is an average ratio of one security staff person to every nine incarcerated people, and in state facilities across the country there is an average ratio of one security staff person for every five incarcerated people,[36] meaning New York State has a staff to incarcerated person ratio nearly three times higher than the average for state facilities and nearly six times higher than federal facilities.

## 2. Other Factors May Contribute to Risks of Violence

Some incarcerated people have also reported that violence stems from a lack of programs, policies perceived as counterproductive, and actions taken by staff that are perceived by incarcerated people as unfair or abusive. For example, some people incarcerated at Elmira reported during CANY monitoring that violence that happens at Elmira is a direct result of a lack of programming at the prison. Incarcerated people have also alleged that staff have increased false tickets, including false tickets for assaults on staff after staff have assaulted an incarcerated person. Many people have alleged that such misconduct was intentionally carried out as collective retaliation for HALT passing or to undermine the HALT Law. CANY has received numerous specific allegations of staff assaults in correspondence and during CANY monitoring visits to Upstate, Orleans, Coxsackie, Midstate, Marcy, and Albion.

For example, according to a person CANY interviewed in the SHU at Marcy, who reported he was supposed to go home the following month until this incident happened: "They're setting people up with assaults on staff. The typical way they set people up is to tell people to put their hands on the wall, then they pepper spray them, and then they say you assaulted them. I was put on the wall for a pat frisk. They said I refused. I didn't. They immediately pepper sprayed me on my left side. Medical staff didn't decontaminate me, and they brought me to the SHU. They punched and hit me. They gave me a false ticket. They're very racist. They said I'm a 'no good nigger and this is what happens when you mess with staff.' I haven't been in the box since 2016. Why would I wait until right when I'm about to go home to have my first assault on staff?"

Taken all together, an increase in reported violence could be attributable to several factors inside the prisons. As the Court stated in dismissing the lawsuit brought by NYSCOPBA, "it is difficult for the Court to assume that the increase in violence in New York prisons is attributable to any one factor. ... It is particularly difficult for the Court to attribute the increase in violence solely to solitary confinement reform."[37]

---

36    Laura M. Maruschak and Emily D. Buehler, Census of State and Federal Adult Correctional Facilities, 2019 – Statistical Tables, U.S. Department of Justice, Bureau of Justice Statistics, Nov. 2021, available at: https://bjs.ojp.gov/content/pub/pdf/csfacf19st.pdf.

37    Mae A. D'Agostino U.S. District Judge, NYSCOPBA v. Hochul et. al., 2022 WL 2180050, June 16, 2022.

# The First Eight Months of HALT Implementation

## Observed Benefits

The HALT Law has reduced the use of segregated confinement and provided opportunities for out-of-cell group engagement and programming for people who have long SHU sanctions.

### Reductions in the Use of Segregated Confinement

The HALT Law has led to dramatic reductions in the number of people in segregated confinement and the lengths of time people are spending in segregated confinement. For example, following passage of the HALT Law, DOCCS officially ended the practice of keeplock, a form of disciplinary cell confinement. As noted above, in the years leading up to HALT's passage, DOCCS was sentencing people to keeplock sanctions more than 27,000 times per year.[38] For example, during CANY's monitoring visit to Upstate in March 2022, the administration reported that they had nine people left in keeplock and planned to have zero people by March 18, the deadline set by the department for ending keeplock.

On May 1, 2022, one month after HALT went into effect, there were 286 people in SHU, as of October 1, 2022 there were over 550 people in SHU[39] and as of December 1, 2022, there were 398 people in SHU.[40] Even with the increases after May, the number of people in SHU is dramatically lower compared to over 4,500 people in SHU on a given day in 2008 plus an unknown number of people in keeplock,[41] 4,000 people in SHU on a given day in 2015,[42] 1,740 people in SHU on a given day[43] in July 2021 plus more than 1,000 people in keeplock[44] for a total of over 2,700 people, and nearly 1,800 people in SHU on a given day[45] plus an unknown additional number of people in keeplock just prior to HALT's implementation in February 2022.

---

38    Trapped Inside: The Past, Present, and Future of Solitary Confinement in New York, New York Civil Liberties Union, Oct. 2019, available at: https://www.nyclu.org/sites/default/files/field_documents/201910_nyclu_solitary_web.pdf.

39    DOCCS, HALT Semi-Annual Report, May to October 2022, available at: https://doccs.ny.gov/system/files/documents/2022/10/halt-semi-annual-report-2022-may-october.pdf.

40    DOCCS, HALT Monthly Report, Dec. 1, 2022, https://doccs.ny.gov/system/files/documents/2022/12/halt-monthly-report-november-2022.pdf.

41    Correctional Association of New York, Mental Health Services in NY Prisons, Testimony before the Hearing of the NYS Assembly's Corrections and Mental Health Committees, p. 19, Nov. 13, 2014, available at: https://static1.squarespace.com/static/5o2c07e2a9e02851b387477/t/5cba2ea3ec212a3c3698oab8/1555705508892/2014-Testimony-DOCCS+Mental+Health+Services.pdf.

42    Correctional Association of New York, Oversight and Investigations of DOCCS, Testimony before the Hearing of the NYS Assembly Committee on Correction, p. 75, Dec. 2, 2015, available at: https://static1.squarespace.com/static/5o2c07e2a9e02851b387477/t/5cb9f86b15fcc0b12fa4cc72/1555691831861/2015-Oversight-of-DOCCS-Testimony.pdf.

43    DOCCS Fact Sheet, July 1, 2021, available at: https://doccs.ny.gov/system/files/documents/2021/07/doccs-fact-sheet-july-2021.pdf.

44    DOCCS did not publicly report on the number of people in keeplock in a general population cell or other cell that is not a SHU. Based on past prison monitoring visits, CANY previously made a conservative estimate that there had been approximately 1,000 people in keeplock outside of a SHU on any given day. This estimate is likely a low estimate given that at this time, as noted above, there were over 27,000 sentences to keeplock in a given year.

45    DOCCS Fact Sheet, May 1, 2022, available at: https://doccs.ny.gov/system/files/documents/2022/05/doccs-fact-sheet-may-2022.pdf.

CANY has met people during its monitoring in 2022 who had spent years in SHU, including in administrative segregation. After HALT went into effect, some of these individuals moved out of SHU for the first time in decades. Some DOCCS and OMH staff have expressed the positive nature of the transition away from segregated confinement. DOCCS medical staff at one prison CANY monitored, for instance, reported their belief that implementing HALT and utilizing more programming will be a positive, particularly from a mental health perspective. Some DOCCS counseling staff also said they were enthusiastic about the implementation of HALT. Similarly, Office of Mental Health administrators and staff at multiple prisons reported that implementation of HALT was a positive development.

## Operation of Out-of-Cell Group Programming and Engagement

The HALT Law has led to people in disciplinary confinement having access to some out-ofcell group programming and activities. For example, 69% of people interviewed in the RRU at Orleans – which had a capacity to hold 124 people and held 97 people at the time of CANY's monitoring – reported that they had access to two modules per day of out-of-cell programming, with reports that each module generally lasted three hours and involved eight to ten people. Although there were overall mixed reviews and many people incarcerated across RRUs expressed concern that the isolating conditions of the RRU were akin to SHU, several incarcerated people at Orleans and Albion appreciated that, unlike in SHU prior to HALT, they now had opportunities for out-of-cell time and programming with other people, as well as the ability to have their property with them. For example, one person in Albion's RRU – which held nine people at the time of CANY's monitoring – reported that that the RRU felt "a lot more humane" than the SHU and it "helps if you're depressed to get out of cell." Similarly, one person in Orleans' RRU reported that "everyone's getting more opportunities to spend time out-of-cell and now we have our property. The RRU is better than the SHU." Another person at Orleans reported, "RRU is a good program. It helps me recognize my decision making and helps me to be a better person", while another person in the Orleans RRU stated, "RRU gives a little time to rehabilitate our decision-making and it keeps us in a population setting with other people. I think it's good. We give each other therapeutic support. We are able to talk to each other rather than yelling on the gate. You can talk to someone face to face."

As one person in Coxsackie's RRU reported, "It's a good program because you get to keep your personal property and you can socialize with others and you have time outside." Others in Coxsackie's RRU similarly reported that it was positive that "it gets me out of cell and gives me something to do" and "you can come out and be in a social environment." Similarly, one person interviewed by CANY in the Upstate RRU reported, "The RRU is the best thing to happen to this facility. It was terrible before the RRU. You get to come out of your cell and have classroom time. I get my property."

Some staff and administrators also expressed their view that the RRU has been a positive development. One administrator CANY met with several months after HALT implementation said the RRU is "really positive," and that it has been a very positive development to see "more programs, people coming out of their cells, and people sitting in groups and actually doing it – actively participating in programs." Similarly, a medical provider CANY met with several months after HALT implementation said the new law was having a positive impact. This medical provider said, "isolation is not a good thing for anyone. The fact that programs have been developing and people are participating is having a positive impact." The administration at Orleans reported that many staff put in bids to work in the RRU.

# Observed Challenges

## Location and Approach to the RRUs

DOCCS staff and incarcerated people have raised concerns about the location of the RRUs and the impacts on both program space and recruitment of program and treatment staff. For example, during CANY's monitoring visit to Upstate, some staff questioned the decision to have an RRU at Upstate – the largest RRU in the state holding over 550 people daily with reported plans to expand further. Some staff reported their belief that it would have been better to have the RRUs at prisons where there was a history of programs and where there was already program staff and program space. Other staff questioned the construction, which began prior to HALT's passage following 2019 DOCCS regulations that were much more limited than HALT, of space in a basement to use for programming. Staff said that the space for the classrooms that was in the basement looked like a "dungeon down there," and asked, "why are they building classrooms in a basement when they could have built a beautiful building outside." CANY observed classrooms with low ceilings and no windows to the outside. The administration reported that the space had previously been used for storage. Several people interviewed in the Upstate RRU in November 2022 also reported concerns about the programming taking place in the basement.

Regarding recruitment of staff for operating the RRUs, both staff and the administration at Upstate, which is located in Malone, NY, reported that it would be challenging to hire the personnel they need to have to operate the RRUs. Specifically, because Malone is in a relatively remote rural area in the North Country near the Canadian border, DOCCS and OMH staff and administrators indicated it would be difficult to find licensed psychologists, social workers, doctors, and other medical staff, and generally would be difficult to hire enough teachers and other program and therapeutic staff. CANY has documented staffing challenges in other regions of the state across clinical, administrative, educational, and vocational positions.

There are significant concerns about the suitability of using Upstate and other former SHU units, rather than facilities with more program-rich environments, as rehabilitative and therapeutic RRUs. At the same time, operating meaningful and effective programs has the

potential to transform the culture of a prison in profound and positive ways. The conversion of facilities that have historically operated exclusively for segregated confinement into RRUs will require ongoing support, qualified program and treatment staff, capital improvements, and oversight.

## Program and Treatment Staff for RRUs

As noted above, just prior to HALT's implementation the Upstate administration reported difficulty in being able to hire program and mental health staff. At the time of CANY's November monitoring visit to Upstate, the prison still had not been able to hire for three new positions for licensed social workers for operating RRU programming, and the administration reiterated its view that it is "hard to recruit up here." Similarly at Orleans, the administration reported that they got off to a "rocky start" with HALT implementation because they did not have the necessary program staff. The administration reported that chaplains and the librarian covered some classes. Security staff at Coxsackie reported a lack of civilian and mental health staff to implement the HALT Law, leaving officers to "act as counselor and mental health professional", particularly on nights and weekends. Some people incarcerated in the general population raised concerns that program staff had been pulled from their programs to cover unfilled RRU program staff, and even to help build RRU space. Staff at various prisons also expressed concern about a lack of training and preparation for implementing HALT.

## Segregated Confinement in SHUs and RRUs

### 15 Day Limit

The HALT Law specifies that no person may be held beyond 15 consecutive days in segregated confinement. When the law first went into effect, the department was reportedly holding 286 total people in segregated confinement in SHU and only two people in segregated confinement in SHU past 15 days on May 1, 2022, with the longest time in SHU of 16 days. Over the next five months, the number of people in segregated confinement in SHU and the number in SHU beyond 15 consecutive days rose significantly.

On October 1, 2022, 551 people were reported in segregated confinement, and 288 people, or over 52%, had been in segregated confinement for more than 15 days. Nearly 42% of all people in segregated confinement had been held longer than 20 consecutive days, and over a quarter had been held between 31 and 89 days. As of December 1, the number of people in SHU was 398; 168 people, or over 42%, in SHU for more than 15 consecutive days.

Assessing the Early Months of Implementation of the
HALT Solitary Confinement Law in New York State Prisons

| Continuous Length of Stay in SHU[46] | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Days | Dec 1 2022 | | Oct 1 2022 | | Sept 1 2022 | | Aug 1 2022 | | July 1 2022 | | June 1 2022 | | May 1 2022 | |
| 1–7 | 121 | 30% | 151 | 27% | 146 | 27% | 142 | 29% | 124 | 29% | 143 | 36% | 178 | 62% |
| 8–15 | 109 | 27% | 112 | 20% | 118 | 22% | 120 | 25% | 138 | 32% | 129 | 32% | 106 | 37% |
| 16–20 | 40 | 10% | 57 | 10% | 71 | 13% | 68 | 14% | 69 | 16% | 69 | 17% | 2 | 1% |
| 21–30 | 88 | 22% | 95 | 17% | 119 | 22% | 110 | 22% | 75 | 18% | 57 | 14% | 0 | 0% |
| 31–90 | 40 | 10% | 136 | 25% | 86 | 16% | 50 | 10% | 19 | 4% | 4 | 1% | 0 | 0% |
| Total | 398 | 100% | 551 | 100% | 540 | 100% | 490 | 100% | 425 | 100% | 402 | 100% | 286 | 100% |
| Max LOS | 65 | | 89 | | 63 | | 72 | | 42 | | 38 | | 16 | |
| Over 15 | 168 | 42% | 288 | 52% | 276 | 51% | 228 | 47% | 163 | 38% | 130 | 32% | 2 | 1% |

CANY's monitoring visits confirmed these trends. For example, CANY interviewed people in both the SHU and RRU at Orleans, Coxsackie, and Upstate, as well as people in the SHU at Marcy and Midstate, who had been held in SHU beyond 15 days. Of the 73 people CANY interviewed in the RRU at Upstate who responded to the question, 96% reported that they had spent more than 15 consecutive days in SHU since HALT went into effect, with the median length of reported time in SHU being 37 days and many people for multiple months. Over 80% of the people CANY interviewed in Marcy's SHU on October 12, 2022, had been in SHU past 15 days, including up to 45 days. Similarly, at the time of CANY's monitoring at Midstate on October 13 and 14, 2022, according to information provided by DOCCS, 70% of the 20 people in the traditional SHU had been held for longer than 15 consecutive days, half had spent more than 20 days, over a third had spent more than 35 consecutive days, and 30% had spent more than 50 days, with multiple people spending over 60 consecutive days.

DOCCS reported that excessive stays in SHU were caused by capacity issues in the RRUs across the state, causing long wait lists and delays in transfers from SHUs to RRUs. On a November 29, 2022 call, DOCCS officials reported that a new RRU would open soon, which was anticipated to reduce delays in these transfers and help the department adhere to the 15 day limit. Issuing SHU/RRU sanctions only for conduct that meets the HALT criteria and following HALT's mechanisms for release from RRUs and SHU may significantly reduce the number of people in SHU and RRU and ease RRU capacity issues.

---

46      The raw data in this chart come from DOCCS semi-annual report on HALT and DOCCS monthly report for Dec. 1, 2022. DOCCS did not publish a report with data for Nov. 1, 2022. The percentages in the chart were calculated by dividing the number of people for each timeframe divided by the total number of people in segregated confinement.

## Special Populations

HALT excludes "special populations" from being placed in segregated confinement, including any person as defined in section 292(21) of the Executive Law with a "physical, mental, or medical impairment . . . demonstrable by medically accepted ... diagnostic techniques." In other words, HALT prohibits anyone with a mental health diagnosis, including anyone on the state Office of Mental Health caseload, and anyone with a physical or cognitive disability diagnosis from being placed in segregated confinement.

DOCCS has been placing people with such diagnoses in segregated confinement. For example, on October 1, 2022, DOCCS reported that it held 207 people on the OMH caseload in segregated confinement in SHU, nearly 38% of all people reported in segregated confinement that day. Each month of DOCCS' reported data reveals that on any given day between 33% and 39% of all people reported in segregated confinement are on the OMH caseload.

| Percentage of People on OMH Caseload in SHU and RRU[47] | | | | | | |
|---|---|---|---|---|---|---|
| OMH | SHU | % | RRU | % | Total | % |
| December 1, 2022 | 155 | 38.94% | 594 | 38.85% | 749 | 38.87% |
| October 1, 2022 | 207 | 37.57% | 536 | 38.29% | 743 | 38.08% |
| September 1, 2022 | 211 | 39.07% | 550 | 38.19% | 761 | 38.43% |
| August 1, 2022 | 176 | 35.92% | 529 | 37.54% | 705 | 37.12% |
| July 1, 2022 | 142 | 33.41% | 553 | 38.09% | 695 | 37.03% |
| June 1, 2022 | 140 | 34.83% | 492 | 37.61% | 632 | 36.96% |
| May 1, 2022 | 96 | 33.57% | 471 | 39.55% | 567 | 38.39% |
| Total | 972 | 36/08% | 3131 | 38.18% | 4103 | 37.67% |

---

[47]    The data in this chart was derived from data in DOCCS' monthly HALT reports from May 1 through Dec. 1. The data in this chart was derived by adding together the number of people reported in segregated confinement on each date on the OMH caseload (levels 1 to 4, which are the levels at which people are receiving mental health services) and dividing that number by the total number of people reported in segregated confinement on that date.

## Disciplinary Tickets Resulting in SHU and RRU Sanctions

As a general matter, the HALT Law requires a shift away from the use of disciplinary sanctions to deescalation, incentives, and other alterative interventions and only allows disciplinary tickets or disciplinary confinement sanctions as a last resort, only if nondisciplinary interventions have failed or, in situations specified in the law the department determines non-disciplinary interventions would not succeed. In addition, HALT specifically prohibits placement in segregated confinement beyond 3 days or placement in an RRU unless a person meets the very strict criteria of both having committed one of the specific enumerated acts in the law under section 137(6)(k)(ii) and such act was so "heinous or destructive" as to present "a significant risk of imminent serious physical injury."

DOCCS issued more than 6,500 SHU sanctions in the first six months of HALT implementation, more SHU sanctions than it did prior to HALT in a comparable time period.[48]According to an analysis of DOCCS data by New York Focus, in the first six months after HALT went into effect, at least nearly 1,200 sanctions – or over 18% – were for conduct that categorically did not meet the listed acts specified in the HALT Law, and thousands of additional sanctions – upwards of two-thirds of all SHU sanctions – may not have met the criteria of conduct that can result in placement in segregated confinement or RRUs.[49]

## Racial Disparities

DOCCS is imposing disciplinary confinement disproportionately on people of color, and particularly Black people. According to DOCCS data on the number of people in segregated confinement and RRUs on the first of each month between May 1 and December 1,[50] over 64% were Black, nearly 23% were Hispanic, less than 10% were white, and over 3% were of other or unknown race and ethnicity.[51]

---

48    DOCCS, HALT Semi-Annual Incident List, April through Sept. 2022, available at: https://doccs.ny.gov/system/files/documents/2022/10/halt-semi-annual-incident-list-2022-april-september.pdf. The issuance of SHU sanctions at a rate of 13,000 per year since HALT went into effect is higher than the latest available data noted above, when DOCCS issued 10,466 SHU sanctions over the course of the year in 2018. Taking the total prison population also into account, the rate of SHU sanctions has nearly doubled, since there were approximately 47,000 people in New York prisons on a given day in 2018 and approximately 31,000 people currently. As discussed above, DOCCS had also issued over 27,000 keeplock sanctions in 2018 and DOCCS is no longer officially imposing keeplock sanctions. Still, the increased imposition of SHU sanctions is particularly relevant for assessing the application of the restricted criteria under HALT for placement in segregated confinement and RRUs.

49    Chris Gelardi, Lesser Infractions Aren't Supposed to Land You in Solitary Confinement. They Do Anyway, New York Focus, Oct. 24, 2022, available at: https://www.nysfocus.com/2022/10/24/lesser-infractions-halt-solitary-confinement/.

50    DOCCS, HALT Semi-Annual Report, May to October 2022, available at: https://doccs.ny.gov/system/files/documents/2022/10/halt-semi-annual-report-2022-may-october.pdf; DOCCS Fact Sheet, Dec. 1, 2022, available at: https://doccs.ny.gov/system/files/documents/2022/12/doccs-fact-sheet-december-

51    CANY is utilizing the demographic categories for race and ethnicity used by DOCCS: Black, White, Hispanic, and Other/Unknown.

Assessing the Early Months of Implementation of the
HALT Solitary Confinement Law in New York State Prisons

| Race/Ethnicity in SHU & RRU May 1 – Dec 1, 2022[52] | | | | | |
|---|---|---|---|---|---|
| Race/Ethnicity | SHU | RRU | SHU & RRU | All of DOCCS | All of NYS |
| Black | 61.51% | 64.89% | 64.07% | 48.7% | 17.6% |
| White | 12.52% | 8.83% | 9.72% | 23.1% | 54.7% |
| Hispanic | 22.28% | 22.99% | 22.82% | 24.1% | 19.5% |
| Other/Unknown | 3.69% | 3.29% | 3.39% | 4.0% | 8.2% |

During CANY monitoring visits, many people spoke to their perception of racial discrimination in the disciplinary process. As one person at Albion reported, "everyone Black is getting done wrong" and Black people "get more discipline for speaking out." Similarly, as one person reported at Coxsackie's RRU regarding staff using racial slurs, "It is systematic racism, like modern day slavery." Of note, 87.5% of people interviewed in Coxsackie's SHU self-identified as Black and everyone identified as Black or Hispanic.

In addition to the disciplinary process itself, many people across prisons CANY monitored reported additional racialized abuse by staff. For example, nearly 71% of people interviewed in the RRU at Upstate and multiple people in the Upstate SHU reported they had personally seen or experienced racialized abuse by staff at Upstate. For example, numerous people in the Upstate RRU reported being called various racial slurs, including "nigger", "George Floyd", "boy", "filthy animal", and "monkey". Similarly, multiple people in the Orleans and Coxsackie SHU and RRU reported staff use of racial epithets such as calling people "nigger", "savages", "monkey", or "porch monkey", with 46% of people interviewed in the Orleans RRU and 27% of people in the Coxsackie RRU reporting they had personally experienced or witnessed racialized abuse by staff.

The New York State Inspector General's November 2022 report underscored the longstanding vast disparities in the issuance of disciplinary tickets to Black and Hispanic people. According to the report, over a six year period, Black people were 22% more likely and Hispanic people were 12% more likely than white people to be issued a disciplinary ticket in New York's prisons.[53]

---

52    The SHU, RRU, and SHU & RRU data in this chart is derived by adding together DOCCS' reported number of people in segregated confinement and RRUs in each race and ethnicity category in each of DOCCS' monthly reports and dividing by the total sum of all people in segregated confinement and RRUs in each of DOCCS' monthly reports. The data on race and ethnicity for all of DOCCS comes directly from DOCCS, Incarcerated Profile Report, p. 2, Sept. 2022, available at: https://doccs.ny.gov/system/files/documents/2022/09/2022 09 01-uc-profile.pdf. The data on race and ethnicity for all of New York State comes from DOCCS, Incarcerated Profile Report, September 2022, available at: https://doccs.ny.gov/system/files/documents/2022/09/2022 09 01-uc-profile.pdf.

53    Lucy Lang, Inspector General, Racial Disparities in the Administration of Discipline in New York State Prisons, Nov. 2022, https://ig.ny.gov/system/files/documents/2022/12/oig-doccs-racial-disparities-report-12.1.22.pdf.

## RRU Environment

As noted in the summary of the HALT Law above, the law requires RRUs to be "therapeutic and traumainformed", provide "therapy, treatment, and rehabilitative programming", and "aim to address individual treatment and rehabilitation needs and underlying causes of problematic behaviors". RRUs should hold people in the least restrictive environment possible and generally provide access to at least seven hours of daily out-of-cell staff-led, peer-led, or volunteer-led group programming, recreation, and activities, including programming comparable to core programs in the general population, work assignments comparable to the types of work assignments in the general population, and additional therapeutic programming aimed at addressing underlying behaviors.

During CANY's March 2022 monitoring at Upstate prior to HALT's implementation, the administration reported that they intended to operate the RRU programming like a classroom in a medium security prison. Similarly, in testimony before the New York State legislature in February 2022,[54] Commissioner Anthony Annucci reported that with implementation of HALT, "I believe that we will change behavior for the better. We're not just providing them out-of-cell time. Other systems will provide out-of-cell time, let them play cards. We are really trying to focus on the behavior that got them into segregated confinement to begin with."[55] In the RRUs it has monitored this year, CANY found that the environment and the operation of the units are not yet meeting these expectations. Although some people interviewed in RRUs reported the positive benefits of having some access to out-of-cell group programming, people across RRUs reported their overall experience of the RRUs as punitive and isolating. People described the impact of the RRU, for example, as "awful mentally and emotionally" or causing "suffering and stress on the brain," with a number of people viewing their experience as "just like the SHU" or the "same as SHU – hostile environment."

### Out-of-Cell Group Programs and Activities

At the RRUs monitored by CANY since the HALT Law went into effect, and in RRUs CANY has received communications about, incarcerated people seem to not be receiving access to adequate out-of-cell group programming and activities. HALT requires that people in an RRU generally have access to at least seven hours of daily out-of-cell congregate programs, recreation, and activities. The amount of out-ofcell time varied amongst the RRUs at the four prisons monitored.

At Upstate, the administration and people incarcerated reported that people only have access to, at most, three hours of time outside of their cells per day for programming and do not have access to any congregate recreation. People are officially only offered one

---

54      New York State Joint Budget Hearing – Public Protection, Transcript, p. 374, January 25, 2022, available at: https://legislation.nysenate.gov/pdf/hearings/PublicProtection2022.txt/.

55      New York State Joint Budget Hearing – Public Protection, Transcript, p. 374, January 25, 2022, available at: https://legislation.nysenate.gov/pdf/hearings/PublicProtection2022.txt/.

threehour module per day outside of their cells. As one person in Upstate's RRU reported, "We are supposed to participate in the RRU program for six hours [plus an additional one hour of recreation]. We only get two hours. We are in a cell all day." At Coxsackie, roughly 79% of people interviewed in the RRU reported that they were not receiving at least six hours of out-of-cell programming per day and 70% reported that they were only out of their cell for programs one module per day. In turn, people in the RRU at Coxsackie reported that they had access to three hours of out-of-cell programming per day in either the morning or the afternoon, rather than both. As one person interviewed at Coxsackie reported, people in the RRU are "always caged up in a cell or outside, or in a RESTART chair." As discussed above, the Orleans and Albion RRUs officially provided more out-of-cell group engagement, namely six hours per day during weekdays. People are offered three hours of out-of-cell programming in a room with other people and an additional three hours outof- cell for "therapeutic recreation." These programs are conducted while incarcerated people are shackled to restraint chairs.

Staff reported at several prisons that many incarcerated people have chosen not to participate in programming. Many incarcerated people in different RRUs reported that staff had denied them the ability to participate in programming. Many people in the RRUs also reported deciding not to participate in programs for various reasons, including because they did not have access to mandatory programs or think the programs were helpful, because of being automatically shackled during programming, because they weren't given time cuts or other incentives to participate in programs, because of feeling tired or not up for participating, or because they did not want to interact with security staff.

At Upstate, in addition to those reasons for not participating in RRU programming, during CANY's November 2022 monitoring, numerous incarcerated people also complained about a change in incentives for program participation. Participants described how the prison had been operating an incentive program that had been working well, where people who participated in programs could receive incentives such as time cuts, extra commissary buys or visits, and/or food and clothes packages.

In the fall of 2022, these incentives were stopped, with people instead being able to obtain "incentives" of hygiene products or products to clean their cell, causing frustration among people in the RRU. As one person CANY interviewed in the Upstate RRU reported, "They are trying to create a hostile environment to get rid of the program. The COs are fake boycotting the program. They are trying to use fake assaults. There are no incentives so people don't want to go to programs. They're not giving time cuts. They took packages away. This is supposed to be a rehabilitative program."

According to DOCCS data on Upstate RRU participation throughout October 2022 and two weeks of November 2022, on average less than 29% of people in the RRU participate in any programming on a given day.

## Core Programs and Program Quality

The HALT Law requires that people in an RRU have "access to programs and work assignments comparable to core programs and types of work assignments in general population," as well as "access to additional out-of-cell, trauma-informed therapeutic programming aimed at promoting personal development, addressing underlying causes of problematic behavior resulting in placement in a residential rehabilitation unit, and helping prepare for discharge from the unit and to the community." Despite these requirements, people in the RRUs have raised both concerns about not receiving access to core programs and concerns about the quality and therapeutic nature of the programming that is provided.

With respect to core programs, according to the prison administrations, no one in the RRU at Orleans, Coxsackie, Albion, or Upstate had access to any core programs. When asked if they received programs consistent with those they would receive in general population, 99% of people interviewed in the Upstate RRU, 95% of people interviewed in the Orleans RRU, and 94% of people interviewed in the Coxsackie RRU reported that they did not. Many people across the prisons complained about the lack of access to these core programs, especially aggression replacement training (ART) and substance use treatment (ASAT). As one person at Orleans lamented, the RRU "doesn't have programs we need to go home." Similarly, an individual at Upstate reported, "The RRU is good. The program is not bad. I go to program every day. But they should have ASAT, ART, and school so that while we're here we can still work on going home. When I get out of the box, I will have six months until my conditional release date. Since I am not getting programs here, now I will have to max out." The administration at Upstate also lamented the lack of core programs and expressed the desire to be able to provide such programs. Upstate had operated a small ASAT program for people in SHU and the program was discontinued when the prison started operating the RRU.

The lack of access to core programs – such as education, vocational, ASAT, and ART – is concerning given the tremendous need for these core programs among people in the RRU. For example, according to DOCCS data in its October 2022 monthly HALT report, 1,117 people in the RRU had a known substance use program need, representing nearly 80% of all people in an RRU. Meanwhile, no one in the RRU with a substance use program need was enrolled in a substance use program and only 84 people, or 7.5% of all people in the RRU with a substance use program need, had already completed a substance use program during their incarceration.

| Oct 2022 Substance Abuse Program Participation[56] | SHU | % of Need | RRU | % of Need |
|---|---|---|---|---|
| ASAT Need | 434 | | 1117 | |
| % Total with ASAT Need | 78.77% | | 79.79% | |
| Satisfied | 44 | 10.14% | 84 | 7.52% |
| In Program | 6 | 1.38% | 0 | 0.00% |
| Incomplete Participation | 91 | 20.97% | 452 | 40.47% |
| Did Not Participate | 293 | 67.51% | 581 | 52.01% |
| Total Not Satisfied | 390 | 89.86% | 1033 | 92.48% |
| % Not Satisfied in Program | 1.54% | | 0.00% | |
| % Not Satisfied Not in Program | 98.46% | | 100.00% | |

With respect to the requirement for additional therapeutic programming, 79% of people interviewed in the Upstate RRU, 82% of people interviewed in the Orleans RRU, and 93% of people interviewed in the Coxsackie RRU reported they did not have access to trauma-informed therapeutic programming. Office of Mental Health (OMH) staff at Coxsackie reported during CANY's monitoring in July 2022 that OMH was not involved in any programming in the RRU and that there had not been any agreement made with DOCCS about what role OMH would play in RRU programming. Similarly, OMH does not carry out programming in the Orleans or Upstate RRUs; staff indicated Orleans is an OMH level 6 facility and shares OMH staff with Albion. Meanwhile, 46% of people interviewed in the Upstate RRU and 22% of people interviewed in the Coxsackie RRU reported being on the OMH caseload.

Similarly, 80% of people interviewed in the RRU at Orleans, 64% of the people interviewed in the Upstate RRU, and 59% of people interviewed in the Coxsackie RRU reported that they had unaddressed mental health needs. Others raised concerns about a lack of confidentiality because they have to speak to mental health counselors while they were

---

56       The raw data in this chart comes from DOCCS Fact Sheet, Oct. 1, 2022, available at: https://doccs.ny.gov/system/ files/documents/2022/10/doccs-fact-sheet-october-2022 0.pdf. The "Total Not Satisfied" is derived by subtracting the number of people in the SHU or RRU, respectively) who have already satisfied ASAT from the number of people in the SHU or RRU, respectively with an ASAT need. The "% Not Satisfied in Program" is derived from dividing the number of people in the program in the SHU or RRU respectively by the Total Not Satisfied in the SHU or RRU respectively. The "% Not satisfied Not in Program" is derived from adding up all of the people who are not in a program (incomplete participation and did not participate) and dividing that sum by the Total Not Satisfied.

confined in their cell, with correction officers nearby, their cellmate also present, and other incarcerated people able to hear. For example, one person interviewed in the Upstate RRU reported, "I need help, but the counselors always come by with a CO and I need privacy to be able to talk to them. I also don't want to talk to them when my bunky is right there."

Nearly 10% of people interviewed in the Upstate RRU reported they had attempted to harm themselves in the Upstate RRU. For example, one person CANY interviewed in the Upstate RRU showed recent selfharm scars on his wrist, and another spoke about an attempt to hang himself. During CANY's November monitoring visit to Upstate, the administration reported that two people who had been in the RRU at Upstate died in the fall of 2022, including one by suicide and the other with the cause of death still being investigated. CANY also received information that an individual in the RRU at Greene and an individual in the Five Points RMHU, and two people in the Marcy RMHU died in December 2022.

More generally, people in the RRUs raised concerns about the quality of the programming in the RRU, including concerns about having outdated workbooks or program material that were not relevant to their experiences or needs.

## Shackling

A common concern people across the RRUs raised with CANY was the automatic RRU-wide use of restraints. The HALT Law prohibits the use of restraints during out-of-cell activities in the RRUs "unless an individual assessment is made that restraints are required because of a significant and unreasonable risk to the safety and security of other incarcerated persons or staff." However, incarcerated people, as well as staff and administrators, reported that all movement outside of their cells involved being restrained and that programs, therapy and classes took place while shackled in RESTART chairs.

One woman in the RRU at Albion reported suffering from chronic pain and swelling in her legs, which required her use of a wheelchair. She reported that her legs were shackled while in the RESTART chair during programming. Another woman incarcerated at Albion lamented that her hands were restrained behind her back as she moved, and that she was shackled even in transit to and from the shower. Another person highlighted that incarcerated women were shackled and escorted by male officers and were unable to keep their shower bath robes closed if they came open due to the shackles. She reported that one person was ticketed for her robe coming undone, despite her hands being restrained.

## Congregate Recreation

Related to concerns about out-of-cell time and programming, information gathered and observed during CANY's prison monitoring visits raised concerns about the lack of access to out-of-cell congregate recreation for people in the RRUs.

Under the HALT Law, people in RRUs are required to have access to at least six hours of congregate out-of-cell time per day, which can include recreation. If recreation is included as part of the six hours of congregate out-of-cell time, it must be congregate to be part of the required out-of-cell time. For that seventh hour of out-of-cell time that must be designated for recreation, the HALT Law requires that recreation take place in a congregate setting, "unless exceptional circumstances mean doing so would create a significant and unreasonable risk."

While at Albion there were congregate recreation pens where multiple people in the RRU could be in the recreation pen at the same time; at Upstate and Orleans outdoor recreation for people in the RRU took place in the recreation pens that are an extension of people's cells; and outdoor recreation at Coxsackie's RRU took place in the previous SHU rec pens where individuals are placed alone. At all locations, and particularly at Upstate, Orleans, and Coxsackie, incarcerated people raised concerns about the lack of access to meaningful recreation opportunities, including concerns about being locked alone and not having any access to space or equipment for exercise. As one person interviewed in the Upstate RRU reported, "We are only supposed to be in our cell 17 hours a day. But we are only getting two and a half hours out a day. So we are still locked in twenty-one and a half hours a day. Being in the rec pen is not being out of cell. They're still trying to have us in the box. This is still the box. What's really the difference?"

At multiple prisons, the administration reported plans to build enclosed 17 by 30 foot metal recreation pens that could hold up to four people, with a metal table and basketball rim, rather than utilizing existing space for congregate recreation. The administrations at Orleans and Midstate reported that the projects were not likely to be completed for at least over a year, and there were no reported plans to provide people with access to congregate recreation in the meantime. Specifically, the administration at Orleans indicated that they planned to construct 11 congregate recreation pens, with a bidding process to begin in the fall of 2022 and construction to likely take approximately one year after the bidding process was completed. The administration at Midstate said there was a planned congregate recreation pen construction project but they did not know a timeline for when it would take place. At the time of CANY's November 2022 monitoring at Upstate, people in the RRU were not receiving access to congregate recreation, and there had not been bids put out for a project to build 34 congregate recreation pens.

## Disciplinary Sanctions and Mechanisms for Release

Beyond limiting the amount of time a person can spend in segregated confinement to 15 consecutive days, there are multiple mechanisms in existing law designed to limit the use of disciplinary confinement, shorten such sanctions, and release people from the RRUs. First, the HALT Law prescribes a shift away from the use of disciplinary sanctions, allowing the imposition of disciplinary confinement sanctions only as a last resort. Despite this

intended shift in approach, DOCCS continues to issue both high numbers of SHU sanctions and long disciplinary confinement sanctions.

For example, according to data provided by the DOCCS administration at Upstate, for the approximately 580 people in the Upstate RRU at the time of CANY's November 2022 monitoring, the median length of disciplinary confinement time a person had from the time they entered the Upstate RRU until their current discharge date was approximately six months. Roughly 43% of all people in the RRU at Upstate had a total of at least seven months until the end of their sanction, and some individuals had much lengthier RRU sanctions, including multiple years and some sanctions that extended past people's release date from prison. Looking at the sanctions another way, at the time of CANY's monitoring in November 2022, the median length of time a person had already spent in the Upstate RRU was approximately four months, with a number of people having spent nearly eight months already in the RRU– the entire time since the Upstate RRU was opened. The median length of disciplinary confinement sanction a person had remaining was over three and a half months.

Similarly, the median disciplinary sentence that people interviewed in the Orleans RRU reported was 150 days, with some people having up to a year disciplinary confinement sentence and over 46% of people reporting a disciplinary sentence of at least six months. One person reported that their disciplinary sentence went beyond their release date from prison. The median disciplinary sentence for people interviewed in the Coxsackie RRU was 105 days, over 44% of people interviewed reported a disciplinary sentence of at least four months, and the longest reported disciplinary sentence remaining was 10 months. At Elmira, the median disciplinary sentence for people in SHU was 75 days. The median disciplinary sentence length for people interviewed in the Albion RRU was four months, with the longest sentence being nine months.

In addition, people interviewed during CANY monitoring reported that DOCCS continues to issue disciplinary tickets to people while they are in RRUs, resulting in additional disciplinary confinement time and the denial of commissary, packages, visits, tablets, phone calls, property, good time, and more. For example, 56% of people interviewed in the Upstate RRU and over 41% of people interviewed in the Coxsackie RRU reported they had received additional disciplinary tickets while in the RRU. As one person in the Coxsackie RRU reported there is an "overuse of tickets. It is a very negative environment in the RRU and very punitive." Similarly, over 38% of people interviewed in the Orleans RRU reported they had received additional tickets while in the RRU. Multiple women interviewed in the Albion RRU also reported receiving further disciplinary tickets while in the RRU.

Apart from concerns regarding the issuance of disciplinary sanctions, there should be multiple opportunities under existing regulations and the HALT Solitary Law for people to have their disciplinary sanctions reduced and/or to be released from the RRU. Specifically, a settlement agreement in the case of Peoples v. Annucci, and New York Codes, Rules, and

Regulations section 255.1 have required, and continue to require, DOCCS to issue time cuts. Section 255.1 explicitly makes no distinction in the issuance of time cuts whether a person is serving their sanction in a SHU or RRU.

The Orleans administration stated during CANY's monitoring visit that they were no longer providing automatic time cuts to people in the RRU because of HALT, even though existing regulations related to time cuts remain in effect and were not changed by the HALT Law. On the other hand, OMH staff at Coxsackie reported that they review time cuts every week in the RRU and every two weeks in the RMHU, noted that the amount of time cut can vary from a week to several months, and stated that HALT had changed time cut rewards. At least one person in the RRU at Coxsackie reported that he had received a time cut. The DOCCS administration at Marcy reported that people in the RMHU were reviewed every 60 days for time cuts and that such reviews had taken place every 90 days before HALT. The Marcy administration also indicated that people can ask for a discretionary review in addition to the 60-day review and/or DOCCS or OMH staff can assign time cuts. The administration reported that on average time cuts are provided 12 times per month. They also reported that no one is ever released from an RMHU while their disciplinary sanction is still pending, although someone could have their time cut and then be released.

The HALT Law provides multiple additional mechanisms for release from an RRU and upon release requires any remaining disciplinary sanction to be dismissed. Specifically, a person must be released from an RRU if their disciplinary sanction expires or they complete their rehabilitation plan. In addition, DOCCS must carry out a review every 60 days of whether to release the person from the RRU, and if the person is not released must specify in writing what the person has to do in order to be discharged.

While staff at Upstate reported their belief that the programs in the RRUs should be incentive-based in order to encourage people to participate, many people interviewed in various RRUs reported concerns about the rehabilitation plans and 60 day reviews for people in the RRUs. A number of people at multiple prisons, including people who had been in the RRU for over six months, reported that they had not had a review, and, at some prisons, for those who did, they said the reviews were very short and unhelpful. In the Upstate RRU, 80% of the people CANY interviewed reported that they had not had a periodic review of their placement in an RRU. People also raised concerns that since core programs that people needed were not available, the plans and review process were not helpful. Some people did report they had a review and that meeting with a counselor was helpful. At Coxsackie's RRU, over 82% of people interviewed reported that they did not have a rehabilitation plan or were not aware of one. Roughly half of people interviewed in the Orleans RRU and 55% of the people in the Upstate RRU reported that they were not aware of having a rehabilitation plan at all, although a number of people interviewed in the Upstate RRU reported having a rehabilitation plan and having a conversation with a counselor when it was put together.

Case 1:24-cv-01001-LJV-JJM    Document 1-2    Filed 10/18/24    Page 127 of 157

Assessing the Early Months of Implementation of the
HALT Solitary Confinement Law in New York State Prisons

## Other Units

There are other units across the state where DOCCS seems not to be applying the HALT Law. CANY has monitored several such units since the HALT Law went into effect, including the Midstate Step-Down Program (SDP), the Orleans and Elmira protective custody units (PC), the Marcy and Coxsackie Residential Mental Health Treatment Units (RMHTU), and Elmira reception.

In addition to these specific units, CANY has concerns about the implementation of the law for incarcerated people held in general population, where monitoring has documented that some individuals routinely spend in excess of 17 hours each day in cell due to idleness (i.e., not being enrolled in programs or work assignments), lack of access to recreation yards, or other operational limitations. People in general population at multiple prisons also raised concerns about inadequate access to phone calls, expressing a desire to have the ability to make phone calls from tablets as individuals incarcerated in the SHU and RRU are able to do, and a lack of incentives, which has been exacerbated by the recent package restrictions and increasing commissary prices despite stagnant wages.

### Step-Down Units

DOCCS appears to be operating step-down units outside the requirements of the HALT Law. CANY monitored the Step-Down Program (SDP) at Midstate on October 13 and 14, 2022. Midstate's SDP is one of three step-down units in DOCCS prisons, and the only one that is a step-down to general population. The step-down units at Wende and Green Haven are step-downs to the outside community for people being released from prison. Overall, at the Midstate SDP, DOCCS is holding people in conditions that amount to segregated confinement but is still holding people in special populations in the SDP and holding people in the SDP for periods of time much longer than the HALT Law's 15 consecutive day limit, including upwards of a year and a half. According to DOCCS data, the median length of stay for everyone in the Midstate SDP on October 13, 2022 was 174 days and roughly 19% had been in the SDP for over 200 days including five people for over a year.

Specifically, according to both the Midstate administration and people incarcerated in the SDP, people in the SDP receive at most four or four and a half hours of out-of-cell time on a given day and may have access to less out of cell time on Fridays, Saturdays, and Sundays. The administration and incarcerated people also reported that all people in the SDP are always shackled during out-of-cell programming and during visits, are required to stay in the program at least nine months, are not afforded mechanisms of release, and instead may have their time in the SDP extended through negative information reports without the due process afforded for disciplinary tickets. Many people interviewed in the SDP reported that they never leave their cell, with some people indicating that they are not allowed to go out for out-of-cell programming. As one person interviewed in the Midstate SDP reported, "It is very stressful. I have been suicidal. The step-down is violating the law.

35

Supposed to be 15 days in SHU and then to population or an RRU. I have been here six months. We are not given seven hours out of cell." Another expressed the desire for peer-led programs: "No one can teach better than us. This program is not individualized and the people leading it don't know us and have never been around poverty. They can't relate to us and yet we are supposed to open up to them. They trigger people and then don't respond appropriately."

Administrators at Midstate expressed their own frustration that the profile of the individual now being sent to the SDP has changed since the HALT law, making programming more challenging to implement in what they previously had viewed as a successful program, which was designed to address the needs of incarcerated people with histories of assaults on staff.

## Residential Mental Health Treatment Units

Residential Mental Health Units (RMHUs) are units designed for people with a designated "serious mental illness." The HALT Law requires that people in the RMHUs receive the protections of the RRUs, including access to at least seven hours of daily out-of-cell group programming and activities. Incarcerated people, staff, and administrators at the RMHUs at Coxsackie and Marcy reported that these units have generally continued to operate as they did before the HALT Law went into effect. For example, OMH staff at Coxsackie reported that there had not been changes in the daily operations of their RMHU – which held 31 people at the time of CANY's monitoring visit in July 2022. Staff also reported that people in the RMHU received four hours of out-of-cell programming, five days a week, and noted that people in the Behavioral Health Unit (BHU) at Great Meadow provided people with two hours a day of out of cell programming. Staff reported that people in the RMHU had more property and were receiving more recreation time on weekends than before HALT, but otherwise there had not been any changes made because of HALT.

Similarly, DOCCS and OMH administrators at Marcy reported that people in the RMHU – which held 75 people at the time of CANY's October 2022 monitoring visit – have access to four hours of out-of-cell programming per day, five days a week and no out-of-cell programming on weekends. Specifically, Monday through Friday people are offered two hours of out-of-cell programming in the morning and two hours of out-of-cell programming in the afternoon, and on Saturdays and Sundays there is no out of- cell programming. Recreation on all days of the week takes place alone in a recreation pen in the back of a person's cell. Both DOCCS and OMH administrators stated that nothing had changed with respect to programming as a result of HALT. Administrators indicated that the rec pens in the back of the cell were open for longer, including three hours during weekdays and seven hours on the weekends. The Marcy administration reported that the average length of stay in the RMHU was 9.7 months.

Incarcerated people in the RMHU have access to both DOCCS and OMH programming, in addition to one-on-one mental health care. According to Marcy administrators, programming for at least some people in the RMHU includes access to core DOCCS programs, including out-of-cell group education classes, ART, substance use treatment (in the form of an Integrated Dual Disorder Treatment), and OMH-led programming. As one person reported, the program is "good for mental health; the staff are trying to help." On the other hand, some people interviewed in Marcy's RMHU raised concerns about the quality of the programming and alleged staff misconduct. For example, one person interviewed described the RMHU as "a lot of BS. They are trying to act like we are getting therapeutic treatment but we are not. They have me behind glass in my cell because I told a CO to not talk to me like a child. They yanked my cuffs, then started beating me up and using pepper spray."

## Protective Custody and Other Units

In addition to the specialized units discussed above, CANY has concerns about a lack of out-of-cell group programming and engagement in other housing areas, including in protective custody and general population units. HALT is explicit that any unit used for protective custody must at least conform to the requirements of the residential rehabilitation units. Incarcerated people in protective custody have reported to CANY being confined for more than 17 hours a day, without access to group programming or activities.

At Orleans, on the day of CANY's monitoring at the prison, two people were being held in protective custody. Neither individual was receiving access to any group activities, the requisite out-of-cell time, nor the programming and other requirements of the RRUs.

Elmira's protective custody unit – which has the capacity to hold 59 people and held 38 people at the time of CANY's monitoring on April 26 and 27, 2022, including people on the OMH caseload – seemed to be offering some out-of-cell time and programming, though not seven hours of daily out of cell time or programming. The administration at Elmira reported they were providing out-of-cell programming to people in PC, while staff reported that it was challenging to provide people in PC their out-of-cell time. One person interviewed in Elmira's PC unit reported that he participated in an education GED program three days a week.

At Marcy, staff reported that anyone who needs protective custody is transferred from Marcy by the end of the same day it is determined they need protective custody. The administration and staff at Midstate reported that prior to the onset of the COVID-19 pandemic, the facility ran a long-term protective custody unit. There was a dayroom space at the end of the tier that had tables and stools. There was also a second floor where there were program spaces, including one room with RESTART chairs and another area without RESTART chairs. Staff indicated that when they operated the long-term protective custody unit, incarcerated people participated in regular out-of-cell group programming with access

Assessing the Early Months of Implementation of the
HALT Solitary Confinement Law in New York State Prisons

to programs such as ART, Sex Offender Counseling and Treatment Program (SOCTP), and vocational programs. Staff also indicated that they had just started to do an ASAT program for people in long term PC at Midstate.

## Other Implementation

### Out-of-Cell Programming in the SHU

At several prisons CANY monitored and at many prisons around the state CANY has received correspondence from, some or all people in SHU have not been receiving any out of cell time. The HALT Law requires all people in SHU to have access to at least four hours of daily out-of-cell programming. At Upstate and Orleans, every person interviewed in the SHU reported they did not have out-of-cell programming or out-of-cell congregate recreation. Similarly, at Midstate and Marcy, almost all people in the SHU reported that they never came out of their cell and were not offered an opportunity to participate in out of cell programming.

People in the SHU at Elmira – which has a capacity to hold 24 people and held 18 people at the time of CANY's monitoring – were offered some out-of-cell programming and recreation but most people reported staying in their cell all day. For recreation, 90% of people interviewed in Elmira's SHU reported that they never go to recreation. Most people reported that they are never offered recreation, while some people reported they choose not to go. The administration reported that there is no congregate recreation for people in Elmira's SHU. For out-of-cell programs, Elmira had RESTART chairs on a former SHU tier.

The administration at Coxsackie similarly indicated that generally people in the SHU did not come out for programming, and several people in the SHU reported there were no programs for people in the SHU. Specifically, 78% of people interviewed in Coxsackie's SHU reported they did not have access to at least three hours of out-of-cell programming per day. Also, people in the SHU at Coxsackie reported that recreation only took place alone in an empty rec pen.

### Due Process

There is a long history of people being subjected to disciplinary confinement with little due process protections, including because hearings that can result in such confinement have very low evidentiary standards and are overseen by DOCCS employees rather than an external administrative body. The result has been that as high as 95% or more of disciplinary hearings result in guilty findings. The HALT Law attempted to provide at least some minimal due process protections, while still leaving in place the overall disciplinary system. Specifically, the HALT Law required all hearing officers to undergo 37 hours of training, and one day of training annually thereafter, "on relevant topics, including but not limited to, the physical and psychological effects of segregated confinement, procedural

and due process rights of the accused, and restorative justice remedies." The HALT Law also creates a presumption against the use of pre-hearing confinement, requires hearings to take place within five days of any such confinement unless more time is requested by the person incarcerated, and allows people in disciplinary hearings that can result in segregated confinement or RRUs to have representation at those hearings, by an attorney, law student, paralegal, or other incarcerated person.

Based on information gathered during CANY's monitoring, most people are being held in SHU before they have a hearing, people continued to raise concerns about unfair and biased hearings, and very few people have any type of representation at their hearings. Regarding pre-hearing confinement, 91% of people interviewed in the SHU who responded to the question at Upstate (five out of five), Midstate (four out of four), Marcy (nine out of nine), Orleans (four out of five) and Coxsackie (seven out of nine) had been placed in SHU prior to their disciplinary hearing. The HALT Law states that hearings shall take place prior to placement in the SHU unless a security supervisor, with written approval of the prison's Superintendent or designee, reasonably believes the person fits the criteria for what conduct can result in segregated confinement. Almost everyone interviewed in the SHU at Orleans and Coxsackie reported that their hearing had taken place within five days of placement in SHU, as required under the law.

During CANY's monitoring at Upstate and Albion, the administrations reported that representatives would not be able to be in person or participate via videoconference, but rather would only be able to call in to a hearing telephonically. These limitations raise concerns about whether meaningful access to representation is possible.

People interviewed in the SHUs and RRUs also complained about the lack of access to legal representation during hearings that can result in segregated confinement or RRU placement. For example, at Orleans, 65% of people interviewed in the RRU and 100% of people interviewed in the SHU stated that they were not told that they were allowed to have representation at their disciplinary hearing, and not one person interviewed in the SHU or RRU had representation at their hearing. Similarly at Upstate, 56% of the 72 interview respondents reported they were not told they could have access to representation at their hearing. On the other hand, two-thirds of people interviewed in the Coxsackie SHU reported they were told they could have access to representation, although only half said they were provided an opportunity to make a phone call to try to request such representation.

Assessing the Early Months of Implementation of the
HALT Solitary Confinement Law in New York State Prisons

# Recommendations

CANY's monitoring and DOCCS' publicly released administrative data have documented numerous departures from basic adherence to the HALT Solitary Law. CANY urges the state to take further steps to achieve compliance with both the language and the intent of the law – including by limiting segregated confinement to 15 consecutive days; diverting people with mental health diagnoses from segregated confinement; providing people in RRUs with access to seven hours of daily out-of-cell group programming and activities; offering mandatory (e.g., ASAT, ART) and volunteer programs in RRUs; avoiding unnecessary use of restraints; and ensuring all units such as step-down units, mental health treatment units, and protective custody units follow requirements prescribed by the law. To support this transformation, CANY makes the following recommendations.

- Implementation of the Law:
  - DOCCS must publicly articulate explanations for lack of adherence to or full implementation of each of HALT's requirements and outline steps that can be taken now to follow the law's requirements.
  - Both DOCCS and the Office of Mental Health (OMH, which operates mental health services and programs inside DOCCS facilities) should publish and adopt regulations in line with the requirements of HALT.

- Programs for People Incarcerated in Prison:
  - DOCCS should build on its success in operating programs for incarcerated people by increasing the level of programming systemwide, including by offering rehabilitative programs toward the beginning rather than toward the end of an individual's sentence (i.e., "front-loading" mandatory programs); expanding college, peer-led, and volunteer led programs; implementing more opportunities for incentives; and seek external support to resolve recruitment challenges for program and clinical staff.
  - OMH should articulate its role and needs in the operation of RRUs and expand its important partnership with DOCCS to provide additional mental health services and establish programs in these units.
  - DOCCS should continue to develop meaningful program opportunities for people in SHU and RRU that inspire robust participation.

- Safety and Violence:
  - CANY calls upon DOCCS to increase transparency regarding how the agency is assessing, understanding, and responding to violence in the prisons including by publishing recommendations from the Prison Violence Task Force and publicly releasing data analysis on incidents of violence.

40

- o DOCCS should engage research partners to study causes of violence and mechanisms for reducing violence and increasing safety; the results of these studies should be made public and should lead to partnerships with experts on violence reduction to implement evidence-based, model interventions.
- **Promote Culture Change:**
  - o CANY encourages DOCCS to continue to increase and diversify training, professional development, and wellness opportunities for all staff; to engage with external experts in solutions that build workforce morale; and to continue to develop innovative recruitment strategies and partnerships to adequately staff facilities, particularly in medical and program areas.
  - o CANY calls upon the Governor's Office to establish a multidisciplinary advisory committee that works cooperatively with DOCCS to inform and support philosophical shifts in culture in prisons.
  - o CANY urges the Legislature to pass laws that create incentives for incarcerated people to engage in productive activities that lead to opportunities for release, including expanded parole release, sentencing credits, and earned time off.

# Conclusion

As discussed in the introduction to this report, evidence is clear that the use of segregated confinement causes harm and worsens safety while implementing effective alternatives that are based in full days of out-of-cell programming and engagement decreases violence and improves safety for everyone inside prisons and in outside communities. The HALT Law continues to allow the department to separate people who pose a risk of harm to others; if implemented properly, the law has the potential to change the nature of that separation such that incarcerated people receive access to help and services.

For the health, well-being, and safety of people who are incarcerated as well as staff, it is imperative that DOCCS make significant adjustments in its approach to implementing the HALT Law to demonstrate that it is possible and beneficial to decrease punishment and isolation while simultaneously increasing safety and wellness of both incarcerated people and staff.



Response by DOCCS

**Corrections and Community Supervision**

KATHY HOCHUL
Governor

ANTHONY J. ANNUCCI
Acting Commissioner

This is in response to the Correctional Association of New York's (CANY) report of their assessment of the early months of implementation of the Humane Alternatives to Long-Term (HALT) solitary confinement Law in the New York State Department of Corrections and Community Supervision.

## SEGREGATED CONFINEMENT REFORM

Dating back to 2014, DOCCS has made significant strides in reducing its use of segregated confinement and adding additional amenities to individuals held in disciplinary confinement, which include but are not limited to, access to two tablets, one that has the capabilities to make phone calls and access educational or self-help material, and the second that allows access to law library materials. We had also developed and implemented out-of-cell programs in step-down units, automatic time cuts, incentives and the ability to earn additional time cuts.

Prior to the passage of HALT, upon agreement of the Legislature and the Executive, DOCCS had promulgated regulations and engaged in infrastructure projects that would enact a number of provisions contained in HALT within a 3-year timetable, with a cap of no more than 30 days in segregated confinement. With the enactment of HALT into law in 2021, DOCCS was provided a 1-year timetable to execute and operationalize this complex law with a cap of no more than 15 days in segregated confinement. DOCCS immediately convened a core group of Central Office Executive Team Members to ensure compliance with the law on the effective date of March 31, 2022. In addition to the core group, DOCCS formed a number of sub-committees to enact specific provisions of the law, such as infrastructure, hearings, Special Housing Unit (SHU)/Residential Rehabilitation Unit (RRU) programming, incarcerated movement, training, and reporting.

DOCCS held multiple trainings prior to the implementation and effective date of the law, including to all Superintendents and Division Heads, Union Representatives from all four unions at both the statewide and local levels, hearing officers, program staff, security staff assigned to specific units, and all staff as required by the law. In early March of 2022, in advance of the effective date of the law, DOCCS launched programming components in both SHU and the RRU, starting with two facilities, with all facilities being operational across the State prior to the effective date.

## SIGNIFICANT INCREASE IN VIOLENCE

In the first thirty days of HALT being effective, DOCCS witnessed a considerable rise in violence in general population and more specifically, within the RRU, both in the housing area and in the classroom setting, targeting both staff and the incarcerated population. The increase in violence in both general population and RRU resulted in DOCCS not having enough RRU capacity to transfer incarcerated individuals who received a disciplinary confinement sanction in excess of 15 days after they served 15 days in segregated confinement. It should be noted, as part of the implementation of HALT, individuals who are serving a confinement sanction in segregated confinement receive 4-hours out-of-cell that

includes 3-hours of therapeutic programming, 1-hour of recreation and access to two tablets, one that has the capabilities to make phone calls and access educational or self-help material, and the second that allows access to law library materials.

Upon recognizing that, due to the increased violence, we encountered a depleted RRU capacity, DOCCS issued direction to all Superintendents directing them to offer any incarcerated individual that was in segregated confinement beyond 15 days 7-hours out-of-cell time, which results in the individual no longer meeting the definition of segregated confinement as provided for in Correction Law Section 2, subdivision 23. In addition, DOCCS identified additional locations to establish RRUs across the State in order to build capacity to deal with the increase in violence and facilitate movement from segregated confinement to RRU, or in the case of special populations, directly to RRU. As of February of 2023, DOCCS had sufficient capacity to comply with the no more than 15-days of segregated confinement requirement, however, if capacity becomes an issue in the future, we will keep the previously described mitigation efforts in place.

While the report points out that DOCCS has seen an increase in violence over the past several years, the report fails to recognize that the historical increases were marginal, whereas the increases experienced since the passage of HALT were significant. This was evidenced by significant increases in violence against staff and other incarcerated individuals and the rate of assault and the injuries sustained between 2021 and 2022, which coincides with the passage of HALT. Additional information is as follows:

| Year | Assault on Staff | Assault on I/I | Corr. Facility |
|------|------------------|----------------|----------------|
|      | # / Rate per 1,000 | # / Rate per 1,000 | Average Pop |
|      |                  |                |                |
| 2020 | 1,052 / 26.9     | 1,206 / 31.0   | 39,243         |
| 2021 | 1,177 / 36.8     | 1,107 / 34.6   | 31,964         |
| 2022 | 1,469 / 47.6     | 1,486 / 48.1   | 30,872         |

In addition to the above, below are 2022 statistics germane to violence within the system:
- Assaults on Staff – 1,469
  - 25% increase since 2021
  - 15% or 220 occurred in RRU
  - Staff injuries increased +24%
  - I/I injuries increased +24%
- Assaults on Incarcerated – 1,486
  - 34% increase since 2021
  - 4% or 53 occurred in RRU
  - I/I injuries increased +27%
  - Staff injuries increased +24%

Notably, the section of the report that discusses degree of injury to staff and incarcerated individuals only includes *percentage* comparisons and fails to include the increased *number* of injuries. By failing to include the increased *number* of injuries, the report misrepresents the data and minimizes the extent of the increase in injuries between 2021 and 2022. For example, the following data points provide a more accurate depiction of injuries sustained between 2021 and 2022:

43

- For assault on staff incidents, the number of staff that sustained injuries increased from 1,880 in 2021 to 2,328 in 2022, which is an increase of 448 (+24%).
- For assault on staff incidents, the number of I/Is that sustained injuries increased from 527 in 2021 to 654 in 2022, which is an increase of 127 (+24%).
- For incarcerated on incarcerated assault incidents, the number of staff that sustained injuries increased from 96 in 2021 to 119 in 2022, which is an increase of 23 (+24%).
- For incarcerated on incarcerated assault incidents, the number of I/Is that sustained injuries increased from 1,460 in 2021 to 1,859 in 2022, which is an increase of 399 (+27%).

The report also cited substantial increases in staff use of force incidents between 2011 and 2020. However, the report failed to note that this increase is largely attributable to the Department's increased utilization of OC pepper spray over that time period, which is used as an alternative to "hands on" force to de-escalate situations.

As a result of the increase in violence and the injuries to individuals that work or are incarcerated within our facilities, in order to protect staff under the Public Employees Safety and Health Act (PESH) and incarcerated people under their 8th amendment of the constitution, DOCCS placed all incarcerated individuals participating in out-of-cell programming in a RRU back in leg restraints. As a result, we have seen an increased level of participation by incarcerated individuals in out-of-cell programming in RRU. DOCCS continues to review this direction on a regular basis and has returned to an individual assessment for use of restraints in two facilities as a result of the decrease in violence at those two locations, however, we maintain restraints at all other institutions.

To the extent the report attempts to draw some correlation between staffing ratios to violence and provides the security staff to incarcerated individual ratio we will take some time to explain that prisons are not staffed on ratios.

Security staffing for each facility is based on an individual facility plot plan to maintain overall safety and security and optimal operational functionality. Plot plans are based on a relief factor of 1.7 for 7-day posts and 1.2 for 5-day posts. There are 151 funded absence days for the 1.7 relief factor and 51 for 1.2. Funded absences for 1.7 are regular days off, vacation, holiday, personal leave, sick leave, and annual training. Funded absences for 1.2 is the same, with the exception of regular days off, which are not funded. Day shift (Tour 2) has the largest amount of security staff with night shift (Tour 1) when the incarcerated are sleeping has the least.

Plot plans are developed based on facility-specific data such as facility mission, security level designation, incarcerated individual capacity, physical plant configuration and operational and program schedules of each shift. Posts (jobs) are created for recurring security functions that must be performed. Each facility plot plan displays each security post, the shift of the post and the number of days per week it must be covered (seven days a week - staffed at 1.7 or five weekdays – staffed at 1.2 to include a relief factor). Seven-day posts include coverage for areas such as facility security (towers), yards, mess halls, and housing units. Five-day posts can include academic, vocational, and industrial locations that are closed on weekends.

The plot plan also reflects the number of officers assigned to the facility for additional services (security functions that are unpredictable or fluctuate) and relief for absences. Additional service officers perform security tasks that are integral to prison operations but are not consistent enough to require the duties to be designated as a post. Relief officers cover posts when the bid officers are on RDO (regular days off) and other absences. One RDO relief officer will fill in for five bid shift RDOs a week, so that the relief officers also work a full week.

3

Additionally, while the incarcerated population has decreased significantly, resulting in the closure of several correctional facilities, notably, the proportion of the population that are Violent Felony Offenders (VFO) has steadily increased. As of February 1, 2023, over 74% of DOCCS under custody population were VFOs based on the most serious instant offense.  When we look at all charges and prior convictions, the percentage increases to 82% VFOs. Furthermore, the vast majority of facilities that were closed over the last several years were classified as minimum or medium security and very few maximum-security facilities were closed.

To evaluate facility staffing needs based on an across-the-board application of an incarcerated individual-to-officer staffing ratio, ignores the reality that staffing is based on institutional layout and mission.

## HEARING PROCESS AND LEGAL REPRESENTATION

All incarcerated individuals alleged to have violated the standards of behavior for the incarcerated population, are provided with significant due process protections, which include meaningful opportunities to challenge the allegations.  The disciplinary system is rooted in fair practices and procedures, that require lawfully obtained and credible evidence.  The disciplinary system assists in protection of the health, safety, and security of all persons within a correctional facility, but serves an important role in rehabilitation of incarcerated individuals and maintaining the morale of the facility.

The Department's disciplinary system has several built-in safeguards to ensure due process. Moreover, it is the Department's policy that the disciplinary procedures are conducted in a fair and equitable manner to ensure that decisions are not influenced by stereotypes or biases.  Misbehavior reports set forth three (3) tiers of offenses, and the standards for behavior are provided to all incarcerated individuals.  In certain cases where an incarcerated individual is charged with serious misconduct resulting in a Superintendent's Hearing that could result in a confinement sanction, the individual may seek employee assistance to gather additional evidence, and be represented by an attorney, law student, paralegal, or other incarcerated individual at the hearing.  Such criteria were published and is provided to the incarcerated individual upon being served with the misbehavior report. The Department's standards of behavior violations are classified based on the severity of the offense and the potential sanctions.

As a result of the HALT solitary confinement law, the Department made significant changes to the hearing process, conducted a review of the offenses that could result in pre-hearing confinement as well as a confinement sanction in general.  As a result, DOCCS modified six disciplinary charges that did not meet the criteria as outlined in Correction Law Section 137, subdivision 6(k), and lowered their Tier from a 3 to a 2, which resulted in confinement time not being a sanction available to the hearing officer. The remaining disciplinary infractions, depending on the circumstances of the specific instance, could rise to a Tier 3 level, and comply with the aforementioned subdivision.  In order to ensure that disciplinary review officers and hearing officers are correctly comparing the conduct as described in the misbehavior report to what is outlined in this subsection, DOCCS has published a review officer's manual that includes the specific criteria outlined in this subdivision and provided a copy to all disciplinary review officers and hearing officers.  This, as well as other operational impacts of HALT, were also codified in NYCRR Title 7.

As required by law, DOCCS has been publishing a variety of data associated with HALT on our web page.  Unfortunately, some entities have misinterpreted the data and have asserted that we are placing

4

people in segregated confinement for conduct that does not rise to the level of segregated confinement. The information posted provides all disciplinary charges associated with a misbehavior report.  If the individual assaulted another incarcerated individual and when staff responded did not follow direction to stop, they may be charged with assault and direct order, with the assault being behavior where a segregated confinement sanction may be an appropriate disposition.

## SPECIAL POPULATIONS

The Halt solitary confinement law defines "special populations" within the incarcerated populations and prohibits those individual's placement in segregated confinement for any length of time.  A "special population" is defined in Correction Law Section 2, subdivision 33 as follows:

> *Any person: (a) twenty-one years of age or younger; (b) fifty-five years of age or older; (c) with a disability as defined in paragraph (a) of subdivision twenty-one of section two hundred ninety-two of the executive law; or (d) who is pregnant, in the first eight weeks of the post-partum recovery period after giving birth, or caring for a child in a correctional institution pursuant to subdivisions two and three of section six hundred eleven of this chapter.*

In order to ensure compliance, DOCCS took a number of steps to ensure staff clearly understood who met the definition of a "special population", including the placement of a "NO SHU CELL" flashing indicator on our incarcerated management system, issuance of policy memorandums that clarifying disability and who would fall under such category and direction to enter the appropriate medical code into mainframe health record system.  In addition, the policy allows for a medical code to be entered by the physician for those evaluated/assessed that, due to their current condition, SHU is medically contraindicated that otherwise would not fall under special population.

It is important for this report to further provide the full language contained in paragraph (a) of subdivision twenty-one of section two hundred ninety-two of the executive law, which reads as follows:

> *The term "disability" means (a) a physical, mental or medical impairment resulting in anatomical, physiological, genetic or neurological conditions which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques.*

Based on the definition provided in this section and contained within the definition of "special population", based on the community standards and in consultation with the Office of Mental Health (OMH), it was determined that individuals identified as seriously mentally ill meet the criteria.   This is further supported by the previous use of Executive Law Section 21 definition being defined in the SHU Exclusion Law, which was passed in 2008 and excluded individuals identified as seriously mentally ill from going to segregated confinement for more than 30 days.  Other incarcerated individuals that are on the OMH caseload, but have not been identified as seriously mentally ill, do not meet the definition as provided for in Executive Law Section 21 or that of a "special population."

## SHU/RRU Out-of-Cell Time and Programming

In compliance with the HALT solitary confinement law, DOCCS developed policies that requires all incarcerated individuals in segregated confinement to be offered 4-hours of out-of-cell time.  This includes an intensive 3-hour program module of Cognitive Behavioral Treatment, as they are only in the program for a maximum of 15-days.  In addition, individuals are offered at least one-hour of recreation.

5

Individuals that received a disciplinary confinement sanction beyond 15-days are transferred to an RRU, where they receive an assessment by the multi-disciplinary Program Management Team. Incarcerated individuals in a RRU are offered 7-hours out-of-cell time.  Each individual receives a combination of out-of-cell time consistent with the law that includes programming and recreation, with the ability to earn additional incentives.  The Department does have several infrastructure projects that could not be completed within the one-year timeframe to implement this complex law, which will provide for congregate recreation areas for RRU's at various facilities.

The foundational curriculum used in an RRU is a Cognitive Behavioral Treatment (CBT) that uses interactive journaling as the selected methodology.   The programming intervention provides opportunities for skill building in areas of rational thinking, communication skills, violence prevention, responsibility, health/wellness and maintaining positive change. An assortment of holistic resources is used to supplement the CBT materials. Topics include self-regulation skill development, health, soft skills/life skills, current events, stress management and recreation.  The curriculum in the RRU also incorporates components of core programs that are delivered to general population incarcerated individuals based on their individual needs, which is compliant with Correction Law Section 137, subdivision (6)(v).  There is some misconception in the report that the RRU must access to mandatory DOCCS programming, which is not what is required.  To provide for mandatory programs that allow for credit toward merit time or limited credit time, would reward misbehavior, serve as a disincentive for positive institutional adjustment, and not address the fundamental behavior which resulted in their placement in an RRU.

Special Population participants who are 21 years of age and younger who have an unmet academic need are provided academic programming in addition to their RRU holistic programming, for a combined total not less than 5.5-hours daily. This is multi-level programming that may consist of English as a Second Language, Adult Basic Education, Pre-High School Equivalency, High School Equivalency and Special Education.  Upon arrival at the RRU, an individualized rehabilitation plan is developed and implemented.  Throughout their time in the RRU, individuals are assessed by the Program Management Team more frequently than the 60 days, as required under the law, often resulting in time assessments to reduce their confinement time and, if they have substantially completed their rehabilitation plan, they are released to general population prior to the end of their disciplinary sanction with all good time restored if such sanction included a recommended loss of good time.

The law further requires that all protective custody units and the conditions and services provided in the residential mental health treatment units be at least comparable to those in RRU.  It also specifies that all the residential mental health treatment units comply with certain provisions of the law.  DOCCS has modified the operations of those units and is in compliance with the provisions of the law.  It should be noted that in a recent audit, deficiencies were identified in one such specialized unit which have subsequently been corrected.

The report indicates that DOCCS is operating units outside of the requirements of both segregated confinement and RRUs.  As previously noted, DOCCS operates a step-down unit which offers 7-hours out-of-cell, as a result, it is not segregated confinement as defined in Correction Law.

## REPORTS OF STAFF MISCONDUCT

The report included several quotes from incarcerated individuals alleging staff misconduct, to include the use of racial slurs. The Department has absolutely zero tolerance for any form of racial discrimination and will take disciplinary action against any staff member found to have committed

misconduct, including referrals for outside investigation and prosecution when appropriate. The Department has successfully terminated employees for even a single use of the N word. While the Department cannot comment on unverified allegations, any incarcerated individual who feels they experienced discrimination or were the subject of staff misconduct are encouraged to submit a complaint to our Office of Special Investigations, including via the 444 telephone hotline available to the population.

## CONCLUSION

The Department has long recognized that we needed to shift our reliance on segregated confinement as a means to drive safety within the system. In the early 1990s, when violence began to escalate, the Department erected additional segregated confinement space in order to appropriately separate individuals from staff and the general population. Unfortunately, over time, disciplinary confinement sanctions continued to increase and we, as a Department were not previously addressing the underlying behavior the led the incarcerated individual to engage in violent conduct.

As previously outlined, dating back to 2014, DOCCS has made significant strides in reducing its use of segregated confinement and adding additional rehabilitative amenities to individuals held in disciplinary confinement, which include but are not limited to, access to two tablets, one that has the capabilities to make phone calls and access educational or self-help material, and the second that allows access to law library materials. We had also developed and implemented out-of-cell programs in step-down units, automatic time cuts, incentives and the ability to earn additional time cuts.

DOCCS agrees with the fundamental principles behind the HALT law to limit the amount of time people spend in segregated confinement and provide individuals with meaningful out-of-cell trauma informed therapeutic programming that addresses underlying causes of the problematic behavior. To display this commitment, as the Commissioner previously testified before the state legislature, the Commissioner and Executive Deputy Commissioner spent 24 hours in a SHU cell in December of 2018. This was carefully planned to ensure that agency leadership had a realistic experience to witness first-hand the conditions of the units and opportunities to engage with staff and other incarcerated individuals to limit the amount of isolation. This commitment remains, however, despite developing and deploying such program module, if staff and incarcerated individuals do not feel safe, staff will not deliver the program in the manner intended and incarcerated individuals will not participate or attend these meaningful programs. We have an obligation to provide the safest environment possible for staff to work and the incarcerated population to program. The safety and well-being of staff and incarcerated individuals is our top priority. We look forward with working with our workforce, unions, interested stakeholders and the legislature in identifying ways to reduce the violence within our institutions.

Attached are some of the letters that the Commissioner and the Department have received from incarcerated individuals and staff about the effects that HALT has had on them ranging from resigning their employment as a Correction Officer to violent incarcerated individuals assaulting other individuals.

7

Assessing the Early Months of Implementation of the
HALT Solitary Confinement Law in New York State Prisons

Response by DOCCS

**NEW YORK STATE** | **Corrections and Community Supervision**

*D. Di Cairano DSS s/dsups*

KATHY HOCHUL
Governor

ANTHONY J. ANNUCCI
Acting Commissioner

## MEMORANDUM

TO: Personnel ▮▮▮▮▮

FROM ▮▮▮▮▮▮▮▮

SUBJECT: Resignation Letter

DATE: 2/6/23

RESIGNATION ACCEPTED ___2/16/23___

*Kelly Ahearn*

KELLY AHEARN
DIRECTOR OF HUMAN RESOURCES
NYS DEPARTMENT OF CORRECTIONS
AND COMMUNITY SUPERVISION

Please accept this letter as formal notice of my resignation from my position as a Correctional Officer at Sullivan Correctional Facility. My last day of employment will be effective February 17, 2023. I would like to thank the officers I worked beside and for throughout my time here. The brother and sisterhood is unmatched inside these walls at Sullivan Correctional Facility. I want to take this time to also express the negative changes that I have experienced working at DOCCS the last 7 years. The HALT act giving the I/I's no repercussions for their actions towards security staff. The extremely dangerous working environment it also has created. With the passing of the HALT act, the same year DOCCS has seen an astonishing number of resignations and retirements that is causing the jails to be short staffed. Each facility has a significant number of overtime that even at some facilities they're mandating on their regular days off. For many people it has become a choice to either pick work, where it doesn't seem to get any better and never know when you're guaranteed to see your family. Or they choose facility add a better mental health state with a different career path. That is where I C.O. ▮▮▮▮▮ have made the choice of choosing to be with my family than a workplace that is changing for the best for the convicted I/I's than the safety and mental health well being of hand working Personnel.

*Sincerely,*

*[signature]*

Sullivan CF ▮▮▮▮▮

▮▮▮▮▮

▮▮▮▮▮

*[handwritten annotations]*

Sullivan Correctional Facility, 325 Riverside Drive, P.O. Box 116, Fallsburg, NY 12733-0116 | (845) 434-2080 | www.doccs.ny.gov

49

Response by DOCCS

ACTING COMMISSIONER
TO: ANTHONY ANNUCC — NYS DOCCS
HARIMAN CAMPUS BLGQ
Received
JUN 22 2022
Commissioner's Office

MOHAWK C/F
56 E:19

SIR: WHEN SHU (THE BOX) WAS TAKEN AWAY AS PUNISHMENT, GANGSTERS AND THUGS NOW HAVE FREE REIGN TO VICTIMIZE OTHER INMATES WITH NO REAL PUNISHMENT. THIS ACTION HAS TAKEN AWAY THE POWER OFFICERS USED TO HAVE TO CONTROL PREDATOR TYPE INMATES.
THE FACT THERE IS NO PROTECTIVE CUSTODY CREATES ALOT OF VICTIMS IN THIS LEANIANT SYSTEM. NOW.
I WAS ATTACTED TWICE BY A GANG CALLED "THE BLOODS" BECAUSE A GANG MEMBER TRIED TO EXTORT ME AND OTHER WHITE INMATES FOR COMMISSARY AND SEXUAL FAVORS. I STOOD UP TO HIM SAYING "NO WAY, AND HE SNUCH ME FROM BEHIND HITTING ME WITH A WOODEN TABLE BRUSH GIVING ME 5 STITCHES IN MY EAR AT WYOMING COUNTY HOSP. THIS WAS ON RECORD ON OCT 2020 AT GROVELAND. HE GOT 180 SHU AND DID ALL OF IT BECAUSE THEY HAD THE "BOX" THEN, A GANG MEMBER RETALIATED AGAINST ME HITTING ME IN THE FACE WHILE I WAS ASLEEP IN MY CUBE JUST BEFORE MY TRANSFER. THIS IS ON RECORD WITH A PICTURE OF

P.S. I NEED TO SEE EYE DOCTOR FOR CLOSE UPS - SO MY LETTM IS SLOPPY.

Assessing the Early Months of Implementation of the
HALT Solitary Confinement Law in New York State Prisons

Response by DOCCS

② 

MY INJURYS TAKEN HERE AT THE CLINIC
AT MOHAWK C.F. ON MAY-13-2020.
THIS IS ALL PROOF THAT PREDATORS WILL
ONLY BE DETEARED BY REAL PUNISHMENT.
I FEEL IN DANGER FROM SUCH GANG
MEMBERS AS MANY OF US DO. SINCE THEY
CAN GET AWAY WITH ASSULTS NOW.
    I FEEL MUCH SAFER IN 56 DORM, THE
F.P.C. DORM AS ITS A MUCH BETTER
GMOE OF INMATES.

    I PUT IN FOR SENIOR LIVING
PROGRAM AS IM 69 NOW AND CAN NO
LONGER DEFEND MYSELF AS I USED TO
DO. I WAS TOLD I CANT GET IN
AT ULSTER BECAUSE I HAVE LIFE ON
BACK OF MY SENTENCE. COULD YOU
PLEASE SEE IF I COULD GET SENT
TO ADIRANDAC SENIOR LIVING
PROGRAM IF THEY WOULD ACCEPT ME
I COULD LIVE SAFELY AS THE SYSTEM
IS SO DANGEROUS NOW WITH NO SHU,
AND NO P.C.
    MANDTORY PROGRAMING IS DANGEROUS
FOR ME AS IT PUTS ME AROUND MY
ENEMYS SEEKING REVENGE FOR TESTIFYING
AGAINST A GANG MEMBM. ████████
        THANK YOU.

Assessing the Early Months of Implementation of the
HALT Solitary Confinement Law in New York State Prisons

Response by DOCCS

NYS DOCCS
Received

AUG 25 2022
12833
Commissioner's Office

Dear Commissioner Anthony J. Annucci,
I am ▮▮▮▮▮▮▮▮▮▮▮▮▮ currently in
Collins Correctional facility.
I am writing you due to the fact that I
would like to take full Responsibility pertaining
to my misjudgement in stating : "Facilitators
Ms Smith and Ms Fisher were participating
with Correctional officers in keeping us from
attending in the R.R.U Program."
After observing and participating in
Group, I come to Realize that its out of
their hands. Also, I Realized that
they are Bringing our Concerns to Ranking
officers, So I apologize for Passing
early Judgement. Ms Smith and Ms Fisher
are actually Extraordinary facilitators who
thoroughly Provides the tools for us to use
to Be Prepare for Society ; forcefully,
Seriously and without the Bullshit.(excuse
my language)
Attending their Group Granted me the full
understanding of accepting things I cannot
change, the Courage to change the things
I can and the wisdom to know the
difference.
More to the Point, Commissioner Annucci,
I humbly appreciate you for Establishing
and/or allowing the R.R.U program to Exist,
its vital and Crucially Needed.
Thank you for Reading
C.C. my attorney          Respectively Submitting
C.C. others.          Sincerely ; ▮▮▮▮▮▮  7/22/22

52

Assessing the Early Months of Implementation of the
HALT Solitary Confinement Law in New York State Prisons

Response by DOCCS

OG- Legal

ANTHONY J. ANNUCCI
COMMISSIONERS' OFFICE
THE HARRIMAN STATE CAMPUS
1220 WASHINGTON AVE.
ALBANY, NY 12226-2050

NYS DOCCS
Received
JUL 18 2022
Commissioner's Office

7/12/2022

COXSACKIE CORR. FAC.
P.O. BOX 999
COXSACKIE, NY 12051-0999

NYS DEPT. OF CORRECTIONS
AND COMMUNITY SUPERVISION

JUL 19 2022

RECEIVED
OFFICE OF THE COUNSEL

DEAR MR. ANNUCCI,

TO BEGIN WITH, THIS LETTER IS BEING FORWARDED TO YOUR OFFICE BECAUSE I DON'T BELIEVE THAT THE "HALT ACT" IS SERVING A BENEFICIAL PURPOSE, I BELIEVE THE "HALT ACT" HAS BEEN A FAILURE SINCE IMPLEMENTED.

THE "HALT ACT" ENABLES MANY VIOLENT OFFENDERS TO CONTINUE WITH THERE VIOLENT WAYS, ASSAULTING OTHER I/M's, ASSAULTING STAFF, AND COMMUNICATING THIS LETTER TO YOUR OFFICE, I DO SO

①

Response by DOCCS

As a concerned I/I in NYS DOCCS. I have been incarcerated in DOCCS since 1-9-2014, upon entering DOCCS, prison has always been a place where you would need to proceed with caution. Prison is no day care, camp, it was designed to rehabilitate. This has always been the goal.

Since the implementation of "Halt Act", prison violence has increased, both against staff and those I/I, assaults with unknown substances, bodily fluids has all increased.

As mentioned above, prison has always been a place where everyone should watch there back. Even more so now, I/I's must be even more cautious, there are those whom know there is no consequences to there actions, disciplinary is no longer a deterrent, solely because 15 days in SHU is max and they will transfer to an RRU

②

Assessing the Early Months of Implementation of the
HALT Solitary Confinement Law in New York State Prisons

Response by DOCCS

WITH PRIVILEGES, SIMILAR TO THOSE IN GENERAL POPULATION OR EVEN MORE. THIS SYSTEM IS NOW CREATED AN UNSAFE ENVIRONMENT, FOR ALL THOSE INSIDE, INCLUDING STAFF.

I WANT TO OUTLINE MY DAILY ROUTINE SINCE IMPLEMENTATION OF THE "HALT ACT" AND GIVE AN EXPLANATION OF THE REASONS FOR MY NOW ALTERED DAILY ROUTINE.

I WAKE UP AT APPROX. 5ᵃᵐ, I PROCEED TO MY AM PROGRAM, WHERE I WORK AS A PORTER IN THE NORTH SHOP CORRIDOR, I WORK FOR ABOUT AN HOUR, THEN RETURN TO MY UNIT, WHERE I AM ALLOWED A SHOWER.

FROM APPROX. 9ᵃᵐ UNTIL THE NEXT MORNING, I SPEND IN MY CELL, I DO NOT GO TO REC PERIODS, I.E. YARD RUNS, RELIGIOUS EVENTS, ETC.

③

Response by DOCCS

I DO NOT ATTEND MEALS, I SURVIVE ON FOOD PACKAGES FROM FAMILY AND FRIENDS, I NO LONGER ATTEND CALLOUTS OF ANY SORT, INCLUDING THOSE MANDATORY AS WELL.

I WANT TO CREATE A SCENARIO, TO SHOW HOW THIS "HALT ACT" ENABLES VIOLENCE. "AN I/I ARRIVES TO COXSACKIE, HE'S ANGRY BECAUSE HE HEARD HOW COXSACKIE CF IS OPERATED, HE COMES UP WITH A PLAN, THE PLAN IS TO GO TO THE MESS HALL AND ASSAULT A RANDOM I/I. THE AGGRESSOR IS MOVED TO ANOTHER UNIT AND ALLOWED TO ATTEND THE NEXT DAY REC. PERIOD, HE THEN ASSAULTS ANOTHER I/I, WHOM HE DOES NOT KNOW. NOW THE AGGRESSOR IS SENT TO SHU.

THE VICTIMS OF THIS GUY'S ASSAULT NOW FACES DISCIPLINARY HEARING,

④

Response by DOCCS

FOUND GUILTY OF FIGHTING, EVEN THOUGH, 1) THE VICTIMS DIDN'T KNOW THE ATTACKER. 2) BOTH INCIDENTS CAPTURED ON CAMERA, BUT TO NO AVAIL. LET'S SAY THE VICTIMS IN THIS RANDOM ATTACK HAS A PAROLE BOARD OR T.A.C. THERE CRIME OF CONVICTION IS VIOLENT, BOTH COMMITTEE'S ARE GOING TO GREATLY REFER TO THE FIGHT THAT WAS RANDOM AND UNJUSTIFIED. BUT THE "HALT ACT" ENABLES THIS TYPE OF CONDUCT TO OCCUR.

PRIOR TO "HALT ACT" SECURITY ALWAYS BEEN ABLE TO KEEP PROBLEMATIC I/I's SEGREGATED, IF THERE PRESENCE IN GP POSES A DANGER TO THE POPULATION OR CREATES SECURITY CONCERNS INVOLVING STAFF. TODAY, THIS IS NOT THE CASE.

I/I KNOW THAT STAFF CAN ONLY DO SO MUCH, WHICH AGAIN MAKES PRISON THAT MUCH MORE UNSAFE.

(5)

APPROX. TWO MONTHS AGO, IN THE MESS HALL, TWO GANG MEMBERS ASSAULTED ANOTHER I/I. CHEMICAL AGENT USED, BOTH AGGRESSORS SENT TO SHU, RELEASED FROM SHU IN 15 DAYS, EVEN THOUGH A SGT. WAS INJURED.

ANOTHER INCIDENT OCCURED DURING THE REC PERIOD IN THE YARD, MULTIPLE I/I'S ASSAULT ANOTHER I/I, AT LEAST 7 WENT TO SHU, 4 RETURNED TO RRU AND THE OTHERS BACK TO GP, THE VICTIM IN THAT INCIDENT WAS ALLOWED BACK INTO GENERAL POPULATION,

ANOTHER INCIDENT OCCURED IN NORTH SIDE CORRIDOR, (EIGHT) I/I MOVED TO SEPARATE SIDES OF PRISON,

ON F3, AN I/I ASSAULTED FEMALE OFFICER,

THESE ARE JUST A FEW OF THE MOST RECENT INCIDENTS I'M AWARE OF.

⑥

Response by DOCCS

IT's SHOCKING TO SEE THESE INCIDENTS OCCURING, KNOWING "HALT ACT" POSES IMMENT DANGER ALL WITHIN, BUT YET THERE IS NO CORRECTIVE ACTION BEING TAKEN TO COMBAT THE INCREASINGLY, RAPID FLUX OF VIOLENCE.

IF I REQUESTED TO BE MOVED TO ANOTHER HOUSING UNIT, MY REQUEST WOULD BE DENIED, BUT I WOULD BE GRANTED PROTECTIVE CUSTODY.

I UNDERSTAND THAT NOTHING WILL CHANGE IN THE IMMEDIATE, NEAR FUTURE, MY QUESTION IS, "WHAT HAS TO HAPPEN BEFORE CHANGES ARE MADE?" IT SEEMS THAT DEATH AT THE HANDS OF AN I/I AGAINST STAFF OR VISE VERSA IS THE ONLY FOR CHANGE TO OCCUR.

⑦

Response by DOCCS

THAT's WRONG, I HAVE FAMILY, LOVED ONES, STAFF HAS FAMILY, CHILDREN, LOVED ONES, THEY WANT TO RETURN HOME AT THE END OF THERE SHIFT, AS I WANT TO RETURN HOME IN 10 MONTHS.

I ENCOURAGE THIS LETTER TO BE SHARED WITH THOSE IN POSITION TO PROMOTE CHANGE, THOSE WHO ARE GOING TO PRESS FOR THE "HALT ACT" TO BE REPEALED.

Sincerely,

⑧

Assessing the Early Months of Implementation of the
HALT Solitary Confinement Law in New York State Prisons

Response by DOCCS

1-24-23

To The entire PMT*

Peace & Blessings to every single Lady & gentleman.
I greatly appreciate all of the patience & understanding
that y'all dish out to the entire RRu. I've been
incarcerated for well over a decade and i really wanna
thank you for treating me like a human being. Thank you
for every time cut. Thank for any incentive. Thank you
for letting me be heard. thank you for being able to
attend these programs. I've learned so much about myself
and others and i can honestly say i feel rehabilitated now!
I've learn many lessons. I figured out ways to deal with
stress better. I have more respect for myself & others. you
ladies & gentlemen have been every bit of a bunch of professionals.
Always answering any questions that you could and allowing me
to be the porter and allowing me to have several different
shoulders to lean on to talk & some staff i even cried to. I'm
very appreciative for having You Deputies, captains, sergents
Officers, Olc's, ORas, nurses, everyone of the teachers, &
Vocational staff who let me talk & listened to me. Also who
taught me many more lessons. Thank you all for your time,
energy & patience. I have to utmost respect for all of
You here at Greene correctional facility. I hope everyone
has a blessed day & god protects you & your families ::
respectfully submitted.



NEW YORK STATE OF OPPORTUNITY. | **Office of Mental Health**

| KATHY HOCHUL | ANN MARIE T. SULLIVAN, M.D. | MOIRA TASHJIAN, MPA |
|---|---|---|
| Governor | Commissioner | Executive Deputy Commissioner |

March 13, 2023

Sumeet Sharma
Director of Monitoring and Advocacy
Correctional Association of New York
Post Office Box 793
Brooklyn, New York 11207

RE: Report Assessing the Early Months of Implementation of the HALT Solitary Confinement Law in New York State Prisons

Dear Director Sharma:

We received your report of findings regarding the implementation of the Humane Alternatives to Long-Term (HALT) Solitary Confinement Law across New York State prisons. We recognize that the bulk of your report and findings are directed towards the Department of Corrections and Community Supervision (DOCCS); however, we would like to respond to the matters pertaining to the Office of Mental Health (OMH).

CANY's recommendations for OMH were as follows:

1. "OMH should articulate its role and needs in the operation of RRUs and expand its important partnership with DOCCS to provide additional mental health services and establish programs in these units."

   **OMH Response:**
   OMH has established policies and procedures in the operation of RRUs that are consistent with completing required assessments of every RRU participant according to the timeframes established per facility OMH service level in the HALT statute. Additionally, OMH provides individual treatment services to every RRU participant on the active OMH caseload, in accordance with their individual treatment needs and goals. Finally, OMH staff are participating in the RRU Program Management Team meetings. Since the HALT statute was passed, OMH has been engaged in continuous discussions with DOCCS related to the additional staffing items that would be required to provide mental health programming in RRUs. OMH is prepared to begin group programming to OMH caseload patients in select RRUs when concerns about security monitoring of RRU classrooms is resolved. This topic also continues to be discussed with DOCCS.

Other comments were made that OMH would like to address:

- On page 8: "A 2020 report documented that the rate of self-harm in New York's prisons was 12 times higher in SHU than the rest of the prison population, with suicide attempts in the prisons as a whole occurring on average almost once every two days, and the rate of death by suicide was five times higher in SHU and keeplock.[23]"

1

**OMH Response:** It is unclear what report CANY is referring to as information about footnote 23 is not present at the end of any pages and this claim contradicts OMH's data. In review of the report OMH provided to CANY about the 2020 suicides, suicide attempts, and self-harm, it was indicated that 1 out of 11 suicides occurred in the SHU/Long-Term Keeplock (LTKL), and 13 out of 82 attempts occurred in SHU/LTKL. Housing locations could not be provided for the self-harm incidents. The numbers reported by CANY also do not match DOCCS's Unusual Incident Report, which indicates 6 out of 68 self-inflicted injury reports were from SHU and 62 out of 176 suicide attempt reports were from SHU. OMH requests that CANY release the source of this claim for verification.

- On page 21, "HALT excludes 'special populations' from being placed in segregated confinement, including any person as defined in section 292(21) of the Executive Law with a 'physical, mental, or medical impairment . . .demonstrable by medically accepted ... diagnostic techniques.' In other words, HALT prohibits anyone with a mental health diagnosis, including anyone on the state Office of Mental Health (OMH) caseload, and anyone with a physical or cognitive disability diagnosis from being placed in segregated confinement."

**OMH Response:** This is an inaccurate interpretation of the Executive Law's definition of "special population." Per section 292(21) of Executive Law, a "disability," which would require someone to be considered part of the "special population," is defined as "a physical, mental or medical impairment resulting from anatomical, physiological, genetic or neurological conditions which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques..." Not all mental health diagnoses are synonymous with an individual experiencing substantial functional disability (Mental Hygiene Law 1.03). This is not only true in the correctional environment, but applies across mental health settings, including the community. In cases where an individual at a correctional facility is experiencing substantial functional disability due to their mental health, they are assigned an S-designation and thus appropriately considered part of the "special population."

- On page 26, "Others raised concerns about a lack of confidentiality because they have to speak to mental health counselors while they were confined in their cell, with correction officers nearby, their cellmate also present, and other incarcerated people able to hear. For example, one person interviewed in the Upstate RRU reported, 'I need help, but the counselors always come by with a CO and I need privacy to be able to talk to them. I also don't want to talk to them when my bunky is right there.'"

**OMH Response:** These statements appear to be about the rounds conducted in the SHU/RRU as opposed to mental health callouts. OMH staff are required to have a DOCCS escort when they are on the housing block and, with the double-bunk structure of the RRU, it is likely a bunkmate will be present during rounds. This contact is meant to be a brief check-in and opportunity for individuals to let OMH staff know they want to be seen; this is not meant to be a full mental health assessment. If incarcerated individuals do not feel comfortable telling OMH at that time that they would like to be scheduled for a private interview, they can either submit a request to OMH staff in writing or ask security and/or medical personnel to refer them. Official mental health callouts are done in designated private interview rooms unless the individual refuses to attend, does not show, or there are environmental factors such as a facility lockdown that prevent this from happening.

OMH will continue to monitor the services provided to individuals in need of mental health services and make changes as indicated and as achievable. Collaboration with DOCCS will continue as many of these processes rely on input from both agencies.

Sincerely,

Li-Wen Lee, M.D.
Associate Commissioner
Division of Forensic Services

cc: Danielle Dill, Psy.D., Executive Director, CNYPC
    William Vertoske, Deputy Director, Corrections Based Operations, CNYPC
    File

Assessing the Early Months of

# Implementation of the HALT Solitary Confinement Law in New York State Prisons

Correctional Association of New York
Post Office Box 793
Brooklyn, NY 11207
212-254-5700 (We accept collect calls)
info@correctionalassociation.org
www.correctionalassociation.org



GANY  INDEPENDENT
PRISON OVERSIGHT
SINCE 1844